Nos. 12-2853, 12-3142 & 12-3143

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

---

SIERRA CLUB,

*Petitioner*,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents*.

---

PETITIONS FOR REVIEW OF FINAL AGENCY ACTIONS OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

---

# PETITIONER'S OPENING BRIEF

---


Sanjay Narayan
Sierra Club
Environmental Law Program
85 Second Street, 2d Floor
San Francisco, CA 94105
(415) 977-5769
(415) 977-5793 (fax)
sanjay.narayan@sierraclub.org

Robert Ukeiley
Law Office of Robert Ukeiley
507 Center Street
Berea, KY 40403
(859) 986-5402
rukeiley@igc.org

David C. Bender
McGillivray Westerberg
& Bender LLC
211 S. Paterson St., Suite 320
Madison, WI 53703
(608) 310-3560
(608) 310-3561 (fax)
bender@mwbattorneys.com

*Attorneys for Petitioner, Sierra Club*


**ORAL ARGUMENT REQUESTED**

## RULE 26.1 CERTIFICATE

Petitioner, Sierra Club, is a not-for-profit charitable organization. It has no parent companies, subsidiaries or affiliates that issue shares to the public; and there are no publicly-owned companies that have an ownership share in the Sierra Club. The only counsel appearing in this case for Sierra Club are those listed on the cover.

## TABLE OF CONTENTS


Rule 26.1 Certificate ........ i

Table of Contents ........ ii

Table of Authorities ........ v

Jurisdictional Statement ........ 1

Issues Presented for Review ........ 5

Statement ........ 9

A. Ground-Level Ozone ........ 9

B. Legal Framework: The Clean Air Act's Air Quality Standards, Non-Attainment, and Re-designation ........ 12

1. *Air Quality Standards, Non-Attainment, and State Plans* ........ 12

2. *Re-designations to Attainment: Permanent and Enforceable Reductions* ........ 14

C. Decisions Under Review: EPA's Re-designations of Milwaukee-Racine, St. Louis, and Chicago ........ 17

1. *EPA's Re-designation of Milwaukee-Racine* ........ 19

a. *Wisconsin's Demonstration of Permanent and Enforceable Reductions* ........ 19

b. *EPA's Approval of Milwaukee-Racine's Re-designation* ........ 21

i. *EPA's Correlation Between Ozone Levels, Actual Precursor Emissions, and Adoption of Regulations* ........ 22

ii. *EPA's Use of 'Actual' Emissions to Establish Permanent and Enforceable Reductions* ........ 24

iii. *EPA's Reliance on the $NO_x$ SIP Call* ........ 26

2. *EPA's Re-designation of St. Louis* ........ 27

a. *Illinois' Demonstration of Permanent and Enforceable Reductions* ........ 27

b. *EPA's Finding of Permanent and Enforceable Reductions in St. Louis* .......... 30
c. *St. Louis' Relapse into Non-Attainment* .......... 32
3. *EPA's Re-designation of Chicago* .......... 33
Summary of Argument .......... 35
Standard of Review .......... 39
Argument .......... 40
I. EPA Did Not Determine that the Necessary Improvement in Air Quality Was Due to Permanent and Enforceable Measures .......... 40
A. *The Statute Demands A Showing of Causation..* .......... 40
B. *EPA Failed to Make that Causal Connection When Re-Designating Milwaukee-Racine.* .......... 43
C. *EPA's Failure to Undertake a Causal Analysis Prior to Re-designating Milwaukee-Racine Violates the Act.* .......... 50
D. *In Re-Designating St. Louis and Chicago EPA Failed to Establish the Necessary Causal Connection Between Reduced Ozone Levels and Permanent, Enforceable Measures.* .......... 53
1. *EPA Relied Upon a Correlation That Does Not Establish Causation.* .......... 53
2. *Illinois' Submissions Expressly Fail to Establish the Necessary Causation.* .......... 56
II. EPA Unlawfully Equated 'Actual' 2008 Emissions With Permanent, Enforceable Reductions. .......... 58
III. In Relying on the $NO_x$ SIP Call, EPA Relied Upon Measures that do Not Provide Permanent and Enforceable Reductions in Any Specific Non-Attainment Area. .......... 63
Conclusion .......... 69
Certificate of compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements .......... 71

Circuit Rule 30(d) Statement ........ 72
Statutory Addendum
Certificate of Service
Petitioner's Required Short Appendix

**TABLE OF AUTHORITIES**

## Cases


*Am. Farm Bureau Fed'n v. EPA,*
559 F.3d 512 (D.C. Cir. 2009) ........................................ 50

*Am. Trucking Ass'n v. EPA,*
283 F.3d 355 (D.C. Cir. 2002) ........................................ 18

*Ass'n of Battery Recyclers v. EPA,*
716 F.3d 667 (D.C. Cir. 2013) ........................................ 5

*Bluewater Network v. EPA,*
370 F.3d 1 (D.C. Cir. 2004) ........................................ 39

*Burrage v. United States*,
134 S. Ct. 881 (2014) ........................................ 41

*Chevron U.S.A. v. Natural Res. Def. Council,*
467 U.S. 837 (1984) ........................................ 40

*Com. of Pa., Dep't of Envtl. Res. v. EPA*,
932 F.2d 269 (3d Cir. 1991) ........................................ 15

*Huss v. Gayden,*
571 F.3d 442 (5th Cir. 2009) ........................................ 46

*Illinois Chamber of Commerce v. EPA*,
775 F.2d 1141 (7th Cir. 1985) ........................................ 4

*Levy v. Minnesota Life Ins. Co.,*
517 F.3d 519 (7th Cir. 2008) ........................................ 41

*Louisiana Envtl. Action Network v. EPA,*
382 F.3d 575 (5th Cir. 2004) ........................................ 67

*Loving v. IRS,*
742 F.3d 1013 (D.C. Cir. 2014) ........................................ 41, 59, 61

*Michigan v. EPA,*
213 F.3d 663 (D.C. Cir. 2000) ........................................ 63, 64

*Mississippi v. EPA,*
723 F.3d 246 (D.C. Cir. 2013) *amended and superseded on reh'g,* 744 F.3d 1334 (D.C. Cir. 2013) ........................................ 10

**Cases (Cont'd)**


*Natural Res. Def. Council v. EPA*, 25 F.3d 1063 (D.C. Cir. 1994) .......... 4

*Natural Res. Def. Council v. EPA,* 571 F.3d 1245 (D.C. Cir. 2009). .......... 21, 39, 67, 68

*Natural Res. Def. Council v. EPA*, 643 F.3d 311 (D.C. Cir. 2011) .......... 4, 5

*New York v. EPA,* 133 F.3d 987 (7th Cir. 1998) .......... passim

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) .......... 3, 59

*North Carolina v. EPA,* 531 F.3d 896 *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) .......... 8, 64, 66

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000) .......... 46, 54

*S. Coast Air Quality Mgmt. Dist. v. EPA,* 472 F.3d 882 (D.C. Cir. 2006) *decision clarified on denial of reh'g*, 489 F.3d 1245 (D.C. Cir. 2007) .......... 9, 16

*Sierra Club v EPA,* 356 F.3d 296 (D.C. Cir. 2004) *amended sub nom. Sierra Club v. EPA*, 03-1084, 2004 WL 877850 (D.C. Cir. Apr. 16, 2004) .......... 12

*Sierra Club v. EPA,* 311 F.3d 853 (7th Cir. 2002) .......... 14, 40, 43

*Sierra Club v. EPA,* 375 F.3d 537 (7th Cir. 2004) .......... 15, 50

*Sierra Club v. EPA*, 699 F.3d 530 (D.C. Cir. 2012) .......... 5

*Sierra Club v. Franklin Cnty. Power of Illinois, LLC,* 546 F.3d 918 (7th Cir. 2008) .......... 2, 5

*Sw. Penn. Growth Alliance v. Browner,* 121 F.3d 106 (3d Cir. 1997) .......... 14

**Cases (Cont'd)**

*Tagatz v. Marquette Univ.*,
861 F.2d 1040 (7th Cir. 1988) .......... 37, 46
*Tex Tin Corp. v. EPA*,
992 F.2d 353 (D.C. Cir. 1993) .......... 46
*Town of Barnstable, Mass. v. FAA*,
659 F.3d 28 (D.C. Cir. 2011) .......... 4
*West Virginia v. EPA*,
362 F.3d 861 (D.C. Cir. 2004) .......... 10, 11

**Federal Statutes**

42 U.S.C. § 7401(a)(3) .......... 15, 50
42 U.S.C. § 7401(b)(1) .......... 12
42 U.S.C. § 7407(d) .......... 13
42 U.S.C. § 7407(d)(3) .......... 14
42 U.S.C. § 7407(d)(3)(E) .......... 14, 35
42 U.S.C. § 7407(d)(3)(E)(i) .......... 14
42 U.S.C. § 7407(d)(3)(E)(iii) .......... passim
42 U.S.C. § 7409 *et seq.* .......... 1
42 U.S.C. § 7409 .......... 13
42 U.S.C. § 7409(1)(b)(1) .......... 13
42 U.S.C. § 7409(1)(b)(2) .......... 13
42 U.S.C. § 7409(1)(d)(1) .......... 13
42 U.S.C. § 7410 .......... 13
42 U.S.C. § 7411(a)(2) .......... 29
42 U.S.C. § 7475 .......... 3
42 U.S.C. § 7491 .......... 20
42 U.S.C. § 7502(c)(1) .......... 68
42 U.S.C. §§ 7511-7511f .......... 6, 13
42 U.S.C. § 7511a(b)(2) .......... 3, 4
42 U.S.C. § 7607(b)(1) .......... 1
42 U.S.C. § 7607(d)(7)(B) .......... 8, 9
42 U.S.C. § 7607(d)(9) .......... 39

**Federal Register**

57 Fed. Reg. 13,498 (April 16, 1992) ........ 58
62 Fed. Reg. 38,856 (July 18, 1997) ........ 17
63 Fed. Reg. 57,356 (Oct. 27, 1998) ........ 21, 35, 64, 66
69 Fed. Reg. 23,858 (April 30, 2004) ........ 6, 19
69 Fed. Reg. 23,951 (April 30, 2004) ........ 17
70 Fed. Reg. 30,396 (May 26, 2005) ........ 10
70 Fed. Reg. 39,104 (July 6, 2005) ........ 60
73 Fed. Reg. 16,436 (March 27, 2008) ........ 10, 18, 35
75 Fed. Reg. 24,844 (May 6, 2010) ........ 11, 48, 54
76 Fed. Reg. 758 (Jan. 6, 2011) ........ 60
76 Fed. Reg. 64,825 (Oct. 19, 2011) ........ 57
76 Fed. Reg. 79,579 (Dec. 22, 2011) ........ 27, 31
77 Fed. Reg. 6,727 (Feb. 9, 2012) ........ passim
77 Fed. Reg. 6,743 (Feb. 9, 2012) ........ 33, 34
77 Fed. Reg. 22,392 (April 13, 2012) ........ 48
77 Fed. Reg. 34,819 (June 12, 2012) ........ passim
77 Fed. Reg. 45,252 (July 31, 2012) ........ passim
77 Fed. Reg. 48,062 (Aug. 13, 2012) ........ passim
77 Fed. Reg. 64,039 (Oct. 18, 2012) ........ 59
78 Fed. Reg. 29,816 (May 21, 2013) ........ 9
78 Fed. Reg. 59,242 (Sept. 26, 2013) ........ 22
79 Fed. Reg. 13,415 (June 9, 2014) ........ 67

## JURISDICTIONAL STATEMENT

These petitions seek review of final actions of the Environmental Protection Agency under the Clean Air Act, 42 U.S.C. 7409 *et seq*. (West 2013), applicable in Wisconsin and Illinois. 77 Fed. Reg. 34,819 (June 12, 2012) (re-designating Illinois portion of metropolitan St. Louis) (Petitioner's Required Short Appendix ("R.") 22),[1] 77 Fed. Reg. 45,252 (July 31, 2012) (re-designating Milwaukee-Racine) (R.11), 77 Fed. Reg. 48,062 (Aug. 13, 2012) (re-designating Chicago) (R.1). This Court has jurisdiction, under 42 U.S.C. § 7607(b)(1) ("A petition for review of . . . any . . . final agency action of the Administrator under this chapter . . . which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit."). Sierra Club timely filed its petitions on August 10, 2012 (St. Louis), and September 18, 2012 (Milwaukee-Racine & Chicago). *See id.* ("Any petition for review under this subsection must be filed within sixty days from the date notice of such . . . action appears in the Federal Register.").

[1] Relevant portions of the administrative record for these three decisions are included in the short appendix and a consecutively paginated joint supplemental appendix (both cited herein as "R.").

This Court also has jurisdiction under Article III of the Constitution, U.S. Const., art. III, § 2. *See Sierra Club v. Franklin Cnty. Power of Illinois,* 546 F.3d 918, 924-28 (7th Cir. 2008) (organization has standing where a member "believes [air] pollutants will ruin her ability to enjoy" an area and remand may result in additional pollution controls). Sierra Club members are injured by ozone pollution in Milwaukee-Racine, St. Louis, and Chicago. *See* Declaration of Dianne Dagelen ("Dagelen Decl."); Declaration of Camille Faherty ("Faherty Decl."); Declaration of William Moore ("Moore Decl."); Declaration of Melissa Warner ("Warner Decl."); Declaration of Christine Zapf ("Zapf Decl."); Declaration of Linda Cole ("Cole Decl"); Declaration of Terri Voitck ("Voitck Decl."); Declaration of Barbara Klipp ("Klipp Decl."); Declaration of Linda Horn Wegrzyn ("Wegryzn Decl."); and Declaration of Jack Norman ("Norman Decl.").[2]

---

[2] Sierra Club members include, for example, sufferers of respiratory illnesses and family members of young children, all of whom are especially harmed by ozone pollution. 12-3142, Mot. to Supplement the R. ("12-3142 Declarations"), Dec. 20, 2013, Dkt. No. 17-2, Dagelen Decl. ¶¶ 2-6; Dkt. No. 17-3, Faherty Decl. ¶¶ 2-4; Dkt. No. 17-4, Moore Decl. ¶¶ 2-5; Dkt. No. 17-5, Warner Decl. ¶¶ 2-3; Dkt. No. 17-6, Zapf Decl. ¶¶ 2-5; 12-3143, Mot. to Supplement the R. ("12-3143 Declarations"), April 4, 2014, Dkt. No. 15: Cole Decl. ¶¶ 4-7; Klipp Decl. ¶¶ 4-7; Voitck Decl. ¶¶4-7; 12-2853, Mot. to Supplement the R. ("12-2853 Declarations"),

Those injuries are traceable to EPA's decisions. The Agency's re-designations eliminate pollution-reduction measures which would otherwise apply in the relevant regions, and which would reduce Sierra Club members' exposure to ozone pollution. For example, absent EPA's re-designations, new sources of the pollutants that produce ozone, and sources undergoing major modifications, must meet more stringent 'new source review' obligations. *See generally New York v. EPA*, 413 F.3d 3, 12-13 (D.C. Cir. 2005) (new sources in nonattainment areas "must meet stricter requirements"). EPA's re-designation substitutes a less demanding permitting regime applicable in areas designated "attainment." 42 U.S.C. § 7475. EPA's re-designation also relieves Wisconsin of the obligation to impose 'reasonably available control technologies' to reduce pollution from a variety of existing sources of

---

April 13, 2014, Dkt. No. 28, Wegrzyn Decl. ¶¶ 2-3; Norman Decl. Their activities and enjoyment are significantly curtailed because of their concerns regarding such pollution. 12-3142 Declarations, Dkt. 17-2, Dagelen Decl. ¶¶ 4-6, 10; Dkt. No. 17-3, Faherty Decl. ¶¶ 4-7; Dkt. No. 17-4, Moore Decl. ¶¶ 4-8; Dkt. No. 17-5, Warner Decl. ¶¶ 4-10; Dkt. No. 17-6, Zapf Decl. ¶¶ 4-6, 10-11; 12-3143 Declarations, Dkt. No. 15, Klipp Decl. ¶¶ 5-7; Voitck Decl. ¶¶5-7; 12-2853 Declarations, Wegrzyn Decl. ¶¶ 4-10.

ozone precursors which it has not yet regulated.[3] 42 U.S.C. § 7511a(b)(2).

And EPA's re-designation removes these regulatory protections, while also failing to provide the "permanent and enforceable" controls that might ensure that ozone pollution in Milwaukee-Racine, St. Louis, and Chicago remains below health-based standards, 42 U.S.C. § 7407(d)(3)(E)(iii). *Town of Barnstable, Mass. v. FAA*, 659 F.3d 28, 34 (D.C. Cir. 2011) (where court ruling would "significantly affect" state decision, standing exists). Because of those "differences [in] regulation" following re-designation, Sierra Club's injuries are "traceable to EPA's [decision]." *Natural Res. Def. Council v. EPA*, 25 F.3d 1063, 1067 (D.C. Cir. 1994). *See Illinois Chamber of Commerce v. EPA*, 775 F.2d 1141, 1142 n.2 (7th Cir. 1985) ("likelihood of increased controls" that results from EPA's designation decision creates standing).

A decision from this Court would redress Sierra Club's injury, by, for example, reinstating the stringent 'non-attainment' requirements described above, *Natural Res. Def. Council v. EPA*, 643

---

[3]*http://www.epa.gov/air/urbanair/sipstatus/reports/wi_elembypoll.html#ozone-8hr__1997__687* (listing requirements Wisconsin would need to implement absent re-designation).

F.3d 311, 318 (D.C. Cir. 2011) (where EPA decision "delay[s] or suspend[s] future air quality improvements," vacatur redresses injury), and requiring "permanent and enforceable" measures safeguarding air quality before eliminating those requirements, *Franklin Cnty. Power*, 546 F.3d at 927-28 (finding redressability where it is "reasonable to believe that any new" decision would include "tougher emission standards," and plaintiff's "concerns will be addressed if more stringent emission standards are imposed"). *See Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013) (redressability exists where decision might force EPA to regulate pollution more stringently than the agency has already purported to do). At a minimum, vacatur would "require EPA . . . to entertain and respond to the [Sierra Club's] claims about the necessary scope and stringency" of the states' pollution-control measures. *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012) (finding injury redressable).

## ISSUES PRESENTED FOR REVIEW

In 2004 the Environmental Protection Agency ("EPA") determined that ozone pollution in metropolitan Milwaukee and Racine, Wisconsin ("Milwaukee-Racine"), Chicago, Illinois ("the "Greater Chicago Area," or

“Chicago”), and the portion of St. Louis lying in Illinois (“St. Louis”) exceeded the Agency’s then-prevailing air quality standard under the Clean Air Act. The Agency accordingly designated all three areas as ‘non-attainment’ areas for the standard. 69 Fed. Reg. 23,858, 28,898, 23,915, 23,947 (April 30, 2004). *See* 42 U.S.C. §§ 7511-7511f (describing pollution-reduction requirements imposed by designation).

The Agency has issued final rules re-designating Milwaukee-Racine, Chicago, and St. Louis as ‘attainment’ areas. 77 Fed. Reg. at 34,819, 45,252 & 48,062 (R.22, R.11 & R.1). To make those re-designations, the Clean Air Act requires that EPA “determine[] that the improvement in air quality” underlying the re-designation “is due to permanent and enforceable reductions in emissions resulting from the applicable [Clean Air Act] implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions.” 42 U.S.C. § 7407(d)(3)(E)(iii).

In re-designating each area:

(1) EPA determined that ozone levels, and emissions of ozone-forming pollutants, had fallen in the area. And it noted the adoption of permanent and enforceable regulations governing ozone-forming

pollutants in the area. The Agency did not, however, undertake any analysis to establish that those regulations *caused* a reduction in ozone pollution sufficient to meet the applicable air quality standard. Did EPA thereby violate its obligation to reasonably "determine[] that the improvement in air quality" underlying any re-designation "is due to" and "result[s] from . . . permanent and enforceable" measures? 42 U.S.C. § 7407(d)(3)(E)(iii).

(2) EPA treated 2008 "actual" emissions from power plants and similarly large polluters – that is, whatever quantity of pollution the plants actually emitted in that year – as if these pollution rates represented both "permanent" and "enforceable" pollution reductions from the plants' prior emission rates. The plants' 2008 emissions were well below the pollution the plants could legally and physically produce that year; and nothing prevents the plants from increasing pollution above their 2008 levels at any time. May the Agency rely on non-compulsory emissions levels to establish the "enforceable" and "permanent" reductions required by the Act, 42 U.S.C. § 7407(d)(3)(E)(iii)?

(3) EPA determined that a federal nitrogen oxides emissions-trading program resulted in 'permanent and enforceable' ozone reductions in Milwaukee-Racine, Chicago, and St. Louis. The trading program allows sources to increase their emissions at any time, by purchasing allowances from other plants in a 22-state region (most of which do not contribute to ozone pollution in Milwaukee-Racine, Chicago, or St. Louis). As a result, the program only ensures reductions in ozone-forming pollutants from somewhere within those twenty-two states – not ozone reductions in Milwaukee-Racine, Chicago, St. Louis or any other specific nonattainment area. *North Carolina v. EPA,* 531 F.3d 896, 908 *on reh'g in part*, 550 F.3d 1176 (D.C. Cir. 2008) (noting that program requires reductions which "do not correlate directly with each state's relative contribution to a specific downwind nonattainment area"). May EPA rely on that regional trading program to create "permanent and enforceable" ozone reductions in the specific areas of Milwaukee-Racine, St. Louis, and Chicago, as required by the Clean Air Act, 42 U.S.C. § 7407(d)(3)(E)(iii)?[4]

[4] These issues were "raised with reasonable specificity during the period for public comment," 42 U.S.C. § 7607(d)(7)(B). Letter from Robert Ukeiley to Douglas Aburano dated February 22, 2012 at 3-5 (R.378-80);

## Statement

A. Ground-Level Ozone

Ground-level ozone – colloquially, smog – causes "lung dysfunction, coughing, wheezing, shortness of breath, nausea, respiratory infection and in some cases, permanent scarring of the lung tissue." *S. Coast Air Quality Mgmt. Dist. v. EPA,* 472 F.3d 882, 887 (D.C. Cir. 2006) *decision clarified on denial of reh'g*, 489 F.3d 1245 (D.C. Cir. 2007) (citation omitted). Repeated exposure to ozone "may lead to permanent changes in lung tissue and irreversible reductions in lung function"; EPA has even noted "suggestive evidence" that ozone may contribute to "cardiopulmonary mortality." 78 Fed. Reg. 29,816, 29,829-30 (May 21, 2013).

Much of that harm falls upon children, whose "lungs are still developing," and who "are more likely to be outdoors." http://www.epa.gov/glo/health.html. "Children are also more likely than adults to have asthma" – and "people with asthma are likely to experience larger and more serious effects" from exposure to elevated

---

Comments of the Sierra Club and Midwest Environmental Defense Center at 5-11 (March 12, 2012) (R.392-98). Letter from Robert Ukeiley to Douglas Aburano dated March 12, 2012 at 2-4 (R.401-03).

ozone levels. 73 Fed. Reg. 16,436, 16,476 (March 27, 2008). The elderly suffer severe effects from ozone pollution as well. *Id.* at 16,450.

Even "healthy adults" experience "lung inflammation, increased airway responsiveness, and decreased resistance to infection," when exposed to ozone pollution. *Id.* at 16,466. EPA has further "determined that ozone has a broad array of effects on trees, vegetation, and crops and can indirectly affect other ecosystem components such as soil, water, and wildlife." *Mississippi v. EPA,* 723 F.3d 246, 252 (D.C. Cir. 2013) *amended and superseded on reh'g,* 744 F.3d 1334 (D.C. Cir. 2013).

Ozone is "not a direct product of human activity," but rather results from "other atmospheric pollutants" under specific weather conditions. *Id.* It is "formed from [the] chemical reactions between [nitrogen oxides] ('$NO_x$')" with any of a number of "volatile organic compounds ('VOCs'), in the presence of sunlight." *West Virginia v. EPA,* 362 F.3d 861, 865 (D.C. Cir. 2004). Ozone's precursors – nitrogen oxides and volatile organic compounds – are produced by many sources, including cars, power plants, and a variety of manufacturing facilities. 70 Fed. Reg. 30,396, 30,398 (May 26, 2005) (noting that "$NO_x$ and VOCs are emitted into the air through many sources such as vehicles, power plants and

other industrial facilities"). *See West Virginia,* 362 F.3d at 865. ("$NO_x$ is emitted primarily from fossil fuel combustion sources, including motor vehicles and power plants.").

But ozone pollution levels do not depend solely upon the quantity of precursor pollutants in an area. For example, ozone formation requires sunlight; weather therefore plays a critical role. 75 Fed. Reg. 24,844, 24,846 (May 6, 2010) (also noting importance of "transport of ozone precursors from outside the . . . area"). Accordingly, EPA has elsewhere observed that "the formation of ozone is dependent on a number of variables which cannot be estimated solely through [precursor] emissions growth and reduction calculations." *Id.*

Even where weather and other variables are held constant, ozone levels do not vary straightforwardly with changes in precursor emissions. For example, "once ozone is formed, a further addition of nitrogen oxides may react with the ozone in a way that will cause the ozone level to fall in the immediate area," rather than to rise; "[a]nd, conversely, reducing the quantity of nitrogen oxides in the air may raise rather than lower the ozone level in the area in which the mixing of the nitrogen oxides and the ozone takes place." *New York v. EPA,* 133 F.3d

987, 989 (7th Cir. 1998). Consequently, as this Circuit has remarked, "predicting the total effect on ozone . . . of a reduction in [precursor] emissions, and the geographical incidence of that effect, is a tricky business." *Id.* To negotiate these complexities, EPA has elsewhere used methods that account for geography, timing, and weather conditions to determine the effect of regulations upon precursor emissions, and of precursor emissions upon ozone formation. *See, e.g., Sierra Club v EPA,* 356 F.3d 296, 304 (D.C. Cir. 2004) *amended sub nom. Sierra Club v. EPA*, 03-1084, 2004 WL 877850 (D.C. Cir. Apr. 16, 2004) (describing "photochemical grid model," "a mathematic model that predicts ozone levels . . . based on monitoring data, meteorology, planned emission reductions, . . . projected growth, and other factors").

B. Legal Framework: The Clean Air Act's Air Quality Standards, Non-Attainment, and Re-designation

1. *Air Quality Standards, Non-Attainment, and State Plans*

The Clean Air Act was enacted to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). To that end, the Act requires EPA to specify national ambient air quality standards ("air quality standards," or "NAAQS") for

air pollutants, like ozone, that endanger public health and welfare. 42 U.S.C. § 7409. Those standards must reflect the Agency's assessment of air quality levels "requisite to protect the public health," while "allowing an adequate margin of safety." 42 U.S.C. § 7409(1)(b)(1). *See also* 42 U.S.C. § 7409(1)(b)(2) (describing "secondary" air quality standards set at levels "requisite to protect the public welfare"). The Act instructs EPA to review, and if necessary update, its air quality standards at least every five years. 42 U.S.C. § 7409(1)(d)(1).

When EPA issues a new air quality standard, it works with states to designate areas in which air quality fails to meet the standard ("non-attainment" areas, in the jargon of the Clean Air Act). 42 U.S.C. § 7407(d). States are responsible for devising plans to reduce air pollution in such non-attainment areas to meet the pertinent air quality standard. 42 U.S.C. § 7410. The Act provides deadlines by which non-attainment areas must improve air quality to attain the standard, and prescribes substantive requirements for state implementation plans designed to achieve that improvement.[5] 42 U.S.C. §§ 7511-7511f. *See*

---

[5] Both attainment deadlines and implementation plan contents depend, for ozone, upon the severity of pollution in the area to which the plan applies. Areas with grave ozone pollution must meet stricter

*generally Sw. Penn. Growth Alliance v. Browner,* 121 F.3d 106, 109-10 (3d Cir. 1997).

2. *Re-designations to Attainment: Permanent and Enforceable Reductions*

A state may request that EPA re-designate an area from "non-attainment" to "attainment" for an air quality standard. 42 U.S.C. § 7407(d)(3). *See Sw. Penn. Alliance,* 121 F.3d at 110. The Act enumerates several preconditions that must be met before EPA may make such a re-designation. 42 U.S.C. § 7407(d)(3)(E). Two of those conditions have to do with air quality. First, EPA must "determine[] that the area has attained the national ambient air quality standard" – the Agency must find, in other words, that air pollution in the area has in fact been reduced to meet the applicable standard. 42 U.S.C. § 7407(d)(3)(E)(i).

Second – and central to these petitions – EPA must "determine[] that [this] improvement in air quality is *due to permanent and enforceable reductions in emissions resulting from* implementation of the applicable

---

requirements than areas with moderate pollution, but are given more time to meet the standard. *See Sierra Club v. EPA,* 311 F.3d 853, 855-56 (7th Cir. 2002).

[State] implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions." 42 U.S.C. § 7407(d)(3)(E)(iii) (emphasis added). EPA must ensure, in other words, that the State has enacted measures sufficient to sustain its newfound clean air. To do so, the statute instructs EPA to ascertain the cause of the area's pollution reductions – to confirm that the area's improved air quality is not "due to" fluctuations in weather, the economy, or other temporary influences beyond the State's (or EPA's) control, but rather "result[s] from" permanent regulatory measures that may be reliably enforced in the future. *Id.*

As this Circuit has observed, this finding is "vital." *Sierra Club v. EPA,* 375 F.3d 537, 539 (7th Cir. 2004). It ensures that the State has met the Act's basic goal of "air pollution control at its source," 42 U.S.C. § 7401(a)(3), by adopting enforceable measures that will allow it to safeguard healthy air quality in the future. *See Com. of Pa., Dep't of Envtl. Res. v. EPA*, 932 F.2d 269, 272 (3d Cir. 1991) ("The need to maintain the Clean Air Act standards once they are reached is well-recognized by the Courts. These standards cannot be maintained unless the measures taken to achieve them are enforceable."). The importance

of that assurance is underlined by the absence of a specific statutory framework or deadline to reverse a re-designation, should air quality deteriorate; that structure emphasizes Congress's intent that re-designation only occur when healthy air quality is permanently secured by enforceable measures. *Cf. S. Coast Air Quality Mgmt. Dist.,* 472 F.3d at 900 ("The Act placed states onto a one-way street whose only outlet is attainment.").

To meet the statute's command, as EPA recognizes, "the improvement in air quality necessary for the area to attain the relevant [air quality standard] must be reasonably attributable to permanent and enforceable reductions in emissions," such as those compelled by state or federal regulations. 77 Fed. Reg. at 45,258 (R.17). EPA's longstanding interpretation of the Act's specification of "permanent and enforceable reductions" requires the Agency to verify that the area's attainment is not the "result[] [of] temporary reductions in emissions rates (e.g., reduced production or shutdown due to temporary adverse economic conditions) or unusually favorable meteorology." *Memorandum from John Calcagni* (Sept. 4, 1992) ("Calcagni Memorandum") at 4 (R.86).

According to the Agency's interpretative guidance, to make the necessary attribution "the State should estimate the percent reduction [in air pollution] achieved from Federal measures . . . as well as control measures that have been adopted and implemented by the State," and make certain that this reduction is sufficient to meet the air quality standard. *Id.* at 4 (R.86). To distinguish the effects of enforceable regulations from temporary or voluntary reductions, the analysis "should assume that sources are operating at permitted levels (or historical peak levels) unless evidence is presented that such an assumption is unrealistic." *Id.*

C. Decisions Under Review: EPA's Re-designations of Milwaukee-Racine, St. Louis, and Chicago

In 1997 EPA revised its air quality standard for ozone, to 0.08 parts per million (ppm) measured over an 8-hour average. 62 Fed. Reg. 38,856 (July 18, 1997) (the "1997 ozone standard").[6] *See generally*

[6] EPA measures the fourth-highest ozone levels in an area each year. If the three-year average of that fourth-highest level exceeds the standard, EPA judges an area to be in non-attainment. 69 Fed. Reg. 23,951, 23,968 n.27 (April 30, 2004). In demanding multiple high-ozone episodes, over several consecutive years, the standard permits some harm to health (every exceedance of the standard causes harm) in order to ensure that only those areas with persistent air pollution, demanding

*Am. Trucking Ass'n v. EPA,* 283 F.3d 355, 375-78 (D.C. Cir. 2002). *See also* 73 Fed. Reg. at 16,471 (concluding that 1997 standard "does not provide sufficient protection," especially for children and older adults).[7] Ozone pollution in the Milwaukee-Racine metropolitan area was well in excess of that level, as was pollution in the cities of Chicago and St. Louis. *See Comments of the Sierra Club and Midwest Environmental Defense Center* (March 12, 2012) ("Milwaukee-Racine Comments") at 12 (R.399) (noting ozone levels as high as .099 ppm in Milwaukee in 2002); Draft Maintenance Plan for the Metro-East Ozone Nonattainment Area for the 1997 8-Hour Ozone National Ambient Air Quality Standard (Ill. Envt'l Prot. Agency February 24, 2010) ("St. Louis Request") at 11 (R.169); Maintenance Plan for the Illinois Portion of the Chicago Ozone Nonattainment Area for the 1997 8-Hour Ozone Standard (Revised) (Illinois Envt'l Prot. Agency Sept. 15, 2011) ("Chicago Request") at 12 (R.322). So EPA designated Milwaukee-Racine (as well as Sheboygan County, Wisconsin) as a "moderate" nonattainment area for the 1997

---

a regulatory response, violate the standard. *See* 73 Fed. Reg. at 16,474-5.

[7] EPA issued a new, lower ozone standard in 2008 (of .075 ppm over an 8-hour average). 73 Fed. Reg. at 16,436. That stricter air quality standard is not directly at issue in this case.

ozone standard. 69 Fed. Reg. at 23,858, 23,947. EPA also designated Chicago and St. Louis (including the portion of the metropolitan area lying in Illinois), as non-attainment. *Id.*

1. *EPA's Re-designation of Milwaukee-Racine*

In 2009, the State of Wisconsin asked EPA to re-designate both Milwaukee-Racine and Sheboygan County (among other parts of the State) as having attained the 1997 standard. 77 Fed. Reg. at 45,252 (R.11).

a. *Wisconsin's Demonstration of Permanent and Enforceable Reductions*

Wisconsin provided monitoring reports indicating that ozone levels in Milwaukee-Racine and Sheboygan fell below the 1997 standard between 2006 and 2008. *Id.* The State sought to demonstrate that this improvement in air quality resulted from "permanent and enforceable" measures, 42 U.S.C. § 7407(d)(3)(E)(iii), as follows:

First, the State presented "data indicating a decrease in emissions" of nitrogen oxides and volatile organic compounds between 2002, when ozone levels exceeded the standard, and 2007, when ozone levels fell below the standard. 8-Hour Ozone Re-designation Request and Maintenance Plan (Wisconsin Department of Natural Resources Sept.

2009) ("Milwaukee-Racine Request") at 13 (R.114). That data quantified emissions of ozone precursors in the Milwaukee-Racine and Sheboygan areas, and confirmed that emissions of those precursors had fallen during the same years that ozone pollution dropped to meet the 1997 standard. *See id.*13-18 (R.114-19) (describing inventory of precursors).

Second, Wisconsin listed various "permanent and enforceable programs responsible for emission reductions" in Milwaukee-Racine and Sheboygan County over that time period. *Id.* at 13 (R.114). Those programs included elements required by the Act's non-attainment provisions, such as a "rate of progress plan" and imposition of "reasonably available control technolog[ies]." *Id.* at 18-20 (R.119-21). In addition, Wisconsin described several other Clean Air Act programs: *inter alia,* "best available retrofit technology" limits adopted to comply with the Act's regional haze requirements, 42 U.S.C. § 7491; federal gasoline and diesel-engine standards; and rules limiting air toxics from mobile and stationary sources, Milwaukee-Racine Request at 21-23 (R.122-24). Wisconsin also listed voluntary local traffic-congestion controls, such as ride-sharing services and carpool lanes that "reduce

idling times of motor vehicles and thus reduce $NO_x$ emissions," but did not commit to continuing those programs. *Id.* 23-24 (R.124-25).

In addition to those in-state measures, Wisconsin cited the multi-state trading program (which EPA calls the "$NO_x$ SIP Call") implemented by EPA in 1998 to reduce "regional transport of ozone," *Id.* at 21 (R.122). 63 Fed. Reg. 57,356 (Oct. 27, 1998). That program creates a cap-and-trade regime encompassing twenty-two states, whose emissions affect thirteen different non-attainment areas. *Id.* at 57,395. All twenty-two states are collectively responsible for reducing emissions of nitrogen oxides, to "address the interstate transport of ozone." *Natural Res. Def. Council v. EPA,* 571 F.3d 1245, 1255-56 (D.C. Cir. 2009) ("*NRDC v. EPA*"). The program allows "a source within a state [to] meet its emissions target either by installing controls or by purchasing allowances from other sources located anywhere in the region." *Id.* at 1256.

b. *EPA's Approval of Milwaukee-Racine's Re-designation*

In February 2012 EPA issued a proposed rule granting Wisconsin's request to re-designate the Milwaukee-Racine and Sheboygan areas. 77 Fed. Reg. 6,727 (Feb. 9, 2012) (R.34). It finalized the re-designation in

July 2012 – but only for Milwaukee-Racine. Ozone levels in Sheboygan County had risen, despite the "permanent and enforceable" reductions allegedly in place, and the area was once again "violating the 1997 8-hour ozone standard." 77 Fed. Reg. at 45,252 (R.11).

i. *EPA's Correlation Between Ozone Levels, Actual Precursor Emissions, and Adoption of Regulations*

EPA observed that ozone levels in Wisconsin-Racine had remained below the standard between 2008 and 2010, *id.* at 6,731 (R.38) – albeit barely, Milwaukee-Racine Comments at 12 (R.399) (noting monitored ozone levels in Kenosha County and Milwaukee at .081 and .082 ppm in 2010).[8]

To establish that these reduced ozone levels were "due to permanent and enforceable" measures, EPA determined: (1) that several "permanent and enforceable measures ha[d] been implemented in the areas," citing a sub-set of the various regulations submitted by the State, including the $NO_x$ SIP Call trading program, *Id.* at 6,737 (R.44); and (2) that Wisconsin had "document[e]d changes in VOC and $NO_x$

[8] EPA employs a rounding convention that deems ambient levels up to .084 ppm to be below the 1997 ozone standard of .08 ppm. See 78 Fed. Reg. 59,242, 59,243 (Sept. 26, 2013).

emissions" in the area that largely coincided with the adoption of those regulations; and (3) that ozone levels had fallen during that same period. *Id.* at 6,737-8 (R.44-45). EPA found this sufficient to "adequately demonstrate[] that the improvement in air quality is due to permanent and enforceable emissions reductions." *Id.* at 6,738 (R.45).

EPA acknowledged that the Act requires that "the improvement in air quality necessary [to] attain the relevant [air quality standard] must be reasonably attributable to permanent and enforceable reductions in emissions." 77 Fed. Reg. at 45,258 (R.17). But EPA did not determine how much of the "changes in VOC and $NO_x$" emissions that had occurred in Milwaukee-Racine resulted from the listed "permanent and enforceable measures," as opposed to temporary weather or economic conditions. *Id.* at 6,737-8 (R.44-45). Nor did it determine the location or timing of the precursor reductions resulting from those measures. *Id.* And EPA did not undertake any analysis of the quantity, location, or timing of volatile organic compound and nitrogen oxides reductions "necessary to assure" the 1997 ozone standard, *id.* Instead, EPA cited its "longstanding practice" of allowing states to demonstrate that an observed improvement in air quality is "due to" permanent and

enforceable measures solely by "compar[ing] nonattainment area emissions [of ozone precursors] during the nonattainment period with emissions in the area during the attainment period." 77 Fed. Reg. at 45,256 (R.15).

ii. *EPA's Use of 'Actual' Emissions to Establish Permanent and Enforceable Reductions*

To establish that emissions reductions at power plants and other large sources of nitrogen oxides within Milwaukee-Racine were the result of permanent and enforceable measures, the Agency used reports of such sources' actual emissions during 2008, compiled from sources such as the Agency's "Clean Air Markets Division" database, to which electric generating units must report their nitrogen oxides emissions.[9] 77 Fed. Reg. at 6,737. *See* Milwaukee-Racine Request at 15 (R.116). The Agency thereby accepted the 'actual' emissions of those plants in 2008 – whatever quantity of pollution (in tons per day) that happened to

---

[9] To determine 'permanent and enforceable' pollution reductions from smaller and mobile sources, the Agency used projections of their emissions based upon, *inter alia,* "applicable emission controls." Milwaukee-Racine Request at 15 (R.116). *See* 77 Fed. Reg. at 6,737 (R.44) (describing estimates for 'area' – i.e., smaller – and mobile sources).

emerge from the plants' smokestacks that year – as indicative of a permanent, enforceable reduction in ozone precursors.

77 Fed. Reg. at 6,737 (R.44).

The Agency did not assess the emissions that might result if those plants chose to produce the amounts of pollution they could lawfully release. And it identified no regulatory measures by which the plants' 2008 emissions levels might be enforced in the future. As Sierra Club pointed out, no such regulatory measures existed; in fact, the governing regulations permitted power plants *alone* in Milwaukee-Racine to emit more than six times the nitrogen oxides 'actually' emitted by *all* stationary sources in the area in 2008 – and more than four times the nitrogen oxides that were emitted when the area failed to attain the 1997 ozone standard. Milwaukee-Racine Comments at 6-7 (R.393-94).

Rather than identify some reason why the emissions reductions that occurred between 2005 and 2008 in Milwaukee-Racine might be enforceable, or otherwise permanent, the Agency relied on its purported "longstanding practice and . . . policy" of using "actual emissions when demonstrating permanent and enforceable emission reductions." 77 Fed. Reg. at 45,257 (R.16) (citing Calcagni Memorandum). *But see*

Calcagni Memorandum at 4 (EPA "should assume that sources are operating at permitted levels (or historical peak levels) unless evidence is presented that such an assumption is unrealistic"). It explained that because "[s]ources seldom . . . emit at maximum allowable emission levels . . . EPA believes actual emissions are the appropriate emission levels to consider" when assessing permanent and enforceable reductions in pollution. *Id.*

iii. *EPA's Reliance on the $NO_x$ SIP Call*

EPA further decided that reductions from the $NO_x$ SIP Call's regional trading program were "permanent," even though the program allows individual sources to increase their $NO_x$ emissions by purchasing "allowances" from other sources elsewhere in the 22-state trading region, *id.* at 45,259 (R.18). As its rationale, EPA stated that "[a]ny purchase of allowances and increase in emissions by a utility" affecting Milwaukee-Racine "necessitates a corresponding . . . reduction by another utility" within the 22-state region, providing "an air quality benefit that will compensate, at least in part, for the impact of any emission increase." *Id.*

2. *EPA's Re-designation of St. Louis*

a. *Illinois' Demonstration of Permanent and Enforceable Reductions*

In 2010, Illinois requested that its portion of St. Louis be re-designated.[10] The state observed that ozone levels in St. Louis had remained below the standard between 2007-2009 and 2009-2011, *id.* at 34,820 (R.23). But that monitoring data gave little confidence that such below-standard levels would persist; five ozone monitors in the area showed an upward trend in pollution levels between 2009 and 2011, *id.* (R.23).

The State nevertheless sought to demonstrate that its improved air quality was caused by "permanent and enforceable" measures, 42 U.S.C. § 7407(d)(3)(E)(iii), as follows:

First, Illinois presented evidence of a reduction in emissions of nitrogen oxides and volatile organic compounds within St. Louis between 2002, a year when ozone levels exceeded the standard, and 2008, "one of the years the St. Louis area monitored attainment of the standard." 76 Fed. Reg. 79,579, 79,586 (Dec. 22, 2011) (R.68, R.75).

---

[10] For simplicity's sake, references to "St. Louis" refer to the portion of the metropolitan area lying in Illinois – the area that is the subject of EPA's re-designation.

Illinois did not state that these in-area emission reductions between 2002 and 2008 were sufficient to produce ozone levels that met the necessary air quality standard. Rather, all Illinois did and could claim was:

> The Metro-East area was designated as nonattainment of the 1997 8-hour ozone NAAQS in 2004, based on ozone air quality monitoring data collected between 2001 and 2003. Since that time, permanent and enforceable reductions of ozone precursor emissions have *contributed* to improvements in ozone air quality and to the attainment of the 8-hour ozone NAAQS.

St. Louis Request Att. 1 at 15 (R.173) (emphasis added).

Further diminishing the claimed results of the described in-area precursor reductions, Illinois went to emphasize the importance of unspecified "upwind" reductions:

> These sizeable emissions reductions in ozone precursor emissions, and corresponding reductions in the Missouri portion of the [non-attainment area], *plus* reductions in upwind areas in Illinois and other nearby states, resulted in a substantial improvement in ozone air quality in the St. Louis area, ultimately resulting in attainment of the 1997 8-hour ozone NAAQS.

*Id.* (emphasis added). Illinois did not assert that these 'upwind' reductions were permanent and enforceable, or that they came from Federal or state air pollution control regulations.

Second, Illinois listed various allegedly "permanent and enforceable" programs addressing nitrogen oxides and volatile organics, which had been adopted between 2002 and 2008 (the period when emissions of those pollutants fell, and the area moved into attainment of the standard). Illinois included the $NO_x$ SIP Call as primary amongst these cited emission-reduction measures. *Id.* at 15, 18 (R.173, R.176). Illinois also provided a general reference to other programs. For example, Illinois listed New Source Performance Standards (which compel no reductions from existing sources, but govern newly constructed or modified sources of air pollution)), *see* 42 U.S.C. § 7411(a)(2), and National Emission Standards for Hazardous Air Pollutants (which govern air toxics, including some organic compounds). There are dozens of these standards; EPA issues separate New Source and Hazardous Air Pollutant standards for a variety of separate industrial categories, and updates them regularly. Illinois did not identify particular standards that became applicable between 2002 and 2008; much less assess the specific reductions that may have resulted from such regulatory measures. St. Louis Request, Att. 1 at 18-19 (R.176-77).

b. *EPA's Finding of Permanent and Enforceable Reductions in St. Louis*

In re-designating St. Louis, as in Milwaukee-Racine, EPA acknowledged that the Act requires that "the improvement in air quality necessary [to] attain the relevant [air quality standard] must be reasonably attributable to permanent and enforceable reductions in emissions." 77 Fed. Reg. at 34,821 (R.24). And as in Milwaukee-Racine, EPA made that attribution solely by noting that: (1) ozone levels fell in St. Louis between 2002 and 2008; (2) precursor emissions between 2002 and 2008 also decreased in the nonattainment area; and (3) Illinois (and EPA) had adopted some regulatory measures which the Agency found to be permanent and enforceable. *Id.* at 34,821 & 34,823 (R.24 & R.26). From this the Agency concluded that it and Illinois had "implemented a number of permanent and enforceable regulatory control measures which have reduced emissions and resulted in a corresponding improvement in air quality" sufficient to meet the ozone standard. *Id*. at 34,821 (R.24).

Illinois did not provide, and EPA did not demand, *any* additional analysis – qualitative or quantitative – to demonstrate that regulation-driven precursor reductions between 2002 and 2008 produced the

improvements in air quality observed in St. Louis during that time. And EPA did not undertake any analysis of the quantity, location, or timing of volatile organic compound and nitrogen oxides reductions "necessary to assure" the 1997 ozone standard.[11] *See id.* Instead, as in Milwaukee-Racine, EPA cited its "longstanding practice" of allowing states to demonstrate that an observed improvement in air quality is "due to" permanent and enforceable measures solely by "compar[ing] nonattainment area emissions [of ozone precursors] during the nonattainment period . . . with emissions in the area during the attainment period." 77 Fed. Reg. at 34,823 (R.26).

EPA also determined (in parallel, again, to its decision in Milwaukee-Racine) that 'actual' reductions in precursor emissions from power plants and other major sources of ozone precursors in St. Louis between 2002 and 2008 – that is, whatever reduction in emissions occurred between those years – were both permanent and enforceable. 76 Fed. Reg. at 79,587 (R.76). And as in Milwaukee-Racine, EPA made no analysis of whether any regulatory measures existed to permit

---

[11] EPA did not, for example, compare meteorological parameters relevant to ozone formation in 2002 and 2008, or determine the periods and places when emissions occurred and the resulting ozone formation.

enforcement of the reduced emissions levels achieved in 2008, or whether any physical (or other) constraint ensured that they would be sustained permanently. 77 Fed. Reg. at 34,823 (R.26) ("us[ing] . . . actual emissions when demonstrating permanent and enforceable emissions reductions").

Just as it did when re-designating Milwaukee-Racine, EPA found that reductions from the $NO_x$ SIP Call's regional trading program were "permanent," notwithstanding the acknowledged ability of sources to cease those reductions by purchasing "allowances" from sources elsewhere in the 22-State trading region. EPA claimed, again, that "[a]ny purchase of allowances and increase in emissions by a utility necessitates a corresponding . . . reduction in emissions by another utility" within the region, providing "an air quality benefit that will compensate, at least in part, for the impact of any emission increase." *Id.*

c. *St. Louis' Relapse into Non-Attainment*

In 2012, shortly after EPA found that St. Louis' improved air quality was both 'permanent' and 'enforceable,' the area's air quality deteriorated so that St. Louis once again violated the 1997 ozone

standard (that is, ozone levels between 2010-2012 were so high, so often, that the 3-year average of the 4th highest level exceeded .085 ppm, *see* nn.6 & 8, above).[12]

3. *EPA's Re-designation of Chicago*

In 2009, the State of Illinois asked EPA to re-designate the Chicago area to attainment for the 1997 standard. 77 Fed. Reg. 6,743 (Feb. 9, 2012) (R.50).[13] In 2012, EPA granted that request, deploying the same reasoning as it had in Milwaukee-Racine and St. Louis. 77 Fed. Reg. at 48,062 (R.1).

The Agency noted that (1) ozone levels fell below the standard in Chicago in 2008, and remained so through 2010. 77 Fed. Reg. at 6,747. (R.54). To confirm that Chicago's reduced ozone pollution was "due to"

---

[12] Sierra Club filed an administrative petition for reconsideration of EPA's re-designation decision based on this 2010-2012 data on June 29, 2013, shortly after EPA deemed the data 'final.' 12-2853, Dkt. No. 17, Attachment 1. Sierra Club also requested the Court to order EPA to respond to Sierra Club's administrative petition for reconsideration. 12-2853, Mot. to Gov. Further Proc. and in the Alt. for Writ of Mandamus, Jan. 16, 2014. Dkt. No. 17. The Court declined. 12-2853, Order, Jan. 22, 2014, Dkt. No. 18. Sierra Club's administrative petition for reconsideration is still pending with EPA; the Agency has made no indication that it intends to respond.

[13] Illinois supplemented that request in 2011. 77 Fed. Reg. at 48,063. (R.2).

and "resulted from . . . permanent and enforceable" measures, 42 U.S.C. § 7407(d)(3)(E)(iii), EPA (2) compared emissions of ozone precursors within Chicago in 2002 (when the area exceeded the ozone standard) with precursor emissions in 2008 (when the area met the ozone standard). 77 Fed. Reg. at 6,754 (to make the necessary demonstration, Illinois "determined and documented the changes in VOC and $NO_x$ emissions in the Illinois portion of the Greater Chicago area between 2002 (a standard-violation year) and 2008 (an attainment year)") (R.61). Finally EPA (3) noted several state and federal "emission controls [regulations] that have been implemented in the Greater Chicago Area" during that period. *Id.* (listing measures).

On that basis, EPA concluded that the ozone reductions that occurred between 2002 in 2008 in Chicago were the result of those regulations. 77 Fed. Reg. at 6,755-56 (stating that reductions in emissions "have occurred statewide and in upwind areas as a result of Federal emission control measures" and concurring with conclusion that "decrease in VOC and $NO_x$ emissions during the 2002-2008 period are primarily due to the implementation of permanent and enforceable emissions controls, and are the primary cause (along with emission

reductions in the Indiana portion of the Greater Chicago area) of the ozone air quality improvement in the Greater Chicago area") (R.62-63).

As with Milwaukee-Racine and St. Louis, EPA assumed that whatever nitrogen oxides and volatile organics were 'actually' produced in 2008 in Chicago represented permanent and enforceable reductions. 77 Fed. Reg. at 48,068 (R.7). *See* Chicago Request at 14 (R.324). And as with Milwaukee-Racine and St. Louis, EPA concluded that the $NO_x$ SIP Call's multi-state trading program would produce permanent, enforceable reductions in Chicago's ozone pollution. 77 Fed. Reg at 48,067 (R.6). *See* 63 Fed. Reg. at 57,356.

***

Sierra Club filed these petitions for review.

## SUMMARY OF ARGUMENT

EPA has not met the requirements for re-designation of Milwaukee-Racine, Chicago, or St. Louis. 42 U.S.C. § 7407(d)(3)(E). As a result, the Agency has failed to meet the Act's core command: to ensure that the areas will avoid relapse of ozone levels that harm their residents' health. *See, e.g.,* 73 Fed. Reg. at 16,476 (noting "strong body of clinical evidence" of harm to "healthy people" when exposed to ozone levels of

0.080 ppm or above, and evidence of harm even at lower levels); Milwaukee-Racine Comments at 12 (R.399) (describing ozone levels of .081 and .082 ppm in counties within Milwaukee-Racine area in 2010 and 2011).

I. The Clean Air Act requires EPA to determine, as a prerequisite to re-designation, that the "improvement in air quality" underlying the re-designation is "due to permanent and enforceable reductions in emissions resulting from" the state implementation plan, federal regulations, and other such measures. 42 U.S.C. § 7407(d)(3)(E)(iii). That statutory text demands a causal connection, as EPA accepts. 77 Fed. Reg. at 45,258 (R.17) ("the improvement in air quality necessary for the area to attain the relevant NAAQS must be reasonably attributable to permanent and enforceable" measures).

EPA failed to make that necessary causal connection in any of these three decisions. The Agency did not determine whether (or to what extent) the observed reduction in the area's ozone pollution resulted from newly adopted state and federal regulations – rather than from temporary fluctuations in weather or the economy, or from other similarly impermanent and unenforceable factors. *Cf. Emissions Fell in*

*2009, Showing Impact of Recession*, N.Y. Times, Feb. 17, 2011, *available at* http://www.nytimes.com/2011/02/17/science/earth/17emit.html (noting decline in air pollutants, attributed by EPA "to the economic slowdown" and lower natural gas prices).

Instead, EPA merely: (1) confirmed that ozone levels had fallen in each area between 2002 and 2008; (2) "compar[ed]" emissions of ozone precursors in the areas, confirming that such precursors had decreased during that time; and (3) noted state and federal regulations that coincided with that decrease. 77 Fed. Reg. at 34,823, 45,256, 48,067 (R.26, R.15 & R.6). That coincidence does not satisfy the statute; it does not demonstrate that the decrease in precursor emissions (or a portion of it sufficient to achieve the ozone standard) was *caused by* those State and federal measures, or that the decrease in precursors *caused* the necessary decrease in Milwaukee-Racine's, St. Louis's, or Chicago's ozone pollution. *See Tagatz v. Marquette Univ.,* 861 F.2d 1040, 1044 (7th Cir. 1988) ("Correlation is not causation."). This is especially so given the complexity of ozone formation, and the large number of variables upon which ozone formation depends. *See New York,* 133 F.3d at 989.

II. In each decision, EPA concluded that emissions levels observed from power plants and other major sources in 2008 represented "permanent and enforceable" reductions in ozone precursors from prior levels. 77 Fed. Reg. at 34,823, 45,257 & 48,068 (R26, R.16 & R.7). It identified no means, however, by which such sources may be compelled to sustain those 2008 levels. Nor did the Agency identify any other technical or economic constraint that might render those 2008 levels permanent. EPA thereby failed to reasonably support its conclusion, and contradicted the policy upon which it claimed to rely. *See* Calcagni Memorandum at 4 (R.86). The Agency's conclusion that major point sources' actual 2008 emissions demonstrated "permanent and enforceable" reductions, within the meaning of 42 U.S.C. § 7407(d)(3)(E)(iii), was therefore arbitrary and capricious.

III. In all three re-designations, EPA relied on the $NO_x$ SIP Call's multi-state trading program to produce permanent and enforceable reductions in ozone levels in each specific area. 77 Fed. Reg. at 34,828, 45,257, 48,066 (R.31, R.16, & R.5). Because that program allows trading across a 22-state region, pollution reductions at sources contributing to ozone in (for example), Milwaukee-Racine are not assured in future

years; those sources can increase emissions by purchasing allowances from other plants, whose emissions may affect an entirely different area. *See Natural Res. Def. Council v. EPA,* 571 F.3d at 1256-57. EPA cannot, for that reason, rely on the $NO_x$ SIP Call to provide "permanent and enforceable" reductions in any specific area. 42 U.S.C. § 7407(d)(3)(E)(iii).

## STANDARD OF REVIEW

The Clean Air Act allows this Court to reverse any action that is, *inter alia,* "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or which is "in excess of statutory jurisdiction [or] authority." 42 U.S.C. § 7607(d)(9). Such review is "principally concerned with ensuring that EPA has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made,' that the Agency's 'decision was based on a consideration of the relevant factors,' and that the Agency has made no 'clear error of judgment.'" *Bluewater Network v. EPA,* 370 F.3d 1, 11 (D.C. Cir. 2004) (citations omitted).

Questions of statutory interpretation are governed by the "two-step inquiry" set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842-43 (1984). *Sierra Club v. EPA,* 311 F.3d 853, 858 (7th Cir. 2002). That inquiry begins with "'whether Congress 'has directly spoken to the precise question at issue,' in which case [the Court] 'must give effect to the unambiguously expressed intent of Congress." *Sierra Club,* 311 F.3d at 858. "If the statute is silent or ambiguous on the issue, [a Court] will defer . . . to any reasonable agency interpretation." *Id.*

## ARGUMENT

I. EPA Did Not Determine that the Necessary Improvement in Air Quality Was Due to Permanent and Enforceable Measures.

A. *The Statute Demands A Showing of Causation.*

In order to re-designate an area, the Clean Air Act requires EPA to determine that "the improvement in air quality" underlying the re-designation "is due to permanent and enforceable reductions in emissions," underscoring that requirement by repeating that the reductions must "result[] from implementation" of the state's implementation plan, federal regulations, and other "permanent and enforceable" measures. 42 U.S.C. § 7407(d)(3)(E)(iii). By its plain text,

the statute thereby demands that EPA establish that the "improvement in air quality" necessary for Milwaukee-Racine, St. Louis, and Chicago to attain the 1997 ozone standard was caused by "permanent and enforceable" measures. *See Burrage v. United States*, 134 S. Ct. 881, 887-88 (2014) ("results from" and similar phrases' ordinary statutory meaning is a requirement of causation); Merriam-Webster's Collegiate Dictionary 385 (11th ed. 2009) (defining "due," when combined with "to," as "capable of being attributed," or "ascribable") & 1063 (defining "result" as "to proceed or arise as a consequence, effect, or conclusion"). *See also id.* at 80 (defining "attribute" as "to explain by indicating a cause") & 71 (defining "ascribe" as "to refer to a supposed cause, source or author"); *Levy v. Minnesota Life Ins. Co.,* 517 F.3d 519, 525-6 (7th Cir. 2008) (contractual phrase "due to" requires causation). *Cf. Loving v. IRS,* 742 F.3d 1013, 1019 (D.C. Cir. 2014) (where "statute uses the conjuctive 'and' – and not the disjunctive 'or' – when listing . . . requirements," it provides "a strong indication that Congress did not intend the requirements as alternatives," even where requirements "are somewhat overlapping").

EPA did not dispute the need for that causal connection in its decision. It interpreted the Act to require that "the improvement in air quality necessary for the area to attain the relevant [air quality standard] must be *reasonably attributable* to permanent and enforceable reductions *resulting from* [permanent and enforceable] programs." 77 Fed. Reg. at 45,258 (R.17) (emphases added). *Accord* 77 Fed. Reg. at 34,822 & 48,067 (R.25 & R.6). The Agency's interpretative guidance similarly understands the Act to require that EPA distinguish "temporary reductions" resulting from "temporary adverse economic conditions" or "unusually favorable meteorology" from the permanent, enforceable reductions required by the statute. Calcagni Memorandum at 4 (R.86). That guidance suggests that the required showing of permanent and enforceable measures "should estimate the percent reduction . . . achieved from Federal measures . . . as well as control measures that have been adopted and implemented by the State" . . . and "clearly show that the air quality improvements *are the result of* implemented controls." *Id.* (emphasis added).

The plain text of the statute, and EPA's interpretation of that text, demand not just that EPA establish the existence of "air quality

improvement" and coincidental "permanent and enforceable measures" – but that the Agency draw a connection between the two, ensuring that the improvement *resulted from* specific permanent and enforceable measures, rather than temporary or unenforceable conditions. 42 U.S.C. § 7407(d)(3)(E)(iii).[14]

B. *EPA Failed to Make that Causal Connection When Re-Designating Milwaukee-Racine.*

EPA did not make that necessary connection in re-designating Milwaukee-Racine. It determined only "that emission reductions occurred in the area between the years of nonattainment and attainment," 77 Fed. Reg. at 45,256 (R.15); and that "the State has identified a number of permanent and enforceable regulatory control measures which have been implemented in Wisconsin as well as in upwind areas," during the same timeframe. *Id.* at 45,258 (R.17). But it undertook no analysis to establish that Milwaukee's attainment of the

[14] Because EPA's own interpretation of the statute confirms that the "improvement in air quality necessary to attain" the ozone standard must be "reasonably attribut[ed]" to permanent and enforceable measures, 77 Fed. Reg. at 45,258 (R.17), this petition presents no question of statutory interpretation to be resolved under *Chevron*'s "two-step inquiry," *Sierra Club v. EPA,* 311 F.3d at 858.

ozone standard *resulted* from those "permanent and enforceable" measures.

EPA confirmed that ozone levels had fallen to meet the standard in Milwaukee-Racine; but it undertook no analysis of the meteorology, or the timing and location of precursor emissions, that produced that improved air quality. *Id.* at 45,259 (R.18) (EPA established causation solely through "occurrence of [precursor] emission reductions in the area between the years of nonattainment and attainment"). Likewise, EPA established the existence of reductions in precursor emissions; but it made no effort to determine the cause of those reductions (or, at least, the precursor reductions necessary to achieve the underlying standard). 77 Fed. Reg. at 6,738 (R.45).

And EPA found that some "permanent and enforceable" regulations were adopted; but the Agency failed to determine what precursor reductions those regulations achieved within Milwaukee-Racine. *Id.* at 6,737 (R.44). For example, EPA did not estimate the emissions that would result if "sources [affecting the area] operat[ed] at permitted levels," or "historic peak levels," as EPA's interpretative guidance suggests. Calcagni Memorandum at 4 (R.86). Rather, the Agency merely

noted the "actual reported emissions" of those sources during 2008, 77 Fed. Reg. at 6,737 (R.44), without connecting those 'actual' emissions to the regulatory requirements the Agency cited.[15] *See* Argument Section II, at pp.58-63 *below*.

In other words, the Agency identified only a correlation between: (1) a reduction in ozone pollution within Milwaukee-Racine; (2) a reduction in ozone precursors in the area; and (3) the adoption of permanent and enforceable regulations. *See* 77 Fed. Reg. at 45,257-58 (R.16-17) (EPA followed "longstanding practice and policy" of "demonstrat[ing] permanent and enforceable emissions reductions by comparing nonattainment area [precursor] emissions occurring during the nonattainment period with emissions in the area during the attainment period," and identifying permanent and enforceable regulatory control measures implemented during that same period).

---

[15] The State used various models to generate its estimates of 2008 precursor emissions. 77 Fed. Reg. at 45,255 (R.14). But none of those models estimated the effects of permanent regulatory measures alone in Milwaukee-Racine; they merely confirmed that reductions in precursors had occurred. *See Id.* at 45,257-8 (R.16-17) (asserting that "it is not necessary for the state to identify the portion of these [emission] reductions attributable to each individual control measure"); Milwaukee-Racine Request Att. B at 1-5 (R.147-55) (describing modeling).

But the statute requires a finding of causation, 42 U.S.C. § 7407(d)(3)(E)(iii) – and "[c]orrelation is not causation," *Tagatz,* 861 F.2d at 1044. That is especially so where the observed result – reduced ozone pollution – has multiple potential causes. *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 616-17 (7th Cir. 2000) (Correlation may only suggest causation when "other variables are shown be insignificant"). *See Huss v. Gayden,* 571 F.3d 442, 459 (5th Cir. 2009) (noting danger of implying causation from correlation in the face of uncertainty); *Tex Tin Corp. v. EPA,* 992 F.2d 353, 355-56 (D.C. Cir. 1993) (EPA "confuses correlation with causation" where it "attributes [pollution] concentrations to" a particular source, without conducting "analysis to confirm that [pollution] came from the [source]").[16]

Each link of EPA's presumed chain – between the adoption of regulations, reduced emissions of ozone precursors, and reduced ozone pollution – features precisely the sort of "other variables" that prevent an inference of causation from correlation. *Radue,* 219 F.3d at 616-17. First, reduced precursor emissions are not caused solely by regulatory

---

[16] For other mistaken substitutions of correlation for causation, *see* Daniel Kahnemann, Thinking Fast & Slow 199-207 (2011).

restrictions. EPA claimed that the State's "estimat[ed] emissions" of ozone precursors in 2008 (when ozone levels were below the standard) necessarily "took into account" the effect of regulations in place at that time. 77 Fed. Reg. at 45,257 (R.16) (citing 77 Fed. Reg. at 6,738 (R.45)). But those estimates also reflected the effect of other, unrelated influences: the economic recession then occurring[17]; temporary reductions in production at various industrial sources; fuel prices (e.g., lower natural gas costs relative to other more polluting fuels); and other impermanent conditions. Despite the existence of those multiple variables, EPA made no effort to distinguish reductions attributable to "permanent and enforceable" regulations from those ascribable to weather, recession, and similarly temporary factors. *Cf.* Calcagni Memorandum at 4 (R.86) (agency "should estimate the percent reduction" from federal and state control measures).

Second, ozone pollution does not depend solely upon aggregate emissions of precursor pollutions. Ozone's "formation," according to the Agency itself, "is dependent [upon] a number of variables which cannot

[17] Economic conditions in 2008 were uncommonly adverse. *See Alan S. Blinder, After the Music Stopped: The Financial Crisis, the Response, and the Work Ahead* 3-7 (2013).

be estimated solely through emissions growth and reduction calculations" – such as the weather. 75 Fed. Reg. at 24,846 (advising use of "more sophisticated tools such as air quality modeling"). *See* Calcagni Memorandum at 4 (R.86) (requiring Agency to distinguish pollution reductions due to "unusually favorable meteorology"). *See also* 77 Fed. Reg. 22,392, 22,402 (April 13, 2012) (noting that "higher average temperatures" resulting from climate change are "expected to increase ozone pollution over broad areas of the country"). The relationship between precursor emissions and ozone levels is, furthermore, highly dependent upon geographic location and timing. *New York v. EPA,* 133 F.3d at 989. That "tricky" relationship, *id.,* precludes the Agency's assumption that Milwaukee-Racine's reduced ozone levels were the result of the area's coincident, aggregate changes in precursor emissions – much less the (unknown) subset of those changes that are permanent and enforceable.

EPA sought to justify its decision by stating that only the portion of emissions reductions "necessary . . . to attain" the 1997 ozone standard need result from "permanent and enforceable" measures. 77 Fed. Reg. at 45,258 (R.17). But EPA never determined what precursor reductions

(amongst those which had occurred) were "necessary to attain" the standard in Milwaukee-Racine. Nor did EPA determine what reductions in precursors were attributable to permanent and enforceable measures. Without having identified either the precursor reductions necessary to attain the standard, or the precursor reductions attributable to regulatory measures, the Agency could not reasonably conclude that reductions sufficient to achieve "the improvement in air quality necessary for the area to" achieve the 1997 ozone standard were "attributable" to permanent and enforceable measures. *Id.* at 45,258 (R.17).

In sum, EPA determined only that emissions of ozone precursors fell between 2005 and 2008; it did not determine *why* they fell. EPA determined only that permanent and enforceable state and federal regulations had been enacted in Milwaukee-Racine; it did not determine what reductions in the area's precursors *resulted* from those regulations. And EPA determined only that ozone pollution was below the 1997 ozone air quality standard in Milwaukee-Racine; it did not determine the timing and geography of the reductions in ozone precursors *necessary* to attain that standard. Hence, the Agency could

not plausibly determine that "the improvement in air quality" that was necessary for Milwaukee-Racine to attain the 1997 ozone standard was "reasonably attributable" to the permanent and enforceable measures in place. *Id. See Am. Farm Bureau Fed'n v. EPA,* 559 F.3d 512, 518 (D.C. Cir. 2009) (invalidating EPA decision where agency "fail[s] adequately to explain its . . . premise").

C. *EPA's Failure to Undertake a Causal Analysis Prior to Re-designating Milwaukee-Racine Violates the Act.*

That failure violates the Clean Air Act, which demands a determination that air quality in Milwaukee-Racine improved "due to" and "resulting from" permanent and enforceable measures. 42 U.S.C. § 7407(d)(3)(E)(iii). As this Circuit has observed, that determination is "vital," *Sierra Club v. EPA,* 375 F.3d at 539. It assures that the State has accomplished the core duty imposed by the Act: to assert control over the sources of air pollution, and provide a regulatory bulwark against recurrence of unhealthy air pollution. 42 U.S.C. § 7401(a)(3).

The inadequacy of EPA's approach is illuminated by the fate of Sheboygan County – which EPA proposed to re-designate along with, and on the same basis as, Milwaukee-Racine. In Sheboygan County, as in Milwaukee-Racine, EPA observed a decrease in ozone pollution,

coinciding with "reduced" annual emissions of ozone precursors. 77 Fed. Reg. at 6,738 (R.45). EPA described precisely the same "permanent and enforceable" measures adopted in Sheboygan County as it did for Milwaukee-Racine. *Id.* at 6,737 (R.44). *See also* Milwaukee-Racine Request at. 13-14 (R.114-15) (citing same state and federal regulations to demonstrate that reductions are permanent and enforceable in both areas). As it did in Milwaukee-Racine, EPA applied its "practice" of *assuming* that whatever permanent and enforceable measures were enacted necessarily "account[ed] for" the "observed air quality improvement" in Sheboygan County. 77 Fed. Reg. at 45,256 (R.15).

But Sheboygan County did not sustain its improvement in air quality – despite the state and federal measures EPA claimed would render the improvement permanent and enforceable. By the time EPA finalized its decision, "data for the Sheboygan area . . . indicate[d] that the area [was] currently violating the 1997 8-hour ozone standard." 77 Fed. Reg. at 45,252 (R.11). The federal and state regulations in place demonstrably failed to result in permanent and enforceable reductions sufficient to sustain the "improvement in air quality necessary for the area to attain" the standard. *Id.* at 45,258 (R.17).

That failure belies EPA's assumption that the improvement was attributable to those regulations. *Id.* at 45,258 (R.17). And it vividly illustrates the inadequacy of EPA's approach. Ozone levels depend upon a variety of factors – among them the weather, economy, and business decisions by sources of nitrogen oxides and volatile organics. Observed reductions may be the result of those impermanent, unenforceable conditions – or they may result from state and federal regulatory initiatives.

In light of those varying possibilities, EPA cannot rationally assume that improvements in air quality result from state and federal regulations, without separating the effects of those regulations from other influences. Until EPA quantifies the effects of the "permanent and enforceable" measures in place, identifies the emissions reductions necessary to attain the standard, and confirms that the measures in place achieve those necessary reductions – it cannot meet the statute's requirements. 42 U.S.C. § 7407(d)(3)(E)(iii).

D. *In Re-Designating St. Louis and Chicago EPA Failed to Establish the Necessary Causal Connection Between Reduced Ozone Levels and Permanent, Enforceable Measures.*

1. *EPA Relied Upon a Correlation That Does Not Establish Causation.*

EPA similarly failed to undertake the analysis necessary to establish that St. Louis' and Chicago's improved ozone levels were caused by permanent and enforceable measures. As in Milwaukee-Racine, EPA concluded that St. Louis' and Chicago's improved ozone levels were 'permanent and enforceable' solely by establishing a correlation between: (1) a reduction in ozone pollution within St. Louis and Chicago between 2002 and 2008; (2) a reduction in ozone precursors in the nonattainment area during that same period; and (3) the adoption of various regulatory constraints on ozone precursors. 77 Fed. Reg. at 34,822-23 (R.25-26); (EPA "demonstrate[d] permanent and enforceable emissions reductions by comparing nonattainment area emissions," using 2002 as a representative example, "with emissions in the area during the attainment period," "represented by . . . 2008," and confirmed that "a number of permanent and enforceable regulatory control measures" have been implemented) 77 Fed. Reg. at 48,067 (R.6) (same). As in Milwaukee-Racine, that correlation cannot establish

causation unless “other variables are shown be insignificant.” *Radue,* 219 F.3d at 616-17.

But here, ‘other variables’ are decidedly significant, at each stage of EPA’s analysis. Precursor reductions in St. Louis and Chicago between 2002 and 2008 were not solely a function of regulatory measures; they also reflect the effect of other, unrelated influences, including the economic downturn, energy demand, and natural gas prices. Having failed to separate reductions attributable to “permanent and enforceable” regulations from those attributable to temporary conditions, EPA could not rationally infer that St. Louis’s and Chicago’s reduced *precursor* emissions were caused by *regulations,* merely because they coincided with the adoption of those regulations.

And additional variables affect the relationship between *precursor* emissions and *ozone pollution.* Ozone levels are dependent upon weather, as well as the location and timing of reductions in nitrogen oxides and volatile organic compounds. 75 Fed. Reg. at 24,846; *New York v. EPA,* 133 F.3d at 989. As in Milwaukee-Racine, EPA made no effort to address those additional variables, observing only that aggregate, annual precursor emissions had fallen in St. Louis and

Chicago. 77 Fed. Reg. 34,822 & 48,067 (R.25 & R.6). Again, absent some assessment of those additional influences, the Agency's observed correlation between reduced precursor emissions and reduced ozone levels could not reasonably establish causation.[18]

EPA did not, therefore, reasonably determine that the ozone reductions observed in St. Louis and Chicago between 2002 and 2008 were the result of "permanent and enforceable" measures. 42 U.S.C. § 7407(d)(3)(E)(iii). Indeed, like Sheboygan, St. Louis' improved ozone levels proved neither permanent nor enforceable. Shortly after EPA re-designated the area, ozone pollution in St. Louis increased so that the area once again violated the standard, *see* n.12 and accompanying text, *above* – revealing, once again, the faults in EPA's assumption that correlation between improved air quality and regulatory measures

---

[18] As with Milwaukee-Racine's re-designation, EPA claimed that only the portion of emissions reductions "necessary… to attain" the 1997 ozone standard need result from "permanent and enforceable" measures. 77 Fed. Reg. at 34,821 (R.24). But even if so, EPA never determined what precursor reductions (amongst those which had occurred) were "necessary to attain" the standard in St. Louis and Chicago, or what reductions in precursors were attributable to permanent and enforceable measures. *See above* at pp. 49-50.

demonstrates that that the improvement "result[s] from" those measures. 42 U.S.C. § 7407(d)(3)(E)(iii).

2. *Illinois' Submissions Expressly Fail to Establish the Necessary Causation.*

Moreover, the record expressly contradicts EPA's assertion that "nonattainment area [precursor] emissions reductions" between 2002 and 2008 "account for the observed [ozone] air quality improvement" within St. Louis and Chicago. EPA based its decision on Illinois' submission; the record includes no further analysis. And Illinois claimed only that these in-area precursor reductions *contributed* to improved air quality in St. Louis and Chicago. St. Louis Request, Att. 1 at 15 (R.173); Chicago Request at 15 (R.325).

EPA itself acknowledged that precursor reductions within St. Louis and Chicago were insufficient to produce compliance with the ozone standard. It claimed, instead, "Illinois *and upwind areas* have implemented a number of permanent and enforceable regulatory control measures which have reduced emissions and resulted in a corresponding improvement in air quality," sufficient to sustain St. Louis' and Chicago's compliance with the standard. 77 Fed. Reg. at 34,821 (R.24) (emphasis added); 77 Fed. Reg. at 48,067 (R.6) (same).

According to EPA's own interpretation, the Act demands a showing that "permanent and enforceable" measures produce reductions "necessary . . . to attain" the standard. 77 Fed. Reg. at 34,822 & 48,067 (R.25 & R.6). 42 U.S.C. § 7407(d)(3)(E)(iii). But EPA provided nothing to suggest that these unspecified 'upwind' reductions – necessary for St. Louis and Chicago to attain the standard – are permanent or enforceable. EPA did not conduct any analysis of emission reductions from the unidentified "upwind states." EPA did not even compare the emissions from the unidentified "upwind states" in 2002 versus 2008. In other re-designation actions, EPA has at least calculated the upwind reductions that occurred (albeit also without determining whether they were permanent and enforceable). *See, e.g.,* 76 Fed. Reg. 64,825, 64,831-32 (Oct. 19, 2011) (in re-designating Metro-Cincinnati PM2.5 nonattainment area, EPA compares emission decreases in the nonattainment area (Tables 1, 2 and 3) and also emission decreases from "upwind states" allegedly impacting the nonattainment area (Table 4)).

## II. EPA Unlawfully Equated 'Actual' 2008 Emissions With Permanent, Enforceable Reductions.

EPA re-designated Milwaukee-Racine, St. Louis, and Chicago based upon its assumption that 'actual' emissions in 2008 sufficed to demonstrate the statutorily required 'permanent' and 'enforceable' reductions from prior levels. The Agency has long acknowledged that "the language of [42 US.C. 7407(d)(e)(E)(iii)] clearly requires that the emission reductions that were achieved and enabled the area to attain the standard *must be linked to enforceable regulations."* 57 Fed. Reg. 13,498, 13,562 (April 16, 1992) (emphasis added). EPA's interpretative guidance states, accordingly, that in order to ensure that "emission reductions are permanent and enforceable," the agency's "analysis should assume that sources are operating at permitted levels (or historic peak levels) unless evidence is presented that such an assumption is unrealistic." Calcagni Memorandum at 4 (R.86). *Cf.* 77 Fed. Reg. at 45,257 (R.16) (claiming that "longstanding practice and EPA policy" allows EPA to equate change in "actual emissions" with "permanent and enforceable" emissions reductions, without further analysis). *Accord* 77 Fed. Reg. at 34,823 & 48,067 (R.26, R.6). EPA must confirm, in other words, that the reduction in pollution enabling an

area's re-designation can be enforced in the future, or that the reduced emissions levels are otherwise incapable of being exceeded.

In these three decisions, EPA did not provide any 'link to enforceable regulations,' or any other constraint, that might prevent power plants and other similar sources from exceeding the emissions they reported in 2008 in future years. The Agency conceded, rather, that 2008 emissions were below the "maximum allowable" pollution from those plants. 77 Fed. Reg. at 34,823, 45,257 & 48,068 (R.26, R.16, R.7). *See also New York v. EPA,* 413 F.3d 3, 29 (D.C. Cir. 2005) (noting EPA assertion that "typical source operation frequently does result in actual emissions that are below allowable emissions levels"). As a result, the Agency could not reasonably conclude those actual 2008 emissions reflect reductions that are both "permanent" *and* "enforceable." 42 U.S.C. § 7407(d)(3)(E)(iii). *See Loving,* 742 F.3d at 1019*,* ("the conjunctive 'and'" provides "a strong indication that Congress did not intend the requirements as alternatives," even where requirements "are somewhat overlapping")

EPA had no basis to conclude that plants' 2008 emissions levels are 'enforceable'; it identified no means by which those emissions levels can be enforced. *See* 77 Fed. Reg. 64,039, 64,046 (Oct. 18, 2012) ("'[A]ctual

emissions' generally are not enforceable as a practical matter."). And no such basis exists. The permanent reductions attributable to the State's enforceable regulations account for only a fraction of the 'actual reported' precursor reductions. For example, the State's enforceable regulations allow Milwaukee-Racine's power plants, alone, to emit more than six times the nitrogen oxides that EPA ascribed to *all* stationary sources in the area – and more than four times the nitrogen oxides that were emitted during Milwaukee-Racine's non-attainment period. Milwaukee-Racine Comments at 6-7 (R.393-94). In other words, the 'permanent and enforceable' pollution rates are more than four times higher than the actual emissions that occurred even when the area's ozone pollution exceeded the standard.

EPA has consistently recognized that absent a defined regulatory limit prohibiting plants from exceeding a specified emissions level, "enforcement by the States, citizens and EPA would not be effective," and the emissions level cannot be considered "enforceable." 76 Fed. Reg. 758, 762 (Jan. 6, 2011) (emissions level is not enforceable where emissions limit corresponding to that level is "incomplete, vague, or nonexistent"). *See also* 70 Fed. Reg. 39,104, 39,172 (July 6, 2005) (in

order to be "enforceable as a practical matter," emissions must be subject to a limit which has "appropriate averaging times, compliance verification procedures and recordkeeping requirements"); *Loving*, 742 F.3d at 1017 ("[A]n agency's use of a term can be valuable information not only about ordinary usage but also about any specialized meaning that people in the field attach to that term. That is particularly true when, as here, the term is one that the agency uses in a number of contexts."). The Agency's interpretative guidance, accordingly, suggests default use of "permitted," rather than 'actual' levels. Calcagni Memorandum at 4 (R.86). But EPA has identified no emissions limits to prevent plants from exceeding their 2008 emissions levels; those levels consequently cannot be considered 'enforceable.'

And EPA could not reasonably conclude that plants' 2008 emissions were 'permanent'; the record contains no evidence that the plants affecting Milwaukee-Racine, Chicago, and St. Louis would permanently sustain those emissions levels. EPA asserted, *ipse dixit,* that sources "seldom" reach their "maximum allowable emission levels," or "simultaneously operate at maximum capacity," 77 Fed. Reg. at 34,823, 45,257 & 48,068 (R.26, R.16 & R.7). But the record contains nothing to

support that conclusion. *Cf.* Calcagni Memorandum at 4 (R.86) (suggesting that agency should "assume [plants] are operating at permitted levels unless evidence is presented that such an assumption is unrealistic").

And even if such support existed – so what? The record contains nothing to suggest that plants were operating at their 'maximum' levels in 2008 (an unlikely proposition, given the historically poor economic conditions at that time). That plants "seldom" operate at their *maximum* levels provides no insight into whether (and how often) they might exceed their *2008* emissions. EPA has provided no reason at all, accordingly, to support its conclusion that emissions reductions which occurred in 2008 at major sources contributing to ozone in Milwaukee-Racine, St. Louis, and Chicago will be 'permanent.'

The Agency's conclusion that 2008 emissions from power plants and other major point sources demonstrated permanent and enforceable reductions was, accordingly, arbitrary and capricious. 42 U.S.C. § 7407(d)(3)(E)(iii).

## III. In Relying on the $NO_x$ SIP Call, EPA Relied Upon Measures that do Not Provide Permanent and Enforceable Reductions in Any Specific Non-Attainment Area.

EPA relied upon the $NO_x$ SIP Call trading program to create "permanent and enforceable" reductions in ozone levels in Milwaukee-Racine, Chicago and St. Louis. 77 Fed. Reg. at 34,822, 45,259, 48,068 (R25, R.18 & R.7). But that trading program does not create permanent, enforceable reductions in Milwaukee-Racine, Chicago, St. Louis or any other specific location. It allows sources contributing to ozone in such areas to increase their emissions by purchasing allowances from sources elsewhere that are willing to decrease emissions. *See Michigan v. EPA,* 213 F.3d 663, 676 (D.C. Cir. 2000) ("EPA's rule allows for ton-for-ton emissions trading between firms based on allowances determined by each state.").

A source contributing to ozone pollution in Milwaukee-Racine (for example) can, therefore, increase its emissions by purchasing allowances. The corresponding decrease in emissions (at the plant from which the allowances are purchased) may occur anywhere within the program's 22-state trading region, which spans the Midwest and eastern seaboard; it could come from anywhere from Illinois and Ohio,

to Connecticut or New York, to Tennessee and the Carolinas. *Id.* at 669 n.1. That reduction, in turn, could affect any one of thirteen different non-attainment areas, from Alabama to Massachusetts to Indiana – it need not benefit Milwaukee-Racine (or Chicago, or St. Louis). 63 Fed. Reg. at 57,395. As the D.C. Circuit has noted, the "emissions controls" that the program compels "do not correlate directly with each state's relative contribution to a specific downwind nonattainment area." *North Carolina,* 531 F.3d at 908. *See* 63 Fed. Reg. at 57,377 (EPA established only that reductions correlate with ozone levels in "major urban areas" throughout "the northeast, Midwest, and south").

EPA acknowledged that sources contributing to ozone pollution in Milwaukee-Racine, Chicago, or Metro-St. Louis which reduced emissions in response to the $NO_x$ SIP Call may not sustain those reductions in the future; they may "purchas[e]. . . allowances" in order to "increase" their pollution. 77 Fed. Reg. at 34,822, 45,259, 48,066 (R.25, R.18, R.5). The Agency found the reductions 'permanent and enforceable' nevertheless, because the program requires "an emission reduction by another utility," which "will have an air quality benefit

that will compensate, at least in part, for the impact of any emission increase." *Id.*

That rationale fails as a matter of law, and for want of support in the record. As a legal matter, it is not – under EPA's own interpretation of the statute – sufficient that the program 'compensate' in some unknown 'part' for decreases in air quality in the pertinent non-attainment area. Rather, EPA must ensure that "permanent and enforceable reductions in emissions" are in place to ensure the "improvement in air quality necessary for the area to attain" the 1997 ozone standard. 77 Fed. Reg. at 45,258 (R.17). The Act does not state that decreases in ozone may be permanent and enforceable only 'in part' – there must be sufficient reductions to ensure attainment of the standard. *Id.* Having failed to identify the emissions "necessary for the area to attain" the standard, *id.*, or the "reductions attributable" to the $NO_x$ SIP Call (or any other "individual control measure"), *id.* at 45,257 (R.16), EPA cannot satisfy that test.

Second, EPA has no basis in the record – aside from speculation – for its conclusion that the program as a whole will provide *any* permanent benefits in Milwaukee-Racine, St. Louis, and Chicago. The $NO_x$ SIP Call

provides a trading program whose "emissions controls . . . do not correlate directly with each state's relative contribution to a specific downwind nonattainment area." *North Carolina,* 531 F.3d at 908. By EPA's own admission, it never assessed "the location of particular emissions" controlled by the trading program, or the "effects that the emissions have on other areas within the region," even though "[e]missions in some locations may cause greater overall effects than emissions from other locations." 63 Fed. Reg. at 57,459-60.

The program controls only the emissions of the entire region; it assures no benefit to any particular county or area – such as the particular non-attainment areas at issue here. *See North Carolina,* 531 F.3d at 907 (noting that under parallel trading program, "sources in [one state] could purchase enough . . . allowances to cover all their current emissions, resulting in no change in [state's] contribution to" a specific, downwind non-attainment area). Of the 22 states within the trading program, EPA identified only five whose nitrogen oxides emissions contribute significantly to non-attainment of the 1997 ozone standard in Wisconsin as a whole, and six whose emissions affect Illinois as a whole. 63 Fed. Reg. at 57,394 (summarizing EPA

modeling). The program provides nothing to assure that the particular sources responsible for ozone pollution in Wisconsin and Illinois will reduce them, rather than purchase allowances – much less that specific contributions to Milwaukee-Racine, St. Louis, and Chicago will be permanently eliminated. *See Louisiana Envtl. Action Network v. EPA,* 382 F.3d 575, 586-7 (5th Cir. 2004) (rejecting EPA's "naked assertion that reductions [from one area] will reasonably aid [a non-attainment area] in its quest for attainment.").

In *NRDC v. EPA,* the Agency offered a similar contention: that the $NO_x$ SIP Call would "collectively" ensure a reduction in emissions within a specific area, because "most" sources subject to the program would reduce emissions. 571 F.3d at 1257. The D.C. Circuit found this "bare assertion" insufficient to meet the Act's demand for "reductions from sources in the area." *Id.* The Circuit reasoned that "[e]ven if most sources in a nonattainment area installed controls rather than purchasing allowances, a small number of sources purchasing allowances and increasing emissions could mean that overall emissions from sources in the area remained unchanged or even increased." *Id.* *See also* 79 Fed. Reg. 13,415, 13897 (June 9, 2014) ("Implicit in a

regional cap-and-trade program is that some sources may elect to use allowances in lieu of emissions controls to meet the regional emissions reductions requirements, and that those elections could change year to year.").

Here, the Act does not demand reductions from sources within the non-attainment area (as it did in *NRDC)*. EPA may rely on reductions at sources outside the area – but only so long as they result in lower ozone levels in the specific area being re-designated. *Compare* 42 U.S.C. § 7407(d)(3)(E)(iii) (allowing agency to rely upon any "permanent and enforceable" reductions) *with* 42 U.S.C. § 7502(c)(1) (requiring reductions "from existing sources in the area"). The basic flaw in EPA's rationale is consequently the same as that identified in *NRDC*: both statutory provisions demand specificity, and the $NO_x$ SIP Call's trading program does not ensure "reductions in emissions from sources within" *any* specific area. 571 F.3d at 1256-7. EPA therefore cannot rely on that program to secure reductions from sources *contributing* to a specific non-attainment area, any more than it can rely on the program for reductions from sources *within* an area.

EPA has provided nothing to demonstrate that the $NO_x$ SIP Call produces a permanent, enforceable "improvement in air quality" sufficient to sustain Milwaukee-Racine's, Chicago's, and St. Louis' compliance with the 1997 ozone standard. For that reason, EPA's re-designation of the area fails to meet the standards of the Act, 42 U.S.C. § 7407(d)(3)(E)(iii).

## CONCLUSION

For the above stated reasons, Sierra Club requests that this Court vacate EPA's final actions re-designating the Milwaukee-Racine, Chicago and St. Louis areas.

Respectfully submitted on July 16, 2014,

By: /s/ Sanjay Narayan

Sanjay Narayan
Sierra Club Environmental Law Program
85 Second St., 2d Floor
San Francisco, California 94105
(415) 977-5769
sanjay.narayan@sierraclub.org

Robert Ukeiley
Law Office of Robert Ukeiley
507 Center St.
Berea, Kentucky 40403
(859) 986-5402
rukeiley@igc.org

///
///

David C. Bender
McGillivray Westerberg & Bender LLC
211 S. Paterson St., Suite 320
Madison, Wisconsin 53703
(608) 310-3560
bender@mwbattorneys.com

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), and this Court's order of July 2, 2014. It contains 12,915 words, excluding the parts of the brief exempted by Fed. R. App. Proc. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in Century Schoolbook 14-point font.

By: /s/ Sanjay Narayan

Sanjay Narayan
Attorney for Petitioner

Dated: July 16, 2014

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the Required Short Appendix.

By: /s/ Sanjay Narayan

Sanjay Narayan
Attorney for Petitioner

Dated: July 16, 2014

# STATUTORY ADDENDUM

## § 7407. Air quality control regions

### (a) Responsibility of each State for air quality; submission of implementation plan

Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.

### (b) Designated regions

For purposes of developing and carrying out implementation plans under section 7410 of this title—

(1) an air quality control region designated under this section before December 31, 1970, or a region designated after such date under subsection (c) of this section, shall be an air quality control region; and

(2) the portion of such State which is not part of any such designated region shall be an air quality control region, but such portion may be subdivided by the State into two or more air quality control regions with the approval of the Administrator.

### (c) Authority of Administrator to designate regions; notification of Governors of affected States

The Administrator shall, within 90 days after December 31, 1970, after consultation with appropriate State and local authorities, designate as an air quality control region any interstate area or major intrastate area which he deems necessary or appropriate for the attainment and maintenance of ambient air quality standards. The Administrator shall immediately notify the Governors of the affected States of any designation made under this subsection.

### (d) Designations

#### (1) Designations generally

##### (A) Submission by Governors of initial designations following promulgation of new or revised standards

By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as—

(i) nonattainment, any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

(ii) attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

(iii) unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant.

The Administrator may not require the Governor to submit the required list sooner than 120 days after promulgating a new or revised national ambient air quality standard.

##### (B) Promulgation by EPA of designations

(i) Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) submitted under subparagraph (A) as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations.

(ii) In making the promulgations required under clause (i), the Administrator may make such modifications as the Administrator deems necessary to the designations of the areas (or portions thereof) submitted under subparagraph (A) (including to the boundaries of such areas or portions thereof). Whenever the Administrator intends to make a modification, the Administrator shall notify the State and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate. The Administrator shall give such notification no later than 120 days before the date the Administrator promulgates the designation, including any modification thereto. If the Governor fails to submit the list in whole or in part, as required under subparagraph (A), the Administrator shall promulgate the designation that the Administrator deems appropriate for any area (or portion thereof) not designated by the State.

(iii) If the Governor of any State, on the Governor's own motion, under subparagraph (A), submits a list of areas (or portions thereof) in the State designated as nonattainment, attainment, or unclassifiable, the Administrator shall act on such designations in accordance with the procedures under paragraph (3) (relating to redesignation).

(iv) A designation for an area (or portion thereof) made pursuant to this subsection shall remain in effect until the area (or portion thereof) is redesignated pursuant to paragraph (3) or (4).

##### (C) Designations by operation of law

(i) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(A), (B), or (C) of this subsection (as in effect immediately before November 15, 1990) is designated, by operation of law, as a nonattainment area for such pollutant within the meaning of subparagraph (A)(i).

(ii) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(E) (as in effect immediately before November 15, 1990) is designated by operation of law, as an attainment area for such pollutant within the meaning of subparagraph (A)(ii).

(iii) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(D) (as in effect immediately before November 15, 1990) is designated, by operation of law, as an unclassifiable area for such pollutant within the meaning of subparagraph (A)(iii).

**(2) Publication of designations and redesignations**

(A) The Administrator shall publish a notice in the Federal Register promulgating any designation under paragraph (1) or (5), or announcing any designation under paragraph (4), or promulgating any redesignation under paragraph (3).

(B) Promulgation or announcement of a designation under paragraph (1), (4) or (5) shall not be subject to the provisions of sections 553 through 557 of title 5 (relating to notice and comment), except nothing herein shall be construed as precluding such public notice and comment whenever possible.

**(3) Redesignation**

(A) Subject to the requirements of subparagraph (E), and on the basis of air quality data, planning and control considerations, or any other air quality-related considerations the Administrator deems appropriate, the Administrator may at any time notify the Governor of any State that available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised. In issuing such notification, which shall be public, to the Governor, the Administrator shall provide such information as the Administrator may have available explaining the basis for the notice.

(B) No later than 120 days after receiving a notification under subparagraph (A), the Governor shall submit to the Administrator such redesignation, if any, of the appropriate area (or areas) or portion thereof within the State or interstate area, as the Governor considers appropriate.

(C) No later than 120 days after the date described in subparagraph (B) (or paragraph (1)(B)(iii)), the Administrator shall promulgate the redesignation, if any, of the area or portion thereof, submitted by the Governor in accordance with subparagraph (B), making such modifications as the Administrator may deem necessary, in the same manner and under the same procedure as is applicable under clause (ii) of paragraph (1)(B), except that the phrase ‘‘60 days’’ shall be substituted for the phrase ‘‘120 days’’ in that clause. If the Governor does not submit, in accordance with subparagraph (B), a redesignation for an area (or portion thereof) identified by the Administrator under subparagraph (A), the Administrator shall promulgate such redesignation, if any, that the Administrator deems appropriate.

(D) The Governor of any State may, on the Governor's own motion, submit to the Administrator a revised designation of any area or portion thereof within the State. Within 18 months of receipt of a complete State redesignation submittal, the Administrator shall approve or deny such redesignation. The submission of a redesignation by a Governor shall not affect the effectiveness or enforceability of the applicable implementation plan for the State.

(E) The Administrator may not promulgate a redesignation of a nonattainment area (or portion thereof) to attainment unless—

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

(iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

(v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D of this subchapter.

(F) The Administrator shall not promulgate any redesignation of any area (or portion thereof) from nonattainment to unclassifiable.

**(4) Nonattainment designations for ozone, carbon monoxide and particulate matter (PM–10)**

**(A) Ozone and carbon monoxide**

(i) Within 120 days after November 15, 1990, each Governor of each State shall submit to the Administrator a list that designates, affirms or reaffirms the designation of, or redesignates (as the case may be), all areas (or portions thereof) of the Governor's State as attainment, nonattainment, or unclassifiable with respect to the national ambient air quality standards for ozone and carbon monoxide.

(ii) No later than 120 days after the date the Governor is required to submit the list of areas (or portions thereof) required under clause (i) of this subparagraph, the Administrator shall promulgate such designations, making such modifications as the Administrator may deem necessary, in the same manner, and under the same procedure, as is applicable under clause (ii) of paragraph (1)(B), except that the phrase ‘‘60 days’’ shall be substituted for the phrase ‘‘120 days’’ in that clause. If the Governor does not submit, in accordance with clause (i) of this subparagraph, a designation for an area (or portion thereof), the Administrator shall promulgate the designation that the Administrator deems appropriate.

(iii) No nonattainment area may be redesignated as an attainment area under this subparagraph.

(iv) Notwithstanding paragraph (1)(C)(ii) of this subsection, if an ozone or carbon monoxide nonattainment area located within a metropolitan statistical area or consolidated metropolitan statistical area (as established

by the Bureau of the Census) is classified under part D of this subchapter as a Serious, Severe, or Extreme Area, the boundaries of such area are hereby revised (on the date 45 days after such classification) by operation of law to include the entire metropolitan statistical area or consolidated metropolitan statistical area, as the case may be, unless within such 45-day period the Governor (in consultation with State and local air pollution control agencies) notifies the Administrator that additional time is necessary to evaluate the application of clause (v). Whenever a Governor has submitted such a notice to the Administrator, such boundary revision shall occur on the later of the date 8 months after such classification or 14 months after November 15, 1990, unless the Governor makes the finding referred to in clause (v), and the Administrator concurs in such finding, within such period. Except as otherwise provided in this paragraph, a boundary revision under this clause or clause (v) shall apply for purposes of any State implementation plan revision required to be submitted after November 15, 1990.

(v) Whenever the Governor of a State has submitted a notice under clause (iv), the Governor, in consultation with State and local air pollution control agencies, shall undertake a study to evaluate whether the entire metropolitan statistical area or consolidated metropolitan statistical area should be included within the nonattainment area. Whenever a Governor finds and demonstrates to the satisfaction of the Administrator, and the Administrator concurs in such finding, that with respect to a portion of a metropolitan statistical area or consolidated metropolitan statistical area, sources in the portion do not contribute significantly to violation of the national ambient air quality standard, the Administrator shall approve the Governor's request to exclude such portion from the nonattainment area. In making such finding, the Governor and the Administrator shall consider factors such as population density, traffic congestion, commercial development, industrial development, meteorological conditions, and pollution transport.

**(B) PM–10 designations**

By operation of law, until redesignation by the Administrator pursuant to paragraph (3)—

(i) each area identified in 52 Federal Register 29383 (Aug. 7, 1987) as a Group I area (except to the extent that such identification was modified by the Administrator before November 15, 1990) is designated nonattainment for PM–10;

(ii) any area containing a site for which air quality monitoring data show a violation of the national ambient air quality standard for PM–10 before January 1, 1989 (as determined under part 50, appendix K of title 40 of the Code of Federal Regulations) is hereby designated nonattainment for PM–10; and

(iii) each area not described in clause (i) or (ii) is hereby designated unclassifiable for PM–10.

Any designation for particulate matter (measured in terms of total suspended particulates) that the Administrator promulgated pursuant to this subsection (as in effect immediately before November 15, 1990) shall remain in effect for purposes of implementing the maximum allowable increases in concentrations of particulate matter (measured in terms of total suspended particulates) pursuant to section 7473(b) of this title, until the Administrator determines that such designation is no longer necessary for that purpose.

**(5) Designations for lead**

The Administrator may, in the Administrator's discretion at any time the Administrator deems appropriate, require a State to designate areas (or portions thereof) with respect to the national ambient air quality standard for lead in effect as of November 15, 1990, in accordance with the procedures under subparagraphs (A) and (B) of paragraph (1), except that in applying subparagraph (B)(i) of paragraph (1) the phrase "2 years from the date of promulgation of the new or revised national ambient air quality standard" shall be replaced by the phrase "1 year from the date the Administrator notifies the State of the requirement to designate areas with respect to the standard for lead".

**(6) Designations**

**(A) Submission**

Notwithstanding any other provision of law, not later than February 15, 2004, the Governor of each State shall submit designations referred to in paragraph (1) for the July 1997 $PM_{2.5}$ national ambient air quality standards for each area within the State, based on air quality monitoring data collected in accordance with any applicable Federal reference methods for the relevant areas.

**(B) Promulgation**

Notwithstanding any other provision of law, not later than December 31, 2004, the Administrator shall, consistent with paragraph (1), promulgate the designations referred to in subparagraph (A) for each area of each State for the July 1997 $PM_{2.5}$ national ambient air quality standards.

**(7) Implementation plan for regional haze**

**(A) In general**

Notwithstanding any other provision of law, not later than 3 years after the date on which the Administrator promulgates the designations referred to in paragraph (6)(B) for a State, the State shall submit, for the entire State, the State implementation plan revisions to meet the requirements promulgated by the Administrator under section 7492(e)(1) of this title (referred to in this paragraph as "regional haze requirements").

**(B) No preclusion of other provisions**

Nothing in this paragraph precludes the implementation of the agreements and rec-

ommendations stemming from the Grand Canyon Visibility Transport Commission Report dated June 1996, including the submission of State implementation plan revisions by the States of Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, or Wyoming by December 31, 2003, for implementation of regional haze requirements applicable to those States.

**(e) Redesignation of air quality control regions**

(1) Except as otherwise provided in paragraph (2), the Governor of each State is authorized, with the approval of the Administrator, to redesignate from time to time the air quality control regions within such State for purposes of efficient and effective air quality management. Upon such redesignation, the list under subsection (d) of this section shall be modified accordingly.

(2) In the case of an air quality control region in a State, or part of such region, which the Administrator finds may significantly affect air pollution concentrations in another State, the Governor of the State in which such region, or part of a region, is located may redesignate from time to time the boundaries of so much of such air quality control region as is located within such State only with the approval of the Administrator and with the consent of all Governors of all States which the Administrator determines may be significantly affected.

(3) No compliance date extension granted under section 7413(d)(5)[1] of this title (relating to coal conversion) shall cease to be effective by reason of the regional limitation provided in section 7413(d)(5)[1] of this title if the violation of such limitation is due solely to a redesignation of a region under this subsection.

(July 14, 1955, ch. 360, title I, § 107, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1678; amended Pub. L. 95–95, title I, § 103, Aug. 7, 1977, 91 Stat. 687; Pub. L. 101–549, title I, § 101(a), Nov. 15, 1990, 104 Stat. 2399; Pub. L. 108–199, div. G, title IV, § 425(a), Jan. 23, 2004, 118 Stat. 417.)

REFERENCES IN TEXT

Section 7413 of this title, referred to in subsec. (e)(3), was amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsec. (d) of section 7413 no longer relates to final compliance orders.

CODIFICATION

Section was formerly classified to section 1857c–2 of this title.

PRIOR PROVISIONS

A prior section 107 of act July 14, 1955, as added Nov. 21, 1967, Pub. L. 90–148, § 2, 81 Stat. 490, related to air quality control regions and was classified to section 1857c–2 of this title, prior to repeal by Pub. L. 91–604.

Another prior section 107 of act July 14, 1955, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 399, was renumbered section 111 by Pub. L. 90–148 and is classified to section 7411 of this title.

AMENDMENTS

2004—Subsec. (d)(6), (7). Pub. L. 108–199 added pars. (6) and (7).

1990—Subsec. (d). Pub. L. 101–549 amended subsec. (d) generally, substituting present provisions for provisions which required States to submit lists of regions not in compliance on Aug. 7, 1977, with certain air quality standards to be submitted to the Administrator, and which authorized States to revise and resubmit such lists from time to time.

1977—Subsecs. (d), (e). Pub. L. 95–95 added subsecs. (d) and (e).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

OZONE AND PARTICULATE MATTER STANDARDS

Pub. L. 108–199, div. G, title IV, § 425(b), Jan. 23, 2004, 118 Stat. 417, provided that: ''Except as provided in paragraphs (6) and (7) of section 107(d) of the Clean Air Act [subsec. (d)(6), (7) of this section] (as added by subsection (a)), section 6101, subsections (a) and (b) of section 6102, and section 6103 of the Transportation Equity Act for the 21st Century [Pub. L. 105–178] (42 U.S.C. 7407 note; 112 Stat. 463), as in effect on the day before the date of enactment of this Act [Jan. 23, 2004], shall remain in effect.''

Pub. L. 105–178, title VI, June 9, 1998, 112 Stat. 463, as amended by Pub. L. 109–59, title VI, § 6012(a), Aug. 10, 2005, 119 Stat. 1882, provided that:

''SEC. 6101. FINDINGS AND PURPOSE.

''(a) The Congress finds that—

''(1) there is a lack of air quality monitoring data for fine particle levels, measured as $PM_{2.5}$, in the United States and the States should receive full funding for the monitoring efforts;

''(2) such data would provide a basis for designating areas as attainment or nonattainment for any $PM_{2.5}$ national ambient air quality standards pursuant to the standards promulgated in July 1997;

''(3) the President of the United States directed the Administrator of the Environmental Protection Agency (referred to in this title as the 'Administrator') in a memorandum dated July 16, 1997, to complete the next periodic review of the particulate matter national ambient air quality standards by July 2002 in order to determine 'whether to revise or maintain the standards';

''(4) the Administrator has stated that 3 years of air quality monitoring data for fine particle levels, measured as $PM_{2.5}$ and performed in accordance with any applicable Federal reference methods, is appropriate for designating areas as attainment or nonattainment pursuant to the July 1997 promulgated standards; and

''(5) the Administrator has acknowledged that in drawing boundaries for attainment and nonattainment areas for the July 1997 ozone national air quality standards, Governors would benefit from considering implementation guidance from EPA on drawing area boundaries.

''(b) The purposes of this title are—

''(1) to ensure that 3 years of air quality monitoring data regarding fine particle levels are gathered for use in the determination of area attainment or nonattainment designations respecting any $PM_{2.5}$ national ambient air quality standards;

''(2) to ensure that the Governors have adequate time to consider implementation guidance from EPA on drawing area boundaries prior to submitting area designations respecting the July 1997 ozone national ambient air quality standards;

''(3) to ensure that the schedule for implementation of the July 1997 revisions of the ambient air quality standards for particulate matter and the schedule for the Environmental Protection Agency's visibility regulations related to regional haze are consistent with the timetable for implementation of such particulate matter standards as set forth in the President's Implementation Memorandum dated July 16, 1997.

[1] See References in Text note below.

''SEC. 6102. PARTICULATE MATTER MONITORING PROGRAM.

''(a) Through grants under section 103 of the Clean Air Act [42 U.S.C. 7403] the Administrator of the Environmental Protection Agency shall use appropriated funds no later than fiscal year 2000 to fund 100 percent of the cost of the establishment, purchase, operation and maintenance of a $PM_{2.5}$ monitoring network necessary to implement the national ambient air quality standards for $PM_{2.5}$ under section 109 of the Clean Air Act [42 U.S.C. 7409]. This implementation shall not result in a diversion or reprogramming of funds from other Federal, State or local Clean Air Act activities. Any funds previously diverted or reprogrammed from section 105 Clean Air Act [42 U.S.C. 7405] grants for $PM_{2.5}$ monitors must be restored to State or local air programs in fiscal year 1999.

''(b) EPA and the States, consistent with their respective authorities under the Clean Air Act [42 U.S.C. 7401 et seq.], shall ensure that the national network (designated in subsection (a)) which consists of the $PM_{2.5}$ monitors necessary to implement the national ambient air quality standards is established by December 31, 1999.

''(c)(1) The Governors shall be required to submit designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 $PM_{2.5}$ national ambient air quality standard within 1 year after receipt of 3 years of air quality monitoring data performed in accordance with any applicable Federal reference methods for the relevant areas. Only data from the monitoring network designated in subsection (a) and other Federal reference method $PM_{2.5}$ monitors shall be considered for such designations. Nothing in the previous sentence shall be construed as affecting the Governor's authority to designate an area initially as nonattainment, and the Administrator's authority to promulgate the designation of an area as nonattainment, under section 107(d)(1) of the Clean Air Act, based on its contribution to ambient air quality in a nearby nonattainment area.

''(2) For any area designated as nonattainment for the July 1997 $PM_{2.5}$ national ambient air quality standard in accordance with the schedule set forth in this section, notwithstanding the time limit prescribed in paragraph (2) of section 169B(e) of the Clean Air Act [42 U.S.C. 7492(e)(2)], the Administrator shall require State implementation plan revisions referred to in such paragraph (2) to be submitted at the same time as State implementation plan revisions referred to in section 172 of the Clean Air Act [42 U.S.C. 7502] implementing the revised national ambient air quality standard for fine particulate matter are required to be submitted. For any area designated as attainment or unclassifiable for such standard, the Administrator shall require the State implementation plan revisions referred to in such paragraph (2) to be submitted 1 year after the area has been so designated. The preceding provisions of this paragraph shall not preclude the implementation of the agreements and recommendations set forth in the Grand Canyon Visibility Transport Commission Report dated June 1996.

''(d) The Administrator shall promulgate the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 $PM_{2.5}$ national ambient air quality standard by the earlier of 1 year after the initial designations required under subsection (c)(1) are required to be submitted or December 31, 2005.

''(e) FIELD STUDY.—Not later than 2 years after the date of enactment of the SAFETEA–LU [Aug. 10, 2005], the Administrator shall—

''(1) conduct a field study of the ability of the $PM_{2.5}$ Federal Reference Method to differentiate those particles that are larger than 2.5 micrometers in diameter;

''(2) develop a Federal reference method to measure directly particles that are larger than 2.5 micrometers in diameter without reliance on subtracting from coarse particle measurements those particles that are equal to or smaller than 2.5 micrometers in diameter;

''(3) develop a method of measuring the composition of coarse particles; and

''(4) submit a report on the study and responsibilities of the Administrator under paragraphs (1) through (3) to—

''(A) the Committee on Energy and Commerce of the House of Representatives; and

''(B) the Committee on Environment and Public Works of the Senate.

''SEC. 6103. OZONE DESIGNATION REQUIREMENTS.

''(a) The Governors shall be required to submit the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] within 2 years following the promulgation of the July 1997 ozone national ambient air quality standards.

''(b) The Administrator shall promulgate final designations no later than 1 year after the designations required under subsection (a) are required to be submitted.

''SEC. 6104. ADDITIONAL PROVISIONS.

''Nothing in sections 6101 through 6103 shall be construed by the Administrator of Environmental Protection Agency or any court, State, or person to affect any pending litigation or to be a ratification of the ozone or $PM_{2.5}$ standards.''

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7408. Air quality criteria and control techniques

### (a) Air pollutant list; publication and revision by Administrator; issuance of air quality criteria for air pollutants

(1) For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after December 31, 1970, publish, and shall from time to time thereafter revise, a list which includes each air pollutant—

(A) emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare;

(B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing filing was electronically filed with the Clerk of the United States Court of Appeals for the Seventh Circuit on July 16, 2014, using the CM/ECF system, which will send notification of said filing to the attorneys of record registered with the Court's CM/ECF system.

By: /s/ Sanjay Narayan

Sanjay Narayan
Attorney for Petitioner

Dated: July 16, 2014

Nos. 12-2853, 12-3142 & 12-3143

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

---

SIERRA CLUB,

*Petitioner*,

v.

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents*.

---

PETITIONS FOR REVIEW OF FINAL AGENCY ACTIONS OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

---

# PETITIONER'S REQUIRED SHORT APPENDIX

---


Sanjay Narayan
Sierra Club
Environmental Law Program
85 Second Street, 2d Floor
San Francisco, CA 94105
(415) 977-5769
(415) 977-5793 (fax)
sanjay.narayan@sierraclub.org

David C. Bender
McGillivray Westerberg
& Bender LLC
211 S. Paterson St., Suite 320
Madison, WI 53703
(608) 310-3560
(608) 310-3561 (fax)
bender@mwbattorneys.com

Robert Ukeiley
Law Office of Robert Ukeiley
507 Center Street
Berea, KY 40403
(859) 986-5402
rukeiley@igc.org

*Attorneys for Petitioner, Sierra Club*

## TABLE OF CONTENTS FOR PETITIONER'S REQUIRED SHORT APPENDIX[1]

**Document No.**

### A. Notices Concerning the Challenged Rulemakings

1. Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Illinois; Ozone, Final Rule, 77 Fed. Reg. 48,062 (Aug. 13, 2012)……….**R.1**

2. Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Wisconsin; Redesignation of the Milwaukee-Racine Area to Attainment for 1997 8-Hour Ozone Standard. Final Rule, 77 Fed. Reg. 45,252 (July 31, 2012)………………………………………**R.11**

3. Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Illinois; Redesignation of the Illinois Portion of the St. Louis MO-IL Area to Attainment for the 1997 8-hour Ozone Standard, Final Rule, 77 Fed. Reg. 34,819 (June 12, 2012). …………………………**R.22**

4. Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Wisconsin; Redesignation of the Milwaukee-Racine and Sheboygan Areas to Attainment for 1997 8-Hour Ozone Standard. Proposed Rule, 77 Fed. Reg. 6,727 (Feb. 9, 2012) ……………………………………………………………………**R.34**

5. Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Illinois;

[1] This appendix contains the materials required by Federal Rule of Appellate Procedure (F.R.A.P.) 30, and Seventh Circuit Rule 30(a) & (b).

Ozone, Proposed Rule, 77 Fed. Reg. 6,743 (Feb. 9, 2012) ……………………………………………………………………….**R.50**

6. Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Illinois; Redesignation of the Illinois Portion of the St. Louis MO-IL Area to Attainment for the 1997 8-hour Ozone Standard, Proposed Rule, 75 Fed. Reg. 79,579 (Dec. 22, 2011). ……………………..**R.68**

**ACTION:** Final rule; correction.

**SUMMARY:** This document corrects errors in the amendatory instructions and paragraph heading regarding EPA's limited approval of Pennsylvania's Regional Haze State Implementation Plan (SIP).

**DATES:** *Effective Date:* August 13, 2012.

**FOR FURTHER INFORMATION CONTACT:** Melissa Linden, (215) 814–2096 or by email at *linden.melissa@.epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document wherever "we," "us," or "our" are used we mean EPA. On July 13, 2012 (77 FR 41279), we published a final rulemaking action announcing our limited approval of Pennsylvania's Regional Haze SIP. In this document, we inadvertently provided an incorrect amendatory instruction on page 41284 regarding the addition of an entry to § 52.2020(e)(1), and also omitted a paragraph heading. This action corrects both the erroneous amendatory instruction and the omitted paragraph heading in part 52 for this paragraph.

In rule document 2012–16428, published in the **Federal Register** on July 13, 2012 (77 FR 41279), the following corrections are made:

**§ 52.2020 [Corrected]**

■ 1. On page 41284 in the third column, amendatory instruction number 2 is revised to read as follows:

"2. In § 52.2020, the table in paragraph (e)(1) is amended by adding an entry for Regional Haze Plan at the end of the table to read as follows:"

■ 2. On page 41284 in the third column, the paragraph designation is revised from "(e)" to "(e)(1)."

Section 553 of the Administrative Procedure Act, 5 U.S.C. 553(b)(3)(B), provides that, when an agency for good cause finds that notice and public procedure are impracticable, unnecessary or contrary to the public interest, the agency may issue a rule without providing notice and an opportunity for public comment. We have determined that there is good cause for making today's rule final without prior proposal and opportunity for comment because we are merely correcting an incorrect citation in a previous action. Thus, notice and public procedure are unnecessary. We find that this constitutes good cause under 5 U.S.C. 553(b)(3)(B).

**Statutory and Executive Order Reviews**

Under Executive Order (E.O.) 12866 (58 FR 51735, October 4, 1993), this action is not a "significant regulatory action" and is therefore not subject to review by the Office of Management and Budget. For this reason, this action is also not subject to Executive Order 13211, "Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use" (66 FR 28355 (May 22, 2001)). Because the agency has made a "good cause" finding that this action is not subject to notice-and-comment requirements under the Administrative Procedures Act or any other statute as indicated in the Supplementary Information section above, it is not subject to the regulatory flexibility provisions of the Regulatory Flexibility Act (5 U.S.C. 601 et seq.), or to sections 202 and 205 of the Unfunded Mandates Reform Act of 1995 (UMRA) (Pub. L. 104–4). In addition, this action does not significantly or uniquely affect small governments or impose a significant intergovernmental mandate, as described in sections 203 and 204 of UMRA. This rule also does not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes, as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), nor will it have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of governments, as specified by Executive Order 13132 (64 FR 43255, August 10, 1999). This rule also is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997), because it is not economically significant.

This technical correction action does not involve technical standards; thus the requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) do not apply. The rule also does not involve special consideration of environmental justice related issues as required by Executive Order 12898 (59 FR 7629, February 16, 1994). In issuing this rule, EPA has taken the necessary steps to eliminate drafting errors and ambiguity, minimize potential litigation, and provide a clear legal standard for affected conduct, as required by section 3 of Executive Order 12988 (61 FR 4729, February 7, 1996). EPA has complied with Executive Order 12630 (53 FR 8859, March 15, 1998) by examining the takings implications of the rule in accordance with the "Attorney General's Supplemental Guidelines for the Evaluation of Risk and Avoidance of Unanticipated Takings" issued under the executive order. This rule does not impose an information collection burden under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.).

The Congressional Review Act (5 U.S.C. 801 et seq.), as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. Section 808 allows the issuing agency to make a rule effective sooner than otherwise provided by the CRA if the agency makes a good cause finding that notice and public procedure is impracticable, unnecessary or contrary to the public interest. This determination must be supported by a brief statement. 5 U.S.C. 808(2). As stated previously, EPA had made such a good cause finding, including the reasons therefore, and established an effective date of August 13, 2012. EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. This correction for 40 CFR part 52, subpart NN (Pennsylvania) is not a "major rule" as defined by 5 U.S.C. 804(2).

Dated: July 23, 2012.

**W.C. Early,**

*Acting Regional Administrator, EPA Region III.*

[FR Doc. 2012–19044 Filed 8–10–12; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 52 and 81

**[EPA–R05–OAR–2009–0666; FRL–9712–8]**

## Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Illinois; Ozone

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is approving a request from the State of Illinois to redesignate the Illinois portion of the Chicago-Gary-Lake County, Illinois-Indiana (IL–IN) area (the Greater Chicago area) to attainment of the 1997 8-hour ozone National Ambient Air Quality Standard (NAAQS or standard). The Illinois portion of the Greater Chicago area includes Cook, DuPage, Kane, Lake,

McHenry, and Will Counties and portions of Grundy (Aux Sable and Goose Lake Townships) and Kendall (Oswego Township) Counties. The Illinois Environmental Protection Agency (IEPA) submitted this request on July 23, 2009, and supplemented its request on September 16, 2011. In addition to approval of Illinois' ozone redesignation request, EPA is: (1) Approving the State's plan for maintaining the 1997 8-hour ozone standard through 2025 and the State's 2002 Volatile Organic Compound (VOC) and Nitrogen Oxides (NOx) emission inventories, as revisions to the Illinois State Implementation Plan (SIP) for the Illinois portion of the Greater Chicago area; and (2) approving and finding adequate the State's 2008 and 2025 VOC and NOx Motor Vehicle Emission Budgets (MVEBs).

**DATES:** This final rule is effective August 13, 2012.

**ADDRESSES:** EPA has established a docket for this action: Docket ID No. EPA–R05–OAR–2009–0666. All documents in the docket are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, i.e., Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket material is available either electronically in *www.regulations.gov* or in hard copy at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. We recommend that you telephone Edward Doty, Environmental Scientist, at (312) 886–6057 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:**
Edward Doty, Environmental Scientist, Attainment Planning and Maintenance Section, Air Programs Branch, U.S. Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 886–6057, *doty.edward@epa.gov.*

**SUPPLEMENTARY INFORMATION:**
Throughout this document whenever "we," "us," or "our" is used, we mean EPA. This supplementary information section is arranged as follows:

**Table of Contents**

I. What is the background for this rule?
II. What comments did we receive on the proposed rule?
III. What actions is EPA taking?
IV. Statutory and Executive Order Reviews

## I. What is the background for this rule?

On July 18, 1997 (62 FR 38856), EPA promulgated an 8-hour ozone standard of 0.08 parts per million (ppm) (85 parts per billion (ppb) or higher exceeds the standard). EPA published a final rule designating and classifying areas under the 1997 8-hour ozone NAAQS on April 30, 2004 (69 FR 23857). In that rulemaking, the Greater Chicago area was designated as nonattainment for the ozone standard. This area was classified as a moderate nonattainment area under subpart 2 of the Clean Air Act (CAA).

On July 23, 2009, IEPA requested redesignation of the Illinois portion of the Greater Chicago area to attainment of the 1997 8-hour ozone standard based on ozone data for the period of 2006–2008. On September 16, 2011, IEPA supplemented the original ozone redesignation request, submitting ozone data for the period of 2008–2010, revising the mobile source emission estimates using EPA's on-road mobile source emissions model, MOVES, and extending the demonstration of maintenance of the ozone standard through 2025, with new MVEBs, but without emission reductions resulting from implementation of EPA's Clean Air Interstate Rule (CAIR).

On March 12, 2010, EPA issued a final rulemaking determining that the entire Chicago-Gary-Lake County, IL-IN area had attained the 1997 8-hour ozone NAAQS based on three years of complete, quality-assured ozone data for the period of 2006–2008, and continuing through 2009 [1] (75 FR 12088). On May 11, 2010, EPA issued a final rulemaking redesignating the Indiana portion (Lake and Porter Counties) of the Chicago-Gary-Lake County, IL-IN area to attainment of the 1997 8-hour ozone NAAQS (75 FR 26118).

On February 9, 2012 (77 FR 6743), EPA issued a notice of rulemaking proposing to approve Illinois' request to redesignate the Illinois portion of the Greater Chicago area to attainment of the 1997 8-hour ozone standard, as well as proposing to approve Illinois' ten-year ozone maintenance plan for the area, VOC and NOx MVEBs, and 2002 VOC and NOx emission inventories as revisions of the Illinois SIP. This proposed rulemaking sets forth the basis for determining that Illinois' redesignation request meets the CAA requirements for redesignation for the 1997 8-hour ozone NAAQS. Complete, quality-assured air quality monitoring data in the Greater Chicago area for 2008–2010 and for 2009–2011 show that this area is currently attaining the 1997 8-hour ozone NAAQS. Preliminary data available to date for 2012 are consistent with continued attainment of the 1997 8-hour ozone NAAQS. The quality-assured ozone data in the Greater Chicago area were discussed in the February 9, 2012, proposed rule for this rulemaking (77 FR 6747). Table 1 summarizes the 2009–2011 annual fourth high ozone concentrations and 2009–2011 ozone design values (three-year averages of the annual fourth high daily maximum 8-hour ozone concentrations) for each of the monitoring sites in the Greater Chicago area. These and other ozone data for the Greater Chicago area are also documented at EPA's Web site *http://www.epa.gov/airdata/ad_rep_mon.html.*

TABLE 1—ANNUAL FOURTH HIGH OZONE CONCENTRATIONS AND THREE-YEAR AVERAGES FOR 2009–2011 (CONCENTRATIONS IN PARTS PER MILLION (PPM))

| Site Name (site code) | County | 2009 | 2010 | 2011 | Three-year average |
|---|---|---|---|---|---|
| 4500 W. 123rd Street, Alsip (170310001) | Cook | 0.069 | 0.073 | 0.071 | 0.071 |
| 3300 E. Cheltenham, Chicago (170310032) | Cook | 0.065 | 0.074 | 0.079 | 0.073 |
| Wacker At Adams, Chicago (170310042) | Cook | 0.076 | 0.077 | No Data | |
| 5720 S. Ellis Avenue, Chicago (170310064) | Cook | 0.060 | 0.071 | 0.074 | 0.068 |
| 1000 E. Ohio, Chicago (170310072) | Cook | 0.062 | 0.075 | 0.074 | 0.070 |
| 7801 Lawndale, Chicago (1703100760 | Cook | 0.067 | 0.068 | 0.073 | 0.069 |

[1] The area continued to attain the 1997 8-hour ozone standard based on quality assured ozone data for 2010. See February 9, 2012, proposed rule (77 FR 6743).

TABLE 1—ANNUAL FOURTH HIGH OZONE CONCENTRATIONS AND THREE-YEAR AVERAGES FOR 2009–2011 (CONCENTRATIONS IN PARTS PER MILLION (PPM))—Continued

| Site Name (site code) | County | 2009 | 2010 | 2011 | Three-year average |
|---|---|---|---|---|---|
| 6545 W. Hurlbut, Chicago (170311003) | Cook | 0.064 | 0.070 | 0067 | 0.067 |
| 729 Houston, Lemont (170311601) | Cook | 0.067 | 0.073 | 0.069 | 0.070 |
| 1820 S. 51st Avenue, Cicero (170314002) | Cook | 0.067 | 0.068 | 0.072 | 0.069 |
| 9511 W. Harrison Street, Chicago (170314007) | Cook | 0.057 | 0.064 | 0.065 | 0.062 |
| 750 Dundee Road, Northbrook (170314201) | Cook | 0.069 | 0.072 | 0.076 | 0.072 |
| 531 E. Lincoln, Evanston (170317002) | Cook | 0.064 | 0.067 | 0.078 | 0.070 |
| Route 53 (170436001) | DuPage | 0.059 | 0.064 | 0.068 | 0.064 |
| 665 Dundee Road, Elgin (170890005) | Kane | 0.068 | 0.069 | 0.070 | 0.069 |
| Golf and Jackson Streets, Waukegan (170971002) | Lake | 0.057 | 0.074 | No Data | |
| Illinois Beach State Park, Zion (170971007) | Lake | 0.075 | 0.078 | 0.076 | 0.076 |
| First Street and Three Oaks Road, Cary (171110001) | McHenry | 0.066 | 0.065 | 0.071 | 0.67 |
| 36400 S. Essex Road (171971011) | Will | 0.063 | 0.065 | 0.061 | 0.063 |
| 201 Mississippi Street, Gary (180890022) | Lake | 0.058 | 0.064 | 0.066 | 0.063 |
| 1751 Oliver Street, Whiting (180890030) | Lake | 0.062 | 0.069 | 0.069 | 0.067 |
| 1300 141 Street, Hammond (180892008) | Lake | 0.065 | 0.069 | 0.072 | 0.069 |
| 84 Diana Road, Ogden Dunes (181270024) | Porter | 0.067 | 0.067 | 0.068 | 0.067 |
| 1000 Wesley/Valparaiso Water Department (181270026) | Porter | 0.064 | 0.061 | 0.063 | 0.063 |
| Chiwaukee Prairie, Pleasant Prairie (550590019) | Kenosha | 0.071 | 0.081 | 0.081 | 0.078 |

The primary background for today's action is contained in EPA's February 9, 2012, proposal to approve Illinois' redesignation request, and in EPA's March 12, 2010, final rulemaking determining that the area has attained the 1997 8-hour ozone NAAQS. In these rulemakings, we noted that, under EPA regulations at 40 CFR 50.10 and 40 CFR part 50, appendix I, the 1997 8-hour ozone standard is attained when the three-year average of the annual fourth-highest daily maximum 8-hour average ozone concentrations is less than or equal to 0.08 ppm at all ozone monitoring sites in an area. See 69 FR 23857 (April 30, 2004) for further information. To support the redesignation of the area to attainment of the NAAQS, the area must show attainment based on complete, quality-assured data for the most recent three-year period. The data completeness requirement, for any given monitoring site, is met when the three-year average of days with valid ambient monitoring data is greater than 90 percent, and no single year has less than 75 percent data completeness, as determined in accordance with appendix I of 40 CFR part 50. Under the CAA, EPA may redesignate a nonattainment area to attainment if sufficient, complete, quality-assured data are available demonstrating that the area has attained the standard and if the State meets all applicable redesignation requirements specified in section 107(d)(E) and section 175A of the CAA.

The February 9, 2012, proposed rule provides a detailed discussion of how Illinois' ozone redesignation request meets the CAA requirements. Complete, quality-assured and certified air quality monitoring data in the Greater Chicago area for 2009–2011 and preliminary data available for 2012 show that this area is currently attaining the 1997 8-hour ozone NAAQS. With the final approval of its VOC and NOx emission inventories, Illinois has met all CAA requirements for redesignation of the Illinois portion of the Greater Chicago area to attainment for the 1997 8-hour ozone NAAQS. Illinois has demonstrated that attainment of the 1997 8-hour ozone NAAQS will be maintained in the Greater Chicago area through 2025 with or without the implementation of EPA's CAIR. Finally, Illinois has adopted 2008 and 2025 MVEBs that are supported by Illinois' ozone maintenance demonstration and adopted ozone maintenance plan.

## II. What comments did we receive on the proposed rule?

EPA provided a 30-day review and comment period for the February 9, 2012, proposed rule. During the comment period, we received one comment set from an individual representing the Sierra Club. These comments are summarized and addressed below.

*Comment 1:* The commenter argues that it is inappropriate to redesignate the Illinois portion of the Greater Chicago area to attainment under the 1997 8-hour ozone standard when EPA intends to designate this area as nonattainment under the 2008 8-hour ozone standard, and asserts that EPA is delaying the implementation of the 2008 8-hour ozone standard.

*Response 1:* We disagree with the commenter. The area's status with respect to the 2008 8-hour ozone standard is not relevant to the area's attainment status under the 1997 8-hour ozone standard. It would be inappropriate to defer or reject the redesignation of the area under the 1997 8-hour ozone standard based on EPA's designation of the area under the 2008 8-hour ozone standard.

On June 11, 2012, EPA published its designation for the Chicago-Naperville, IL-IN-WI area for the 2008 ozone standards. 77 FR 34221. EPA designated the Chicago-Naperville, IL-IN-WI area as nonattainment with a classification of marginal for the 2008 ozone standards. The area's status with respect to the 2008 ozone standards, however, does not affect or prevent redesignation of the area to attainment for the 1997 ozone standard. The 1997 ozone standard currently remains in effect, and, thus, EPA continues to evaluate the area's designation status with respect to that standard. Until the 1997 8-hour ozone standard is revoked, it remains in effect and independent of the 2008 8-hour ozone standards, and EPA continues to evaluate and act upon states' redesignation requests with respect to the 1997 ozone standard.

EPA has in the past continued to redesignate areas under existing standards even after the adoption of new standards for the same pollutant. After adopting the 1997 8-hour ozone standard, EPA continued to redesignate areas for the 1-hour ozone standard

until the 1-hour ozone standard was revoked. See, for example the Cincinnati ozone redesignation for the 1-hour ozone standard, 70 FR 35946 (June 21, 2005) and the Atlanta ozone redesignation for the 1-hour ozone standard, 70 FR 34660 (June 15, 2005).

Subsequent to the adoption of the 2008 8-hour ozone standard and designation of areas for this standard, EPA has continued to redesignate areas to attainment for the 1997 8-hour ozone standard. See, for example, the Detroit, Michigan redesignation, 74 FR 30950 (June 29, 2009); Clearfield and Indiana Counties, Pennsylvania redesignation, 74 FR 11674 (March 19, 2009); Kewaunee County, Wisconsin redesignation, 73 FR 29436 (May 21, 2008); and, Door and Manitowoc Counties, Wisconsin redesignation, 75 FR 39635 (July 12, 2010). Also see the redesignation of the Illinois portion of the St. Louis area for the 1997 8-hour ozone standard, 77 FR 34819 (June 12, 2012).

*Comment 2:* The commenter argues that EPA has failed to consider ambient monitoring data from 2011 even though Illinois has already submitted and certified these data. The commenter asserts that the EPA must include these data in its consideration of Illinois' ozone redesignation request and provide the public with the opportunity to review and comment on these data before making any final decision on Illinois' ozone redesignation request.

*Response 2:* At the time EPA prepared the proposed rule for rulemaking on Illinois' ozone redesignation request, EPA had not yet received Illinois' certification of the 2011 ozone data. At the time of EPA's proposed redesignation of the area, the 2008–2010 ozone data were the most recent three years of State-certified data available to EPA. Illinois has subsequently certified its 2011 ozone data for the Illinois portion of the Greater Chicago area.

Indiana has certified its 2011 ozone data for the Indiana portion of the Greater Chicago area. In addition, Wisconsin has certified the 2011 ozone data for the Chiwaukee Prairie monitoring site in Kenosha County, generally considered to be the peak ozone design value site attributable to emissions in the Greater Chicago area.

The complete, certified 2011 ozone data, along with ozone data for 2009 and 2010, show that the Greater Chicago area continues to attain the 1997 8-hour ozone standard. The highest 8-hour ozone design value for the 2009–2011 period was recorded at the Chiwaukee Prairie monitoring site, with a value of 0.077 parts per million. All of these data show that the area continued to attain the 1997 8-hour ozone standard during the 2009–2011 period. Preliminary ozone data for 2012 for the Greater Chicago area and for Chiwaukee Prairie are consistent with the Greater Chicago area's continued attainment of the 1997 8-hour ozone standard. EPA has, thus, considered these data, which reflect continued attainment of the 1997 8-hour ozone standard. Although the 2011 data were not certified at the time of proposal, these data were available to the public through EPA's Air Quality System and commenters could have reviewed the data and addressed them in comments.

*Comment 3:* The commenter asserts that the consideration of the 2011 data is particularly important because 2008 (the attainment year used by the IEPA to document the emissions reduction-basis for the attainment of the ozone standard in the Chicago-Gary-Lake County, IL–IN area and the base year for the 10-year ozone standard maintenance demonstration) was the first year of a major recession. The commenter contends that emission reductions leading to the observed air quality improvement were the result of temporary economic conditions rather than the result of permanent emission reductions.

*Response 3:* First, as set forth in EPA's response to comment 2 above, EPA has considered the complete, quality assured and certified monitoring data for the bi-state nonattainment area for 2011. These data show that the area has continued to attain the 1997 8-hour ozone standard, and preliminary data for 2012 are consistent with continued attainment. A determination of attainment is based solely on air quality considerations, and, therefore, underlying economic conditions are not relevant to the limited inquiry that results in a determination. In another portion of this rulemaking, and with respect to a separate and independent criterion for redesignation under section 107(d)(3)(E)(iii), EPA examines whether attainment is due to permanent and enforceable emission reductions. See discussion in the proposed rulemaking (77 FR 6743, February 9, 2012) and elsewhere in these responses to comments.

The commenter provides no data to demonstrate that the economic recession of recent years had any impact on emissions in 2008. The commenter merely speculates that there was such an impact. Lacking any data to the contrary, we see no reason to assume that the lower emissions of 2008 (relative to those of the base nonattainment year of 2002) were exclusively or predominantly an artifact of temporary emission reductions resulting from the economic recession.

In addition, the Chicago-Gary-Lake County, IL–IN area has continued to attain the 1997 ozone standard over an extended period (over a number of sequential three-year periods, 2006–2008, 2007–2009, 2008–2010, and now 2009–2011), with general downward trends in ozone design values at most monitoring sites in the area (see Table 1 in the proposed rule for this rulemaking action, 77 FR 6747). Given the downward trend in ozone design values and the ozone design values below the 0.085 ppm ozone standard violation level, we see no reason to believe that a reversal in the economic situation in this area will cause a return to violation of the 1997 8-hour ozone standard in this area in the foreseeable future.

*Comment 4 General:* The commenter argues that Illinois and EPA have failed to comply with the ozone redesignation requirement of section 107(d)(3)(E)(iii) of the CAA, which requires that the observed improvement in air quality be due to permanent and enforceable emission reductions resulting from the State's implementation of its SIP and implementation of applicable Federal air pollution control requirements and other permanent and enforceable emission reductions. The commenter argues, in particular, that EPA relied on several emission control programs that are not permanent and enforceable. These questioned emission controls are specified in the following:

*Comment 4a:* The commenter asserts that the $NO_X$ SIP call is not permanent and enforceable. The commenter notes that EPA found that the $NO_X$ emission reductions leading to attainment in the Greater Chicago area were due, in part, to the implementation of the $NO_X$ SIP call. The commenter argues that the $NO_X$ SIP call cannot be assumed to be permanent and enforceable because it has been replaced, and, therefore, no longer exists. In addition, the $NO_X$ SIP call is implemented through a cap-and-trade program, which means that no actual $NO_X$ emission reduction may have been required for any specified source upwind of the high ozone areas in the Greater Chicago area. The commenter cites a 2009 decision by the D.C. Circuit Court of Appeals, which the commenter believes held that EPA cannot use cap-and-trade programs to satisfy an area-specific statutory mandate. See *NRDC* v. *EPA,* 571 F.3d 1245, 1257 (D.C. Cir. 2009).

*Response 4a:* EPA disagrees with the commenter's position that emission reductions associated with the $NO_X$ SIP call cannot be considered to be

permanent and enforceable. The commenter's first argument—that the $NO_X$ emission reductions are not permanent and enforceable because the $NO_X$ SIP call has been replaced—is based on a misunderstanding of the relationship between the CAIR and the $NO_X$ SIP call. While the CAIR ozone-season trading program replaced the ozone-season $NO_X$ trading program developed in the $NO_X$ SIP call (70 FR 25290), nothing in the CAIR relieved states of their $NO_X$ SIP call obligations. In fact, in the preamble to CAIR, EPA emphasized that the states and certain units covered by the $NO_X$ SIP call but not by CAIR must still satisfy the requirements of the $NO_X$ SIP call. EPA provided guidance regarding how such states could meet these obligations.[2] In no way did EPA suggest that states could disregard their $NO_X$ SIP call obligations. (70 FR 25290). For $NO_X$ SIP call states, the CAIR $NO_X$ ozone season program provides a way to continue to meet the $NO_X$ SIP call obligations for electric generating units (EGUs) and large non-electric generating units (nonEGUs). In addition, the anti-backsliding provisions of 40 CFR 51.905(f) specifically provide that the provisions of the $NO_X$ SIP call, including the statewide $NO_X$ emission budgets, continue to apply.

In summary, the requirements of the $NO_X$ SIP call remain in force. They are permanent and enforceable as are state regulations developed to implement the requirements of the $NO_X$ SIP call.

EPA also disagrees with the commenter's second argument—that the emission reductions associated with the $NO_X$ SIP call cannot be considered permanent and enforceable because the $NO_X$ SIP call provides for a trading program. There is no support for the commenter's argument that EPA must ignore all emission reductions achieved by the $NO_X$ SIP call simply because the mechanism used to achieve the emission reductions is an emissions trading program. As a general matter, trading programs establish mandatory caps on emissions and permanently reduce the total emissions allowed by sources subject to the programs. The emission caps and associated controls are enforced through the associated SIP rules or Federal Implementation Plans (FIPs). Any purchase of allowances and increase in emissions by a utility necessitates a corresponding sale of allowances and results in an emission reduction by another utility. Given the regional nature of ozone formation and transport, the emission reductions will have an air quality benefit that will compensate, at least in part, for the impact of any emission increase.

In addition, the case cited by the commenter, *NRDC* v. *EPA,* 571 F.3d 1245 (D.C. Cir. 2009), does not support the commenter's position. The case addressed EPA's determination that the CAA nonattainment area RACT requirement was satisfied by the $NO_X$ SIP call trading program. The court held that, because EPA had not demonstrated that the trading program would result in sufficient emission reductions within a nonattainment area, its determination that the program satisfied RACT was not supported. Id. 1256–58. The court explicitly noted that EPA might be able to reinstate the provision providing that compliance with the $NO_X$ SIP call satisfies $NO_X$ RACT for EGUs for particular nonattainment areas if, upon conducting a technical analysis, it could demonstrate that the $NO_X$ SIP call results in greater emissions reductions in a nonattainment area than would be achieved if RACT-level controls were installed in that area. Id. at 1258. In this case, EPA's comparison of emissions in 2002 and 2008 in this rulemaking necessarily looked only at changes in emissions ''in the nonattainment area.'' As such, the commenter's reliance on *NRDC* v. *EPA* is misplaced.

*Comment 4b:* The commenter contends that EPA cannot rely on the Cross State Air Pollution Rule (CSAPR) to provide permanent and enforceable emission reductions because the implementation of this rule has been stayed by the U.S. Court of Appeals for the District of Columbia Circuit. The commenter contends that this stay makes CSAPR neither permanent nor enforceable. In addition, the commenter notes that CSAPR is to be implemented through a cap-and-trade program, and, therefore, as summarized in Comment 4a, CSAPR cannot be relied on to produce permanent and enforceable emission reductions. Further, EPA cannot take credit for the promise of any emission control program that would replace CSAPR should the Court remand or vacate CSAPR.

*Response 4b:* Illinois has not relied on CSAPR to demonstrate that attainment was due to permanent and enforceable emission reductions or to demonstrate that it will maintain the standard. EPA did not credit Illinois with $NO_X$ emission reductions from the implementation of CSAPR for attainment or maintenance of the 1997 ozone standard. While CSAPR was listed by the State as a possible contingency measure in the State's ozone maintenance plan, EPA did not credit Illinois with $NO_X$ emission reductions resulting from the implementation of CSAPR, nor did the State take credit for any such emission reduction when demonstrating maintenance of the 1997 ozone standard. As such, the stay of CSAPR is not relevant here.

In addition, modeling performed by EPA during the CSAPR rulemaking process also demonstrates that the counties in the Greater Chicago area will have ozone levels below the 1997 8-hour ozone standard in both 2012 and 2014 without emission reductions from CSAPR or CAIR, with the highest value for any county in the area projected to be 81.1 ppb without the implementation of CSAPR/CAIR-based emission controls. See ''Air Quality Modeling Final Rule Technical Support Document,'' Appendix B, pages B–9, B–10, B–11, and B–33, which is available in the docket for this rulemaking.

Although Illinois did list the ''Cross-State Air Pollution Rule'' as a possible contingency measure in the ozone maintenance plan, this measure is only one of many that may be selected should the contingency plan be triggered. EPA has concluded, in its consideration of the ozone maintenance plan contingency measures, that there are other contingency measures sufficient to satisfy the requirements of section 175A of the CAA, without the consideration of CSAPR.

With regard to the commenter's assertion that EPA cannot rely on the emission reductions resulting from the implementation of CSAPR because CSAPR would be implemented through the application of an emissions trading program, see our response to the commenter's similar comment with regard to emissions trading under EPA's NOx SIP call in the response to comment 4a above. In addition, CSAPR contains assurance provisions that guarantee that emission reductions will occur in specific states.

*Comment 4c:* The commenter asserts that Illinois emission control rules are not permanent and enforceable. To support this assertion, the commenter argues that Illinois' Consumer Products and Architectural and Industrial Coatings (AIM) rules have been adopted only by the State, and that, until these rules are approved by the EPA and incorporated into the SIP they cannot be relied upon for redesignation.

*Response 4c:* EPA in fact finalized approval of Illinois' consumer products and AIM rules on June 7, 2012, at 77 FR 33659. Thus, the commenter's concern

[2] EPA guidance regarding the $NO_X$ SIP call transition to CAIR can be found at *http://www.epa.gov/airmarkets/progsregs/cair/faq-10.html.* EPA guidance regarding the $NO_X$ SIP call transition for the Cross-State Air Pollution Rule (CSAPR) can be found at *http://www.epa.gov/crossstaterule/faqs.html.*

is moot. Moreover, EPA wishes to note that it is not necessary for every change in emissions between the nonattainment year (in this case 2002) and the attainment year (2008) to be permanent and enforceable. Rather, the improvement in air quality necessary for the area to attain must be reasonably attributable to permanent and enforceable reductions in emissions. As discussed in the proposed rule at 77 FR 6754 (February 9, 2012), Illinois and upwind areas have implemented a number of permanent and enforceable regulatory control measures which have reduced emissions and have resulted in a corresponding improvement in ozone air quality. Even if EPA did not finalize action on Illinois' consumer products and AIM rules before completing action on the State's ozone redesignation request, these emission reductions are not necessary to demonstrate that the improvement in air quality is reasonably attributable to permanent and enforceable emission reductions.

*Comment 4d:* The commenter asserts that the use of 2008 air quality data is inappropriate to demonstrate that the attainment of the 1997 8-hour ozone standard is due to the implementation of permanent and enforceable emission reductions. The commenter claims that EPA simply documented the changes in emissions between 2002 and 2008 to demonstrate that the observed ozone air quality improvement is due to permanent and enforceable emission reductions during this period. The commenter contends that this is unacceptable for a number of reasons.

First, the commenter asserts that EPA has done nothing to connect the emission changes with air quality impacts. The commenter claims that EPA has conducted no analyses to prove that emission reductions between 2002 and 2008 have led to reduced ozone concentrations and attainment of the 1997 8-hour ozone standard.

Second, the commenter argues that using a single attainment year, 2008, is arbitrary because, as explained in preceding comments, the impact of cap-and-trade emission control programs, such as the $NO_X$ SIP call and CSAPR, can cause emissions to vary over time and location as sources buy, sell, and trade emission allowances.

Third, the commenter characterizes the choice of 2008 is further problematic because 2008 marked the beginning of a large economic recession in this country. The commenter contends that this resulted in decreased electricity demand, decreased automobile, truck, and shipping traffic, and decreased factory production. The commenter contends that EPA makes the ''unsupported and implicit conclusion'' that monitored changes in ozone levels between 2002 and 2008 were due to the implementation of permanent and enforceable emission controls rather than to changes in meteorology, economic conditions, temporary, or voluntary (not enforceable) emission controls. The commenter asserts that EPA provides no analysis showing that the recession was not the cause of the 2002–2008 emission reduction and observed ozone air quality improvement.

Finally, the commenter argues that EPA has not shown that the 2008 emissions inventory reflects permanent and enforceable emission reductions occurring between 2002 and 2008. The 2008 emissions inventory appears to be the ''actual'' or the ''projected'' emissions from an unidentified group of sources. The commenter argues that there is a significant difference between what sources actually emit and what sources are allowed to emit, and that the IEPA and EPA have incorrectly assumed that allowable emissions are equal to actual emissions.

*Response 4d:* EPA's conclusion here is fully supported by the facts and applicable legal criteria. EPA policy [3] and longstanding practice allows states to demonstrate permanent and enforceable emission reductions by comparing emissions occurring during the nonattainment period (represented by emissions during one of the years in the three-year period used to designate an area as nonattainment,[4] in this case 2002) with emissions occurring during the attainment period (represented by emissions during one of the three attainment years, in this case 2008, which is part of the three-year period, 2006–2008, in which Chicago-Gary-Lake County, IL–IN area first attained the 1997 8-hour ozone standard). In EPA's determination of attainment and proposed approval of the redesignation request, EPA considered data for the 2008–2010 time period, which was then the most recent quality-assured, certified three years of data available. See 77 FR 6743, 6746 (February 9, 2012). Therefore, selecting 2008 as the representative attainment year and comparing emissions for this year to those of the representative violation year, 2002, is an appropriate and long-established approach that demonstrates emission reductions in the period between the years of nonattainment and attainment. These emission reductions, therefore, can be reasonably seen to account for the observed air quality improvement.

EPA disagrees with the commenter's assertion that EPA has conducted no analyses to prove that emission reductions between 2002 and 2008 led to reduced ozone concentrations. EPA's analyses included comparison of emissions for the representative nonattainment year to the emissions for the representative attainment year. This comparison, which established the existence of significant emission reductions that resulted in attainment, and also linked these emission reductions to control measures, is consistent with longstanding practice and EPA policy for making such a demonstration. As noted in the proposed rulemaking for this redesignation (77 FR 6754, February 9, 2012), the State of Illinois documented changes in VOC and $NO_X$ emissions between 2002 and 2008 in the Illinois portion of the Greater Chicago area and the emission control measures that have been implemented in the Illinois portion of the Greater Chicago area. These emission control measures resulted from the State's adoption and implementation of regulations, including regulations to: Control $NO_X$ emissions at electric generating utilities and large industrial combustion sources under EPA's $NO_X$ SIP call; control emissions and implement New Source Performance Standards (NSPS), National Emission Standards for Hazardous Air Pollutants (NESHAPS), and Maximum Available Control Technology (MACT) standards for new sources; control VOC solvent emissions for aerosol coatings and AIM coatings and consumer solvents; control vehicle emissions through the implementation of enhanced vehicle inspection and maintenance; control vehicle refueling emissions; and control vehicle evaporative emissions through use of low volatility fuels and reformulated gasoline. In addition to the State's implementation of state-specific emission control measures, Federal emission control measures have also been implemented in the Greater Chicago area, including: Tier 2 emission standards for vehicles; Tier 4 nonroad diesel engine standards; marine compression-ignition engine standards; and locomotive engine standards. As noted in the February 9, 2012, proposed rule, all of these emission controls have been implemented since the 2001–2003 ozone standard violation period for the Greater Chicago area. Therefore, it is

[3] See September 4, 1992, memorandum from John Calcagni entitled ''Procedures for Processing Requests to Redesignate Areas to Attainment,'' pp. 4 and 8–9.

[4] The nonattainment designation of the Greater Chicago area for the 1997 8-hour ozone standard was based on 2001–2003 ozone data.

reasonable to conclude that the emission reductions resulting from these emission controls contributed to the attainment of the 1997 8-hour ozone standard in the Greater Chicago area. See the February 9, 2012, proposed rule (77 FR 6754 and 6759) for discussions of implemented emission control measures and how Illinois derived the 2002 and 2008 VOC and $NO_X$ emissions, demonstrating emission reductions between the 2002 violation year and 2008 attainment year.

The State demonstrated that the implementation of these emission controls along with other ongoing emission controls resulting from continued implementation of the Illinois SIP have led to the emission reductions used to demonstrate the emissions reduction in this area. To derive the 2008 emissions, the State determined source category-specific emission control factors associated with the implemented emission controls. Note that the State applied emission control factors only for those source categories covered by State or Federal emission control requirements and for specific sources subject to permanent, enforceable source closures. The State took no credit for temporary or non-permanent emission reductions resulting from voluntary emission control measures or source activity downturn resulting from the current downturn in the economy. The source category-specific emission control factors, along with source category-specific growth factors, were applied to the 2002 base year emissions to project the 2008 emissions. Emission reductions resulting from source closures occurring between 2002 and 2008 and determined to be permanent (including forfeiture of source permits) were also considered and factored into the emission projections, but produced relatively small emission reductions compared to the impacts of implemented emission controls. Since most source categories had positive growth factors, almost all projected emission reductions can be attributed to the impacts of implemented emission controls. Therefore, the State has demonstrated that the derived emission reduction that occurred between 2002 and 2008 is due to the implementation of emission controls.

The CAA does not specifically require the use of ozone modeling to make a demonstration that the observed ozone air quality improvement is due to permanent and enforceable emission reductions resulting from the implementation of emission controls. It has not been the general practice of states to do so in demonstrating emission reductions for purposes of ozone redesignation requests.

EPA disagrees with the commenter's contention that using emissions from a single attainment year is arbitrary due to the year-to-year variation in emission levels resulting from the implementation of cap-and-trade programs. As a general matter, trading programs establish mandatory caps on emissions and permanently reduce total emissions allowed for sources subject to the programs. The emission caps and associated controls are enforced through the associated SIP rules and FIPs. Any purchase of emission allowances and increase in emissions by a utility necessitates a corresponding sale of emission allowances and reduction in emissions by another utility. Given the regional nature of ozone formation and transport, the emissions reduction will have an ozone air quality benefit that will compensate, at least in part, for the impact of any emission increase.

With respect to $NO_X$ SIP call emission reductions within the Greater Chicago area, there is no evidence of significant temporal variation in emissions levels. In fact, actual emissions from $NO_X$ SIP call sources in the Chicago area have not varied much from year-to-year over the 2003–2011 time period. Some of the largest emitters in the Greater Chicago area that are covered by the $NO_X$ SIP call are operating near full capacity. In addition, an analysis of ozone season $NO_X$ emission rates and total operating hours for all $NO_X$ SIP call sources in this area shows that annual levels of $NO_X$ emission rates (tons per hour of operation) have generally trended downward subsequent to 2003 as a result of the implementation of emission controls.

While the commenter expressed concerns that an economic downturn was responsible for the observed air quality improvement, the commenter has made no demonstration that the reduction in emissions and observed improvement in air quality is due to an economic recession, changes in meteorology, or temporary or voluntary emission reductions. In addition, as noted previously, the CAA does not require modeling to make any such demonstration. There are no data demonstrating that the observed air quality improvement is due to the economic downturn, temporary changes in meteorology, or voluntary emission reductions, and, as discussed above, EPA's modeling for the CSAPR demonstrates that the Greater Chicago area would attain the NAAQS in 2012 and 2014 with or without implementation of CAIR, which is place only temporarily. We, thus, have no reason to believe that factors other than permanent and enforceable emission reductions let to attainment of the 1997 8-hour ozone standard in the Greater Chicago area.

Finally, with regard to consideration of actual versus allowable/permitted emission levels, longstanding practice and EPA policy allows for the use of actual emissions when demonstrating permanent and enforceable emission reductions. Sources seldom emit at maximum allowable emission levels, and assuming that all sources simultaneously operate at maximum capacity would grossly overestimate emission levels. For this reason, EPA believes actual emissions are the appropriate emission levels to consider when comparing nonattainment year emissions with attainment year emissions to demonstrate the basis for improvements in peak ozone levels. EPA also notes that the certified monitoring data establish that the area has been attaining the 1997 8-hour ozone standard continuously during the periods of 2006–2008, 2007–2009, 2008–2010, and 2009–2011, and that EPA's modeling demonstrates that the Greater Chicago area would have attainment air quality in 2012 and 2014 with or without the implementation of CAIR. Emissions reductions have continued during this extended period as the State has continued to implement and enforce emission controls in addition to those required by CAIR.

*Comment 5:* The commenter claims that EPA has not conducted an adequate analysis of the effect redesignation to attainment will have on attainment and maintenance of other NAAQS under section 110(l) of the CAA. The commenter complains that EPA has failed to conduct an adequate analysis of the ozone redesignation impacts with respect to the 1997 annual fine particulate ($PM_{2.5}$) NAAQS, the 2006 24-hour $PM_{2.5}$ NAAQS, the 1-hour nitrogen dioxide ($NO_2$) NAAQS, the 1-hour sulfur dioxide ($SO_2$) NAAQS, and 2008 8-hour ozone NAAQS.

*Response 5:* Section 110(l) of the CAA provides in part: ''the Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress * * *, or any other applicable requirement of this chapter.'' As a general matter, EPA must and does consider section 110(l) requirements for every SIP revision, including whether the revision would ''interfere with'' any applicable requirement. See, e.g., 70 FR 53, 57 (January 3, 2005); 70 FR 17029, 17033 (April 4, 2005); 70 FR 28429,

28431 (May 18, 2005); and 70 FR 58119, 58134 (October 5, 2005).

The Illinois redesignation request and maintenance plan for the 1997 8-hour ozone standard neither revises nor removes any existing emission control requirements. On that basis, EPA concludes that the redesignation will not interfere with attainment or maintenance of any of the air quality standards. Moreover, the maintenance plan itself demonstrates that the emission emissions of $NO_X$ and VOC in the Greater Chicago area will remain at or below the attainment year (2008) levels through 2025, thus demonstrating non-interference with other pollutants, in particular fine pollutants, that are formed through reactions and processes involving $NO_X$ and/or VOC. In addition, contingency measures, if subsequently activated, can be selected to ensure non-interference through lowered emission levels.

The commenter does not provide any information in the comment to indicate that approval of this redesignation would have any impact on the area's ability to comply with any of the referenced NAAQS. In fact, the ozone maintenance plan provided with the State's redesignation request demonstrates a decline in VOC and $NO_X$ emissions over the timeframe of the 10-plus year maintenance period. This reflects the fact that the redesignation does not relax any existing emission control rules or emission limits, nor will the redesignation alter the status quo air quality. The commenter has not explained why the redesignation might interfere with attainment of any standard or with satisfaction of any other CAA requirement, and EPA finds no basis under section 110(l) for EPA to disapprove the SIP revision (ozone maintenance plan and emissions inventories) at issue or to disapprove the requested ozone redesignation.

*Comment 6:* The commenter asserts that EPA cannot approve Illinois' 2002 emissions inventory as meeting the emission inventory requirement of section 182(a)(1) of the CAA for a number of reasons. In particular, the commenter believes that Illinois' mobile source emission inventories, based on the use of EPA's MOVES model, does not account for the increase VOC and $NO_X$ emissions that would result from the use of up to 15 percent ethanol content in gasoline recently approved by the EPA. The commenter argues that many car and light-duty truck emission control systems are not designed to control vehicle emissions with blends of 15 percent ethanol (Ethanol 15 or E15). The commenter believes that EPA has not accounted for the extra VOC and $NO_X$ emissions that would result from the use of E15.

*Response 6:* First, it is noted that this comment was directed at EPA's proposed approval of Illinois' 2002 base period emissions. The commenter's concern is not relevant to approval of the 2002 base year emission inventories because the EPA-approved use of E15 fuels was not in place during 2002. The use of E15 fuels was approved by EPA well after 2002. Therefore, the mobile source emissions for 2002 could not have reflected the future use of E15 fuels.

With regard to the use of E15 fuels in later years, it is noted that, in 2010 and 2011, EPA granted partial waivers for the use of E15 fuels in Model Year (MY) 2001 and newer light-duty motor vehicles (75 FR 68094, November 4, 2010 and 76 FR 4662, January 26, 2011). As discussed in the waiver decisions, there may be some small emission impacts for the use of E15. E15 is expected to cause a small immediate emissions increase in $NO_X$ emissions. However, due to its lower volatility than the E10 fuels currently in use, its use is also expected to result in lower evaporative emissions. Other possible emissions impacts may be from the misfueling of E15 in vehicles or engines for which its use is not approved, i.e., MY 2000 and older motor vehicles, heavy-duty engines and vehicles, motorcycles and all non-road engines, vehicles, and equipment. EPA has promulgated a separate rule dealing specifically with the mitigation of misfueling to reduce potential emissions impacts from misfueling (76 FR 44406, July 25, 2011).

EPA's partial waiver for E15 is based on extensive studies done by the Department of Energy, as well as EPA's engineering assessment, to determine the effects on exhaust and evaporative emissions for the vehicle fleet prior to and after the partial waiver. The criteria for granting the waiver was not that there are no emission impacts for E15, but rather that vehicles operating on E15 would not be expected to violate their emission standards in-use.

The E15 partial waivers do not require that E15 be made or sold, and it is unclear if and to what extent E15 may even be used in Illinois. Even if E15 is introduced into commerce in Illinois, considering the likely small and offsetting direction of the emission impacts, the limited set of motor vehicles approved for its use, and the measures required to mitigate misfueling, EPA believes that any potential emission impacts of E15 will be less than the margin of safety by which Illinois shows maintenance of the 1997 ozone standard.

*Comment 7:* The commenter argues that EPA has not accounted for the effects of changes in weather in its analysis of Illinois' ozone redesignation request. The commenter asserts that EPA should have adjusted monitored ozone levels to account for the varying impacts of meteorology. The commenter contends that EPA cannot approve Illinois' ozone resignation request without a weather adjusted analysis. In addition, the commenter believes that EPA has erred in not considering the impacts that climate change will have on ozone formation during the maintenance period.

*Response 7:* A determination that an area has attained the 1997 8-hour ozone standard is based on an objective review of the air quality data for a specified period. There are no provisions in the CAA for considering the impacts of changing meteorology and adjusting monitored ozone concentrations to reflect a standardized set of meteorological data or some historical range of meteorological data. Therefore, we disagree with the commenter's argument that EPA should have adjusted ozone levels to assess the impacts of meteorology during the attainment period versus meteorology more reflective of historical high ozone periods. In addition, it should be noted that the very nature of the three-year averaging of ozone concentrations used to assess compliance with the 1997 8-hour ozone standard is used, in part, to negate the impacts of year-to-year variations in meteorology on ozone formation.

By the same reasoning, we also disagree with the commenter that EPA must, in the context of a redesignation rulemaking, consider the impact of climate change on future ozone formation. While EPA agrees that climate change is a serious environmental issue, at this time EPA does not believe that an area-specific climate change analysis must occur in the context of rulemaking on a redesignation request and maintenance plan. Even if EPA chose to make such an assessment, it is virtually impossible, especially given the relatively limited spatial and temporal focus of a redesignation request and related maintenance plan, to project or predict the local meteorological changes that might result from climate change. Current modeling uncertainties result in conflicting projections of the spatial patterns of future changes in meteorological variables and the specific regional distributions of future ozone changes across the United States.

Modeling guidance is not yet available for the type of area-specific analysis of effects or climate change on ozone concentrations required for SIP planning. EPA, therefore, believes it is premature to require a precise mathematical accounting in the SIP process for the effect of higher ambient temperatures due to climate change on ozone concentrations. EPA is ready to reevaluate this position when the state of science and confidence in projection improve. Given the above, at this time, EPA is not in a position to forecast the impact climate change may have on future ozone considerations with the specificity needed for evaluating a state's ozone maintenance demonstration. See EPA's similar reasoning in its approval of Kentucky's section 110(a)(1) maintenance for Huntington-Ashland, Kentucky, 76 FR 21853 (April 14, 2011). Finally, EPA notes that the Greater Chicago area has continued to attain the 1997 8-hour ozone standard since the 2006–2008 monitoring period, and that its attainment of the standard has withstood the challenges of meteorological variability for many years longer than required. Elsewhere in this notice, EPA has addressed extensively its reasoning for concluding, as required for redesignation, that attainment is due to permanent and enforceable emissions reductions, rather than to unduly favorable meteorology.

*Conclusion of Comment Review and Response*

We conclude that none of the comments discussed above provides a basis for precluding EPA from finalizing the actions we proposed on February 9, 2012.

### III. What actions is EPA taking?

After reviewing Illinois' ozone redesignation request, EPA has determined that it meets the redesignation criteria set forth in section 107(d)(3)(E) f the CAA. Therefore, EPA is approving the redesignation of the Illinois portion of the Greater Chicago area to attainment of the 1997 8-hour ozone NAAQS. EPA is also approving Illinois' ozone maintenance plan for the Illinois portion of the Greater Chicago area as a revision of the Illinois SIP based on Illinois' demonstration that the plan meets the requirements of section 175A of the CAA. EPA is approving the 2002 VOC and $NO_X$ emission inventories for the Illinois portion of the Greater Chicago area as meeting the requirements of section 182(a)(1) of the CAA. Finally, EPA is also approving and finding adequate Illinois' 2008 and 2025 VOC and $NO_X$ MVEBs for the Illinois portion of the Greater Chicago area. For 2008, these MVEBs are 117.23 tons per ozone season weekday for VOC and 373.52 tons per ozone season weekday for $NO_X$. For 2025, these MVEBs are 48.13 tons per ozone season weekday for VOC and 126.27 tons per ozone season weekday for $NO_X$.

In accordance with 5 U.S.C. 553(d), EPA finds there is good cause for this action to become effective immediately upon publication. This is because a delayed effective date is unnecessary due to the nature of a redesignation to attainment, which relieves the area from certain CAA requirements that would otherwise apply to it. The immediate effective date for this action is authorized under both 5 U.S.C. 553(d)(1), which provides that rulemaking activities may become effective less than 30 days after publication if the rule ''grants or recognizes an exemption or relieves a restriction,'' and section 553(d)(3), which allows an effective date less than 30 days after publication ''as otherwise provided by the agency for good cause found and published with the rule.'' The purpose of the 30-day waiting period prescribed in section 553(d) is to give affected parties a reasonable time to adjust their behavior and prepare before the final rule takes effect. Today's rule, however, does not create any new regulatory requirements such that affected parties would need time to prepare before the rule takes effect. Rather, today's rule relieves the State of planning requirements for this 8-hour ozone nonattainment area. For these reasons, EPA finds good cause under 5 U.S.C. 553(d)(3) for this action to become effective on the date of publication of this action.

### IV. Statutory and Executive Order Reviews

Under the CAA, redesignation of an area to attainment and the accompanying approval of a maintenance plan under section 107(d)(3)(E) are actions that affect the status of a geographical area and do not impose any additional regulatory requirements on sources beyond those imposed by State law. A redesignation to attainment does not in and of itself create any new requirements, but rather results in the applicability of requirements contained in the CAA for areas that have been redesignated to attainment. Moreover, the Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve State choices, provided that they meet the criteria of the CAA. Accordingly, these actions do not impose additional requirements beyond those imposed by State law and the CAA. For that reason, these actions:

- Are not ''significant regulatory actions'' subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);
- Do not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);
- Are certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);
- Do not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);
- Do not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);
- Are not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);
- Are not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);
- Are not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA; and,
- Do not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this rule does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the SIP is not approved to apply in Indian country located in the State, and EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law.

The Congressional Review Act, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate,

the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by October 12, 2012. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

**List of Subjects**

*40 CFR Part 52*

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Volatile organic compounds.

*40 CFR Part 81*

Air pollution control, Environmental protection, National parks, Wilderness areas.

Dated: July 27, 2012.

**Susan Hedman,**

*Regional Administrator, Region 5.*

40 CFR parts 52 and 81 are amended as follows:

## PART 52—[AMENDED]

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 52.726 is amended by adding paragraphs (mm)(2) and (nn) to read as follows:

### § 52.726 Control strategy: Ozone.

* * * * *

(mm) * * *

(2) Approval—Illinois' 2002 volatile organic compounds and nitrogen oxides emission inventories satisfy the emissions inventory requirements of section 182(a)(1) of the Clean Air Act for the Illinois portion of the Chicago-Gary-Lake County, Illinois-Indiana area under the 1997 8-hour ozone standard.

(nn) Approval—On July 23, 2009, and September 16, 2011, Illinois submitted a request to redesignate the Illinois portion of the Chicago-Gary-Lake County, Illinois-Indiana area to attainment of the 1997 8-hour ozone standard. The Illinois portion of the Chicago-Gary-Lake County, Illinois-Indiana area includes Cook, DuPage, Kane, Lake, McHenry, and Will Counties and portions of Grundy (Aux Sable and Goose Lake Townships) and Kendall (Oswego Township) Counties. As part of the redesignation request, the State submitted a plan for maintaining the 1997 8-hour ozone standard through 2025 in the area as required by section 175A of the Clean Air Act. Part of the section 175A maintenance plan includes a contingency plan. The ozone maintenance plan establishes 2008 motor vehicle emissions budgets for the Illinois portion of the Chicago-Gary-Lake County, Illinois-Indiana area of 117.23 tons per day (tpd) for volatile organic compounds (VOC) and 373.52 tpd for nitrogen oxides ($NO_X$). In addition, the maintenance plan establishes 2025 motor vehicle emissions budgets for the Illinois portion of the Chicago-Gary-Lake County, Illinois-Indiana area of 48.13 tpd for VOC and 125.27 tpd for $NO_X$.

## PART 81—[AMENDED]

■ 3. The authority citation for part 81 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 4. Section 81.314 is amended by revising the entry for Chicago-Gary-Lake County, IL-IN in the table entitled ''Illinois—1997 8-Hour Ozone NAAQS (Primary and Secondary)'' to read as follows:

### § 81.314 Illinois.

* * * * *

ILLINOIS—1997 8-HOUR OZONE NAAQS (PRIMARY AND SECONDARY)

| Designated area | Designation [a] | | Classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| Chicago-Gary-Lake County, IL-IN: | | | | |
| Cook County | 8/13/2012 | | | |
| DuPage County | | Attainment. | | |
| Grundy County (part). | | | | |
| Aux Sable Township. | | | | |
| Goose Lake Township. | | | | |
| Kane County. | | | | |
| Kendall County (part). | | | | |
| Oswego Township. | | | | |
| Lake County. | | | | |
| McHenry County. | | | | |
| Will County. | | | | |
| * * * * * * * | | | | |

[a] Includes Indian Country located in each county or area, except as otherwise specified.
[1] This date is June 15, 2004, unless otherwise noted.

* * * * *

[FR Doc. 2012–19556 Filed 8–10–12; 8:45 am]

BILLING CODE 6560–50–P

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 52 and 81**

**[EPA–R05–OAR–2009–0730; FRL–9702–9]**

## Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Wisconsin; Redesignation of the Milwaukee-Racine Area to Attainment for 1997 8-Hour Ozone Standard

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is approving a request from the Wisconsin Department of Natural Resources (WDNR) to redesignate the Milwaukee-Racine area to attainment for the 1997 8-hour National Ambient Air Quality Standard (NAAQS or standard). The Milwaukee-Racine area includes Milwaukee, Ozaukee, Racine, Washington, Waukesha, and Kenosha Counties. WDNR submitted this request on September 11, 2009, and supplemented the submittal on November 16, 2011. These submittals also requested the redesignation of the Sheboygan area (Sheboygan County) to attainment for the 1997 8-hour ozone NAAQS. EPA proposed to approve the redesignation of both areas on February 9, 2012, and provided a 30-day review and comment period. EPA received comments submitted on behalf of Sierra Club and Midwest Environmental Defense Center and from the Wisconsin Manufacturers and Commerce. EPA is not taking final action on the Sheboygan redesignation request at this time because preliminary 2012 ozone monitoring data indicate that the area has violated the 1997 standard. In addition to approving the redesignation of the Milwaukee-Racine area, EPA is taking several other related actions. EPA is approving, as a revision to the Wisconsin State Implementation Plan (SIP), the State's plan for maintaining the 1997 8-hour ozone standard through 2022 in the Milwaukee-Racine area. EPA is approving the 2005 emissions inventories for the Milwaukee-Racine and Sheboygan areas as meeting the comprehensive emissions inventory requirement of the Clean Air Act (CAA or Act). Finally, EPA finds adequate and is approving the State's 2015 and 2022 Motor Vehicle Emission Budgets (MVEBs) for the Milwaukee-Racine area.

**DATES:** *Effective Date:* This rule is effective on July 31, 2012.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–R05–OAR–2009–0730. All documents in the docket are listed on the *www.regulations.gov* web site. Although listed in the index, some information is not publicly available, *i.e.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. We recommend that you telephone Kathleen D'Agostino, Environmental Engineer, at (312) 886–1767 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:** Kathleen D'Agostino, Environmental Engineer, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 886–1767, *dagostino.kathleen@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever "we," "us," or "our" is used, we mean EPA. This supplementary information section is arranged as follows:

I. What is the background for this rule?
II. What comments did we receive on the proposed rule?
III. What actions is EPA taking?
IV. Statutory and Executive Order Reviews

### I. What is the background for this rule?

On July 18, 1997 (62 FR 38856), EPA promulgated an 8-hour ozone standard of 0.08 parts per million (ppm). EPA published a final rule designating and classifying areas under the 1997 8-hour ozone NAAQS on April 30, 2004 (69 FR 23857). In that rulemaking, the Milwaukee-Racine area was designated as nonattainment for the 1997 8-hour ozone standard and classified as a moderate nonattainment area under subpart 2 of part D of the CAA (69 FR 23857, 23947).

On September 11, 2009, WDNR requested redesignation of the Milwaukee-Racine and Sheboygan areas to attainment of the 1997 8-hour ozone standard based on ozone data for the period of 2006–2008. On November 16, 2011, WDNR supplemented the original ozone redesignation requests, revising the mobile source emission estimates using EPA's on-road mobile source emissions model, MOVES, and extending the demonstration of maintenance of the ozone standard through 2022, with new MVEBs, but without relying on emission reductions resulting from implementation of EPA's Clean Air Interstate Rule (CAIR) or Cross-State Air Pollution Rule (CSAPR).

On March 1, 2011 (76 FR 11080), EPA issued a final rulemaking determining that the Milwaukee-Racine and Sheboygan areas had attained the 1997 8-hour ozone NAAQS based on three years of complete, quality-assured ozone data for the 2006–2008, 2007–2009, and 2008–2010 time periods.[1]

On February 9, 2012 (77 FR 6727), EPA issued a rulemaking action proposing to approve Wisconsin's requests to redesignate the Milwaukee-Racine and Sheboygan areas to attainment of the 1997 8-hour ozone standard, as well as proposing to approve Wisconsin's maintenance plans for the areas, volatile organic compound (VOC) and nitrogen oxides ($NO_X$) MVEBs, and VOC and $NO_X$ emissions inventories. This proposed rulemaking sets forth the basis for determining that Wisconsin's redesignation request meets the CAA requirements for redesignation of the Milwaukee-Racine area to attainment for the 1997 8-hour ozone NAAQS. Air quality monitoring data in the Milwaukee-Racine and Sheboygan areas for 2007–2009, 2008–2010, and 2009–2011 show attainment of the 1997 8-hour ozone NAAQS. Preliminary data available for the Milwaukee area for 2012 are consistent with continued attainment. Preliminary 2012 data for the Sheboygan area, however, indicate that the area is currently violating the 1997 8-hour ozone standard. For this reason, EPA is not finalizing action on the State's request to redesignate the Sheboygan area at this time. The primary background for today's action is contained in EPA's February 9, 2012, proposal to approve Wisconsin's redesignation requests, and in EPA's March 1, 2011, final rulemaking determining that the areas have attained the 1997 8-hour ozone NAAQS, based on complete, quality-assured monitoring

[1] Certified ozone data for 2011 demonstrates that the areas continued to attain the 1997 8-hour ozone standard in 2011. EPA recognizes that the ozone data for 2007–2009 as well as the data for 2010 and 2011 are impacted by emission reductions associated with the CAIR, which was promulgated in 2005, but remanded to EPA in 2008. The fact that the data reflect some reductions associated with the remanded and therefore not permanent CAIR, however, is not an impediment to redesignation in the circumstances presented here where WDNR's demonstration and EPA's own modeling demonstrates that the areas do not need reductions associated with the CAIR to attain the 1997 ozone NAAQS.

data for 2006–2008, 2007–2009, and 2008–2010 time periods. In these rulemakings, we noted that under EPA regulations at 40 CFR 50.10 and 40 CFR part 50 appendix I, the 1997 8-hour ozone standard is attained when the 3-year average of the annual fourth highest daily maximum 8-hour average ozone concentrations is less than or equal to 0.08 ppm at all ozone monitoring sites in the area. *See* 69 FR 23857 (April 30, 2004) for further information. To support the redesignation of an area to attainment of the NAAQS, the ozone data must be complete for the three attainment years. The data completeness requirement is met when the 3-year average of days with valid ambient monitoring data is greater than 90 percent, and no single year has less than 75 percent data completeness, as determined in accordance with appendix I of 40 CFR part 50. Under the CAA, EPA may redesignate a nonattainment area to attainment if sufficient, complete, quality-assured data are available demonstrating that the area has attained the standard and if the state meets the other CAA redesignation requirements specified in section 107(d)(3)(E) and section 175A.

The February 9, 2012, proposed redesignation rulemaking provides a detailed discussion of how Wisconsin's ozone redesignation request for the Milwaukee-Racine area meets the CAA requirements for redesignation to attainment. With the final approval of its VOC and $NO_X$ emissions inventories, and its VOC Reasonably Available Control Technology (RACT) regulations, Wisconsin has met all applicable CAA requirements for redesignation to attainment of the area for the 1997 8-hour ozone NAAQS. Complete, quality-assured, and certified air quality monitoring data in the Milwaukee-Racine area for 2009–2011, and preliminary data for 2012, show that this area continues to attain the 1997 8-hour ozone NAAQS. In the maintenance plan it submitted for this area, Wisconsin has demonstrated that attainment of the 1997 8-hour ozone NAAQS will be maintained in the Milwaukee-Racine area through 2022, with or without the implementation of CAIR or CSAPR. In addition, modeling conducted by EPA during the CSAPR rulemaking demonstrates that in both 2012 and 2014, even without taking into account reductions associated solely with CAIR or CSAPR, the counties in the Milwaukee-Racine nonattainment area will have air quality that attains the 1997 ozone NAAQS. Finally, Wisconsin has adopted 2015 and 2022 MVEBs that are supported by Wisconsin's ozone maintenance demonstrations and Wisconsin has adopted an ozone maintenance plan.

## II. What comments did we receive on the proposed rule?

EPA provided a 30-day comment period for the February 9, 2012, proposed rule. During the comment period, Wisconsin Manufacturers and Commerce submitted comments in support of the actions and we received one set of comments objecting to the redesignation of the Milwaukee-Racine area submitted on behalf of the Sierra Club and the Midwest Environmental Defense Center. The adverse comments are summarized and addressed below.

*Comment 1:* The commenter asserts that the redesignation of the Milwaukee-Racine area to attainment of the 1997 8-hour ozone standard would violate the CAA because the State of Wisconsin and EPA have not ensured that nonattainment area New Source Review (NSR) would apply after redesignation. The commenter contends that such a situation conflicts with the language of section 107(d)(3)(E)(v) of the CAA, which requires the State to have met all requirements of part D of the CAA, since part D includes requirements for NSR. The commenter argues that the requirements of section 107(d)(3)(E)(v) make no sense if the State's NSR program is not required to apply in the area after redesignation. The commenter further argues that, at a minimum, a requirement for NSR should be included in the State's ozone maintenance plan as a contingency measure to be implemented if the area subsequently violates the 1997 8-hour ozone standard. The commenter contends that EPA cannot rely on certain policy memoranda to support its approval of the State's ozone redesignation request and ozone maintenance plan without the requirement for the implementation of the NSR program in the Milwaukee-Racine area after redesignation.

*Response 1:* As clearly stated in EPA's October 14, 1994, policy memorandum from Mary D. Nichols entitled ''Part D New Source Review (part D NSR) Requirements for Areas Requesting Redesignation to Attainment,'' ''EPA believes it is reasonable to interpret 'measure,' as used in section 175A(d), not to include part D NSR.'' Congress used the undefined term ''measure'' differently in different provisions of the Act, which indicates that the term is susceptible to more than one interpretation and that EPA has the discretion to interpret it in a reasonable manner in the context of section 175A. *See Greenbaum* v. *EPA,* 370 F.3d 527, 535–38 (6th Cir. 2004). (Court ''find[s] persuasive the EPA's argument that the very nature of the NSR permit program supports its interpretation that it is not intended to be a contingency measure pursuant to section 175A(d).'') It is reasonable to interpret ''measure'' to exclude part D NSR in this context because Prevention of Significant Deterioration (PSD), a program that is the corollary of part D NSR for attainment areas, goes into effect in lieu of part D NSR upon redesignation. PSD requires that new sources demonstrate that emissions from their construction and operation will not cause or contribute to a violation of any NAAQS or PSD increment. The State has demonstrated that the areas will be able to maintain the standard without Part D NSR in effect, and the State's PSD program will become effective in the areas upon redesignation to attainment. *See* the rationale set forth at length in the Nichols Memorandum. *See* also the discussions of why full approval and retention of NSR is not required in redesignation actions in the following redesignation rulemakings: 60 FR 12459, 12467–12468 (March 7, 1995) (Detroit, MI); 61 FR 20458, 20469–20470 (May 7, 1996) (Cleveland-Akron-Lorrain, OH); 66 FR 53665, 53669 (October 23, 2001) (Louisville, KY); 61 FR 31831, 31836–31837 (June 21, 1996) (Grand Rapids, MI); 73 FR 29436, 29440–29441 (May 21, 2008) (Kewaunee County, WI); 77 FR 34819, 34826–34827 (June 12, 2012) (Illinois portion of St. Louis, MO–IL).

*Comment 2:* The commenter contends that the State of Wisconsin does not have a complete PSD program. Therefore, the commenter argues that EPA cannot rely on Wisconsin's PSD program being effective and immediately applicable upon redesignation of the Milwaukee-Racine area. For this reason, and the argument set forth in comment 1 above, the commenter contends that Wisconsin's ozone redesignation request and ozone maintenance plan do not meet the requirements of section 107(d)(3)(E) of the CAA.

The commenter gives the following reasons (*see* Comments 2(a)–2(c)) for its assertion that Wisconsin's PSD and NSR programs are inadequate for purposes of redesignation to attainment.

*Comment 2(a):* The commenter contends that Wisconsin's PSD program does not comply with the requirement in EPA's 1997 8-hour ozone implementation phase 2 rule that $NO_X$ be considered as an ozone precursor under PSD. The commenter argues that the definition in Wisconsin's NSR and PSD regulations specifies only VOC to

be regulated as an ozone precursor. The commenter claims that this allows new or modified sources to add or increase $NO_X$ emissions without analyzing their impacts on ozone levels. The commenter contends that EPA has recently found similar SIPs to be deficient on this basis, and cites EPA's rulemaking at 75 FR 79300 (December 20, 2010, Mississippi PSD rules).

*Response 2(a):* EPA believes that the commenter is mistaken in its view, and that in fact Wisconsin interprets and implements its NSR and PSD regulations to include $NO_X$ as a precursor for ozone. Wisconsin has an approved PSD program that includes ozone as a regulated NSR pollutant. *See* NR 405.02(25i), Wisconsin Administrative Code. While the commenter is correct in stating that Wisconsin's rule does not specifically list $NO_X$ as a precursor for ozone, the rule does define ''regulated NSR air contaminant'' to include ''any air contaminant for which a national ambient air quality standard has been promulgated and any constituents or precursors for the air contaminants identified by the administrator * * *.'' *See* NR 405.02(25i)(a). EPA has identified both VOCs and $NO_X$ as precursors to ozone in the definition of ''Regulated NSR Pollutant.'' *See* 40 CFR 51.166(b)(49)(i)(a), 52.21(b)(50)(i)(a).

Wisconsin also sets a table of significant emissions rates for individual pollutants in the definition of significant at NR 405.02(27)(a). This table sets the significant emissions rate for ozone at 40 tons per year (tpy) of VOCs and separately sets the significant emissions rate for NOx at 40 tpy. Wisconsin interprets its 40 tpy significant emissions rate for nitrogen oxides contained in NR 405.02(27)(a) to apply to require both $NO_2$ and ozone air quality analyses when emissions meet or exceed that emissions rate. Therefore, an increase in $NO_X$ emissions of 40 tpy or more will trigger the requirements to: (1) Obtain a PSD permit for ozone; (2) to perform an air quality analysis that demonstrates that the proposed source or modification will not cause or contribute to a violation of the ozone NAAQS; and (3) to apply best available control technology (BACT) for $NO_X$. Wisconsin has confirmed this interpretation in a May 18, 2012, letter (hereafter, ''Sponseller letter'') and a June 6, 2012, email from Bart Sponseller, Director of the Bureau of Air Management, WDNR to Douglas Aburano, Chief of the Attainment Planning and Maintenance Section, Air Programs Branch, EPA Region 5. Although EPA is requiring Wisconsin to make revisions to its PSD regulations to specifically address $NO_X$ as a precursor to ozone for infrastructure SIP purposes, this interpretation means that Wisconsin is, in practice, requiring air quality analyses for ozone under its state PSD regulations consistent with Federal PSD regulations.

Accordingly, the fact that Wisconsin's approved PSD SIP does not yet explicitly identify $NO_X$ as a precursor to ozone as required by EPA's Phase 2 ozone implementation rule does not prevent the program from addressing and helping to assure maintenance of the ozone standard in accordance with CAA section 175A.

EPA notes that Wisconsin is currently in the process of adopting permanent rules for submission to EPA to add $NO_X$ as an explicit precursor to ozone consistent with the Federal regulations. Irrespective of the State's ongoing regulatory actions, EPA concludes that the features of Wisconsin's currently approved PSD program cited by the commenter do not detract from the program's adequacy for purposes of maintenance of the standard and redesignation of the area. In light of the assurances provided to EPA in the Sponseller letter and email, Wisconsin's currently approved PSD program is adequate for purposes of assuring maintenance of the 1997 8-hour ozone standard as required by section 175A.

*Comment 2(b):* The commenter asserts that the State of Wisconsin does not conduct ambient air quality analyses for ozone standard compliance when issuing PSD permits, and that WDNR does not model ozone impacts, nor does it conduct other analyses of ozone impacts when issuing permits. The commenter therefore argues that Wisconsin's PSD program does not ensure that new and modified sources will not cause additional ozone standard violations.

*Response 2(b):* As discussed in response 2(a), Wisconsin has communicated to EPA that the State is implementing its existing regulations consistent with the requirements of the Federal PSD regulations that require an air quality analysis for ozone if a significant emissions rate of 40 tpy for VOC and/or $NO_X$ is reached or exceeded.

Furthermore, Federal PSD regulations at 40 CFR 51.166(k), (l) and (m) and 40 CFR 52.21(k), (l) and (m) contain requirements for ambient impact analyses for proposed major stationary sources and major modifications to obtain a PSD permit. These requirements apply for ozone when such sources or modifications trigger PSD review for ozone, but do not necessarily require quantitative modeling for ozone in all cases.[2] *See* Letter from Gina McCarthy, EPA Assistant Administrator, Office of Air and Radiation, to Robert Ukeiley (Jan. 4, 2012) at 2; In Re CF&I Steel, L.P. dba EVRAZ Rocky Mountain Steel, Petition Number VIII–2011–01 (Order on Petition) (May 31, 2012) at 21–22. The regulations at 40 CFR 51.166(l) state that for air quality models the SIP shall provide for procedures which specify that all applications of air quality modeling involved in this subpart shall be based on the applicable models, data bases, and other requirements specified in appendix W of part 51 (Guideline on Air Quality Models). Where an air quality model specified in appendix W of part 51 (Guideline on Air Quality Models) is inappropriate, the model may be modified or another model substituted. Such a modification or substitution of a model may be made on a case-by-case basis or, where appropriate, on a generic basis for a specific State program. Written approval of the Administrator must be obtained for any modification or substitution. In addition, use of a modified or substituted model must be subject to notice and opportunity for public comment under procedures set forth in § 51.102. *See* also 40 CFR 52.21(l).

The above-referenced parts of 40 CFR part 51 and 52 contain the umbrella components for ambient air quality and source impact analyses for PSD permitting. PSD requirements for SIPs are found in 40 CFR 51.166. As discussed above, sections 51.166(l) and 52.21(l), and Wisconsin rule NR 405.10, refer to 40 CFR part 51, appendix W for the appropriate method to utilize for the ambient impact assessment. 40 CFR part 51, appendix W is the Guideline on Air Quality Models and Section 1.0.a. states that the *Guideline* recommends air quality modeling techniques that should be applied to State Implementation Plan (SIP) revisions for existing sources and to new source review (NSR), including prevention of significant deterioration (PSD). {footnotes not included} Applicable only to criteria air pollutants, it is intended for use by EPA Regional Offices in judging the adequacy of modeling analyses performed by EPA, State and local agencies, and by industry. The *Guideline* is not intended to be a compendium of modeling techniques. Rather, it should serve as a common measure of acceptable technical analysis when support by sound scientific judgment.

[2] Wisconsin's rules at NR 405.09, NR 405.10 and NR 405.11 meet the requirements of 40 CFR 51.166(k), (l), and (m), respectively.

Appendix W, section 5.2.1 includes the Guideline recommendations for models to be utilized in assessing ambient air quality impacts for ozone. Specifically, Section 5.2.1.c states that choice of methods used to assess the impact of an individual source depends on the nature of the source and its emissions. Thus, model users should consult with the Regional Office to determine the most suitable approach on a case-by-case basis (subsection 3.2.2).

Appendix W, section 5.2.1.c provides that the state and local permitting authorities and permitting applicants should work with the appropriate EPA Regional Office on a case-by-case basis to determine an adequate method for performing an air quality analysis for assessing ozone impacts. Due to the complexity of modeling ozone and the dependency on the regional characteristics of atmospheric conditions, EPA believes this is an appropriate approach, rather than specifying a method for assessing single source ozone impacts, which may not be appropriate in all circumstances.[3] Instead, the choice of method ''depends on the nature of the source and its emissions. Thus, model users should consult with the Regional Office to determine the most suitable approach on a case-by-case basis'' appendix W, section 5.2.1.c. Thus, appendix W allows flexibility through the consultation process to determine either modeling based or other analysis techniques may be acceptable. Based on an evaluation of the source, its emissions and background ozone concentrations, an ozone impact analysis other than modeling may be required. Therefore, permitting authorities should consult and work with EPA Regional Offices as described in appendix W, including section 3.0.b and c, 3.2.2, and 3.3, to determine the appropriate approach to assess ozone impacts for each PSD required evaluation. Although EPA has not selected one particular preferred model in appendix A of appendix W (Summaries of Preferred Air Quality Models) for conducting ozone impact analyses for individual sources, permitting authorities in Wisconsin must comply with the appropriate PSD SIP requirements with respect to ozone.

EPA has previously approved the State's PSD program.[4] EPA expects Wisconsin to consult with staff in the Region 5 Office on a case-by-case basis for permitting purposes to determine appropriate methods for assessing the impacts from specific sources on ozone concentrations. An example of such consultation is the permitting action for Aarrowcast, Inc. in Shawano, Wisconsin.

*Comment 2(c):* The commenter contends that the Wisconsin SIP is deficient because it contains an unacceptable definition of ''major modification'' for purposes of NSR and PSD for sources involving fuel change. The commenter cites a June 17, 2009, letter from EPA to WDNR noting this definition problem in the Wisconsin SIP. The commenter asserts that because of this problem, emissions can increase as a result of non-exempt fuel changes without going through a PSD analysis, meaning that PSD provides no protection for the ozone NAAQS in some situations.

*Response 2(c):* ''Major modification'' as it relates to PSD is generally defined in NR 405.02(21) of Wisconsin's SIP. The exemptions to ''physical change'' or ''change in the method of operation'' are contained at NR 405.02(21)(b). One exemption is the ability of a source capable of accommodating different types of fuels before 1975 to switch the type of fuel burned, unless prohibited by a restriction in a permit established after 1975.

EPA regulations contained at 40 CFR 51.166(b)(2)(iii)(e)(1) and (2) specifically prescribe when use of an alternative fuel is not considered a physical change for purposes of defining a ''major modification.'' These regulations require that a physical change or change in the method shall not include use of an alternative fuel or raw material by a stationary source which the source was capable of accommodating before January 6, 1975, unless such change would be prohibited under any Federally enforceable permit condition which was established after January 6, 1975 pursuant to 40 CFR 52.21 or under regulations approved pursuant to 40 CFR part 51, subpart I, or 40 CFR 51.166; or the source is approved to use the fuel under any permit issued under 40 CFR 52.21 or under regulations approved pursuant to 40 CFR 51.166.

The Wisconsin regulations set out the conditions for the fuel change exemption as follows:

> The source was capable of accommodating the alternative fuel or raw material before January 6, 1975, unless the change would be prohibited under any federally enforceable permit condition which was established after January 6, 1975 pursuant to this chapter or ch. NR 406 or 408 or under an operation permit issued pursuant to ch. NR 407.
>
> [Or, t]he source is approved to use the alternative fuel or raw material under any permit issued under this chapter or ch. NR 406, 407, or 408. *See* NR 405.02(21)(b)(5).

The Wisconsin rule is similar to the Federal rule, but differs by substituting references to Wisconsin Administrative Code sections, and omitting reference to permits issued under the Federal program at 40 CFR 52.21.

The commenter raised concerns that failure to cite Federal regulations results in the loss of prohibitions on fuel use exemptions that may have been contained in Federally-issued PSD permits, issued prior to EPA's approval of Wisconsin's PSD SIP, resulting in more exemptions to the definition of ''major modification'' than allowed by the Federal rules.

WDNR states that under its title V operating permit program, all applicable requirements to a source are included in its operation permit. As a result, WDNR states that it clearly recognizes that requirements contained in a Federally-issued PSD permit would be applicable requirements to the source and that they would be included in the source's title V operating permit, therefore making the requirements fully enforceable under State and Federal law. WDNR has taken the position that this is a very narrow issue and has asserted that ''to its knowledge it is not aware of a single situation where an omission has occurred in practice.'' *See* Sponseller letter. While the commenter contends that emissions can ''increase from non-exempt fuel changes without going through a PSD analysis,'' the commenter has not provided information to support this assertion nor has he identified any instance where any such emissions increase has actually occurred.

Although EPA is requiring Wisconsin to revise its PSD regulations to specifically address this issue for

[3] EPA has explained that given the complexities of ozone formation, its judgment has been that it was not technically sound to designate with particularity specific models that must be used to assess the impacts of a single source on ozone concentrations, but rather has provided a consultation process in appendix W for determining particular models or other analytical techniques that should be used on a case-by-case basis. *See* Letter from Gina McCarthy, EPA Assistant Administrator, Office of Air and Radiation to Robert Ukeiley (Jan. 4, 2012) at 2. However, EPA granted a petition for rulemaking on January 4, 2012, stating that it would engage in a rulemaking process to consider whether updates to EPA's *Guideline on Air Quality Models* as published in appendix W are warranted, and, as appropriate, to incorporate new analytical techniques or models for ozone. *Id* at 1.

[4] *See,* ''Approval and Promulgation of Implementation Plans; Wisconsin,'' 64 FR 28745 (May 27, 1999). While the Phase 2 Rule obligates states to make explicit regulatory changes in order to clarify and remove any ambiguity concerning the requirement that $NO_X$ be treated as a precursor to ozone in permitting contexts, the State has authority in its PSD SIP to treat $NO_X$ as a precursor to ozone in permitting decisions, and the State is correctly interpreting its PSD and NSR regulations with regard to inclusion of $NO_X$ as a precursor to ozone as discussed in Response 2(a).

infrastructure SIP purposes, EPA agrees with WDNR that this issue is a very narrow one, and that an omission in practice is perhaps nonexistent. EPA recognizes that in practice, WDNR has the authority and means to ensure adherence to the prohibitions on fuel use exemptions in certain instances, consistent with our own definition of ''major modification.'' Therefore, EPA concludes that the features of Wisconsin's current PSD program cited by the commenter do not detract from the program's adequacy for purposes of maintenance of the standard and redesignation of the area.

*Comment 3:* The commenter asserts that, besides PSD and NSR deficiencies, the Wisconsin SIP contains several other deficiencies that are contrary to the requirements of section 110 of the CAA.

The commenter claims that the Wisconsin SIP contains a source startup and shutdown excess emissions exemption that EPA has found to be not approvable and in conflict with section 110 of the CAA. The commenter also asserts that the Wisconsin SIP contains ''illegal'' Director's Discretion provisions and that EPA has interpreted section 110 as prohibiting such SIP provisions. The commenter claims that the Wisconsin Administrative Code contains such provisions at NR 436.03(2), NR 436.04, and NR 436.06. The commenter asserts that, historically, EPA has determined that it cannot approve SIPs as being adequate when they contain such Director's Discretion provisions that have the potential to change the stringency of the SIP.

*Response 3:* The issue before EPA in the current rulemaking action is a redesignation for the Milwaukee-Racine area for the 1997 8-hour ozone standard, including the maintenance plan, and comprehensive emissions inventories. The SIP provisions identified by the commenter are not currently being proposed for revision as part of the redesignation submittals. Because the rules cited by the commenter are not pending before EPA and/or are not the subject of this rulemaking action, EPA did not undertake a full SIP review of the individual provisions. It has long been established that EPA may rely on prior SIP approvals in approving a redesignation request plus any additional measures it may approve in conjunction with a redesignation action. *See e.g.,* page 3 of the September 4, 1992, memorandum from John Calcagni entitled ''Procedures for Processing Requests to Redesignate Areas to Attainment'' (Calcagni Memorandum); *Wall* v. *EPA,* 265 F.3d 426 (6th Cir. 2001); *Southwestern Pennsylvania Growth Alliance* v. *Browner,* 144 F.3d 984 (6th Cir. 1998); 68 FR 25413, 25426 (May 12, 2003) (St. Louis redesignation). The CAA does not require EPA in the context of a redesignation to attainment to revisit and address existing SIP provisions, and envisions that EPA may address such issues separately and outside the context of action on a redesignation request.

The CAA provides other avenues and mechanisms to address specific substantive deficiencies in existing SIPs. These statutory tools allow EPA to take appropriate tailored action, depending upon the nature and severity of the alleged SIP deficiency. Section 110(k)(5) authorizes EPA to issue a ''SIP call'' whenever the Agency determines that a state's SIP is substantially inadequate to attain or maintain the NAAQS, to mitigate interstate transport, or otherwise to comply with the CAA.[5] Section 110(k)(6) authorizes EPA to correct errors in past actions, such as past approvals of SIP submissions.[6]

*Comment 4:* The commenter argues that EPA has not demonstrated that the reduction in ozone pollution in the Milwaukee-Racine area is due to permanent and enforceable emission reductions. The bases for the commenter's assertion are set forth in comments 4(a) through (f).

*Comment 4a:* The commenter asserts that comparing 2005 and 2008 emissions in the Milwaukee-Racine ozone nonattainment area is not an adequate method to demonstrate that the ozone air quality improvement in this area is due to the implementation of permanent and enforceable emission control measures, in keeping with section 107(d)(3)(E)(iii) of the CAA. The commenter contends that the calculated change in VOC and $NO_X$ emissions between 2005 and 2008 does not show that the emission changes were due to permanent and enforceable emission reductions, as opposed to temporary emission reductions and/or emission reductions due to factory output slowdowns (under utilization of factory capacity) or recession-related output and transportation declines.

To support the commenter's assertion, the commenter compares 2008 permitted (allowable) $NO_X$ emissions for electric power plants in the Milwaukee-Racine area with the total point source $NO_X$ emissions documented by EPA for this area in EPA's Milwaukee-Racine area ozone redesignation proposed rule. The commenter shows that the permitted $NO_X$ emissions from only the electric power plants in the Milwaukee-Racine area exceed the actual 2008 $NO_X$ emissions for all point sources in the Milwaukee-Racine area reported by EPA in the proposed rule for the redesignation of the Milwaukee-Racine area to attainment of the 1997 8-hour ozone standard, 77 FR 6738. The commenter contends that the comparison of permitted $NO_X$ emissions (electric generating plants) and actual, reported $NO_X$ emissions (all point sources) shows that facilities can lawfully emit at much higher rates. Therefore, the commenter asserts that EPA has not properly considered permanent and enforceable emission reductions.

*Response 4a:* EPA's longstanding practice and policy[7] provide for states to demonstrate permanent and enforceable emissions reductions by comparing nonattainment area emissions occurring during the nonattainment period with emissions in the area during the attainment period. Therefore, selecting 2008 as a representative attainment year, and comparing emissions for this year to those of a representative year during the nonattainment period, 2005, is an appropriate and long-established approach to demonstrate that emission reductions occurred in the area between the years of nonattainment and attainment. These reductions, therefore, can be seen to account for the observed air quality improvement.

As discussed in the proposed rule at 77 FR 6727, 6737–6738 (February 9, 2012), Wisconsin and upwind areas have implemented a number of permanent and enforceable regulatory control measures which have reduced emissions and resulted in a corresponding improvement in air quality. These controls include regulations to control $NO_X$ emissions at electric utilities and large industrial combustion sources and establish $NO_X$ emissions standards for new sources;

[5] For example, EPA has recently issued a SIP call in Utah to rectify a specific SIP deficiency related to a startup, shutdown and malfunction issue. *See,* ''Finding of Substantial Inadequacy of Implementation Plan; Call for Utah State Implementation Plan Revision,'' 74 FR 21639 (April 18, 2011).

[6] EPA has recently utilized this authority to correct errors in past actions on SIP submissions related to PSD programs. *See,* ''Limitation of Approval of Prevention of Significant Deterioration Provisions Concerning Greenhouse Gas Emitting-Sources in State Implementation Plans; Final Rule,'' 75 FR 82,536 (December 30, 2010). EPA has previously used its authority under CAA 110(k)(6) to remove numerous other SIP provisions that the Agency determined it had approved in error. *See, e.g.,* 61 FR 38664 (July 25, 1996) and 62 FR 34641 (June 27, 1997) (corrections to American Samoa, Arizona, California, Hawaii, and Nevada SIPs); 69 FR 67062 (November 16, 2004) (corrections to California SIP); and 74 FR 57051 (November 3, 2009) (corrections to Arizona and Nevada SIPs).

[7] *See* Calcagni memorandum, pp. 4 and 8–9.

Tier 2 emission standards for vehicles; and the nonroad diesel rule. In addition a broad range of emission sectors were required to reduce ozone precursors as a result of being subject to Federal new source performance standards, national emissions standards for hazardous air pollutants, and maximum achievable control technology standards with compliance requirements that take effect over the relevant time period. Further, Federal control measures as well as the $NO_X$ SIP Call have resulted in reduced ozone precursors being transported into the area. While the commenter expressed concerns that the emissions reductions may be temporary and/or due to factory output slowdowns (underutilization of factory capacity) or recession-related output and transportation declines, the commenter has made no demonstration that this is the case.

With regard to consideration of actual versus allowable/permitted emission levels, longstanding practice and EPA policy support the use of actual emissions when demonstrating permanent and enforceable emission reductions.[8] Changes in actual emissions are more reflective of emission reductions that in reality contribute to improvements in monitored ozone concentrations. Sources seldom, if ever, emit at maximum allowable emission levels, and assuming that all sources simultaneously operate at maximum capacity would result in a gross overestimation of emission levels. For this reason, EPA believes actual emissions are the appropriate emission levels to consider when comparing nonattainment year emissions with attainment year emissions.

*Comment 4b:* The commenter contends that neither EPA nor the State of Wisconsin made any calculation of the amounts of emission reduction that actually resulted from the implementation of permanent and enforceable emission controls. The commenter asserts that there was no connection between the reported change in actual emissions and the enforceable emission reduction requirements implemented in the Milwaukee-Racine area.

The commenter objects to EPA's listing of implemented emission control requirements as a demonstration that such emission control requirements have resulted in the observed ozone air quality improvement in the Milwaukee-Racine area. The commenter states that EPA has not estimated the emission impacts of each of the implemented emission control requirements and contends that EPA has not tied such emissions impacts to the reported change in actual emissions between 2005 and 2008.

*Response 4b:* EPA's conclusion here is fully supported by the facts and applicable legal criteria. EPA's longstanding practice and policy[9] provides for states to demonstrate permanent and enforceable emissions reductions by comparing nonattainment area emissions occurring during the nonattainment period with emissions in the area during the attainment period. *See* response 4a.

Therefore, selecting 2008 as a representative attainment year, and comparing emissions for this year to those for a representative year during the nonattainment period, 2005, is an appropriate and long-established approach to establish that emission reductions occurred in the area between the years of nonattainment and attainment. These emission reductions, therefore, can be seen to account for the observed air quality improvement.

In developing the attainment year emissions inventory, the State took into account permanent and enforceable emissions control programs being implemented when estimating emissions. The change in emissions from 2005 to 2008 is shown in Table 4 in the proposed rule (77 FR 6727, 6738).

For point sources, the State's emissions estimates factored in process information, operation information and control factors. Wisconsin adopted $NO_X$ RACT regulations to control $NO_X$ emissions at electric utilities and large industrial combustion sources and established $NO_X$ emissions standards for new sources. The regulation of existing sources was estimated to achieve a 30 ton per day (tpd) reduction in $NO_X$ by 2003 and a 55 tpd reduction by 2007, *i.e.,* approximately a 25 tpd reduction between 2003, a nonattainment year and 2007, an attainment year.

For area sources, emissions are strongly associated with population levels. Therefore, although controls were considered in area source calculations, emissions grew slightly between 2005 and 2008 as a result of population growth.

Reductions in VOC and $NO_X$ emissions have occurred as a result of Federal mobile source emission control measures, with additional emission reductions expected to occur over the maintenance period. These measures include Tier 2 Emission Standards for Vehicles and Gasoline Sulfur Standards, the Heavy-Duty Diesel Engine Rule, and the Nonroad Diesel Rule. Emissions reductions from these permanent and enforceable programs were quantified by the State in its calculation of the nonroad and onroad mobile sector emissions inventories.

For nonroad mobile sources, it is standard and accepted practice for states to estimate emissions using an EPA-approved emissions model. Wisconsin ran EPA's approved emissions model, National Mobile Inventory Model (NMIM), which estimates emissions while taking into account the effect of Federal nonroad mobile control programs and fleet turnover. The NMIM model showed that between 2005 and 2008, total nonroad VOC and $NO_X$ emissions in the Milwaukee-Racine area were reduced by approximately 17 percent and 10 percent, respectively. The emissions estimates generated by NMIM quantify permanent and enforceable emissions reductions from nonroad mobile control programs; it is not necessary for the state to identify the portion of these reductions attributable to each individual control measure.

For onroad mobile sources, it is standard and accepted practice for states to estimate emissions using an EPA-approved emissions model and daily vehicle miles traveled data. Wisconsin ran EPA's approved onroad mobile emissions model, MOVES2010a, which takes into account the effect of Federal motor vehicle control programs and fleet turnover when calculating emissions estimates. Between 2005 and 2008, onroad VOC and $NO_X$ emissions in the Milwaukee-Racine area were reduced by approximately 22 percent and 21 percent, respectively. The emissions estimates generated by the MOVES model quantify permanent and enforceable emissions reductions from all Federal motor vehicle control programs; it is not necessary for the state to identify the portion of these reductions attributable to each individual control measure.

Permanent and enforceable emissions reductions in upwind areas also contributed to attainment of the 1997 8-hour ozone standard in the Milwaukee-Racine area. While Wisconsin did not quantify these upwind emissions reductions by state, overall emissions reductions estimates, by program, are available. Under the $NO_X$ SIP Call, ozone season $NO_X$ emissions were reduced by approximately 68,000[10] tons between 2005 and 2008. In addition, permanent and enforceable reductions in VOC and $NO_X$ emissions have

[8] *See* Calcagni Memorandum, pp. 4 and 8–9.

[9] *See* Calcagni memorandum, pp. 4 and 8–9.

[10] *See* 2008 NOx Budget Trading Program Progress Report, *http://www.epa.gov/airmarkets/progress/NBP_4.html.*

occurred in upwind areas from Federal motor vehicle control programs. Overall emissions reductions from the implementation of these programs have been estimated as follows: Tier 2 Emission Standards for Vehicles and Gasoline Sulfur Standards, 69–95 percent reduction in $NO_X$ and 12–18 percent reduction in VOCs, depending on vehicle class; the Heavy-Duty Diesel Engine Rule, 95 percent reduction in $NO_X$; and the Nonroad Diesel Rule, 90 percent reduction in $NO_X$. Some of these emission reductions occurred by the attainment period and additional emission reductions will occur during the maintenance period as the fleet turns over.

It is not necessary for every change in emissions between the nonattainment year and the attainment year to be permanent and enforceable. Rather, the improvement in air quality necessary for the area to attain the relevant NAAQS must be reasonably attributable to permanent and enforceable reductions in emissions. In summary, the State has identified a number of permanent and enforceable regulatory control measures which have been implemented in Wisconsin as well as in upwind areas and has documented significant emissions reductions resulting from these programs. These documented permanent and enforceable emissions reductions in combination with four three-year periods of monitoring data showing that the Milwaukee-Racine area is attaining the 1997 8-hour ozone NAAQS (2006–2008, 2007–2009, 2008–2010, and 2009–2011) represents an adequate demonstration that the improvement in air quality can reasonably be attributed to the significant reduction in emissions resulting from permanent and enforceable emissions control programs.

*Comment 4c:* The commenter objects to EPA's statement that emission reductions resulted from Wisconsin's implementation of the Rate-Of-Progress (ROP) plan under the previous 1-hour ozone standard. The commenter claims that the ROP plan was implemented well before 2005, the base year of EPA's emission comparison, and that implementation preceded the years the area violated the 1997 8-hour ozone standard.

*Response 4c:* The commenter's objection is unfounded. EPA mentioned Wisconsin's ROP plan under the 1-hour ozone standard in the context of its discussion of Wisconsin's stationary source $NO_X$ emission control rules. *See* 77 FR 6737. Wisconsin estimated that the State's stationary $NO_X$ emission control rules, which include emission controls applied at electric utilities and large industrial combustion sources, would produce $NO_X$ emission reductions between 2005 and 2007. Wisconsin estimated that these emission controls would achieve a 30 tpd reduction in $NO_X$ emissions by 2003 and a 55 tpd reduction by 2007, *i.e.,* approximately a 25 tpd additional reduction between 2003 and 2007.

The fact that the State adopted the $NO_X$ control rules in the State's ROP plan under the 1-hour ozone standard and that it began implementing the ROP plan prior to 2005 does not preclude $NO_X$ emission reductions from these $NO_X$ control rules from occurring after 2005. The implementation of these rules was phased in over time, resulting in additional emission reductions for a number of years after the State's adoption of the $NO_X$ emissions control regulations.

*Comment 4d:* The commenter objects to EPA's citing of EPA's 2004 non-road diesel engine rule and 2000 and 2007 heavy duty diesel rules without acknowledging that the emissions reduction estimates for these rules are national calculations of the possible emission impacts once the rules are fully implemented. The commenter argues that, since these rules rely on fleet turnover, they did not result in major emission reductions between 2005 and 2008. The commenter believes that EPA erred in not making an emission reduction estimate for the local impacts of these rules during the period of 2005–2008.

*Response 4d:* There is no basis for EPA to conclude that the Federal diesel emission controls cited by the commenter have had a smaller impact, on a percentage emission reduction basis, in the Milwaukee-Racine area than in other parts of the United States. EPA has cited national emission reduction estimates on a percentage basis for these controls, with the implication that similar emission reduction percentages have occurred in the Milwaukee-Racine area. The commenter has provided no independent emission reduction estimates localized to the Milwaukee-Racine area to refute EPA's assumption that such emission reductions have occurred in the Milwaukee-Racine area. Lacking such estimates, EPA continues to believe that the Federal diesel emission control requirements have resulted in reduced $NO_X$ and VOC emissions in the Milwaukee-Racine area, resulting in lower peak ozone concentrations in this area.

Furthermore, for nonroad mobile sources, it is a standard and accepted practice for states to estimate emissions using an EPA-approved emissions model. Wisconsin ran EPA's approved emissions model, NMIM, which takes into account the affect of Federal nonroad mobile control programs and fleet turnover when calculating emissions estimates. Between 2005 and 2008, total nonroad VOC and $NO_X$ emissions in the Milwaukee-Racine area were reduced by approximately 17 percent and 10 percent, respectively.

For onroad mobile sources, it is standard and accepted practice for states to estimate emissions using an EPA-approved emissions model and daily vehicle miles traveled data. Wisconsin ran EPA's approved onroad mobile emissions model, MOVES2010a, which takes into account the affect of Federal motor vehicle control programs and fleet turnover when calculating emissions estimates. Between 2005 and 2008, onroad VOC and $NO_X$ emissions in the Milwaukee-Racine area were reduced by approximately 22 percent and 21 percent, respectively.

*Comment 4e:* The commenter objects to EPA's reference to the $NO_X$ SIP Call since EPA failed to mention that Wisconsin sources were not included in this regulation. The commenter asserts that the $NO_X$ emission reductions resulting for sources upwind of the Milwaukee-Racine area are not permanent and enforceable because the $NO_X$ SIP Call has been replaced and its replacement has been stayed by the United States Court of Appeals for the District of Columbia Circuit (D.C. Appeals Court). Finally, the commenter argues that the $NO_X$ SIP Call cannot be relied on to produce permanent and enforceable $NO_X$ emission reductions because the $NO_X$ SIP Call provides for the use of a cap-and-trade emission control program, which the D.C. Appeals Court has held cannot satisfy area-specific statutory emission control requirements. *NRDC* v. *EPA,* 571 F.3d 1245, 1257 (D.C. Cir. 2009).

*Response 4e:* The commenter's assertion that EPA failed to mention that Wisconsin sources were not covered by the $NO_X$ SIP Call is incorrect. The proposal included a footnote explicitly noting that the State of Wisconsin was not included in the $NO_X$ SIP Call (77 FR 6732 n.3). EPA also did not propose to rely on and is not relying on any reductions associated with the $NO_X$ SIP Call in the State of Wisconsin or in the Milwaukee-Racine ozone nonattainment area. With regard to $NO_X$ emission reductions in the Milwaukee-Racine ozone nonattainment area, we note here that Wisconsin has adopted and implemented $NO_X$ RACT rules for major $NO_X$ sources in the Milwaukee-Racine ozone nonattainment area. These $NO_X$ RACT rules were approved into the

Wisconsin SIP by the EPA on October 19, 2010, 75 FR 64155. Wisconsin's $NO_X$ RACT rules became effective on August 1, 2007, and required source compliance with the rules by May 1, 2009. Although sources had until May 1, 2009, to fully comply with the $NO_X$ RACT rules, EPA believes that some sources began implementation of the required $NO_X$ emission controls well ahead of this implementation deadline, resulting in $NO_X$ emission reductions in the Milwaukee-Racine ozone nonattainment area by 2008. These $NO_X$ emission controls are permanent and enforceable.

While the $NO_X$ SIP Call did not cover the State of Wisconsin, it did require the District of Columbia and 22 states to reduce emissions of $NO_X$ and, as EPA noted in the proposal, these reductions resulted in lower concentrations of transported ozone entering the Milwaukee-Racine area. 77 FR 6737. Because the area is impacted by the transport of ozone and its precursors, upwind reductions in $NO_X$ resulting from the $NO_X$ SIP Call are relevant to these redesignation actions. EPA disagrees with the commenter's position that $NO_X$ emission reductions in areas upwind of the Milwaukee-Racine area and associated with the $NO_X$ SIP Call cannot be considered to be permanent and enforceable. The commenter's first argument—that the $NO_X$ emission reductions are not permanent and enforceable because the $NO_X$ SIP Call has been replaced—is based on a misunderstanding of the relationship between CAIR and the $NO_X$ SIP Call. While the CAIR ozone-season trading program replaced the ozone-season $NO_X$ trading program developed in the $NO_X$ SIP Call (70 FR 25290), nothing in the CAIR relieved states of their $NO_X$ SIP Call obligations. In fact, in the preamble to CAIR, EPA emphasized that the states and certain units covered by the $NO_X$ SIP Call but not CAIR must still satisfy the requirements of the $NO_X$ SIP Call. EPA provided guidance regarding how such states could meet these obligations.[11] EPA did not suggest that states could disregard their $NO_X$ SIP Call obligations. (70 FR 25290). For states covered by the $NO_X$ SIP Call, the CAIR $NO_X$ ozone season program provides a way to continue to meet the $NO_X$ SIP Call obligations for electric generating units (EGUs) and large non-electric generating units (nonEGUs). In addition, the anti-backsliding provisions of 40 CFR 51.905(f) specifically provide that the provisions of the $NO_X$ SIP Call, including the statewide $NO_X$ emission budgets, continue to apply.

In sum, the requirements of the $NO_X$ SIP Call remain in force. They are permanent and enforceable as are state regulations developed to implement the requirements of the $NO_X$ SIP Call. Further, the fact that the CSAPR which was to replace CAIR was stayed by the D.C. Appeals Court is not relevant since neither CAIR nor the CSAPR replace the requirements of the $NO_X$ SIP Call, and EPA has determined that the area does not need any additional reductions from CAIR or the CSAPR to remain in attainment.

EPA also disagrees with the commenter's argument that the emission reductions in upwind areas associated with the $NO_X$ SIP Call cannot be considered permanent and enforceable because the $NO_X$ SIP Call provides for a trading program. There is no support for the commenter's argument that EPA must ignore all emission reductions in upwind areas that were achieved by the $NO_X$ SIP Call simply because the mechanism used to achieve the emission reductions is an emissions trading program. As a general matter, trading programs establish mandatory caps on emissions and permanently reduce the total emissions allowed by sources subject to the programs. The emission caps and associated controls are enforced through the associated SIP rules or Federal Implementation Plans (FIPs). Any purchase of allowances and increase in emissions by a utility necessitates a corresponding sale of allowances and results in an emission reduction by another utility. Given the regional nature of ozone formation and transport, the emission reductions will have an air quality benefit that will compensate, at least in part, for the impact of any emission increase.

In addition, the case cited by the commenter, *NRDC* v. *EPA,* 571 F.3d 1245 (DC Cir. 2009), does not support the commenter's position. The case addressed EPA's determination that the CAA nonattainment area RACT requirement was satisfied by the $NO_X$ SIP Call trading program. The court held that, because EPA had not demonstrated that the trading program would result in sufficient emission reductions within a nonattainment area, its determination that the program satisfied RACT was not supported. *Id.* 1256–58. The court explicitly noted that EPA might be able to reinstate the provision providing that compliance with the $NO_X$ SIP Call satisfies $NO_X$ RACT for EGUs for particular nonattainment areas if, upon conducting a technical analysis, it could demonstrate that the $NO_X$ SIP Call results in greater emissions reductions in a nonattainment area than would be achieved if RACT-level controls were installed in that area. *Id.* at 1258. In this case, EPA did not assume that the $NO_X$ SIP Call led to any reductions within the nonattainment area. As such, the *NRDC* v. *EPA* decision is not relevant here.

*Comment 4f:* The commenter asserts that neither EPA nor the State of Wisconsin have attempted to demonstrate the connection between the reported emission reductions and the observed ozone air quality improvement in the Milwaukee-Racine area. No modeling or other acceptable analyses, including temporal analyses of emission changes and ozone changes, have been done to demonstrate that the emission reductions are responsible for the observed air quality improvement. No correlation between emission changes and ozone changes has been established. Therefore, EPA has failed to prove that permanent and enforceable emission reductions have caused the observed ozone air quality improvement in the Milwaukee-Racine area.

*Response 4f:* EPA's conclusion that the ozone improvement in the Milwaukee-Racine area is due to the implementation of emission controls is fully supported by the facts and applicable legal criteria. As discussed in greater detail in response 4(b), EPA's longstanding practice and policy provides for states to demonstrate permanent and enforceable emissions reductions by comparing nonattainment area emissions occurring during the nonattainment period with the emissions in the area during the attainment period. Therefore, selecting 2008 as a representative attainment year, and comparing emissions for this year to those for a representative year during the nonattainment period, 2005, is an appropriate and long-established approach that demonstrates the occurrence of emission reductions in the area between the years of nonattainment and attainment. These emission reductions, therefore, can be seen to account for the observed air quality improvement.

With respect to the commenter's assertion that EPA has not conducted analyses to prove that emission reductions between 2005 and 2008 led to reduced ozone concentrations, as noted above, comparing emissions for a representative nonattainment year to emissions for a representative attainment year is such a demonstration. The CAA does not specifically require the use of modeling in making any such demonstration and it has not been the general practice to do so. The State has

[11] EPA guidance regarding the $NO_X$ SIP Call transition to CAIR can be found at *http://www.epa.gov/airmarkets/progsregs/cair/faq-10.html.* EPA guidance regarding the $NO_X$ SIP Call transition for the CSAPR can be found at *http://www.epa.gov/crossstaterule/faqs.html.*

identified a number of permanent and enforceable regulatory control measures that have been implemented in Wisconsin as well as in upwind areas, and has documented significant emissions reductions resulting from these programs. These documented permanent and enforceable emissions reductions in combination with four three-year periods of monitoring data showing that the Milwaukee-Racine area is attaining the 1997 8-hour ozone NAAQS (2006–2008, 2007–2009, 2008–2010, and 2009–2011) represents an adequate demonstration that the improvement in air quality can reasonably be attributed to the significant reduction in emissions resulting from permanent and enforceable emissions control programs.

*Comment 5:* The commenter contends that EPA has not conducted an adequate analysis of the effect the ozone redesignation will have on other NAAQS. The commenter claims that EPA has failed to comply with the requirements of section 110(l), which requires EPA to conduct such an analysis whenever it approves a revision in a state air quality plan.

*Response 5:* Section 110(l) provides in part: ''the Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress * * *, or any other applicable requirement of this chapter.'' As a general matter, EPA must and does consider section 110(l) requirements for every SIP revision, including whether the revision would ''interfere with'' any applicable requirement. *See, e.g.,* 70 FR 53, 57 (January 3, 2005); 70 FR 17029, 17033 (April 4, 2005); 70 FR 28429, 28431 (May 18, 2005); and 70 FR 58119, 58134 (October 5, 2005). The Wisconsin maintenance plan and redesignation for the 1997 8-hour ozone standard do not revise or remove any existing emissions limit for any NAAQS, nor do they alter any existing control requirements. On that basis, EPA concludes that the redesignation will not interfere with attainment or maintenance of any air quality standards. The commenter does not provide any information to demonstrate that approval of this redesignation would have any impact on the area's ability to comply with the any NAAQS. In fact, the maintenance plan provided with the State's submission demonstrates a decline in ozone precursor emissions over the timeframe of the initial maintenance period. As a result, the redesignation will not relax any existing rules or limits, nor will the redesignation alter the status quo air quality. The commenter has not provided any reason that the redesignation might interfere with attainment of any standard or with satisfaction of any other requirement of the CAA, and EPA finds no basis under section 110(l) for EPA to disapprove the SIP revision.

## III. What actions is EPA taking?

EPA is approving a request from the State of Wisconsin to redesignate the Milwaukee-Racine area to attainment of the 1997 8-hour ozone standard. EPA is also taking several other related actions. EPA is approving, as a revision to the Wisconsin SIP, the State's plan for maintaining the 1997 8-hour ozone standard through 2022 in the area. EPA is approving the 2005 emissions inventories as meeting the comprehensive emissions inventory requirement of the CAA for the Milwaukee-Racine and Sheboygan areas. Finally, EPA finds adequate and is approving the State's 2015 and 2022 MVEBs for the Milwaukee-Racine area.

In accordance with 5 U.S.C. 553(d), EPA finds there is good cause for these actions to become effective immediately upon publication. This is because a delayed effective date is unnecessary due to the nature of a redesignation to attainment, which relieves the area from certain CAA requirements that would otherwise apply to it. The immediate effective date for this action is authorized under both 5 U.S.C. 553(d)(1), which provides that rulemaking actions may become effective less than 30 days after publication if the rule ''grants or recognizes an exemption or relieves a restriction,'' and section 553(d)(3), which allows an effective date less than 30 days after publication ''as otherwise provided by the agency for good cause found and published with the rule.'' The purpose of the 30-day waiting period prescribed in section 553(d) is to give affected parties a reasonable time to adjust their behavior and prepare before the final rule takes effect. Today's rule, however, does not create any new regulatory requirements such that affected parties would need time to prepare before the rule takes effect. Rather, today's rule relieves the state of planning requirements for this 8-hour ozone nonattainment area. For these reasons, EPA finds good cause under 5 U.S.C. 553(d)(3) for these actions to become effective on the date of publication of these actions.

## IV. Statutory and Executive Order Reviews

Under the CAA, redesignation of an area to attainment and the accompanying approval of a maintenance plan under section 107(d)(3)(E) are actions that affect the status of a geographical area and do not impose any additional regulatory requirements on sources beyond those imposed by state law. A redesignation to attainment does not in and of itself create any new requirements, but rather results in the applicability of requirements contained in the CAA for areas that have been redesignated to attainment. Moreover, the Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA. These actions do not impose additional requirements beyond those imposed by state law and the CAA. For that reason, these actions:

- Are not a ''significant regulatory action'' subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);
- Do not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);
- Are certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);
- Do not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);
- Do not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);
- Are not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);
- Are not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);
- Are not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the Clean Air Act; and
- Do not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this rule does not have tribal implications as specified by

Executive Order 13175 (65 FR 67249, November 9, 2000), because redesignation is an action that affects the status of a geographical area and does not impose any new regulatory requirements on tribes, impact any existing sources of air pollution on tribal lands, nor impair the maintenance of ozone national ambient air quality standards in tribal lands. However, because there are tribal lands located in Milwaukee County, we provided the affected tribe with the opportunity to consult with EPA on the redesignation. The affected tribe raised no concerns with the redesignation.

The Congressional Review Act, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by October 1, 2012. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (*See* section 307(b)(2).)

**List of Subjects**

*40 CFR Part 52*

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Ozone, Volatile organic compounds.

*40 CFR Part 81*

Air pollution control, Environmental protection, National parks, Wilderness areas.

Dated: July 11, 2012.

**Susan Hedman,**

*Regional Administrator, Region 5.*

Therefore, 40 CFR parts 52 and 81 are amended as follows:

## PART 52—[AMENDED]

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 52.2585 is amended by adding paragraphs (z) and (aa) to read as follows:

### § 52.2585 Control strategy: Ozone.

* * * * *

(z) Approval—Wisconsin submitted 2005 VOC and $NO_X$ emissions inventories for the Milwaukee-Racine and Sheboygan areas on September 11, 2009, and supplemented the submittal on November 16, 2011. Wisconsin's 2005 inventories satisfy the emissions inventory requirements of section 182(a)(1) of the Clean Air Act for the Milwaukee-Racine and Sheboygan areas under the 1997 8-hour ozone standard.

(aa) Approval—On September 11, 2009, Wisconsin submitted a request to redesignate the Milwaukee-Racine area to attainment of the 1997 8-hour ozone standard. The state supplemented this submittal on November 16, 2011. As part of the redesignation request, the State submitted a maintenance plan as required by section 175A of the Clean Air Act. Elements of the section 175 maintenance plan include a contingency plan and an obligation to submit a subsequent maintenance plan revision in 8 years as required by the Clean Air Act. The ozone maintenance plan also establishes 2015 and 2022 Motor Vehicle Emission Budgets (MVEBs) for the area. The 2015 MVEBs for the Milwaukee-Racine area is 21.08 tpd for VOC and 51.22 tpd for $NO_X$. The 2022 MVEBs for the Milwaukee-Racine area is 15.98 tpd for VOC and 31.91 tpd for $NO_X$.

## PART 81—[AMENDED]

■ 3. The authority citation for part 81 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 4. Section 81.350 is amended by revising the entries for Milwaukee-Racine, WI in the table entitled Wisconsin—1997 8-Hour Ozone NAAQS (Primary and Secondary) to read as follows:

### § 81.350 Wisconsin.

* * * * *

WISCONSIN—1997 8-HOUR OZONE NAAQS (PRIMARY AND SECONDARY)

| Designated area | Designation [a] | | Category/classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| * * | * | * | * | * * |
| Milwaukee-Racine, WI: | | | | |
| Kenosha County | 7/31/12 | Attainment. | | |
| Milwaukee County. | | | | |
| Ozaukee County. | | | | |
| Racine County. | | | | |
| Washington County. | | | | |
| Waukesha County. | | | | |
| * * | * | * | * | * * |

[a] Includes Indian Country located in each county or area, except as otherwise specified.
[1] This date is June 15, 2004, unless otherwise noted.

* * * * *

[FR Doc. 2012–18091 Filed 7–30–12; 8:45 am]
BILLING CODE 6560–50–P

## DEPARTMENT OF HOMELAND SECURITY

## Federal Emergency Management Agency

## 44 CFR Part 67

**[Docket ID FEMA–2012–0003]**

## Final Flood Elevation Determinations

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Final rule.

**SUMMARY:** Base (1% annual-chance) Flood Elevations (BFEs) and modified BFEs are made final for the communities listed below. The BFEs and modified BFEs are the basis for the floodplain management measures that each community is required either to adopt or to show evidence of being already in effect in order to qualify or remain qualified for participation in the National Flood Insurance Program (NFIP).

**DATES:** The date of issuance of the Flood Insurance Rate Map (FIRM) showing BFEs and modified BFEs for each community. This date may be obtained by contacting the office where the maps are available for inspection as indicated in the table below.

**ADDRESSES:** The final BFEs for each community are available for inspection at the office of the Chief Executive Officer of each community. The respective addresses are listed in the table below.

**FOR FURTHER INFORMATION CONTACT:** Luis Rodriguez, Chief, Engineering Management Branch, Federal Insurance and Mitigation Administration, Federal Emergency Management Agency, 500 C Street SW., Washington, DC 20472, (202) 646–4064, or (email) *Luis.Rodriguez3@fema.dhs.gov.*

**SUPPLEMENTARY INFORMATION:** The Federal Emergency Management Agency (FEMA) makes the final determinations listed below for the modified BFEs for each community listed. These modified elevations have been published in newspapers of local circulation and ninety (90) days have elapsed since that publication. The Deputy Associate Administrator for Mitigation has resolved any appeals resulting from this notification.

This final rule is issued in accordance with section 110 of the Flood Disaster Protection Act of 1973, 42 U.S.C. 4104, and 44 CFR part 67. FEMA has developed criteria for floodplain management in floodprone areas in accordance with 44 CFR part 60.

Interested lessees and owners of real property are encouraged to review the proof Flood Insurance Study and FIRM available at the address cited below for each community. The BFEs and modified BFEs are made final in the communities listed below. Elevations at selected locations in each community are shown.

*National Environmental Policy Act.* This final rule is categorically excluded from the requirements of 44 CFR part 10, Environmental Consideration. An environmental impact assessment has not been prepared.

*Regulatory Flexibility Act.* As flood elevation determinations are not within the scope of the Regulatory Flexibility Act, 5 U.S.C. 601–612, a regulatory flexibility analysis is not required.

*Regulatory Classification.* This final rule is not a significant regulatory action under the criteria of section 3(f) of Executive Order 12866 of September 30, 1993, Regulatory Planning and Review, 58 FR 51735.

*Executive Order 13132, Federalism.* This final rule involves no policies that have federalism implications under Executive Order 13132.

*Executive Order 12988, Civil Justice Reform.* This final rule meets the applicable standards of Executive Order 12988.

### List of Subjects in 44 CFR Part 67

Administrative practice and procedure, Flood insurance, Reporting and recordkeeping requirements.

Accordingly, 44 CFR part 67 is amended as follows:

## PART 67—[AMENDED]

■ 1. The authority citation for part 67 continues to read as follows:

**Authority:** 42 U.S.C. 4001 *et seq.;* Reorganization Plan No. 3 of 1978, 3 CFR, 1978 Comp., p. 329; E.O. 12127, 44 FR 19367, 3 CFR, 1979 Comp., p. 376.

### § 67.11 [Amended]

■ 2. The tables published under the authority of § 67.11 are amended as follows:

| State | City/town/county | Source of flooding | Location | * Elevation in feet (NGVD)<br>+ Elevation in feet (NAVD)<br># Depth in feet above ground<br>∧ Elevation in meters (MSL)<br>Modified |
|---|---|---|---|---|
| | | **Unincorporated Areas of Solano County, California**<br>**Docket No.: FEMA–B–1200** | | |
| California | Unincorporated Areas of Solano County. | Sweany Creek | Approximately 375 feet upstream of the McCune Creek confluence. | +64 |
| | | | Approximately 930 feet upstream of Timm Road | +149 |

* National Geodetic Vertical Datum.
\+ North American Vertical Datum.
\# Depth in feet above ground.
∧ Mean Sea Level, rounded to the nearest 0.1 meter.

**ADDRESSES**

**Unincorporated Areas of Solano County**

Maps are available for inspection at the Solano County Public Works Department, 675 Texas Street, Suite 5500, Fairfield, CA 94533.

reference, Intergovernmental relations, Nitrogen dioxide, Ozone, Volatile organic compounds.

Dated: May 30, 2012.

**W.C. Early,**

*Acting Regional Administrator, Region III.*

40 CFR part 52 is amended as follows:

## PART 52—[AMENDED]

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart V—Maryland

■ 2. Section 52.1076 is amended by adding paragraph (y) to read as follows.

**§ 52.1076 Control strategy plans for attainment and rate-of-progress: Ozone.**

* * * * *

(y) Determination—EPA has determined that, as of July 12, 2012, the Baltimore 1-hour ozone nonattainment area has attained the 1-hour ozone standard and that this determination obviates the requirement for Maryland to submit for the Baltimore area the 1-hour ozone contingency measure requirements of section 172(c)(9) of the Clean Air Act.

■ 3. Section 52.1082 is amended by adding paragraphs (f) and (g) to read as follows.

**§ 52.1082 Determinations of attainment.**

* * * * *

(f) Based upon EPA's review of the air quality data for the 3-year period 2003 to 2005, EPA determined, as of July 12, 2012, that the Baltimore 1-hour ozone nonattainment area did not attain the 1-hour ozone standard as of its applicable 1-hour ozone attainment date of November 15, 2005.

(g) Based on 2009–2011 complete, quality-assured ozone monitoring data at all monitoring sites in the Baltimore 1-hour ozone nonattainment area, EPA determined, as of July 12, 2012, that the Baltimore 1-hour ozone nonattainment area has attained the 1-hour ozone standard.

[FR Doc. 2012–14141 Filed 6–11–12; 8:45 am]

BILLING CODE 6560–50–P

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 52 and 81

**[EPA–R05–OAR–2010–0523; FRL–9683–7]**

## Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Illinois; Redesignation of the Illinois Portion of the St. Louis, MO–IL Area to Attainment for the 1997 8-hour Ozone Standard

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is approving a request from the State of Illinois to redesignate the Illinois portion of the St. Louis, MO–IL area to attainment of the 1997 8-hour ozone National Ambient Air Quality Standard (NAAQS or standard). The St. Louis area includes Jersey, Madison, Monroe, and St. Clair Counties in Illinois and St. Louis City and Franklin, Jefferson, St. Charles, and St. Louis Counties in Missouri. The Illinois Environmental Protection Agency (IEPA) submitted this request on May 26, 2010, and supplemented its request on September 16, 2011. EPA proposed to approve this submission on December 22, 2011, and provided a 30-day review and comment period. On January 20, 2012, EPA extended the public comment period for an additional 30 days. The comment period closed on February 22, 2012. EPA received comments submitted on behalf of Sierra Club. In addition to approving the redesignation request EPA is taking several other related actions. EPA is approving, as a revision to the Illinois State Implementation Plan (SIP), the State's plan for maintaining the 1997 8-hour ozone standard through 2025 in the area. EPA is approving the 2002 emissions inventory, submitted by IEPA on June 21, 2006, and supplemented on September 16, 2011, as meeting the comprehensive emissions inventory requirement of the Clean Air Act (CAA) for the Illinois portion of the St. Louis area. Finally, EPA finds adequate and is approving the State's 2008 and 2025 Motor Vehicle Emission Budgets (MVEBs) for the Illinois portion of the St. Louis area.

**DATES:** *Effective Date:* This rule is effective on June 12, 2012.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–R05–OAR–2010–0523. All documents in the docket are listed on the *www.regulations.gov* Website. Although listed in the index, some information is not publicly available, i.e., Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. We recommend that you telephone Kathleen D'Agostino, Environmental Engineer, at (312) 886–1767 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:** Kathleen D'Agostino, Environmental Engineer, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 886–1767, *dagostino.kathleen@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever "we," "us," or "our" is used, we mean EPA. This supplementary information section is arranged as follows:

I. What is the background for this rule?
II. What comments did we receive on the proposed rule?
III. What actions is EPA taking?
IV. Statutory and Executive Order Reviews

### I. What is the background for this rule?

On July 18, 1997 (62 FR 38856), EPA promulgated an 8-hour ozone standard of 0.08 parts per million (ppm). EPA published a final rule designating and classifying areas under the 1997 8-hour ozone NAAQS on April 30, 2004 (69 FR 23857). In that rulemaking, the St. Louis area was designated as nonattainment for the 1997 8-hour ozone standard and classified as a moderate nonattainment area under subpart 2 of the CAA.

On May 26, 2010, IEPA requested redesignation of the Illinois portion of the St. Louis area to attainment of the 1997 8-hour ozone standard based on ozone data for the period of 2007–2009. On September 16, 2011, IEPA supplemented the original ozone redesignation request, revising the mobile source emission estimates using EPA's on-road mobile source emissions model, MOVES, and extending the demonstration of maintenance of the ozone standard through 2025, with new MVEBs, but without relying on emission reductions resulting from

implementation of EPA's Clean Air Interstate Rule (CAIR) or Cross-State Air Pollution Rule (CSAPR).

On June 9, 2011 (76 FR 33647), EPA issued a final rulemaking determining that the entire St. Louis, MO–IL area has attained the 1997 8-hour ozone NAAQS based on three years of complete, quality-assured ozone data for the period of 2008–2010.[1]

On December 22, 2011 (76 FR 79579), EPA issued a rulemaking action proposing to approve Illinois' request to redesignate the Illinois portion of the St. Louis area to attainment of the 1997 8-hour ozone standard, as well as proposing to approve Illinois' maintenance plan for the area, Volatile Organic Compound (VOC) and nitrogen oxides ($NO_X$) MVEBs, and VOC and $NO_X$ emissions inventories. This proposed rulemaking sets forth the basis for determining that Illinois' redesignation request meets the CAA requirements for redesignation to attainment for the 1997 8-hour ozone NAAQS. Air quality monitoring data in the St. Louis area for 2007–2009, 2008–2010, and 2009–2011 show that this area is currently attaining the 1997 8-hour ozone NAAQS.

The primary background for today's action is contained in EPA's December 22, 2011, proposal to approve Illinois' redesignation request, and in EPA's June 9, 2011, final rulemaking determining that the area has attained the 1997 8-hour ozone NAAQS, based on complete, quality-assured monitoring data for 2008–2010, and continuing through 2011. In these rulemakings, we noted that under EPA regulations at 40 CFR 50.10 and 40 CFR part 50, appendix I, the 1997 8-hour ozone standard is attained when the 3-year average of the annual fourth highest daily maximum 8-hour average ozone concentrations is less than or equal to 0.08 ppm at all ozone monitoring sites in the area. See 69 FR 23857 (April 30, 2004) for further information. To support the redesignation of the area to attainment of the NAAQS, the ozone data must be complete for the three attainment years. The data completeness requirement is met when the 3-year average of days with valid ambient monitoring data is greater than 90 percent, and no single year has less than 75 percent data completeness, as determined in accordance with appendix I of 40 CFR part 50. Under the CAA, EPA may redesignate a nonattainment area to attainment if sufficient, complete, quality-assured data are available demonstrating that the area has attained the standard and if the state meets the other CAA redesignation requirements specified in section 107(d)(E) and section 175A.

The December 22, 2011, proposed redesignation rulemaking provides a detailed discussion of how Illinois' ozone redesignation request meets the CAA requirements for redesignation of the Illinois portion of the St. Louis area. With the final approval of its VOC and $NO_X$ emissions inventories, Illinois has met all applicable CAA requirements for redesignation to attainment for the 1997 8-hour ozone NAAQS. Air quality monitoring in the St. Louis area for 2009–2011 shows that this area continues to attain the 1997 8-hour ozone NAAQS. Illinois has demonstrated that attainment of the 1997 8-hour ozone NAAQS will be maintained through 2025 with or without the implementation of CAIR or CSAPR. In addition, modeling conducted by EPA during the CSAPR rulemaking demonstrates that in both 2012 and 2014, even without taking into account reductions associated solely with CAIR or CSAPR, the counties in the St. Louis MO–IL nonattainment area will have air quality that attains the 1997 ozone NAAQS. Finally, Illinois has adopted 2008 and 2025 MVEBs that are supported by Illinois' ozone maintenance demonstration and adopted ozone maintenance plan.

## II. What comments did we receive on the proposed rule?

EPA initially provided a 30-day comment period for the December 22, 2011, proposed rule. On January 20, 2012, EPA extended the comment period for an additional 30 days. During the comment period, we received comments from one individual representing the Sierra Club. These comments are summarized and addressed below.

*Comment 1:* The commenter contends that it is inappropriate to redesignate the Illinois portion of the St. Louis nonattainment area to attainment of the 1997 8-hour ozone standard when EPA intends to designate the St. Louis area as nonattainment under the 2008 8-hour ozone standard, yet the EPA is illegally delaying the implementation of the 2008 8-hour ozone standard.

*Response 1:* On May 21, 2012 EPA published its designations for the 2008 standard. 77 FR 30088, 30116. EPA designated the St. Louis-St. Charles-Farmington, MO–IL area as nonattainment, with a classification of marginal. The area's status with respect to the 2008 standard, however, does not affect or prevent redesignation of the area to attainment for the 1997 standard. The 1997 standard currently remains in effect, and thus EPA continues to evaluate the area's designation status with respect to that standard. Until the 1997 8-hour ozone standard is revoked, it remains in effect and independent of the 2008 8-hour ozone standard, and EPA continues to evaluate and act upon states' requests for redesignation with respect to the 1997 standard.

EPA has in the past continued to redesignate areas under existing standards even after the adoption of new standards for the same pollutant. After adopting the 1997 8-hour ozone standard, EPA continued to redesignate areas for the 1-hour ozone standard until that standard was revoked. See, for example, Cincinnati, Ohio redesignation, 70 FR 35946 (June 21, 2005). Subsequent to the adoption of the 2008 8-hour ozone standard, EPA has continued to redesignate for the 1997 8-hour ozone standard those areas attaining that ozone standard and otherwise meeting redesignation requirements. See, for example, Detroit, Michigan redesignation, 74 FR 30950 (June 29, 2009); Clearfield and Indiana Counties, Pennsylvania redesignation, 74 FR 11674 (March 19, 2009); Kewaunee County, Wisconsin redesignation 73 FR 29436 (May 21, 2008), and Door and Manitowoc Counties, Wisconsin redesignation, 75 FR 39635 (July 12, 2010).

*Comment 2:* The commenter states that the Jerseyville, Nilwood, Maryville, Wood River, and East St. Louis ozone monitors all show upward trends in the annual fourth highest daily maximum 8-hour ozone concentrations over the 2009–2011 three year period.

*Response 2:* The CAA sets forth the criteria for redesignating a nonattainment area to attainment. Section 107(d)(3)(E) provides for approval of a redesignation request if, among other things, the Administrator determines that the area has attained the applicable NAAQS. A determination that an area has attained the standard is based on a review of monitored air quality data that meet regulatory quality-assurance requirements for the specific purpose of comparison to the NAAQS. See 40 CFR part 50.10 and appendix I and 40 CFR part 58. A determination of attainment for ozone is

[1] Certified ozone data for 2011 demonstrates that the area continued to attain the 1997 8-hour ozone standard in 2011. EPA recognizes that the ozone data for 2007–2009 as well as 2010 and 2011 data are impacted by the Clean Air Interstate Rule (CAIR) which was promulgated in 2005, but remanded to EPA in 2008. The fact that the data reflect some reductions associated with the remanded and therefore not permanent CAIR, however, is not an impediment to redesignation in the circumstances presented here where IEPA's demonstration and EPA's own modeling demonstrates that the area does not need reductions associated with the CAIR to attain the 1997 ozone NAAQS.

based on a 3-year average of data, and does not consider monitoring data trends or statistical analyses as criteria for determining attainment in evaluating a redesignation request. As discussed in detail in the proposed rule, the St. Louis area has monitored attainment of the 1997 8-hour ozone standard. See 76 FR 79582–79583 (December 22, 2011).

Furthermore, EPA considers data collected over a 3-year period for determining attainment, but not for statistically determining a ''trend.'' It is expected that there will be year-to-year variations in ozone concentrations due to meteorological influences. A review of annual fourth highest daily maximum 8-hour ozone concentrations and design values over a longer time period, from 2001 (designations under the 1997 8-hour ozone standard was based on air quality monitoring data from 2001–2003) through 2011, shows an overall downward trend at each of the monitors. Moreover, in its maintenance demonstration the State has shown that the 1997 8-hour ozone standard can be maintained in the area through 2025.

*Comment 3 General:* The commenter contends that, to demonstrate that the observed improvement in ozone air quality is due to the implementation of permanent air quality controls, EPA has relied on several emission control programs that are not permanent and enforceable. The commenter sets out several specific points to support this contention, which are discussed below in 3a–3d.

*Response 3 General:* It is not necessary for every change in emissions between the nonattainment year and the attainment year to be permanent and enforceable. Rather, the improvement in air quality necessary for the area to attain the relevant NAAQS must be reasonably attributable to permanent and enforceable reductions in emissions. As discussed in the proposed rule at 76 FR 79586–79588 (December 22, 2011), Illinois and upwind areas have implemented a number of permanent and enforceable regulatory control measures which have reduced emissions and resulted in a corresponding improvement in air quality.

*Comment 3a:* The commenter contends that EPA cannot rely on the implementation of CSAPR, which has been stayed by court order. The commenter objects to EPA claims that IEPA has met its obligation under section 110(a)(2)(D), in part, via emission control programs established through CSAPR, and also objects to inclusion of CSAPR as a potential contingency measure in Illinois' ozone maintenance plan. In addition, EPA credits Illinois with $NO_X$ emission reduction in upwind areas that are projected to result from the implementation of CSAPR. Since CSAPR was stayed by the United States Court of Appeals for the District of Columbia Circuit on December 30, 2011, CSAPR is not enforceable. In addition, CSAPR cannot be assumed to be permanent because EPA cannot conclude that CSAPR will survive the litigation challenge to be subsequently decided by the court. Further, any attempt by EPA to claim it will replace CSAPR is of no moment because courts have repeatedly told EPA that it cannot use the promise of future action to meet current emission control requirements. See, e.g., *Sierra Club* v. *EPA,* 356 F.3d 296, 298 (DC Cir. 2004).

*Response 3a:* Illinois has not relied on CSAPR to demonstrate that attainment was due to permanent and enforceable emissions reductions or to demonstrate that it will maintain the standard. While we did note in the proposal that emissions reductions resulting from the implementation of CSAPR would aid in maintenance of the standard, that statement did not provide the basis for our action. Further, contrary to the commenter's assertion, EPA did not credit Illinois with $NO_X$ emissions reductions from the implementation of CSAPR, nor did the State take credit for any such emissions reductions when demonstrating maintenance.

In addition, modeling performed by EPA during the CSAPR rulemaking process also demonstrates that the counties in the St. Louis MO–IL ozone nonattainment area will have ozone levels below the 1997 8-hour standard in both 2012 and 2014 without emission reductions from CSAPR or CAIR, with the highest average value for any monitor in the area projected to be 79.6 ppb. See ''Air Quality Modeling Final Rule Technical Support Document,'' App. B, B–10, B–11, and B–18, which can be found at *http://www.epa.gov/crossstaterule/pdfs/AQModeling.pdf.* Ozone modeling performed by the Lake Michigan Air Directors Consortium also concludes that the St. Louis area will be able to maintain the ozone standard throughout the maintenance period without considering emission reductions from implementation of the CAIR or CSAPR.[2]

[2] The Lake Michigan Air Directors Consortium modeling was conducted prior to EPA's promulgation of CSAPR. The subsequent modeling conducted by EPA during the CSAPR rulemaking provides a more detailed analysis of the impact upwind state emissions would, in the absence of CAIR, have on downwind areas projected to have difficulty attaining or maintaining the standard.

Although Illinois did list the ''Clean Air Transport Rule, after promulgation by USEPA'' as a possible contingency measure in the maintenance plan, this measure is only one of many that may be selected should the contingency plan be triggered. EPA has concluded, in its consideration of the maintenance plan contingency measures, that there are other contingency measures sufficient to satisfy the requirements of 175A, without consideration of CSAPR.

The commenter also claims that EPA relies, in part, on emission control programs established through CSAPR to determine that IEPA has met its obligation under section 110(a)(2)(D). Section 110(a)(2)(D) of the CAA requires that SIPs contain measures to prevent sources in a state from significantly contributing to air quality problems in another state. While EPA noted in the proposed rule that programs such as the $NO_X$ SIP Call, CAIR, and CSAPR were established to address transport of air pollutants, we also clearly stated that the section 110(a)(2)(D) requirements for a state are not linked with a particular nonattainment area's designation and classification. Further, EPA concludes that the requirements linked with a particular nonattainment area's designation and classification are the relevant measures to evaluate in reviewing a redesignation request. Therefore, because the section 110(a)(2)(D) requirements apply to a state regardless of the designation of any one particular area in the state, EPA further concludes that these requirements should not be construed to be applicable requirements for purposes of redesignation. EPA is not taking any action, in this rulemaking, to determine whether the State of Illinois has satisfied the requirements of 110(a)(2)(D) with respect to the 1997 ozone NAAQS.

*Comment 3b:* The commenter asserts that EPA erred in concluding that emission reductions resulting from regulations developed in response to the $NO_X$ SIP Call are permanent and enforceable. The commenter asserts that the $NO_X$ SIP Call cannot satisfy a requirement that requires reductions to be permanent and enforceable because this program has been replaced and therefore effectively no longer exists. The commenter also asserts that because the $NO_X$ SIP Call is a cap-and-trade program no actual reductions are required from the emission sources in the St. Louis nonattainment area. The commenter argues that to the extent any reductions were once required, they could have happened only in areas downwind that have little to no impact on the St. Louis area nonattainment.

Finally the commenter asserts that the DC Circuit Court of Appeals recently held that EPA cannot use cap-and-trade programs to satisfy an area-specific statutory mandate. See *NRDC* v. *EPA,* 571 F.3d 1245, 1257 (DC Cir. 2009).

*Response 3b:* EPA disagrees with the commenter's position that emission reductions associated with the $NO_X$ SIP Call cannot be considered to be permanent and enforceable. The commenter's first argument—that the reductions are not permanent and enforceable because the $NO_X$ SIP Call has been replaced—is based on a misunderstanding of the relationship between CAIR and the $NO_X$ SIP Call. While the CAIR ozone-season trading program replaced the ozone-season $NO_X$ trading program developed in the $NO_X$ SIP Call (70 FR 25290), nothing in CAIR relieved states of their $NO_X$ SIP Call obligations. In fact, in the preamble to CAIR, EPA emphasized that the states and certain units covered by the $NO_X$ SIP Call but not CAIR must still satisfy the requirements of the $NO_X$ SIP Call. EPA provided guidance regarding how such states could meet these obligations.[3] In no way did EPA suggest states could disregard their $NO_X$ SIP Call obligations. (70 FR 25290). For $NO_X$ SIP Call states, the CAIR $NO_X$ ozone season program provides a way to continue to meet the $NO_X$ SIP Call obligations for electric generating units (EGUs) and large non-electric generating units (nonEGUs). In addition, the anti-backsliding provisions of 40 CFR 51.905(f) specifically provide that the provisions of the $NO_X$ SIP Call, including the statewide $NO_X$ emission budgets, continue to apply. In sum, the requirements of the $NO_X$ SIP Call remain in force. They are permanent and enforceable as are state regulations developed to implement the requirements of the $NO_X$ SIP Call.

EPA also disagrees with the commenter's second argument—that the reductions associated with the $NO_X$ SIP Call cannot be considered permanent and enforceable because the $NO_X$ SIP Call is a trading program. There is no support for the commenter's argument that EPA must ignore all reductions achieved by the $NO_X$ SIP Call simply because the mechanism used to achieve the reductions is an emissions trading program. As a general matter, trading programs establish mandatory caps on emissions and permanently reduce the total emissions allowed by sources subject to the programs. The emission caps and associated controls are enforced through the associated SIP rules or Federal Implementation Plans (FIPs). Any purchase of allowances and increase in emissions by a utility necessitates a corresponding sale of allowances and reduction in emissions by another utility. Given the regional nature of ozone, the emission reductions will have an air quality benefit that will compensate, at least in part, for the impact of any emission increase.

In addition, the case cited by the commenter, *NRDC* v. *EPA,* 571 F.3d 1245 (DC Cir. 2009), does not support the commenter's position. That case addressed EPA's determination that the nonattainment Reasonably Available Control Technology (RACT) requirement was satisfied by the $NO_X$ SIP Call trading program. The court held that because EPA had not demonstrated that the trading program would result in sufficient reductions within a nonattainment area, its determination that the program satisfied RACT (a nonattainment area requirement) was not supported. *Id.* 1256–58. The court explicitly noted that EPA might be able to reinstate the provision providing that compliance with the $NO_X$ SIP Call satisfies $NO_X$ RACT for EGUs for particular nonattainment areas if, upon conducting a technical analysis, it could demonstrate that the $NO_X$ SIP Call results in greater emissions reductions in a nonattainment area than would be achieved if RACT-level controls were installed in that area. *Id.* at 1258. In this case, EPA's comparison of emissions in 2002 and 2008 in this rulemaking necessarily looked only at changes in emissions ''in the nonattainment area.'' As such, the commenter's reliance on *NRDC* v. *EPA* is misplaced.

*Comment 3c:* The commenter contends that the Illinois State rules are not permanent and enforceable. The commenter asserts that Illinois' consumer products and Architectural and Industrial Maintenance Coatings (AIM) rules are not permanent and enforceable components of the Illinois SIP. The commenter contends that these rules have only been adopted by the State, and that EPA has not yet approved them into the Illinois SIP. The commenter claims that, until they are approved by EPA and incorporated into the SIP, they cannot be relied upon for the purposes of redesignation to attainment of the standard. The commenter claims that for EPA to rely on these rules for the redesignation, it must approve them into the SIP in conjunction with the redesignation.

*Response 3c:* It is not necessary for every change in emissions between the nonattainment year and the attainment year to be permanent and enforceable. Rather, the improvement in air quality necessary for the area to attain must be reasonably attributable to permanent and enforceable reductions in emissions. As discussed in the proposed rule at 76 FR 79586–79588 (December 22, 2011), Illinois and upwind areas have implemented a number of permanent and enforceable regulatory control measures which have reduced emissions and resulted in a corresponding improvement in air quality sufficient to demonstrate attainment and maintenance. Even if EPA does not finalize action on the Illinois consumer products and AIM rules before completing action on the redesignation, these emissions reductions are not necessary to demonstrate that the improvement in air quality is reasonably attributable to permanent and enforceable reductions in emissions. It should be noted, however, that EPA proposed to approve the Illinois consumer products and AIM rules on October 27, 2011, at 76 FR 66663. EPA received no comments on the proposal and we are currently in the process of finalizing action on the rules.

*Comment 3d:* The commenter asserts that the use of 2008 air quality data is inappropriate to demonstrate that the attainment of the 1997 8-hour ozone standard is due to the implementation of permanent and enforceable emission reductions. EPA documented the changes in emissions between 2002 and 2008 to demonstrate that the observed ozone air quality improvement is due to permanent and enforceable emissions reduction during this period. The commenter claims that this is unacceptable for a number of reasons.

First, the commenter asserts that EPA has done nothing to connect the emissions and air quality impacts, and EPA has not conducted analyses to prove that emission reductions between 2002 and 2008 have led to reduced ozone concentrations and attainment of the 1997 8-hour ozone standard.

Second, the commenter argues that using a single attainment year, 2008, is arbitrary because the impact of cap-and-trade emission control programs, such as the $NO_X$ SIP Call and CSAPR, can cause emissions to vary over time as sources buy, sell, and trade emission allowances.

Third, the commenter claims that the choice of 2008 is further problematic because 2008 was the beginning of a large economic recession. The commenter contends that this resulted in decreased electricity demand, decreased automobile, truck and shipping traffic, and decreased factory

[3] EPA guidance regarding the $NO_X$ SIP Call transition to CAIR can be found at *http://www.epa.gov/airmarkets/progsregs/cair/faq-10.html.* EPA guidance regarding the $NO_X$ SIP Call transition for CSAPR can be found at *http://www.epa.gov/crossstaterule/faqs.html.*

production. The commenter objects to EPA's conclusion that monitored changes in ozone levels between 2002 and 2008 were due to the implementation of permanent and enforceable emission controls rather than to changes in meteorology, economic conditions, or temporary or voluntary (not enforceable) emissions reductions. The commenter contends that EPA has not provided an analysis showing that the recession was not the cause of the 2002–2008 emission reduction and observed air quality improvement.

Finally, the commenter claims that EPA has not shown that the 2008 emissions inventory reflects permanent and enforceable emission reductions occurring between 2002 and 2008, and states that the 2008 emissions inventory appears to be the ''actual'' or the ''projected'' emissions from an unidentified group of sources. The commenter argues that there is a significant difference between what sources actually emit and what sources are allowed to emit, and that the IEPA and EPA have incorrectly assumed allowable emissions are equal to actual emissions.

*Response 3d:* EPA's conclusion here is fully supported by the facts and applicable legal criteria. EPA's longstanding practice and policy[4] provides for states to demonstrate permanent and enforceable emissions reductions by comparing nonattainment area emissions occurring during the nonattainment period (represented by emissions during one of the years during the 3-year nonattainment period on which the area's nonattainment designated was based,[5] in this case 2002) with emissions in the area during the attainment period (represented by emissions during one of the 3 attainment years, in this case 2008, which is included in the 3-year period, 2007–2009, that the State used to show attainment with 1997 8-hour ozone standard). A determination that an area has attained the 1997 8-hour ozone standard is based on an objective review of air quality data in accordance with 40 CFR 50.10 and part 50, appendix I, based on 3 complete, consecutive calendar years of quality-assured air quality monitoring data. In the State's redesignation request, Illinois considered data for the 2007–2009 time period to demonstrate attainment. In EPA's determination of attainment and proposed approval of the redesignation request, EPA considered data for the 2008–2010 time period, which was the most recent quality-assured, certified data available. See 76 FR 33647 (June 9, 2011), 76 FR 79582–79583 (December 22, 2011). In this final rulemaking, EPA is also considering continued attainment based on complete, quality-assured certified data for 2009–2011. Therefore, selecting 2008 as a representative attainment year, and comparing emissions for this year to those for a representative year during the nonattainment period, 2002, is an appropriate and long-established approach that demonstrates the occurrence of emission reductions in the area between the years of nonattainment and attainment. These reductions therefore, can be seen to account for the observed air quality improvement.

With respect to the commenter's assertion that EPA has conducted no analyses to prove that emission reductions between 2002 and 2008 led to reduced ozone concentrations, as noted above, comparing emissions for a representative nonattainment year to emissions for a representative attainment year is consistent with longstanding practice and EPA policy for making such a demonstration. The CAA does not specifically require the use of modeling in making any such demonstration and it has not been the general practice to do so.

EPA disagrees with the commenter's contention that using a single attainment year is arbitrary due to year-to-year variations in emissions levels resulting from cap-and-trade programs. As a general matter, trading programs establish mandatory caps on emissions and permanently reduce the total emissions allowed by sources subject to the programs. The emission caps and associated controls are enforced through the associated SIP rules or FIPs. Any purchase of allowances and increase in emissions by a utility necessitates a corresponding sale of allowances and reduction in emissions by another utility. Given the regional nature of ozone, the emission reduction will have an air quality benefit that will compensate, at least in part, for the impact of any emission increase.

With respect to $NO_X$ SIP Call reductions within the St. Louis area, there is no evidence of significant temporal variation in emissions levels. In fact, actual emissions from $NO_X$ SIP Call sources in the St. Louis area have not varied much from year-to-year over the 2003–2011 time period. The largest emitters in the St. Louis area that are covered by the $NO_X$ SIP Call are operating near full capacity. Even if all of the large EGUs and large nonEGUs begin emitting at full capacity, emissions would not increase significantly. Further, these sources do not have the type of emissions controls that can simply be ''shut off.''

While the commenter expressed concerns that an economic downturn was responsible for the improvement in air quality, the commenter has made no demonstration that the reduction in emissions and observed improvement in air quality is due to an economic recession, changes in meteorology, or temporary or voluntary emissions reductions. Also, as noted previously, the CAA does not require modeling to make any such demonstration.

Finally, longstanding practice and EPA policy support the use of actual emissions when demonstrating permanent and enforceable emissions reductions. Actual emissions are more reflective of emissions that in reality contribute to monitored ozone concentrations. Sources seldom, if ever, emit at maximum allowable levels and assuming that all sources operate at maximum capacity at the same time would grossly overestimate emissions levels. For this reason EPA believes actual emissions are the appropriate emissions to consider when comparing nonattainment year emissions with attainment year emissions.

*Comment 4:* The commenter claims that EPA has not conducted an adequate analysis of the effect that redesignation to attainment will have on attainment and maintenance of other NAAQS under section 110(l) of the CAA. The commenter asserts that EPA has failed to conduct an adequate analysis of the ozone redesignation impacts with respect to the 1997 annual fine particulate ($PM_{2.5}$) NAAQS, the 2006 24-hour $PM_{2.5}$ NAAQS, the 1-hour $NO_X$ ($NO_2$) NAAQS, the 1-hour sulfur dioxide ($SO_2$) NAAQS, and the 2008 8-hour ozone NAAQS.

*Response 4:* Section 110(l) provides in part: ''The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress * * *, or any other applicable requirement of this chapter.'' As a general matter, EPA must and does consider section 110(l) requirements for every SIP revision, including whether the revision would ''interfere with'' any applicable requirement. *See, e.g.,* 70 FR 53, 57 (January 3, 2005); 70 FR 17029, 17033 (April 4, 2005); 70 FR 28429, 28431 (May 18, 2005); and 70 FR 58119, 58134 (October 5, 2005). The Illinois

[4] See September 4, 1992 memorandom from John Calcagni entitled ''Procedures for Processing Requests to Redesignate Areas to Attainment,'' pp. 4 and 8–9.

[5] The nonattainment designation of the St. Louis area for the 1997 8-hour ozone standard was based on 2001–2003 ozone data.

redesignation request and maintenance plan for the 1997 8-hour ozone standard neither revises nor removes any existing emissions limit for any NAAQS, nor does it alter any existing control requirements. On that basis, EPA concludes that the redesignation will not interfere with attainment or maintenance of any of these air quality standards. The commenter does not provide any information in its comment to indicate that approval of this redesignation would have any impact on the area's ability to comply with the 1997 annual $PM_{2.5}$ NAAQS, the 2006 24-hour $PM_{2.5}$ NAAQS, the 1-hour $NO_2$ NAAQS, the 1-hour $SO_2$ NAAQS, or the 2008 8-hour ozone NAAQS. In fact, the maintenance plan provided with the State's submission demonstrates a decline in ozone precursor emissions over the timeframe of the initial maintenance period. As a result, the redesignation does not relax any existing rules or limits, nor will the redesignation alter the status quo air quality.[6] The commenter has not explained why the redesignation might interfere with attainment of any standard or with satisfaction of any other requirement, and EPA finds no basis under section 110(l) for EPA to disapprove the SIP revision at issue or to disapprove the requested redesignation.

*Comment 5a:* The commenter asserts that the 2002 emissions inventory that EPA is proposing to approve as meeting the emission inventory requirement of section 182(a)(1) of the CAA is inadequate and EPA cannot approve this emissions inventory. The commenter notes that the emissions inventory is 10 years old. In addition, the commenter states that portions of the emissions inventory were estimated, as opposed to being actual emissions, and claims that EPA has not included a ''comprehensive'' emissions inventory in the docket, EPA has only included a summary of the emissions inventory. The commenter asserts that EPA must place a comprehensive emissions inventory, which includes information for each point source, in the docket to allow the public to review the inventory and comment on it.

*Response 5a:* Illinois developed a 2002 comprehensive inventory to meet the requirement of section 182(a)(1) of the CAA in accordance with EPA's November 18, 2002, policy memorandum from Lydia N. Wegman entitled ''2002 Base Year Emission Inventory SIP Planning: 8-hr Ozone, $PM_{2.5}$ and Regional Haze Programs,'' and EPA's policy Phase 2 ozone implementation rule published on November 29, 2005 (70 FR 71612, 71664). EPA notes that Illinois submitted the 2002 inventory on June 21, 2006, and at that time, 2002 was the most current emissions inventory available for the nonattainment area.

The commenter observes that portions of the emissions inventory were estimated. This is entirely consistent with accepted EPA procedures for emissions inventory development procedures. It is common practice, and consistent with EPA emissions inventory guidance, for states to estimate emissions for any given year using related activity factors or to project emissions based on information from prior years and associated activity growth factors. See ''Emissions Inventory Guidance for Implementation of Ozone and Particulate Matter National Ambient Air Quality Standards (NAAQS) and Regional Haze Regulations,'' dated August 2005. For mobile sources, it is standard and accepted practice for states to estimate emissions using an EPA- approved emissions model coupled with the output of a transportation model, which provides traffic levels by roadway and activity type. The commenter provided no information or specific details that show that the 2002 inventory was inaccurate.

With respect to the commenter's concern regarding the availability of the emissions inventory submittal in the docket, we acknowledge that the inventory was unintentionally omitted from the electronic docket at *www.regulations.gov*. However, the document was available to the public in hard copy at the EPA Region 5 office, and had the commenter contacted the Region, the inventory could have been provided. The inventory has since been added to the electronic docket.

While we believe the 2002 inventory submitted by the State meets the inventory requirements of both section 182(a)(1) and section 172(c)(3) of the CAA, EPA notes that the State also submitted a comprehensive 2008 emissions inventory to serve as the attainment year inventory as part of the maintenance plan. EPA's longstanding view, as set forth in the September 4, 1992 memorandom from John Calcagni entitled ''Procedures for Processing Requests to Redesignate Areas to Attainment'' (Calcagni memorandum) is that the ''requirements for an emission inventory [under section 172(c) or 182(a)(1)] will be satisfied by the inventory requirements of the maintenance plan.'' See Calcagni memorandum at 6.

When preparing the comprehensive 2008 emissions inventory, Illinois compiled point source information from the 2008 annual emissions reports submitted to IEPA by sources and EPA's Clean Air Markets Division database for electric utilities. Area source emissions were calculated using the most recently available methodologies and emissions factors from EPA along with activity data (population, employment, fuel use, etc.) specific to 2008. Non-road mobile source emissions were calculated using EPA's NONROAD emissions model. In addition, emissions estimates were calculated for commercial marine vessels, aircraft, and railroads, three non-road categories not included in the NONROAD model. On-road mobile source emissions were calculated using EPA's MOVES emissions model with 2008 Vehicle Miles Traveled (VMT) data provided by Illinois Department of Transportation (IDOT).

Therefore, in actuality, the State has more than satisfied the CAA inventory requirements by its submittal of two inventories that meet the applicable emissions inventory requirement.

*Comment 5b:* The commenter asserts that emissions calculations for on-road mobile sources fail to consider the use of gasoline containing up to 15 volume percent ethanol (E15).

*Response 5b:* In 2010 and 2011, EPA granted partial waivers for use of E15 in model year (MY) 2001 and newer light-duty motor vehicles (75 FR 68094 and 76 FR 4662). As discussed in the waiver decisions, there may be some small emission impacts from the use of E15. E15 is expected to cause a small immediate emissions increase in $NO_X$ emissions. However, due to its lower volatility than the E10 currently in-use, its use is also expected to result in lower evaporative emissions. Other possible emissions impacts may be from the misfueling of E15 in vehicles or engines for which its use is not approved, i.e., MY2000 and older motor vehicles, heavy-duty engines and vehicles, motorcycles and all nonroad engines, vehicles, and equipment. EPA has promulgated a separate rule dealing specifically with the mitigation of misfueling to reduce the potential emissions impacts from misfueling (76 FR 44406).

However, the E15 partial waivers do not require that E15 be made or sold and it is unclear if and to what extent E15 may even be used in Illinois. Even if E15 is introduced into commerce in Illinois, considering the likely small and

[6] EPA notes that the St. Louis area does not have violating monitors for the 1997 annual $PM_{2.5}$ NAAQS, 2006 24-hour $PM_{2.5}$ NAAQS, or the 1-hour $NO_X$ NAAQS, and that this area has not been designated nonattainment for 2006 24-hour $PM_{2.5}$ NAAQS, the 1-hour $NO_X$ NAAQS, or the 1-hour $SO_2$ NAAQS.

offsetting direction of the emission impacts, the limited set of motor vehicles approved for its use, and the measures required to mitigate misfueling, EPA believes that any potential emission impacts of E15 will be less than the maintenance plan safety margin by which Illinois shows maintenance.

*Comment 6:* The commenter contends that EPA cannot approve the ozone redesignation because Illinois' VOC RACT rules have not been approved in conjunction with the approval of the ozone redesignation. The commenter pointed to EPA's statement in the proposed approval of the redesignation that it would take action on Illinois' VOC RACT rules in a separate rulemaking. The commenter states that approval ''in a separate rule'' is not approval ''in conjunction'' with rulemaking on a redesignation, and that this would be a departure from EPA's previous practice of approving needed SIP revisions in the same final rule as a redesignation. The commenter also points to the Sixth Circuit Court of Appeals decision in *Wall* v. *EPA,* in which the Court stated that ''the EPA abused its discretion when it determined that it could redesignate the Cincinnati metropolitan area as achieving attainment before Ohio had fully adopted all RACT rules of Part D, Subpart 2 of the CAA.'' *Wall* v. *EPA,* 265 F.3d 426,442 (6th Cir. 2001). The commenter claims that RACT measures must be contained in SIPs submitted with respect to redesignation requests.

*Response 6:* EPA disagrees with the commenter's position that VOC RACT rules must be approved in the same final rule as the redesignation. The commenter's contention is without basis in either the law or common sense. EPA acknowledged in its proposed redesignation at 76 FR 79585, that approval of IEPA's VOC RACT submittal is a prerequisite for approval of the redesignation of the Illinois portion of the St. Louis area to attainment of the 1997 8-hour ozone standard. This simply requires that EPA approve the VOC RACT rules on or before finalizing approval of the redesignation. EPA approved the Illinois VOC RACT submittal on March 23, 2012 (77 FR 16940). Therefore, this prerequisite to redesignation has been met.

*Comment 7:* The commenter contends that EPA cannot approve the State's ozone redesignation request because the State and EPA have not satisfied all part D requirements. The specific points of contention raised by the commenter are discussed separately below.

*Comment 7a:* The commenter disagrees with EPA's conclusion that an area can be redesignated to attainment of a NAAQS regardless of the status of the State's SIP relative to the requirements of section 110(a)(2) of the CAA. The commenter argues that EPA's position does not make sense given that the State's infrastructure SIP will apply to the ''former'' nonattainment area once it is redesignated to attainment. To the commenter, it is clear that Congress wanted to ensure that there is a valid infrastructure SIP in place to protect areas that are being redesignated to attainment.

*Response 7a:* EPA stands by its position that section 110 elements that are not connected with nonattainment plan submissions and not linked with an area's attainment status are not applicable requirements for purposes of redesignation. A state remains subject to these requirements after an area is redesignated to attainment. We conclude that only the section 110 and part D requirements which are linked with a particular area's designation and classification are the relevant measures which we may consider in evaluating a redesignation request. This approach is consistent with EPA's existing policy on applicability of conformity and oxygenated fuels requirements for redesignation purposes, as well as with section 184 ozone transport requirements. See Reading, Pennsylvania, proposed and final rulemakings (61 FR 53174–53176, October 10, 1996), (62 FR 24826, May 7, 1997); Cleveland-Akron-Lorain, Ohio, final rulemaking (61 FR 20458, May 7, 1996); and Tampa, Florida, final rulemaking (60 FR 62748, December 7, 1995). See also the discussion on this issue in the Cincinnati, Ohio ozone redesignation (65 FR 37890, June 19, 2000), and in the Pittsburgh, Pennsylvania ozone redesignation (66 FR 50399, October 19, 2001), and in the St. Louis 1-hour ozone redesignation 68 FR 25418, 25426–27 (May 12, 2003). Both the 6th and 7th Circuits have agreed that the CAA provides EPA with leeway to determine what is an ''applicable requirement'' for purposes of redesignation. *Sierra Club* v. *EPA,* 375 F.3d 537 (7th Cir. 2004). See *Wall* v. *EPA,* 265 F.3d 426 (6th Cir. 2001), upholding EPA's interpretation of ''applicable requirements'' with respect to conformity.

In any event, on July 13, 2011, EPA approved elements of the Illinois submittal to meet the infrastructure requirements of sections 110(a)(1) and (2) of the CAA for the 1997 8-hour ozone standard. See 76 FR 41075. Specifically, EPA approved the following infrastructure elements: emission limits and other control measures, ambient air quality monitoring and data system, enforcement of SIP measures, interstate and international pollution abatement, adequate resources, stationary source monitoring system, emergency power, future SIP revisions, consultation with government officials, public notification, air quality modeling and data, permitting fees, and consultation and participation by affected local entities. Also note that Federally promulgated Prevention of Significant Deterioration (PSD) rules are in place in Illinois. For all these reasons, EPA concludes that the SIP elements applicable for purposes of redesignation have been approved by EPA.

*Comment 7b:* The commenter contends that EPA cannot redesignate the Illinois portion of the St. Louis nonattainment area to attainment of the 1997 8-hour ozone standard because section 172(c) of the CAA requires SIPs to include a Reasonable Further Progress (RFP) plan, an ozone attainment demonstration, contingency measures, nonattainment New Source Review (NSR) rules, and Reasonably Available Control Measures (RACM)/RACT rules and EPA has not approved these items into the SIP for the Illinois portion of the St. Louis ozone nonattainment area. The commenter disagrees with EPA's conclusions that these CAA requirements are no longer applicable to an area after it has achieved attainment of the NAAQS. In addition, the commenter disagrees with EPA's conclusion that, for an ozone nonattainment area, the CAA section 172(c)(3) SIP requirement for a comprehensive, accurate, and current emissions inventory is superseded by the section 182(a)(1) emission inventory requirement. Therefore, the commenter believes that the EPA has not adequately addressed this SIP requirement when it concludes that Illinois has met all SIP requirements applicable to the Illinois portion of the St. Louis ozone nonattainment area for purposes of redesignation to attainment of the 1997 8-hour ozone standard.

*Response 7b:* Under EPA's Clean Data regulation, 40 CFR 51.918 (1997 8-hour ozone), an EPA rulemaking determination that an area is attaining the relevant standard suspends the area's obligations to submit an attainment demonstration, RACM, RFP, contingency measures, and other planning requirements related to attainment for as long as the area continues to attain. See 70 FR 71702 (November 29, 2005). This regulation, which embodies EPA's interpretation under its ''Clean Data Policy,'' has been

upheld by the DC Circuit. *NRDC* v. *EPA,* 571 F.3d 1245 (DC Cir. 2009).[7]

Because EPA determined that the St. Louis area has attained the 1997 8-hour ozone standard (see 76 FR 33647, June 9, 2011) and because the area continues to meet that standard, the State is not currently obligated to submit an attainment demonstration, RACM, RFP, contingency measures, and other planning requirements related to attainment.

In addition, in the context of redesignations, EPA has interpreted requirements related to attainment as not applicable for purposes of redesignation. For example, in the General Preamble for implementation of Title 1 of the CAA 1990 amendments EPA stated that:

> [t]he section 172(c)(9) requirements are directed at ensuring RFP and attainment by the applicable date. These requirements no longer apply when an area has attained the standard and is eligible for redesignation. Furthermore, section 175A for maintenance plans * * * provides specific requirements for contingency measures that effectively supersede the requirements of section 172(c)(9) for these areas. ''General Preamble for the Interpretation of Title I of the Clean Air Act Amendments of 1990,'' (General Preamble) 57 FR 13498, 13564 (April 16, 1992).

See also Calcagni memorandum at 6 (''The requirements for reasonable further progress and other measures needed for attainment will not apply for redesignations because they only have meaning for areas not attaining the standard.'').

With respect to the RACT requirement, EPA approved the Illinois VOC RACT submittal on March 23, 2012 (77 FR 16940), and granted Illinois a waiver from the requirement to submit RACT rules under section 182(f) of the CAA on February 22, 2011 (76 FR 9655).

With respect to emissions inventories, by meeting the section 182(a)(1) emission inventory requirement, the State has also met the section 172(c)(3) requirement for a comprehensive, accurate, and current emissions inventory. Further, redesignation policy states that emissions inventory requirements of section 172(c) of the CAA are satisfied by the inventory requirements of the maintenance plan. See the Calcagni memorandum at 6.

With respect to the nonattainment NSR requirement, the issue is moot because EPA has approved the Illinois nonattainment NSR SIP. Nonetheless, since PSD requirements will apply after redesignation, areas being redesignated need not comply with the requirement that a part D NSR program be approved prior to redesignation, provided that the area demonstrates maintenance of the NAAQS without a part D NSR program. A more detailed rationale for this view is described in a memorandum from Mary Nichols, Assistant Administrator for Air and Radiation, dated October 14, 1994, entitled, ''Part D New Source Review Requirements for Areas Requesting Redesignation to Attainment'' (Nichols memorandum). Illinois has demonstrated that the St. Louis area will be able to maintain the 1997 8-hour ozone standard without a part D NSR program in effect; therefore, the State need not have a fully approved part D NSR program prior to approval of the redesignation request. This issue is discussed in greater detail below in response to Comment 7d. Upon redesignation, the PSD program will apply. See *Greenbaum* v. *EPA,* 370 F.3d 527, 536 (6th Cir. 2004) (''It would make little sense for [part D NSR] to be included in the post-attainment SIP, as the Clean Air Act * * * explicitly states that attainment area SIPs must include a PSD program.'')

*Comment 7c:* With further regard to contingency measure requirements of the CAA, the commenter contends that EPA is incorrect to conclude that contingency measures are inapplicable once an area reaches attainment of the NAAQS. The commenter asserts that contingency measures must be in place so that, if an area monitor shows a violation of the NAAQS in the future, that violation of the NAAQS is quickly addressed, minimizing the number of people that will be harmed by air quality levels above the NAAQS.

*Response 7c:* As set forth in detail in Response 7b, the nonattainment area contingency measure requirements of section 172(c)(9) are directed at ensuring RFP and attainment by the applicable date. These nonattainment area requirements no longer apply after an area has attained the standard and the area has been redesignated to attainment. Under section 175A of the CAA, maintenance plans must contain contingency provisions, ''as deemed necessary by the Administrator,'' and it is these contingency measures that apply to the area after redesignation to attainment. Illinois included such provisions in its maintenance plan which EPA is approving in this action.

*Comment 7d:* The commenter, although acknowledging that EPA has certified that it has approved Illinois' nonattainment NSR rules, takes issue with EPA's related conclusion that an area being redesignated to attainment of a NAAQS need not have fully approved part D NSR rules, since PSD requirements of the CAA would apply after redesignation to attainment. The commenter contends that this EPA conclusion was explicitly rejected by the Court in *Greenbaum* v. *EPA,* 370 F.3d 527, 534 (6th Cir. 2004). The commenter asserts that without an approved NSR program, there can be no redesignation to attainment of the NAAQS. The commenter believes that this is true, because if a redesignated area violates the NAAQS in the future, all provisions that are contained in the state's nonattainment SIP, including NSR rules, would need to become applicable again.

*Response 7d:* Part D NSR would not be retained in the SIP as a section 175A(d) contingency measure. As clearly stated in the Nichols memorandum, ''EPA believes it is reasonable to interpret 'measure,' as used in section 175A(d), not to include part D NSR.'' Congress used the undefined term ''measure'' differently in different provisions of the CAA, which indicates that the term is susceptible to more than one interpretation and that EPA has the discretion to interpret it in a reasonable manner in the context of section 175A. See *Greenbaum* v. *United States EPA,* 370 F. 3d 527, 535–38 (6th Cir. 2004). (Court ''find[s] persuasive the EPA's argument that the very nature of the NSR permit program supports its interpretation that it is not intended to be a contingency measure pursuant to section 175A(d).'') It is reasonable to interpret ''measure'' to exclude part D NSR in this context because PSD, a program that is the corollary of part D NSR for attainment areas, goes into effect in lieu of part D NSR upon redesignation. PSD requires that new sources demonstrate that emissions from their construction and operation will not cause or contribute to a violation of any NAAQS or PSD increment. The State has demonstrated that the area will be able to maintain the standard without part D NSR in effect, and the State's PSD program will become effective in the area upon redesignation to attainment. See the rationale set forth at length in the Nichols Memorandum. See also the discussions of why full approval and retention of NSR is not required in redesignation actions in the following redesignation rulemakings: 60 FR 12459, 12467–12468 (March 7, 1995) (Redesignation of Detroit, MI); 61 FR 20458, 20469–20470 (May 7, 1996) (Cleveland-Akron-Lorrain, OH); 66 FR 53665, 53669 (October 23, 2001)

[7] See also *Sierra Club* v. *EPA,* 99 F. 3d 1551 (10th Cir. 1996); *Sierra Club* v. *EPA,* 375 F.3d 537 (7th Cir. 2004); and *Our Children's Earth Foundation* v. *EPA,* No. 04–73032 (9th Cir. June 28, 2005) (memorandum opinion).

(Louisville, KY); 61 FR 31831, 31836–31837 (June 21, 1996) (Grand Rapids, MI). Contrary to the commenter's assertion, the *Greenbaum* court declined to reach the issue of whether full approval of a part D NSR program is required prior to redesignation. See *Greenbaum,* 370 F. 3d at 534–35.

*Comment 8:* The commenter generally asserts that Illinois lacks a fully approved maintenance plan complying with the requirements of section 175A of the CAA. The commenter's specific arguments supporting this assertion follow.

*Comment 8a(1):* The commenter asserts that the contingency measures contained in Illinois' maintenance plan do not provide for prompt correction of violations of the 1997 8-hour ozone standard. The commenter believes that neither the ''Level I'' nor the ''Level II'' response occurs on a prompt schedule as required by section 175A of the CAA, and that several of the potential contingency measures are inappropriate, inadequate, or unacceptably vague. The commenter notes that after the determination of a Level I trigger [8] event, Illinois has committed to adopt needed emission control measures within 18 months and has committed to implement the adopted emission control measures within 24 months after adoption. The commenter also notes that after the determination of a Level II trigger [9] event, the maintenance plan contains no specific emission control commitments, but that Illinois will work with Missouri to conduct a study to determine the causes of the ozone standard violation and the emission control measures necessary to mitigate the air quality problem, with implementation of adopted emission controls to occur within 18 months of the determination of the Level II event. The commenter contends that the implementation schedules for the Level I and II triggers are unacceptably long and not in keeping with the prompt response timing required by section 175A of the CAA.

*Response 8a(1):* The commenter overlooks the provisions of the CAA applicable to contingency measures. Section 175(A(d) provides that ''[e]ach plan revision submitted under this section shall contain such contingency provisions as *the Administrator deems necessary* to assure that the state will promptly correct any violation of the standard which occurs after the redesignation of the area as an attainment area.'' (emphasis added). Thus Congress gave EPA discretion to evaluate and determine the contingency measures EPA ''deems necessary'' to assure that the state will promptly correct any subsequent violation. EPA has long exercised this discretion in its rulemakings on section 175A contingency measures in redesignation maintenance plans, allowing as contingency measures commitments to adopt and implement in lieu of fully adopted contingency measures, and finding that implementation within 18 months of a violation complies with the requirements of section 175A. See recent redesignations, e.g. Indianapolis, IN $PM_{2.5}$ annual standard (76 FR 59512), Lake and Porter Counties, IN 8-hour ozone standard (75 FR 12090), and Northwest Indiana $PM_{2.5}$ annual standard (76 FR 59600). Section 175A does not establish any deadlines for implementation of contingency measures after redesignation to attainment. It also provides far more latitude than does section 172(c)(9), which applies to a different set of contingency measures applicable to nonattainment areas. Section 172(c)(9) contingency measures must ''take effect * * * without further action by the State or [EPA].'' By contrast, section 175A confers upon EPA the discretion to determine what constitutes adequate assurance, and thus permits EPA to take into account the need of a state to assess, adopt and implement contingency measures if and when a violation occurs after an area's redesignation to attainment. Therefore, in accordance with the discretion accorded it by statute, EPA may allow reasonable time for states to analyze data and address the causes and appropriate means of remedying a violation. In assessing what ''promptly'' means in this context, EPA also may take into account time for adopting and implementation of the appropriate measure. In the case of the St. Louis area, EPA reasonably concluded that, 18 months constitutes a timeline consistent with prompt correction of a potential monitored violation. This timeframe also conforms with EPA's many prior rulemakings on acceptable schedules for implementing section 175A contingency measures as noted above.

*Comment 8a(2):* The commenter contends that several of Illinois' contingency measures, ''$NO_X$ RACT'' and ''Broader geographic applicability of existing measures,'' are too vague. The commenter asserts that the vagueness of these contingency measures provides no evidence that the maintenance plan will provide enough emission controls to correct ozone standard violations.

*Response 8a(2):* As discussed above in response to Comment 8a (1), the CAA does not specify the requisite nature, scope, specificity, or number of contingency measures to be included in a maintenance plan under section 175A. It is for EPA to determine whether the State has given adequate assurance that it can promptly correct a violation. Illinois has submitted contingency measures that EPA deems adequate. They have committed to remedy a future violation, and have included measures to address potential violations from a range of sources and a timeline for promptly completing adoption and implementation. The State has identified measures that are sufficiently specific but which allow for latitude in potential scope. This will enable the State to address a range of potential sources and differing degrees and types of violations. EPA believes that the contingency measures set forth in the submittal, combined with the State's commitment to an expeditious timeline and process for implementation, provide assurance that the State will promptly correct a future potential violation. Given the uncertainty as to timing, degree and nature of any future violation, EPA believes that the contingency measures set forth adequately balance the need for flexibility in the scope and type of measure to be implemented with the need for expeditious state action.

*Comment 8a(3):* The commenter contends that several of the potential contingency emission control measures are inappropriate or inadequate. The commenter states that several of the contingency emission control measures, including the Tier 2 vehicle emission standards, low sulfur fuel standards, heavy duty diesel standards, and low sulfur diesel standards are Federal emission control measures that EPA is already implementing. The commenter contends that EPA cannot both credit these emission control measures with existing emission reductions and allow IEPA to include them as potential contingency measures in the ozone maintenance plan. The commenter states that this approach would amount to double counting the effects of these emission control measures.

*Response 8a(3):* As discussed above in response to Comment 8a(2), the CAA

[8] A Level I response is triggered in the event that: (1) The annual fourth highest daily maximum 8-hour ozone concentration at any monitoring site in the St. Louis area exceeds 84 parts per billion (ppb) in any year; or, (2) VOC or $NO_X$ emissions increase more than 5 percent above the levels contained in the attainment year (2008) emissions inventory for the Illinois portion of the St. Louis ozone nonattainment area.

[9] A Level II response is triggered in the event that a violation of the 1997 8-hour ozone standard is monitored at any monitoring site in the St. Louis area.

does not specify the requisite nature, scope, specificity, or number of contingency measures to be included in a maintenance plan under section 175A. EPA has considered that the maintenance plan includes adequate state contingency measures, and that these are sufficient for the purpose of maintenance. EPA considers that the state measures themselves constitute adequate contingency measures, and that the Federal measures included also bolster maintenance to the extent that they provide reductions that were not counted in the maintenance plan's demonstration as explained below.

EPA also disagrees with the commenter's contention that EPA is double counting emissions reductions. The fact that some emissions reductions may have already been realized by a control measure does not prevent the control measure from resulting in greater reductions in future years. Further, as stated in the proposed rule (76 FR 79591), ''[t]o qualify as a contingency measure, emissions reductions from that measure must not be factored into the emissions projections used in the maintenance plan.'' This prevents possible double counting of emissions reductions during the maintenance period. Should the contingency plan be triggered, the state would be required to choose a contingency measure that meets this criterion. Any control measure listed in the contingency plan that fails to meet this criterion would not be considered to be an eligible contingency measure at that time and the state would be required to choose one that does.

*Comment 8b:* The commenter asserts that EPA, in assessing the adequacy of Illinois' ozone maintenance demonstration, has credited the state with $NO_X$ emission reductions in upwind areas that are the products of the $NO_X$ SIP call and CSAPR. These rules develop cap-and-trade programs that the commenter argues cannot satisfy the maintenance plan requirement. In addition, CSAPR has been stayed by the Court and may not be relied upon to provide $NO_X$ emission reductions.

*Response 8b:* As discussed in Response 3b, EPA disagrees with the commenter's position that emission reductions associated with the $NO_X$ SIP Call cannot be considered to be permanent and enforceable simply because they result from an emissions trading program. In addition, as discussed in Response 3a, Illinois has not relied on CSAPR to demonstrate attainment or maintenance of the standard.

*Comment 8c:* The commenter contends that Illinois' maintenance plan fails to consider additional emissions expected to occur from the Prairie State electrical power plant, which is currently under construction. This power plant is expected to commence operation during the ozone maintenance period. This power plant is expected to be a major source of $NO_X$ emissions. The commenter asserts that EPA cannot presume that, because the Prairie State power plant has obtained a PSD source permit, it will not cause or contribute to a violation of the 1997 8-hour ozone standard. EPA must review the PSD record and include the relevant portions in the administrative record for this ozone redesignation rulemaking.

*Response 8c:* Neither the CAA nor EPA redesignation policy requires that EPA review and take into consideration construction permits as a criterion for redesignation. Consistent with EPA's redesignation policy as articulated in the September 4, 1992, Calcagni memorandum, the State demonstrated maintenance of the standard by showing that future emissions in the area will not exceed the level of emissions in the attainment inventory for the area. The Prairie State power plant under construction is located in Washington County, which is not part of the St. Louis area. Thus emissions from this facility do not factor into the attainment or maintenance inventories for the area. EPA, in its proposed redesignation and elsewhere in our responses to comments in this final rule, has addressed and considered issues pertaining to the potential impact of emissions from outside the St. Louis area on the area's maintenance of the 1997 ozone standard.

Finally, under title I, part C of the CAA, the PSD preconstruction permit program requires an air quality analysis to demonstrate that emissions from construction or operation of a proposed major stationary source or major modification will not cause or contribute to a violation of any applicable NAAQS or PSD increment. CAA section 165(a)(3); see also 40 CFR 51.166(k) (providing that the owner or operator of a proposed source or modification ''shall demonstrate that allowable emissions increases from the proposed source or modification, in conjunction with all other applicable emissions increases or reduction * * * would not cause or contribute to air pollution in violation of'' any NAAQS or PSD increment). Therefore, the effect of the emissions from a proposed source on the maintenance of the NAAQS is addressed through the PSD permitting program before the facility is authorized to build and operate. Neither the CAA nor EPA policy require EPA to include the record from an independent PSD proceeding in the record for a redesignation action or to reopen permitting issues as part of a redesignation action. In addition, the commenter has not provided data indicating that the Prairie State plant will cause or contribute to a NAAQS or increment violation in the St. Louis area.

*Comment 9:* The commenter asserts that EPA has not accounted for the effects of weather in its modeling. The commenter notes that EPA's analysis of Illinois' ozone redesignation request is devoid of weather-adjusted considerations of ambient ozone levels. For this reason, this commenter believes that EPA cannot approve Illinois' ozone redesignation request. In addition, the commenter believes that EPA has erred in not considering the impacts that climate change will have on future ozone formation during the maintenance period.

*Response 9:* A determination that an area has attained the 1997 8-hour ozone standard is based on a review of monitored air quality data that meets regulatory requirements for purposes of comparison to the NAAQS, and it is not derived from modeling. An area is considered to be in attainment of the 1997 8-hour ozone standard if the 3-year average of the fourth highest daily maximum 8-hour average ozone concentrations measured at each monitor within an area over each year does not exceed 0.084 ppm. Three years of air quality data are used to allow for year-to-year variations in meteorology. As discussed in detail in the proposed rule, the St. Louis area is monitoring attainment of the 1997 8-hour ozone standard. See 76 FR 79582–79583 (December 22, 2011).

In addition, a maintenance demonstration need not be based on modeling. See *Wall* v. *EPA,* 265 F.3d 426 (6th Cir. 2001), *Sierra Club* v. *EPA,* 375 F. 3d 537 (7th Cir. 2004). See also 66 FR 53094, 53099–53100 (October 19, 2001), and 68 FR 25413, 25430–25432 (May 12, 2003). EPA policy and longstanding practice allows states to demonstrate maintenance by preparing an attainment emissions inventory corresponding to the period during which the area monitored attainment and to project maintenance by showing that future emissions are projected to remain below this level for the next ten years. See Calcagni memorandum. Holding emissions at or below the level of attainment is adequate to reasonably assure continued maintenance of the standard. See 65 FR 37879, 37888 (June

19, 2000). Since the St. Louis action is not based on modeling, EPA concludes that weather related impacts, including climate change, on modeling are not relevant. Impacts of weather on monitored data are accounted for by the three years of data used for the attainment determination.

**III. What actions is EPA taking?**

EPA is approving a request from the State of Illinois to redesignate the Illinois portion of the St. Louis, MO–IL area to attainment of the 1997 8-hour ozone standard. EPA is also taking several other related actions. EPA is approving, as a revision to the Illinois SIP, the State's plan for maintaining the 1997 8-hour ozone standard through 2025 in the area. EPA is approving the 2002 emissions inventory as meeting the comprehensive emissions inventory requirement of the CAA for the Illinois portion of the St. Louis area. Finally, EPA finds adequate and is approving the State's 2008 and 2025 MVEBs for the Illinois portion of the St. Louis area.

In accordance with 5 U.S.C. 553(d), EPA finds there is good cause for these actions to become effective immediately upon publication. This is because a delayed effective date is unnecessary due to the nature of a redesignation to attainment, which relieves the area from certain CAA requirements that would otherwise apply to it. The immediate effective date for this action is authorized under both 5 U.S.C. 553(d)(1), which provides that rulemaking actions may become effective less than 30 days after publication if the rule ''grants or recognizes an exemption or relieves a restriction,'' and section 553(d)(3) which allows an effective date less than 30 days after publication ''as otherwise provided by the agency for good cause found and published with the rule.'' The purpose of the 30 day waiting period prescribed in section 553(d) is to give affected parties a reasonable time to adjust their behavior and prepare before the final rule takes effect. Today's rule, however, does not create any new regulatory requirements such that affected parties would need time to prepare before the rule takes effect. Rather, today's rule relieves the state of planning requirements for this 8-hour ozone nonattainment area. For these reasons, EPA finds good cause under 5 U.S.C. 553(d)(3) for these actions to become effective on the date of publication of these actions.

**IV. Statutory and Executive Order Reviews**

Under the CAA, redesignation of an area to attainment and the accompanying approval of a maintenance plan under section 107(d)(3)(E) are actions that affect the status of a geographical area and do not impose any additional regulatory requirements on sources beyond those imposed by state law. A redesignation to attainment does not in and of itself create any new requirements, but rather results in the applicability of requirements contained in the CAA for areas that have been redesignated to attainment. Moreover, the Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA. These actions do not impose additional requirements beyond those imposed by state law and the CAA. For that reason, these actions:

- Are not a ''significant regulatory action'' subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);
- Do not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);
- Are certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);
- Do not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);
- Do not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);
- Are not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);
- Are not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);
- Are not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the Clean Air Act; and
- Do not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this rule does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the SIP is not approved to apply in Indian country located in the state, and EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law.

The Congressional Review Act, 5 U.S.C. 801 *et seq.,* as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this action and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by August 13, 2012. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxide, Ozone, Volatile organic compounds.

Dated: May 30, 2012.

**Susan Hedman,**

*Regional Administrator, Region 5.*

40 CFR part 52 is amended as follows:

**PART 52—[AMENDED]**

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Section 52.726 is amended by adding paragraphs (ll) and (mm) to read as follows:

**§ 52.726 Control strategy: Ozone.**

* * * * *

(ll) *Approval*—On May 26, 2010, and September 16, 2011, Illinois submitted a request to redesignate the Illinois portion of the St. Louis, MO–IL area to attainment of the 1997 8-hour ozone standard. The St. Louis area includes Jersey, Madison, Monroe, and St. Clair Counties in Illinois and St. Louis City and Franklin, Jefferson, St. Charles and St. Louis Counties in Missouri. As part of the redesignation request, the State submitted a plan for maintaining the 1997 8-hour ozone standard through 2025 in the area as required by section 175A of the Clean Air Act. Part of the section 175A maintenance plan includes a contingency plan. The ozone maintenance plan establishes 2008 motor vehicle emissions budgets for the Illinois portion of the St. Louis area of 17.27 tpd for volatile organic compounds (VOC) and 52.57 tpd for nitrogen oxides ($NO_X$). In addition the maintenance plan establishes 2025 motor vehicle emissions budgets for the Illinois portion of the St. Louis area of 5.68 tpd for VOC and 15.22 tpd for $NO_X$.

(mm) *Emissions inventories for the 1997 8-hour ozone standard*—

(1) *Approval*—Illinois' 2002 emissions inventory satisfies the emissions inventory requirements of section 182(a)(1) of the Clean Air Act for the Illinois portion of the St. Louis, MO–IL area under the 1997 8-hour ozone standard.

(2) [Reserved]

## PART 81—[AMENDED]

■ 3. The authority citation for part 81 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 4. Section 81.314 is amended by revising the entry for St. Louis, MO–IL in the table entitled ''Illinois-Ozone (8–Hour Standard)'' to read as follows:

**§ 81.314 Illinois.**

* * * * *

ILLINOIS—OZONE (8-HOUR STANDARD)

| Designated area | Designation [a] | | Classification | |
|---|---|---|---|---|
| | Date [1] | Type | Date [1] | Type |
| * * * | * | * | * | * |
| St. Louis, MO-IL: | | | | |
| Jersey County | 6/12/2012 | Attainment. | | |
| Madison County | 6/12/2012 | Attainment. | | |
| Monroe County | 6/12/2012 | Attainment. | | |
| St. Clair County | 6/12/2012 | Attainment. | | |
| * * * | * | * | * | * |

[a] Includes Indian Country located in each county or area, except as otherwise specified.
[1] This date is June 15, 2004, unless otherwise noted.

* * * * *

[FR Doc. 2012–14102 Filed 6–11–12; 8:45 am]

BILLING CODE 6560–50–P

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 97

**[EPA–HQ–OAR–2009–0491; FRL–9672–4]**

**RIN 2060–AR35**

### Revisions to Federal Implementation Plans To Reduce Interstate Transport of Fine Particulate Matter and Ozone

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is taking final action on revisions to the final Transport Rule (Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, published August 8, 2011). EPA is revising the 2012 and 2014 state budgets for Arkansas, Georgia, Indiana, Kansas, Louisiana, Mississippi, Missouri, New York, Nebraska, Ohio, Oklahoma, South Carolina, and Texas, and revising the new unit set-asides for Arkansas, Louisiana, and Missouri. These revisions are in addition to the revisions to the final Transport Rule published on February 21, 2012.

**DATES:** This final rule is effective on August 13, 2012.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. OAR–EPA–HQ–OAR–2009–0491. All documents in the docket are listed on the *http://www.regulations.gov* Web site. Although listed on the index, some information is not publicly available, e.g., CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *http://www.regulations.gov* or in hard copy at the EPA Docket Center, EPA West, Room B102, 1301 Constitution Ave., NW., Washington, DC. The Public Reading Room is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744, and the telephone number for the Air Docket is (202) 566–1742. This Docket Facility is open from 8:00 a.m. to 5:30 p.m., Monday through Friday, excluding legal holidays. The Docket telephone number is (929)566–1742, fax (202) 566–1741.

**FOR FURTHER INFORMATION CONTACT:** Jeremy Mark, U.S. Environmental Protection Agency, Clean Air Markets Division, MC 6204J, Ariel Rios Building, 1200 Pennsylvania Ave., NW., Washington, DC 20460, telephone (202) 343–9087, email at *mark.jeremy@epa.gov.* Electronic copies of this document can be accessed through the EPA Web site at: *http://epa.gov/airmarkets.*

**SUPPLEMENTARY INFORMATION:**

### I. Glossary of Terms and Abbreviations

The following are abbreviations of terms used in final rule:

CFR Code of Federal Regulations
EGU Electric Generating Unit
FIP Federal Implementation Plan
FR Federal Register
EPA U.S. Environmental Protection Agency
ICR Information Collection Request
NAAQS National Ambient Air Quality Standards
NODA Notice of Data Availability
$NO_X$ Nitrogen Oxides
SIP State Implementation Plan
OMB Office of Management and Budget
$PM_{2.5}$ Fine Particulate Matter, Less Than 2.5 Micrometers
PM Particulate Matter
RIA Regulatory Impact Analysis
$SO_2$ Sulfur Dioxide

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the United States.

EPA lacks the discretionary authority to address environmental justice in this proposed action. In reviewing SIP submissions, EPA's role is to approve or disapprove state choices, based on the criteria of the CAA. Accordingly, this action merely proposes to disapprove certain State requirements for inclusion into the SIP under section 110 and subchapter I, part D of the CAA and will not in-and-of itself create any new requirements. Accordingly, it does not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898.

*K. Statutory Authority*

The statutory authority for this action is provided by section 110 of the CAA, as amended (42 U.S.C. 7410).

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen dioxides, Ozone, Particulate matter, Reporting and recordkeeping requirements, Volatile organic compounds.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: January 30, 2012.

**Al Armendariz,**

*Regional Administrator, Region 6.*

[FR Doc. 2012–2902 Filed 2–8–12; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 52 and 81**

**[EPA–R05–OAR–2009–0730; FRL–9629–2]**

## Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Wisconsin; Redesignation of the Milwaukee-Racine and Sheboygan Areas to Attainment for 1997 8-Hour Ozone Standard

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA is proposing to approve requests from the Wisconsin Department of Natural Resources (WDNR) to redesignate the Milwaukee-Racine and Sheboygan areas to attainment for the 1997 8-hour ozone standard, because the requests meet the statutory requirements for redesignation under the Clean Air Act (CAA or Act). The Milwaukee-Racine area includes Milwaukee, Ozaukee, Racine, Washington, Waukesha, and Kenosha Counties. The Sheboygan area includes Sheboygan County. WDNR submitted these requests on September 11, 2009, and supplemented the submittal on November 16, 2011. This proposed approval also involves several related actions. EPA is proposing to approve, as revisions to the Wisconsin State Implementation Plan (SIP), the state's plans for maintaining the 1997 8-hour ozone National Ambient Air Quality Standard (NAAQS or standard) through 2022 in the above-mentioned areas. EPA is also proposing to approve the 2005 comprehensive emissions inventories for the Milwaukee-Racine and Sheboygan areas as meeting the requirements of the CAA. Finally, EPA finds adequate and is proposing to approve the state's 2015 and 2022 Motor Vehicle Emission Budgets (MVEBs) for the Milwaukee-Racine and Sheboygan areas.

**DATES:** Comments must be received on or before March 12, 2012.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2009–0730, by one of the following methods:

1. *www.regulations.gov:* Follow the on-line instructions for submitting comments.
2. *Email: Aburano.Douglas@epa.gov.*
3. *Fax:* (312) 408–2279.
4. *Mail:* Doug Aburano, Chief, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, Chicago, Illinois 60604.
5. *Hand delivery:* Doug Aburano, Chief, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, 18th floor, Chicago, Illinois 60604. Such deliveries are only accepted during the Regional Office normal hours of operation, and special arrangements should be made for deliveries of boxed information. The Regional Office official hours of business are Monday through Friday, 8:30 a.m. to 4:30 p.m., excluding Federal holidays.

*Instructions:* Direct your comments to Docket ID No. EPA–R05–OAR–2009–0730. EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through *www.regulations.gov* or email. The *www.regulations.gov* Web site is an ''anonymous access'' system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to EPA without going through *www.regulations.gov,* your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses. For additional instructions on submitting comments, go to Section I of this document, ''What Should I Consider as I Prepare My Comments for EPA?''

*Docket:* All documents in the docket are listed in the *www.regulations.gov* index. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hard copy at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. We recommend that you telephone Kathleen D'Agostino, Environmental Engineer, at (312) 886–1767 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:** Kathleen D'Agostino, Environmental Engineer, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), U.S. Environmental

Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 886–1767, *dagostino.kathleen@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever ''we,'' ''us,'' or ''our'' is used, we mean EPA. This supplementary information section is arranged as follows:

**Table of Contents**

I. What should I consider as I prepare my comments for EPA?
II. What actions is EPA proposing to take?
III. What is the background for these actions?
A. What is the general background information?
B. What are the impacts of the December 22, 2006, and June 8, 2007, United States Court of Appeals decisions regarding EPA's Phase 1 Implementation Rule?
IV. What are the criteria for redesignation to attainment?
V. What is EPA's analysis of the State's request?
A. Redesignation
B. Adequacy of Wisconsin's MVEBs
C. 2005 Comprehensive Emissions Inventory
VI. Summary of Actions
VII. Statutory and Executive Order Reviews

## I. What should I consider as I prepare my comments for EPA?

When submitting comments, remember to:

1. Identify the rulemaking by docket number and other identifying information (subject heading, **Federal Register** date and page number).
2. Follow directions—EPA may ask you to respond to specific questions or organize comments by referencing a Code of Federal Regulations (CFR) part or section number.
3. Explain why you agree or disagree; suggest alternatives and substitute language for your requested changes.
4. Describe any assumptions and provide any technical information and/or data that you used.
5. If you estimate potential costs or burdens, explain how you arrived at your estimate in sufficient detail to allow for it to be reproduced.
6. Provide specific examples to illustrate your concerns, and suggest alternatives.
7. Explain your views as clearly as possible, avoiding the use of profanity or personal threats.
8. Make sure to submit your comments by the comment period deadline identified.

## II. What actions is EPA proposing to take?

EPA is proposing to determine that the Milwaukee-Racine and Sheboygan ozone nonattainment areas have met the requirements for redesignation under section 107(d)(3)(E) of the CAA. EPA is thus proposing to approve Wisconsin's requests to change the legal designations of the Milwaukee-Racine and Sheboygan areas from nonattainment to attainment for the 1997 8-hour ozone NAAQS. EPA is also proposing to approve Wisconsin's maintenance plan SIP revisions for the Milwaukee-Racine and Sheboygan areas (such approval being one of the CAA criteria for redesignation to attainment status). The maintenance plans are designed to keep the Milwaukee-Racine and Sheboygan areas in attainment of the ozone NAAQS through 2022. EPA is proposing to approve the 2005 comprehensive emissions inventories for the Milwaukee-Racine and Sheboygan areas as meeting the requirements of section 182(a)(1) of the CAA. Finally, EPA is proposing to approve the newly-established 2015 and 2022 MVEBs for the Milwaukee-Racine and Sheboygan areas. The adequacy comment period for the MVEBs began on December 6, 2011, with EPA's posting of the availability of the submittal on EPA's Adequacy Web site (at *http://www.epa.gov/otaq/stateresources/transconf/adequacy.htm*). The adequacy comment period for these MVEBs ended on January 5, 2012. EPA did not receive any requests for this submittal, or adverse comments on this submittal during the adequacy comment period. See section V. B. of this rulemaking, ''Adequacy of Wisconsin's MVEBs,'' for further explanation on this process. Therefore, EPA finds adequate, and is proposing to approve, the state's 2015 and 2022 MVEBs for use in future transportation conformity analyses for the areas.

## III. What is the background for these actions?

### *A. What is the general background information?*

Ground-level ozone is not emitted directly by sources. Rather, emissions of nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) react in the presence of sunlight to form ground-level ozone. $NO_X$ and VOCs are referred to as precursors of ozone.

The CAA establishes a process for air quality management through the NAAQS. Before promulgation of the 8-hour standard, the ozone NAAQS was based on a 1-hour standard. On November 6, 1991 (56 FR 56693 and 56852), the Milwaukee-Racine and Sheboygan areas were designated as severe and moderate nonattainment areas, respectively, under the 1-hour ozone NAAQS. The Sheboygan area was subsequently redesignated to attainment of the 1-hour standard on August 26, 1996 (61 FR 43675). Although the Milwaukee-Racine area was monitoring attainment of the 1-hour ozone standard by the end of the 2005 ozone season, at the time EPA revoked the 1-hour ozone NAAQS, on June 15, 2005, the Milwaukee-Racine area was never redesignated as attainment under the 1-hour ozone NAAQS.

On July 18, 1997 (62 FR 38856), EPA promulgated an 8-hour ozone standard of 0.08 parts per million parts (ppm). On April 30, 2004 (69 FR 23857), EPA published a final rule designating and classifying areas under the 8-hour ozone NAAQS. These designations and classifications became effective June 15, 2004. EPA designated as nonattainment any area that was violating the 8-hour ozone NAAQS based on the three most recent years of air quality data, 2001–2003.

The CAA contains two sets of provisions, subpart 1 and subpart 2, that address planning and control requirements for nonattainment areas. (Both are found in title I, part D, 42 U.S.C. 7501–7509a and 7511–7511f, respectively.) Subpart 1 contains general requirements for nonattainment areas for any pollutant, including ozone, governed by a NAAQS. Subpart 2 provides more specific requirements for ozone nonattainment areas.

Under EPA's implementation rule for the 1997 8-hour ozone standard, (69 FR 23951, April 30, 2004), an area was classified under subpart 2 based on its 8-hour ozone design value,[1] if it had a 1-hour design value at the time of designation at or above 0.121 ppm (the lowest 1-hour design value in Table 1 of subpart 2) (69 FR 23954). All other areas were covered under subpart 1, based upon their 8-hour design values (69 FR 23958). The Milwaukee-Racine and Sheboygan areas were designated as subpart 2, 8-hour ozone moderate nonattainment areas by EPA on April 30, 2004 (69 FR 23857 and 23947) based on air quality monitoring data from 2001–2003 (69 FR 23860).

40 CFR 50.10 and appendix I of 40 CFR part 50 provide that the 8-hour ozone standard is attained when the three-year average of the annual fourth-highest daily maximum 8-hour average ozone concentration is less than or equal to 0.08 ppm, when rounded. The data completeness requirement is met when the average percent of days with

[1] To determine the 8-hour design value for an area, the three-year average of the fourth-highest daily maximum 8-hour average ozone concentration is calculated for each monitor within an area. The highest three-year average is the design value for the area.

valid ambient monitoring data is greater than 90 percent, and no single year has less than 75 percent data completeness. *See* 40 CFR part 50, appendix I, 2.3(d).

WDNR submitted requests to redesignate the Milwaukee-Racine and Sheboygan areas to attainment for the 1997 8-hour ozone standard on September 11, 2009, and supplemented the request on November 16, 2011. Complete, quality-assured and certified data for the 2006–2008, 2007–2009, and 2008–2010 time periods indicate the 8-hour NAAQS for ozone, as promulgated in 1997, has been attained for the Milwaukee-Racine and Sheboygan areas. In addition, available monitoring data for 2011 continue to show the areas in attainment of the standard. Under the CAA, nonattainment areas may be redesignated to attainment if sufficient complete, quality-assured data are available for the Administrator to determine that the area has attained the standard, and the area meets the other CAA redesignation requirements in section 107(d)(3)(E).

On March 27, 2008 (73 FR 16436), EPA promulgated a revised 8-hour ozone standard of 0.075 ppm. EPA has not yet designated areas under the 2008 standard. The actions addressed in this proposed rulemaking relate only to the 1997 8-hour ozone standard.

*B. What are the impacts of the December 22, 2006, and June 8, 2007, United States Court of Appeals decisions regarding EPA's Phase 1 Implementation Rule?*

1. Summary of Court Decision

On December 22, 2006, in *South Coast Air Quality Management Dist.* v. *EPA,* the U.S. Court of Appeals for the District of Columbia (DC Circuit) vacated EPA's Phase 1 Implementation Rule for the 1997 8-hour Ozone Standard (69 FR 23951, April 30, 2004). 472 F.3d 882 (D.C. Cir. 2006). On June 8, 2007, in response to several petitions for rehearing, the DC Circuit clarified that the Phase 1 Rule was vacated only with regard to those parts of the rule that had been successfully challenged. *Id.,* Docket No. 04 1201. Therefore, several provisions of the Phase 1 Rule remain effective: Provisions related to classifications for areas currently classified under subpart 2 of title I, part D, of the CAA as 8-hour nonattainment areas; the 8-hour attainment dates; and the timing for emissions reductions needed for attainment of the 8-hour ozone NAAQS. The June 8, 2007, decision also left intact the court's rejection of EPA's reasons for implementing the 8-hour standard in certain nonattainment areas under subpart 1 in lieu of subpart 2. By limiting the vacatur, the D.C. Circuit let stand EPA's revocation of the 1-hour standard and those anti-backsliding provisions of the Phase 1 Rule that had not been successfully challenged.

The June 8, 2007, decision reaffirmed the December 22, 2006, decision that EPA had improperly failed to retain four measures required for 1-hour nonattainment areas under the anti-backsliding provisions of the regulations: (1) Nonattainment area New Source Review (NSR) requirements based on an area's 1-hour nonattainment classification; (2) Section 185 penalty fees for 1-hour severe or extreme nonattainment areas; (3) measures to be implemented pursuant to section 172(c)(9) or 182(c)(9) of the Act, on the contingency of an area not making reasonable further progress toward attainment of the 1-hour NAAQS, or for failure to attain that NAAQS; and (4) certain transportation conformity requirements for certain types of Federal actions. The June 8, 2007, decision clarified that the court's reference to conformity requirements was limited to requiring the continued use of 1-hour motor vehicle emissions budgets until 8-hour budgets were available for 8-hour conformity determinations.

This section sets forth EPA's views on the potential effect of the Court's rulings on this proposed redesignation action. For the reasons set forth below, EPA does not believe that the court's rulings alter any requirements relevant to this redesignation action so as to preclude redesignation or prevent EPA from proposing or ultimately finalizing this redesignation. EPA believes that the D.C. Circuit's December 22, 2006, and June 8, 2007, decisions impose no impediment to moving forward with redesignation of this area to attainment, because even in light of the court's decisions, redesignation is appropriate under the relevant redesignation provisions of the CAA and longstanding policies regarding redesignation requests.

2. Requirements Under the 8-Hour Ozone Standard

With respect to the 1997 8-hour standard, the Milwaukee-Racine and Sheboygan areas are classified under subpart 2. The June 8, 2007, opinion clarifies that the court did not vacate the Phase 1 Rule's provisions with respect to classifications for areas under subpart 2. The court's decision therefore upholds EPA's classifications for those areas classified under subpart 2 for the 8-hour ozone standard.

3. Requirements Under the 1-Hour Ozone Standard

a. Milwaukee-Racine Area

In its June 8, 2007 decision the D.C. Circuit limited its vacatur so as to uphold those provisions of the anti-backsliding requirements that were not successfully challenged. Therefore, an area must meet the anti-backsliding requirements which apply by virtue of the area's classification for the 1-hour ozone standard. See 40 CFR 51.900, *et seq.;* 70 FR 30592, 30604 (May 26, 2005). As set forth in more detail below, the area must also address four additional anti-backsliding provisions identified by the court in its decisions.

The anti-backsliding provisions at 40 CFR 51.905(a)(1) prescribe 1-hour ozone standard requirements that continue to apply after revocation of the 1-hour ozone NAAQS to former 1-hour ozone nonattainment areas. 40 CFR 51.905(a)(1)(i) provides that:

> The area remains subject to the obligation to adopt and implement the applicable requirements as defined in section 51.900(f), except as provided in paragraph (a)(1)(iii) of this section, and except as provided in paragraph (b) of this section.

40 CFR 51.900(f), as amended by 70 FR 30592, 30604 (May 26, 2005), states that:

> Applicable requirements means for an area the following requirements to the extent such requirements apply or applied to the area for the area's classification under section 181(a)(1) of the CAA for the 1-hour NAAQS at designation for the 8-hour NAAQS:
> (1) Reasonably available control technology (RACT).
> (2) Inspection and maintenance programs (I/M).
> (3) Major source applicability cut-offs for purposes of RACT.
> (4) Rate of Progress (ROP) reductions.
> (5) Stage II vapor recovery.
> (6) Clean fuels fleet program under section 182(c)(4) of the CAA.
> (7) Clean fuels for boilers under section 182(e)(3) of the CAA.[2]
> (8) Transportation Control Measures (TCMs) during heavy traffic hours as provided section 182(e)(4) of the CAA.[2]
> (9) Enhanced (ambient) monitoring under section 182(c)(1) of the CAA.
> (10) Transportation controls under section 182(c)(5) of the CAA.
> (11) Vehicle miles traveled provisions of section 182(d)(1) of the CAA.
> (12) $NO_X$ requirements under section 182(f) of the CAA.
> (13) Attainment demonstration or an alternative as provided under § 51.905(a)(1)(ii).

Pursuant to 40 CFR 51.905(c), the Milwaukee-Racine area is subject to the

[2] Applies only to areas classified as extreme; therefore, not a requirement for the Milwaukee-Racine area.

obligations set forth in 40 CFR 51.905(a) and 40 CFR 51.900(f).

In addition, the D.C. Circuit held that EPA should have retained four additional measures in its anti-backsliding provisions: (1) Nonattainment area NSR; (2) section 185 penalty fees; (3) contingency measures under section 172(c)(9) or 182(c)(9) of the Act; and (4) 1-hour MVEBs that were not yet replaced by 8-hour emissions budgets. EPA has addressed these four requirements as follows:

With respect to NSR, EPA has determined that an area being redesignated need not have an approved nonattainment NSR program, provided that the state demonstrates maintenance of the standard in the area without part D NSR in effect. The rationale for this view is described in a memorandum from Mary Nichols, Assistant Administrator for Air and Radiation, dated October 14, 1994, entitled, ''Part D New Source Review Requirements for Areas Requesting Redesignation to Attainment.'' This policy assumes that the state's PSD program will become effective in the area immediately upon redesignation to attainment. Consequently EPA concludes that an approved NSR program is not an applicable requirement for purposes of redesignation. See the more detailed explanations in the following rulemakings: Detroit, Michigan (60 FR 12467–12468, March 7, 1995); Cleveland-Akron-Lorrain, Ohio (61 FR 20458, 20469–70, May 7, 1996); Louisville, Kentucky (66 FR 53665, 53669, October 23, 2001); Grand Rapids, Michigan (61 FR 31831, 31836–31837, June 21, 1996). Furthermore, EPA approved Wisconsin's NSR program on January 18, 1995 (60 FR 3538), February 6, 2006 (71 FR 5979), March 8, 2006 (71 FR 55062) and May 16, 2006 (71 FR 28274).

With regard to the requirement for section 185 source penalty fees, the Milwaukee-Racine area was classified as severe nonattainment under the 1-hour standard and is, therefore, subject to this requirement. EPA approved an excess VOC emissions fee rule for the Milwaukee-Racine area on June 25, 2002 (67 FR 42729). On April 24, 2009 (74 FR 18641), EPA published a final rule making a determination that the Milwaukee-Racine area had attained the 1-hour ozone standard and confirming that this finding of attainment relieved Wisconsin of the obligation to adopt section 185 source penalty fee regulations for this area.

With respect to the 1-hour MVEBs that were not yet replaced by 8-hour emissions budgets, the conformity portion of the court's June 8, 2007 ruling clarified that, for those areas with MVEBs for the 1-hour ozone standard, anti-backsliding requires that these MVEBs be used for 8-hour conformity determinations until replaced by MVEBs for the 8-hour ozone standard. To meet this requirement, conformity determinations in such areas must comply with the applicable requirements of EPA's conformity regulations at 40 CFR part 93. Note below that EPA is proposing to find adequate and approve 8-hour MVEBs established by Wisconsin's 8-hour ozone maintenance plans for the Milwaukee and Sheboygan areas.

With respect to the contingency measure requirements under sections 172(c)(9) and 182(c)(9) of the CAA, these requirements must be addressed in state ozone Reasonable Further Progress (RFP) and attainment demonstration plans. Wisconsin addressed these requirements in the 1-hour ozone RFP and attainment demonstration plans for the Milwaukee-Racine area by adopting and implementing extra VOC and $NO_X$ emission controls that go beyond the emission reductions needed for RFP and attainment of the 1-hour ozone standard. EPA approved these ozone control plans, including their contingency elements as follows: VOC 15 percent RFP plan, March 22, 1996 (61 FR 11735); post-1996 RFP plan, November 10, 2001 (66 FR 51572); and 1-hour ozone attainment demonstration and post-1999 RFP plan, November 13, 2001 (66 FR 56931). Therefore, Wisconsin has met the contingency measure requirements of sections 172(c)(9) and 182(c)(9) of the CAA for the 1-hour ozone standard.

b. Sheboygan Area

With respect to the 1-hour standard requirements, the Sheboygan area was an attainment area subject to a CAA section 175A maintenance plan under the 1-hour standard. The D.C. Circuit's decisions do not impact redesignation requests for these types of areas, except to the extent that the court, in its June 8, 2007, decision, clarified that for those areas with 1-hour MVEBs in their maintenance plans, anti-backsliding provisions require that those 1-hour budgets must be used for 8-hour conformity determinations until replaced by 8-hour budgets. All conformity determinations must comply with the applicable requirements of EPA's conformity regulations at 40 CFR part 93.

With respect to the three other anti-backsliding provisions for the 1-hour standard that the court found were not properly retained, the Sheboygan area is an attainment area subject to a maintenance plan for the 1-hour standard, and the nonattainment NSR, contingency measures (pursuant to section 172(c)(9) or 182(c)(9)), and fee provision requirements no longer apply to an area that has been redesignated to attainment of the 1-hour standard.

Thus the decision in *South Coast* should not alter requirements that would preclude EPA from proposing or finalizing the redesignations of these areas.

**IV. What are the criteria for redesignation to attainment?**

The CAA provides the requirements for redesignating a nonattainment area to attainment. Specifically, section 107(d)(3)(E) allows for redesignation provided that: (1) The Administrator determines that the area has attained the applicable NAAQS; (2) the Administrator has fully approved the applicable implementation plan for the area under section 110(k); (3) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable SIP and applicable Federal air pollutant control regulations and other permanent and enforceable reductions; (4) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 175A; and, (5) the state containing such area has met all requirements applicable to the area under section 110 and part D.

EPA provided guidance on redesignation in the General Preamble for the Implementation of Title I of the CAA Amendments of 1990 on April 16, 1992 (57 FR 13498), and supplemented this guidance on April 28, 1992 (57 FR 18070). EPA has provided further guidance on processing redesignation requests in the following documents:

''Ozone and Carbon Monoxide Design Value Calculations,'' Memorandum from William G. Laxton, Director Technical Support Division, June 18, 1990;

''Maintenance Plans for Redesignation of Ozone and Carbon Monoxide Nonattainment Areas,'' Memorandum from G.T. Helms, Chief, Ozone/Carbon Monoxide Programs Branch, April 30, 1992;

''Contingency Measures for Ozone and Carbon Monoxide (CO) Redesignations,'' Memorandum from G.T. Helms, Chief, Ozone/Carbon Monoxide Programs Branch, June 1, 1992;

''Procedures for Processing Requests to Redesignate Areas to Attainment,''

Memorandum from John Calcagni, Director, Air Quality Management Division, September 4, 1992;

''State Implementation Plan (SIP) Actions Submitted in Response to Clean Air Act (ACT) Deadlines,'' Memorandum from John Calcagni, Director, Air Quality Management Division, October 28, 1992;

''Technical Support Documents (TSD's) for Redesignation Ozone and Carbon Monoxide (CO) Nonattainment Areas,'' Memorandum from G.T. Helms, Chief, Ozone/Carbon Monoxide Programs Branch, August 17, 1993;

''State Implementation Plan (SIP) Requirements for Areas Submitting Requests for Redesignation to Attainment of the Ozone and Carbon Monoxide (CO) National Ambient Air Quality Standards (NAAQS) On or After November 15, 1992,'' Memorandum from Michael H. Shapiro, Acting Assistant Administrator for Air and Radiation, September 17, 1993;

''Use of Actual Emissions in Maintenance Demonstrations for Ozone and CO Nonattainment Areas,'' Memorandum from D. Kent Berry, Acting Director, Air Quality Management Division, to Air Division Directors, Regions 1–10, November 30, 1993.

''Part D New Source Review (part D NSR) Requirements for Areas Requesting Redesignation to Attainment,'' Memorandum from Mary D. Nichols, Assistant Administrator for Air and Radiation, October 14, 1994; and

''Reasonable Further Progress, Attainment Demonstration, and Related Requirements for Ozone Nonattainment Areas Meeting the Ozone National Ambient Air Quality Standard,'' Memorandum from John S. Seitz, Director, Office of Air Quality Planning and Standards, May 10, 1995.

## V. What is EPA's analysis of the State's request?

### *A. Redesignation*

EPA is proposing to determine that the Milwaukee-Racine and Sheboygan areas have met all applicable redesignation criteria under CAA section 107(d)(3)(E). The bases for EPA's proposed approval of the redesignation requests are as follows:

#### 1. The Areas Have Attained the 1997 8-Hour Ozone NAAQS. (Section 107(d)(3)(E)(i))

On March 1, 2011 (76 FR 11080), EPA determined that the Milwaukee-Racine and Sheboygan areas have attained the 1997 8-hour ozone NAAQS based on monitoring data for 2006–2008 and 2007–2009, and 2008–2010 time periods. An area may be considered to be attaining the 1997 8-hour ozone NAAQS if there are no violations, as determined in accordance with 40 CFR 50.10 and 40 CFR part 50, appendix I, based on three complete, consecutive calendar years of quality-assured air quality monitoring data. To attain this standard, the three-year average of the fourth-highest daily maximum 8-hour average ozone concentrations measured at each monitor within an area over each year must not exceed 0.08 ppm. Based on the rounding convention described in 40 CFR part 50, appendix I, the standard is attained if the design value is 0.084 ppm or below. The data must be collected and quality-assured in accordance with 40 CFR part 58, and recorded in EPA's Air Quality System (AQS). The monitors generally should have remained at the same location for the duration of the monitoring period required for demonstrating attainment.

All 2006–2010 monitoring data have been quality-assured in accordance with 40 CFR 58.10, recorded in the AQS database, and certified. The data meet the completeness criteria in 40 CFR 50, appendix I, which requires a minimum completeness of 75 percent annually and 90 percent over each three-year period. Monitoring data is presented in Table 1 below. In addition, available preliminary monitoring data for 2011 continue to show the areas in attainment of the standard.

TABLE 1—ANNUAL 4TH HIGH DAILY MAXIMUM 8-HOUR OZONE CONCENTRATIONS AND THREE-YEAR AVERAGES OF 4TH HIGH DAILY MAXIMUM 8-HOUR OZONE CONCENTRATIONS

| Area | County | Monitor | 2006 4th high (ppm) | 2007 4th high (ppm) | 2008 4th high (ppm) | 2009 4th high (ppm) | 2010 4th high (ppm) | 2006–2008 average (ppm) | 2007–2009 average (ppm) | 2008–2010 average (ppm) |
|---|---|---|---|---|---|---|---|---|---|---|
| Milwaukee-Racine. | Kenosha ...... | Pleasant Prairie 55–059–0019. | 0.079 | 0.085 | 0.072 | 0.071 | 0.081 | 0.078 | 0.076 | 0.074 |
| | Milwaukee ... | 16th St. HC 55–079–0010 | 0.064 | 0.067 | 0.059 | 0.066 | 0.065 | 0.063 | 0.064 | 0.063 |
| | | WDNR SERHQ 55–079–0026. | 0.068 | 0.075 | 0.063 | 0.067 | 0.076 | 0.068 | 0.068 | 0.068 |
| | | UWM-North 55–079–0041 | 0.073 | 0.078 | 0.065 | 0.068 | n/a | 0.072 | 0.070 | n/a |
| | | Bayside 55–079–0085 ...... | 0.073 | 0.083 | 0.069 | 0.072 | 0.082 | 0.075 | 0.074 | 0.074 |
| | Ozaukee ...... | Grafton 55–089–0008 ...... | 0.071 | 0.082 | 0.064 | 0.067 | 0.075 | 0.072 | 0.071 | 0.068 |
| | | Harr. Beach 55–089–0009 | 0.072 | 0.084 | 0.067 | 0.070 | 0.078 | 0.074 | 0.073 | 0.071 |
| | Racine ......... | Racine 55–101–0017 ....... | 0.071 | 0.077 | 0.065 | 0.071 | 0.078 | 0.071 | 0.071 | 0.071 |
| | Washington | Slinger 55–131–0009 ....... | 0.066 | 0.071 | 0.060 | 0.065 | 0.064 | 0.065 | 0.065 | 0.063 |
| | Waukesha ... | Waukesha 55–133–0027 | 0.067 | 0.072 | 0.060 | 0.059 | 0.062 | 0.066 | 0.063 | 0.060 |
| Sheboygan .. | Sheboygan .. | Kohler Andre Park 55–117–0006. | 0.083 | 0.088 | 0.075 | 0.074 | 0.085 | 0.082 | 0.079 | 0.078 |

In addition, as discussed below with respect to the maintenance plan, WDNR has committed to continue to operate an EPA-approved monitoring network in the areas. WDNR will continue to quality assure monitoring data in accordance with 40 CFR part 58 and enter all data into the AQS in accordance with Federal guidelines. In summary, EPA believes that the data provide an adequate demonstration that the Milwaukee-Racine and Sheboygan areas have attained and continue to attain the 8-hour ozone NAAQS.

#### 2. The Area Has Met All Applicable Requirements Under Section 110 and Part D; and the Area Has a Fully Approved SIP Under Section 110(k). (Sections 107(d)(3)(E)(v) and 107(d)(3)(E)(ii))

We are proposing to determine that Wisconsin has met all currently applicable SIP requirements for

purposes of redesignation of the Milwaukee-Racine and Sheboygan areas to attainment of the 1997 8-hour ozone standard under section 110 and part D of the CAA, in accordance with section 107(d)(3)(E)(v). We are also proposing to determine that the Wisconsin SIP, with the exception of the comprehensive emission inventory and certain VOC RACT rules, is fully approved with respect to all applicable requirements for purposes of redesignation to attainment of the 1997 8-hour ozone standard, in accordance with section 107(d)(3)(E)(ii) of the CAA. As discussed below, in this action EPA is proposing to approve Wisconsin's 2005 comprehensive emissions inventory as meeting the comprehensive emissions inventory requirement of section 182(a)(1) for the areas. EPA is taking action on the Wisconsin VOC RACT regulations in a separate rule.

Recognizing that the comprehensive emissions inventory and VOC RACT rules must be approved on or before we complete final rulemaking approving the redesignation requests, we determine here that, assuming that this occurs, Wisconsin will have met all applicable section 110 and part D SIP requirements of the CAA for purposes of approval of Wisconsin's ozone redesignation requests for the Milwaukee-Racine and Sheboygan areas. In making these determinations, we have ascertained what SIP requirements are applicable to the area for purposes of redesignation, and have determined that the portions of the SIP meeting these requirements are fully approved or will be fully approved under section 110(k) of the CAA by the time we complete final rulemaking on Wisconsin's ozone redesignation requests for the Milwaukee-Racine and Sheboygan areas. As discussed more fully below, SIPs must be fully approved only with respect to currently applicable requirements of the CAA.

The September 4, 1992, Calcagni memorandum (see ''Procedures for Processing Requests to Redesignate Areas to Attainment,'' Memorandum from John Calcagni, Director, Air Quality Management Division, September 4, 1992) describes EPA's interpretation of section 107(d)(3)(E) of the CAA. Under this interpretation, a state and the area it wishes to redesignate must meet the relevant CAA requirements that are due prior to the state's submittal of a complete redesignation request for the area. *See also* the September 17, 1993, Michael Shapiro memorandum and 60 FR 12459, 12465–66 (March 7, 1995) (redesignation of Detroit-Ann Arbor, Michigan to attainment of the 1-hour ozone NAAQS). Applicable requirements of the CAA that come due subsequent to the state's submittal of a complete request remain applicable until a redesignation to attainment is approved, but are not required as a prerequisite to redesignation. *See* section 175A(c) of the CAA. *Sierra Club* v. *EPA,* 375 F.3d 537 (7th Cir. 2004). *See also* 68 FR 25424, 25427 (May 12, 2003) (redesignation of the St. Louis/East St. Louis area to attainment of the 1-hour ozone NAAQS).

Since EPA determined that the areas have attained the 1997 8-hour ozone standard, under 40 CFR 51.918, the requirements to submit certain planning SIPs related to attainment, including attainment demonstration requirements (the reasonably available control measure (RACM) requirement of section 172(c)(1) of the CAA, the RFP and attainment demonstration requirements of sections 172(c)(2) and (6) and 182(b)(1) of the CAA, and the requirement for contingency measures of section 172(c)(9) of the CAA) are not applicable to the areas as long as they continue to attain the NAAQS and will cease to apply upon redesignation. In addition, in the context of redesignations, EPA has interpreted requirements related to attainment as not applicable for purposes of redesignation. For example, in the General Preamble EPA stated that:

> [t]he section 172(c)(9) requirements are directed at ensuring RFP and attainment by the applicable date. These requirements no longer apply when an area has attained the standard and is eligible for redesignation. Furthermore, section 175A for maintenance plans * * * provides specific requirements for contingency measures that effectively supersede the requirements of section 172(c)(9) for these areas. ''General Preamble for the Interpretation of Title I of the Clean Air Act Amendments of 1990,'' (General Preamble) 57 FR 13498, 13564 (April 16, 1992).

See also Calcagni memorandum at 6 (''The requirements for reasonable further progress and other measures needed for attainment will not apply for redesignations because they only have meaning for areas not attaining the standard.'').

a. The Milwaukee-Racine and Sheboygan Areas Have Met All Applicable Requirements Under Section 110 and Part D of the CAA for Purposes of Redesignation

i. Section 110 General SIP Requirements

Section 110(a) of title I of the CAA contains the general requirements for a SIP. Section 110(a)(2) provides that the implementation plan submitted by a state must have been adopted by the state after reasonable public notice and hearing, and that, among other things, it includes enforceable emission limitations and other control measures, means or techniques necessary to meet the requirements of the CAA; provides for establishment and operation of appropriate devices, methods, systems and procedures necessary to monitor ambient air quality; provides for implementation of a source permit program to regulate the modification and construction of any stationary source within the areas covered by the plan; includes provisions for the implementation of part C, PSD, and part D, NSR permit programs; includes criteria for stationary source emission control measures, monitoring, and reporting; includes provisions for air quality modeling; and provides for public and local agency participation in planning and emission control rule development.

Section 110(a)(2)(D) of the CAA requires that SIPs contain measures to prevent sources in a state from significantly contributing to air quality problems in another state. To implement this provision, EPA has required certain states to establish programs to address transport of air pollutants, *e.g.,* the $NO_X$ SIP Call.[3] However, the section 110(a)(2)(D) requirements for a state are not linked with a particular nonattainment area's designation and classification. EPA believes that the requirements linked with a particular nonattainment area's designation and classification are the relevant measures to evaluate in reviewing a redesignation request. The transport SIP submittal requirements, where applicable, continue to apply to a state regardless of the designation of any one particular area in the state. Thus, we believe that these requirements should not be construed to be applicable requirements for purposes of redesignation.

Further, we conclude that the other section 110 elements described above that are not connected with nonattainment plan submissions and not linked with an area's attainment status are also not applicable requirements for purposes of redesignation. A state remains subject to these requirements after an area is redesignated to attainment. We conclude that only the section 110 and part D requirements which are linked with a particular area's designation and

[3] On October 27, 1998 (63 FR 57356), EPA issued a $NO_X$ SIP call requiring the District of Columbia and 22 states to reduce emissions of $NO_X$ in order to reduce the transport of ozone and ozone precursors. Wisconsin was not included in EPA's $NO_X$ SIP call.

classification are the relevant measures which we may consider in evaluating a redesignation request. This approach is consistent with EPA's existing policy on applicability of conformity and oxygenated fuels requirements for redesignation purposes, as well as with section 184 ozone transport requirements. *See* Reading, Pennsylvania, proposed and final rulemakings (61 FR 53174–53176, October 10, 1996), (62 FR 24826, May 7, 1997); Cleveland-Akron-Lorain, Ohio, final rulemaking (61 FR 20458, May 7, 1996); and Tampa, Florida, final rulemaking (60 FR 62748, December 7, 1995). *See also* the discussion on this issue in the Cincinnati, Ohio 1-hour ozone redesignation (65 FR 37890, June 19, 2000), and in the Pittsburgh, Pennsylvania 1-hour ozone redesignation (66 FR 50399, October 19, 2001).

We have reviewed Wisconsin's SIP and have concluded that it meets the general SIP requirements under section 110 of the CAA, to the extent those requirements are applicable for purposes of redesignation. EPA has previously approved provisions of the Wisconsin SIP addressing section 110 elements under the 1-hour ozone standard (40 CFR 52.2570). Further, in submittals dated December 12, 2007, January 24, 2011, and March 28, 2011, Wisconsin confirmed that the state continues to meet the section 110 requirements for the 8-hour ozone standard. EPA approved some elements of this Wisconsin submittal on July 13, 2011, at 76 FR 41075. The requirements of section 110(a)(2), however, are statewide requirements that are not linked to the 8-hour ozone nonattainment status of the Milwaukee-Racine and Sheboygan areas. Therefore, EPA concludes that these infrastructure SIP elements are not applicable requirements for purposes of review of the state's 8-hour ozone redesignation request.

ii. Part D Requirements

EPA has determined that, if EPA finalizes the approval of the 2005 comprehensive emissions inventory, discussed in section V.C. of this rulemaking, and the VOC RACT submittal, discussed below under the heading ''Subpart 2 Section 182(a) and (b) Requirements,'' the Wisconsin SIP will meet the SIP requirements applicable for purposes of redesignation under part D of the CAA for the Milwaukee-Racine and Sheboygan areas. Subpart 1 of part D, found in sections 172–176 of the CAA, sets forth the basic nonattainment requirements applicable to all nonattainment areas. Subpart 2 of part D, which includes section 182 of the CAA, establishes additional specific requirements depending on the area's nonattainment classification.

The Milwaukee-Racine and Sheboygan areas were classified as moderate areas under subpart 2. Therefore, the state must meet the applicable requirements of both subpart 1 and subpart 2 of part D. The applicable subpart 1 requirements are contained in sections 172(c)(1)–(9) and in section 176. The applicable subpart 2 requirements are contained in sections 182(a) and (b) (marginal and moderate nonattainment area requirements).

*Subpart 1 Section 172 Requirements.* For purposes of evaluating this redesignation request, the applicable section 172 SIP requirements for the Milwaukee-Racine and Sheboygan areas are contained in sections 172(c)(1)-(9). A thorough discussion of the requirements contained in section 172 can be found in the General Preamble for Implementation of Title I (57 FR 13498, April 16, 1992).

Section 172(c)(1) requires the plans for all nonattainment areas to provide for the implementation of all RACM as expeditiously as practicable and to provide for attainment for the national primary ambient air quality standards. EPA interprets this requirement to impose a duty on all states containing nonattainment areas to consider all available control measures and to adopt and implement such measures as are reasonably available for implementation in each area as components of the area's attainment demonstration. Because attainment has been reached in the Milwaukee-Racine and Sheboygan areas, no additional measures are needed to provide for attainment and section 172(c)(1) requirements are no longer considered to be applicable as long as the area continues to attain the standard until redesignation. See 40 CFR 51.918.

The RFP requirement under section 172(c)(2) is defined as progress that must be made toward attainment. This requirement is not relevant for purposes of redesignation because the Milwaukee-Racine and Sheboygan areas have demonstrated monitored attainment of the 1997 8-hour ozone NAAQS. (General Preamble, 57 FR 13564). See also 40 CFR 51.918. In addition, because the Milwaukee-Racine and Sheboygan areas have attained the ozone NAAQS and are no longer subject to an RFP requirement, the section 172(c)(9) contingency measures are not applicable for purposes of redesignation. *Id.*

Section 172(c)(3) requires submission and approval of a comprehensive, accurate and current inventory of actual emissions. This requirement was superseded by the inventory requirement in section 182(a)(1) discussed below.

Section 172(c)(4) requires the identification and quantification of allowable emissions for major new and modified stationary sources in an area, and section 172(c)(5) requires source permits for the construction and operation of new and modified major stationary sources anywhere in the nonattainment area. EPA approved Wisconsin's current NSR program on December 17, 2008 (73 FR 76558 and 76560). Nonetheless, EPA has determined that, since PSD requirements will apply after redesignation, areas being redesignated need not comply with the requirement that a NSR program be approved prior to redesignation, provided that the area demonstrates maintenance of the NAAQS without part D NSR. A more detailed rationale for this view is described in a memorandum from Mary Nichols, Assistant Administrator for Air and Radiation, dated October 14, 1994, entitled, ''Part D New Source Review Requirements for Areas Requesting Redesignation to Attainment.'' Wisconsin has demonstrated that the Milwaukee-Racine and Sheboygan areas will be able to maintain the standard without part D NSR in effect; therefore, EPA concludes that the state need not have a fully approved part D NSR program prior to approval of the redesignation request. The state's PSD program will become effective in the Milwaukee-Racine and Sheboygan areas upon redesignation to attainment. *See* rulemakings for Detroit, Michigan (60 FR 12467–12468, March 7, 1995); Cleveland-Akron-Lorain, Ohio (61 FR 20458, 20469–20470, May 7, 1996); Louisville, Kentucky (66 FR 53665, October 23, 2001); and Grand Rapids, Michigan (61 FR 31834–31837, June 21, 1996).

Section 172(c)(6) requires the SIP to contain control measures necessary to provide for attainment of the standard. Because attainment has been reached, no additional measures are needed to provide for attainment.

Section 172(c)(7) requires the SIP to meet the applicable provisions of section 110(a)(2). As noted above, we believe the Wisconsin SIP meets the requirements of section 110(a)(2) for purposes of redesignation.

Subpart 1, Section 176 Conformity Requirements.

Section 176(c) of the CAA requires states to establish criteria and

procedures to ensure that Federally-supported or funded activities, including highway projects, conform to the air quality planning goals in the applicable SIPs. The requirement to determine conformity applies to transportation plans, programs and projects developed, funded or approved under title 23 of the U.S. Code and the Federal Transit Act (transportation conformity) as well as to all other Federally-supported or funded projects (general conformity). State conformity revisions must be consistent with Federal conformity regulations relating to consultation, enforcement, and enforceability, which EPA promulgated pursuant to CAA requirements.

EPA interprets the conformity SIP requirements as not applying for purposes of evaluating the redesignation request under section 107(d) for two reasons. First, the requirement to submit SIP revisions to comply with the conformity provisions of the CAA continues to apply to areas after redesignation to attainment, since such areas would be subject to a section 175A maintenance plan. Second, EPA's Federal conformity rules require the performance of conformity analyses in the absence of Federally-approved state rules. Therefore, because areas are subject to the conformity requirements regardless of whether they are redesignated to attainment and, because they must implement conformity under Federal rules if state rules are not yet approved, it is reasonable to view these requirements as not applying for purposes of evaluating a redesignation request. *See Wall* v. *EPA,* 265 F.3d 426 (6th Cir. 2001), upholding this interpretation. *See also* 60 FR 62748, 62749–62750 (Dec. 7, 1995) (Tampa, Florida).

EPA approved Wisconsin's general and transportation conformity SIPs on July 29, 1996 (61 FR 39329) and August 27, 1996 (61 FR 43970), respectively. Wisconsin has submitted onroad motor vehicle budgets for the Milwaukee-Racine area of 21.08 tons per day (tpd) and 15.98 tpd VOC and 51.22 tpd and 31.91 tpd $NO_X$ for the years 2015 and 2022, respectively. Wisconsin has submitted onroad motor vehicle budgets for the Sheboygan area of 2.024 tpd and 1.615 tpd VOC and 4.321 tpd and 2.778 tpd $NO_X$ for the years 2015 and 2022, respectively. The areas must use the MVEBs from the maintenance plan in any conformity determination that is effective on or after the effective date of the maintenance plan approval.

*Subpart 2 Section 182(a) and (b) Requirements.*

*Comprehensive Emissions Inventory.* Section 182(a)(1) requires the submission of a comprehensive emissions inventory. As part of Wisconsin's redesignation request for the Milwaukee-Racine and Sheboygan areas, the state submitted a 2005 comprehensive emissions inventory. As discussed below in section V.C., EPA is proposing to approve the 2005 inventory as meeting the section 182(a)(1) comprehensive emissions inventory requirement.

*Emissions Statements.* EPA approved Wisconsin's emission statement SIP, as required by section 182(a)(3)(B), on December 6, 1993 (58 FR 64155).

*Reasonable Further Progress and Attainment Demonstration.* On September 11, 2009, Wisconsin submitted an attainment demonstration and RFP plans for the Milwaukee-Racine and Sheboygan areas as required by section 182(b)(1) of the CAA. Because attainment has been reached, section 182(b)(1) requirements are no longer considered to be applicable as long as the area continues to attain the standard. If EPA finalizes approval of the redesignation of the Milwaukee-Racine and Sheboygan areas, EPA will take no further action on the attainment demonstration and RFP plans submitted by Wisconsin for the areas.

*VOC RACT Requirements.* Section 182(b)(2) requires states with moderate nonattainment areas to implement RACT under section 172(c)(1) with respect to each of the following: (1) All sources covered by a Control Technology Guideline (CTG) document issued between November 15, 1990, and the date of attainment; (2) all sources covered by a CTG issued prior to November 15, 1990; and, (3) all other major non-CTG stationary sources. As required under the 1-hour ozone standard, Wisconsin submitted VOC RACT rules covering the second and third categories. EPA approved these VOC RACT rules on the following dates: August 15, 1994 (59 FR 41709), April 27, 1995 (60 FR 20643), June 30, 1995 (60 FR 34170), July 28, 1995 (60 FR 38722), February 12, 1996 (61 FR 5307), February 13, 1996 (61 FR 5514), April 4, 1996 (61 FR 14972), April 9, 1996 (61 FR 15706), April 25, 1996 (61 FR 18257), July 17, 1996 (61 FR 37216), August 29, 1996 (61 FR 45327), June 8, 2000 (65 FR 36351), November 13, 2001 (66 FR 56931), and September 22, 2006 (71 FR 55287). With respect to the first category, EPA issued CTGs for five source categories in September 2006 and three additional source categories in September 2007. Areas classified as moderate and above were required to submit VOC RACT for the source categories covered by these CTGs, by September 2007 and September 2008, respectively. Wisconsin submitted SIP revisions to address these CTGs on September 1, 2009, and November 16, 2011. EPA is taking action on these revisions in a separate rulemaking action. Full approval of Wisconsin's RACT submittals is a prerequisite for approval of the redesignation of the Milwaukee-Racine and Sheboygan areas to attainment.

$NO_X$ RACT. Section 182(f) establishes $NO_X$ requirements for ozone nonattainment areas. EPA approved Wisconsin's $NO_X$ RACT SIP on October 19, 2010 (75 FR 64155).

*Stage II Vapor Recovery.* Section 182(b)(3) requires states to submit Stage II rules no later than November 15, 1992. EPA approved Wisconsin's Stage II rule on August 13, 1993 (58 FR 43080), August 15, 1994 (59 FR 41709), and April 27, 1995 (60 FR 206423).

*Vehicle Inspection and Maintenance (I/M).* EPA's final I/M regulations in 40 CFR part 85 required the states to submit a fully adopted I/M program by November 15, 1993. EPA approved Wisconsin's enhanced I/M program on January 12, 1995 (60 FR 2881) and August 16, 2001 (66 FR 42949).

Thus, as discussed above, with approval of the comprehensive emissions inventory and Wisconsin's VOC RACT submittals, the Milwaukee-Racine and Sheboygan areas will satisfy the requirements applicable for purposes of redesignation under section 110 and part D of the CAA.

b. The Milwaukee-Racine and Sheboygan Areas Have a Fully Approved Applicable SIP for Purposes of Redesignation Under Section 110(k) of the CAA

If EPA issues a final approval of the comprehensive emissions inventory and Wisconsin's VOC RACT submittals, EPA will have fully approved the Wisconsin SIP for the Milwaukee-Racine and Sheboygan areas under section 110(k) of the CAA for all requirements applicable for purposes of redesignation. EPA may rely on prior SIP approvals in approving a redesignation request (*See* page three of the September 4, 1992, John Calcagni memorandum; *Southwestern Pennsylvania Growth Alliance* v. *Browner,* 144 F.3d 984, 989–990 (6th Cir. 1998); *Wall* v. *EPA,* 265 F.3d 426 (6th Cir. 2001)), plus any additional measures it may approve in conjunction with a redesignation action. *See* 68 FR 25413, 25426 (May 12, 2003). Since the passage of the CAA of 1970, Wisconsin has adopted and submitted, and EPA has fully approved, provisions addressing the various required SIP elements applicable to the Milwaukee-Racine and Sheboygan areas under the

1-hour ozone standard. In this action, EPA is proposing to approve Wisconsin's 2005 comprehensive emissions inventory for the Milwaukee-Racine and Sheboygan areas as meeting the requirement of section 182(a)(1) of the CAA. In a separate rule, EPA will take action on the Wisconsin VOC RACT submittals.

c. The Milwaukee-Racine Area Has a Fully Approved SIP and Meets Anti-Backsliding Requirements Under the 1-Hour Ozone Standard

The anti-backsliding provisions at 40 CFR 51.905(a)(1) prescribe 1-hour ozone NAAQS requirements that continue to apply after the revocation of the 1-hour ozone NAAQS for former 1-hour ozone nonattainment areas. 40 CFR 51.905(a)(1)(i) provides that:

The area remains subject to the obligation to adopt and implement the applicable requirements defined in 40 CFR 51.900(f), except as provided in paragraph (a)(1)(iii) of this section, and except as provided in paragraph (b) of this section.

40 CFR 51.900(f), as amended by 70 FR 30592, 30604 (May 26, 2005), provides that:

Applicable requirements means for an area the following requirements to the extent such requirements apply or applied to the area for the area's classification under section 181(a)(1) of the CAA for the 1-hour NAAQS at designation for the 8-hour NAAQS:

(1) Reasonably available control technology (RACT).

(2) Inspection and maintenance programs (I/M).

(3) Major source applicability cut-offs for purposes of RACT.

(4) Rate of Progress (ROP) reductions.

(5) Stage II vapor recovery.

(6) Clean fuels fleet program under section 182(c)(4) of the CAA.

(7) Clean fuels for boilers under section 182(e)(3) of the CAA. [Not a requirement for the Milwaukee-Racine area.]

(8) Transportation Control Measures (TCMs) during heavy traffic hours as provided under section 182(e)(4) of the CAA.

(9) Enhanced (ambient) monitoring under section 182(c)(1) of the CAA.

(10) Transportation controls under section 182(c)(5) of the CAA.

(11) Vehicle miles travelled provisions of section 182(d)(1) of the CAA.

(12) $NO_X$ requirements under section 182(f) of the CAA.

(13) Attainment demonstration or an alternative as provided under 40 CFR 51.905(a)(1)(ii).

In addition to applicable requirements listed under 40 CFR 51.900(f) and as discussed above, the state must also comply with the 1-hour anti-backsliding requirements discussed in the DC Circuit's decisions in *South Coast Air Quality Management Dist.* v. *EPA. See* III.B.i, above.

Pursuant to 40 CFR 51.905(c), the Milwaukee-Racine area is subject to the obligations set forth in 40 CFR 51.905(a) and 40 CFR 51.900(f). The following paragraphs address the 1-hour ozone SIP requirements applicable to the Milwaukee-Racine area pursuant to all the anti-backsliding requirements described above.

Prior to the revocation of the 1-hour ozone standard on June 15, 2005, the Milwaukee-Racine area was classified as a severe nonattainment area for the 1-hour ozone standard with an attainment deadline of November 15, 2007, and was therefore subject to the ozone SIP requirements for severe 1-hour ozone nonattainment areas contained in sections 182(a) through 182(d) of the CAA. In reviewing Wisconsin's ozone redesignation request for the Milwaukee-Racine area, we assessed whether the area satisfied the CAA requirements under the 1-hour ozone standard. We conclude that this area and the state of Wisconsin have satisfied all anti-backsliding CAA requirements applicable to a severe ozone nonattainment area by complying with all applicable 1-hour ozone SIP requirements. The following discusses how the applicable CAA requirements have been met in the Milwaukee-Racine area.

**40 CFR 51.900(f)(1) and (3) RACT**

Section 182(a)(2)(A) of the CAA requires RACT corrections. Section 182(b)(2) requires RACT for each category of VOC sources covered by a CTG and for all other major sources of VOC within an ozone nonattainment area. Section 182(d) specifies requirements for severe ozone nonattainment areas, including a major source emissions cut-off of 25 tons per year.

Under the 1-hour ozone standard, EPA fully approved Wisconsin's VOC RACT regulations as SIP revisions for CTG sources and for major non-CTG sources through rulemakings on the following dates: August 15, 1994 (59 FR 41709), April 27, 1995 (60 FR 20643), June 30, 1995 (60 FR 34170), July 28, 1995 (60 FR 38722), February 12, 1996 (61 FR 5307), February 13, 1996 (61 FR 5514), April 4, 1996 (61 FR 14972), April 9, 1996 (61 FR 15706), April 25, 1996 (61 FR 18257), July 17, 1996 (61 FR 37216), August 29, 1996 (61 FR 45327), June 8, 2000 (65 FR 36351), November 13, 2001 (66 FR 56931), and September 22, 2006 (71 FR 55287). These RACT SIP revisions include rules covering all non-CTG sources in the Milwaukee-Racine area with the potential to emit VOCs at or in excess of 25 tons per year.

EPA issued CTGs for five source categories in September 2006 and three additional source categories in September 2007. Areas classified as moderate and above for the 1997 8-hour standard were required to submit VOC RACT for the source categories covered by these CTGs by September 2007 and September 2008, respectively. Wisconsin submitted SIP revisions to address these CTGs on September 1, 2009, and November 16, 2011. EPA is taking action on these revisions in a separate rulemaking action. Full approval of Wisconsin's RACT submittals is a prerequisite for approval of the redesignation of the Milwaukee-Racine and Sheboygan areas to attainment.

**40 CFR 51.900(f)(2) Vehicle I/M**

EPA approved Wisconsin's enhanced I/M program on January 12, 1995 (60 FR 2881), and August 16, 2001 (66 FR 42949).

**40 CFR 51.900(f)(4) ROP**

Sections 182(b)(1)(A) and 182(c)(2)(B) of the CAA establish the ROP requirements for ozone nonattainment areas. EPA has fully approved Wisconsin's SIP revisions that demonstrate that Wisconsin achieved ROP in the Milwaukee-Racine area. On March 22, 1996 (61 FR 11735), EPA approved Wisconsin's plan to achieve a 15 percent reduction in VOC emissions in the Milwaukee-Racine area, as required in section 182(b) of the CAA. On October 10, 2001 (66 FR 51572), EPA approved Wisconsin's plan to achieve ROP between 1996 and 1999 in this area, meeting the ROP requirements of section 182(c) of the CAA. Finally, on November 13, 2001 (66 FR 56931), EPA approved Wisconsin's plan to achieve ROP emission reductions for the period of 1999 through 2007.

**40 CFR 51.900(f)(5) Stage II Gasoline Vapor Recovery**

EPA approved Wisconsin's Stage II rule on August 13, 1993 (58 FR 43080), August 15, 1994 (59 FR 41709), and April 27, 1995 (60 FR 206423).

**40 CFR 51.900(f)(6) Clean Fuel Fleet Program**

EPA approved Wisconsin's clean fuel fleet program rules as required by section 182(c)(4) of the CAA on March 11, 1996 (61 FR 9639).

**40 CFR 51.900(f)(7) Clean Fuels for Boilers**

Section 182(e)(3) of the CAA, which requires clean fuels for boilers, does not apply to the Milwaukee-Racine area.

This CAA requirement only applies to extreme ozone nonattainment areas.

**40 CFR 51.900(f)(8) Traffic Control Measures During Heavy Traffic Hours**

This requirement applies to areas subject to section 182(e)(4) of the CAA, which covers extreme ozone nonattainment areas, and, therefore, does not apply to the Milwaukee-Racine area.

**40 CFR 51.900(f)(9) Enhanced Ambient Monitoring**

On March 18, 1994 (59 FR 1251), EPA approved Wisconsin's SIP revision establishing an enhanced monitoring program for ozone in the Milwaukee-Racine area, as required by section 182(c)(1) of the CAA.

**40 CFR 51.900(f)(10) Transportation Control Measures**

Within six months of November 15, 1990, and every three years thereafter, section 182(c)(5) of the CAA requires states to submit a demonstration that current aggregate vehicle mileage, aggregate vehicle emissions, congestion levels, and other relevant traffic-related and vehicle emissions-related factors are consistent with those used for the area's ozone attainment demonstration for serious and above 1-hour ozone nonattainment areas. If the levels of relevant parameters that are projected in the attainment demonstration are exceeded, a state has 18 months to develop and submit a revision to the SIP to include TCMs to reduce mobile source emissions to levels consistent with the emission levels in the attainment demonstration.

The section 182(c)(5) requirements are included in those measures subject to EPA's interpretation under EPA's May 10, 1995, Clean Data Policy memorandum. As provided by the clean data policy, since the Milwaukee-Racine area is attaining the 1-hour ozone standard, any requirement for submitting the section 182(c)(5) measures for the Milwaukee-Racine area is suspended. *See also* 40 CFR 51.918.

**40 CFR 51.900(f)(11) Vehicle Miles Travelled**

Section 182(d)(1)(A) of the CAA requires severe ozone nonattainment areas to offset the growth in emissions attributed to growth in VMT; to select and implement TCMs necessary to comply with the periodic emission reduction requirements of sections 182(b) and (c); and, to consider TCMs specified in section 108(f) of the CAA, and implement TCMs as necessary to demonstrate attainment with the ozone standard. EPA approved Wisconsin's section 182(d)(1)(A) VMT SIP on May 5, 1995 (60 FR 22284), and September 11, 1995 (60 FR 47088).

**40 CFR 51.900(f)(12) $NO_X$ Requirements Under Section 182(f)**

Section 182(f) requires major sources of $NO_X$ in an ozone nonattainment area to be covered by emission control requirements equivalent to those required for major sources of VOC, unless EPA waives the $NO_X$ emission control requirements as provided in section 182(f). The section 182(f) $NO_X$ emission control requirements include $NO_X$ RACT in ozone nonattainment areas required to implement VOC RACT for 1-hour ozone nonattainment areas classified as moderate or above. On February 3, 1998 (63 FR 5460), EPA approved a $NO_X$ emissions control waiver for the Milwaukee-Racine area for the 1-hour ozone standard.

**40 CFR 51.900(f)(13) Ozone Attainment Demonstration**

On November 13, 2001 (66 FR 56931), EPA approved Wisconsin's 1-hour ozone attainment demonstration SIP revision for the Milwaukee-Racine area.

**New Source Review**

EPA has determined that an area being redesignated need not have an approved nonattainment NSR program, provided that the state demonstrates maintenance of the standard in the area without part D NSR in effect. The rationale for this view is described in a memorandum from Mary Nichols, Assistant Administrator for Air and Radiation, dated October 14, 1994, entitled, ''Part D New Source Review Requirements for Areas *See* III.3.a., above

**Transportation Conformity**

The conformity portion of the court's ruling does not impact the redesignation request for the Milwaukee-Racine area except to the extent that the court, in its June 8, 2007, decision clarified that, for those areas with MVEBs for the 1-hour ozone standard, anti-backsliding requires that these MVEBs be used for 8-hour conformity determinations until replaced by MVEBs for the 8-hour ozone standard. To meet this requirement, conformity determinations in such areas must comply with the applicable requirements of EPA's conformity regulations at 40 CFR part 93. Note below that EPA is proposing to find adequate and approve 8-hour MVEBs established by Wisconsin's 8-hour ozone maintenance plans for the Milwaukee and Sheboygan areas.

**Contingency Measures**

The contingency measure requirements under sections 172(c)(9) and 182(c)(9) of the CAA must be addressed in state ozone RFP and attainment demonstration plans. Wisconsin addressed these requirements in the 1-hour ozone RFP and attainment demonstration plans for the Milwaukee-Racine area by adopting and implementing extra VOC and $NO_X$ emission controls that go beyond the emission reductions needed for RFP and attainment of the 1-hour ozone standard. EPA approved these ozone control plans, including their contingency elements as follows: VOC 15 percent RFP plan, March 22, 1996 (61 FR 11735); post-1996 RFP plan, November 10, 2001 (66 FR 51572); and 1-hour ozone attainment demonstration and post-1999 RFP plan, November 13, 2001 (66 FR 56931). Therefore, Wisconsin has met the contingency requirements of sections 172(c)(9) and 182(c)(9) of the CAA for the 1-hour ozone standard.

**Section 185 Source Emission Penalty Fees**

EPA approved an excess VOC emissions fee rule for the Milwaukee-Racine area on June 25, 2002 (67 FR 42729). On April 24, 2009 (74 FR 18641), EPA published a final rule making a determination that the Milwaukee-Racine area had attained the 1-hour ozone standard and confirming that this finding of attainment relieved Wisconsin of the obligation to adopt section 185 source penalty fee regulations for this area.

**Conclusion**

For the reasons discussed above, EPA concludes that Wisconsin has met all part D SIP requirements for the 1-hour ozone standard applicable to the Milwaukee-Racine area for purposes of redesignation, as addressed in the DC Circuit's and EPA's anti-backsliding requirements.

3. The Improvement in Air Quality Is Due to Permanent and Enforceable Reductions in Emissions Resulting From Implementation of the SIP and Applicable Federal Air Pollution Control Regulations and Other Permanent and Enforceable Reductions. (Section 107(d)(3)(E)(iii))

EPA finds that Wisconsin has demonstrated that the observed air quality improvement in the Milwaukee-Racine and Sheboygan areas is due to permanent and enforceable reductions in emissions resulting from implementation of the SIP, Federal

measures, and other state-adopted measures.

In making this demonstration, the state has calculated the change in emissions between 2005 and 2008. For the nonattainment inventory, Wisconsin used the 2005 emissions inventory developed to meet the comprehensive emissions inventory requirement of section 182(a)(1) of the CAA. The state developed an attainment inventory for 2008, one of the years the Milwaukee-Racine and Sheboygan areas monitored attainment of the 1997 8-hour ozone standard. The reduction in emissions and the corresponding improvement in air quality over this time period can be attributed to a number of regulatory control measures that the Milwaukee-Racine and Sheboygan areas and upwind areas have implemented in recent years.

a. Permanent and Enforceable Controls Implemented

The following is a discussion of permanent and enforceable measures that have been implemented in the areas:

i. *Automobile Inspection and Maintenance (I/M) program.* Wisconsin operates an enhanced automobile inspection and maintenance program in the Milwaukee-Racine and Sheboygan areas.

ii. *Stationary Source $NO_X$ Rules.* As part of the state's ROP plan under the 1-hour ozone standard, Wisconsin adopted regulations that control $NO_X$ emissions at electric utilities and large industrial combustion sources and establish $NO_X$ emissions standards for new sources. The regulation of existing sources was estimated to achieve a 55 ton per day reduction by 2007.

iii. *Federal Mobile Source Emission Control Measures.* Reductions in VOC and $NO_X$ emissions have occurred statewide and in upwind areas as a result of Federal emission control measures, with additional emission reductions expected to occur in the future. Federal emission control measures include the following.

*Tier 2 Emission Standards for Vehicles and Gasoline Sulfur Standards.* These emission control requirements result in lower VOC and $NO_X$ emissions from new cars and light duty trucks, including sport utility vehicles. The Federal rules were phased in between 2004 and 2009. The EPA has estimated that, by the end of the phase-in period, the following vehicle $NO_X$ emission reductions will occur nationwide: passenger cars (light duty vehicles) (77 percent); light duty trucks, minivans, and sports utility vehicles (86 percent); and, larger sports utility vehicles, vans, and heavier trucks (69 to 95 percent). VOC emission reductions are expected to range from 12 to 18 percent, depending on vehicle class, over the same period. Some of these emission reductions occurred by the attainment years and additional emission reductions will occur throughout the maintenance period.

*Heavy-Duty Diesel Engine Rule.* In July 2000, EPA issued a rule, effective in 2004, that includes standards limiting the sulfur content of diesel fuel. A second phase took effect in 2007 which further reduced the highway diesel fuel sulfur content to 15 parts per million, leading to additional reductions in combustion $NO_X$ and VOC emissions. This rule is expected to achieve a 95 percent reduction in $NO_X$ emissions from diesel trucks and busses.

*Nonroad Diesel Rule.* EPA issued this rule in 2004. This rule applies to diesel engines used in industries, such as construction, agriculture, and mining. It is estimated that compliance with this rule will cut $NO_X$ emissions from nonroad diesel engines by up to 90 percent. Some of these emission reductions occurred by the attainment years and additional emission reductions will occur throughout the maintenance period.

iv. *New Source Performance Standards (NSPS), National Emissions Standards for Hazardous Air Pollutants (NESHAPS) and Maximum Achievable Control Technology Standards (MACT).* A broad range of emission sectors are subject to Federal NSPS, NESHAP, and MACT standards with compliance requirements which take effect over the attainment period.

v. *Control Measures in Upwind Areas.* On October 27, 1998 (63 FR 57356), EPA issued a $NO_X$ SIP Call requiring the District of Columbia and 22 states to reduce emissions of $NO_X$. Affected states were required to comply with Phase I of the SIP Call beginning in 2004, and Phase II beginning in 2007. The reduction in $NO_X$ emissions has resulted in lower concentrations of transported ozone entering the Milwaukee-Racine and Sheboygan areas. Emission reductions resulting from regulations developed in response to the $NO_X$ SIP Call are permanent and enforceable.

b. Emission Reductions

Wisconsin is using the 2005 emissions inventory developed pursuant to section 182(a)(1) of the CAA as the nonattainment inventory. This inventory is discussed in more detail in section V.C., below. In summary, WDNR developed the point source inventory using actual reported emissions, EPA's Clean Air Markets Database and EPA techniques for emissions calculation. The area source inventory was created by backcasting Wisconsin's 2008 emissions inventory that was submitted to EPA for the National Emissions Inventory. The nonroad mobile inventory was created using EPA's National Mobile Inventory Model (NMIM) (2009/05/04 version). In addition, emissions estimates were developed for commercial marine vessels, aircraft, and railroads, three nonroad categories not included in the model. The onroad mobile source inventory was developed using EPA's MOVES2010a model. Wisconsin is using the 2008 emissions inventory for the attainment inventory. The point source sector of the emissions inventory was created using annually reported point source emissions, EPA's Clean Air Markets Database, and EPA techniques for emissions calculation. Emissions were estimated by collecting process-level information from each facility that qualifies for inclusion in the state's point source database. Area source emissions estimates were taken from the 2008 emissions inventory developed by WDNR to meet the periodic emissions inventory requirement of 40 CFR part 51, subpart A.

In general, area source emissions estimates were calculated using population, gasoline consumption, employment, crop acreages, and other activity surrogates along with emission factors. Emission factors were derived from local data, local or national surveys and EPA guidance for the development of emissions inventories. Nonroad emissions estimates were developed using EPA's NMIM (2009/05/04 version). In addition, emissions estimates were developed for commercial marine vessels, aircraft, and railroads, three nonroad categories not included in the model. The onroad mobile source inventory was developed using EPA's MOVES2010a model.

Using the inventories described above, Wisconsin's submittal documents changes in VOC and $NO_X$ emissions from 2005 to 2008 for the Milwaukee-Racine and Sheboygan areas. Emissions data are shown in Tables 2 through 4.

TABLE 2—MILWAUKEE-RACINE AND SHEBOYGAN AREA VOC AND $NO_X$ EMISSIONS FOR NONATTAINMENT YEAR 2005
[tpd]

| County | Point | | Area | | Nonroad | | Onroad | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ |
| Milwaukee-Racine Area | 13.04 | 64.24 | 55.38 | 14.48 | 60.30 | 50.30 | 46.89 | 117.20 | 175.61 | 246.22 |
| Kenosha County | 0.73 | 32.75 | 3.28 | 0.73 | 5.41 | 4.32 | 3.98 | 9.58 | 13.40 | 47.38 |
| Milwaukee County | 6.88 | 28.13 | 20.65 | 6.77 | 15.71 | 17.94 | 20.79 | 53.12 | 64.03 | 105.96 |
| Ozaukee County | 0.42 | 0.52 | 3.79 | 0.87 | 2.70 | 5.44 | 2.72 | 6.84 | 9.63 | 13.67 |
| Racine County | 1.17 | 0.77 | 5.88 | 1.25 | 7.42 | 5.70 | 4.38 | 10.65 | 18.85 | 18.37 |
| Washington County | 0.47 | 0.88 | 9.71 | 1.19 | 6.45 | 4.08 | 3.91 | 9.78 | 20.54 | 15.93 |
| Waukesha County | 3.37 | 1.19 | 12.07 | 3.67 | 22.61 | 12.82 | 11.11 | 27.23 | 49.16 | 44.91 |
| Sheboygan Area (Sheboygan County) | 2.307 | 17.338 | 6.879 | 1.114 | 6.245 | 4.389 | 3.340 | 8.489 | 18.771 | 31.330 |

TABLE 3—MILWAUKEE-RACINE AND SHEBOYGAN AREA VOC AND $NO_X$ EMISSIONS FOR ATTAINMENT YEAR 2008
[tpd]

| County | Point | | Area | | Nonroad | | Onroad | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ |
| Milwaukee-Racine Area | 12.17 | 39.16 | 57.22 | 14.76 | 50.02 | 45.34 | 36.35 | 92.74 | 155.76 | 192.00 |
| Kenosha County | 1.33 | 8.56 | 3.39 | 0.76 | 4.57 | 3.94 | 3.05 | 7.52 | 12.34 | 20.78 |
| Milwaukee County | 5.52 | 26.91 | 21.19 | 6.85 | 12.90 | 15.83 | 16.05 | 41.68 | 55.66 | 91.27 |
| Ozaukee County | 0.42 | 0.73 | 3.99 | 0.89 | 2.17 | 4.66 | 2.13 | 5.47 | 8.71 | 11.75 |
| Racine County | 1.41 | 1.13 | 6.17 | 1.27 | 6.23 | 4.99 | 3.51 | 8.79 | 17.32 | 16.18 |
| Washington County | 0.49 | 0.26 | 9.97 | 1.23 | 5.39 | 4.10 | 2.97 | 7.62 | 18.82 | 13.21 |
| Waukesha County | 3.00 | 1.57 | 12.51 | 3.76 | 18.76 | 11.82 | 8.64 | 21.66 | 42.91 | 38.81 |
| Sheboygan Area (Sheboygan County) | 2.113 | 12.972 | 7.064 | 1.139 | 5.329 | 3.689 | 2.665 | 6.322 | 17.171 | 24.122 |

TABLE 4—COMPARISON OF MILWAUKEE-RACINE AND SHEBOYGAN AREA 2005 AND 2008 VOC AND $NO_X$ EMISSIONS
[tpd]

| County | VOC | | | $NO_X$ | | |
|---|---|---|---|---|---|---|
| | 2005 | 2008 | Net change (2005–2008) | 2005 | 2008 | Net change (2005–2008) |
| Milwaukee-Racine Area | 175.61 | 155.76 | −19.85 | 246.22 | 192.00 | −54.22 |
| Point | 13.04 | 12.17 | −0.87 | 64.24 | 39.16 | −25.08 |
| Area | 55.38 | 57.22 | 1.84 | 14.48 | 14.76 | 0.28 |
| Nonroad | 60.30 | 50.02 | −10.28 | 50.30 | 45.34 | −4.96 |
| Onroad | 46.89 | 36.35 | −10.54 | 117.20 | 92.74 | −24.46 |
| Sheboygan Area | 18.771 | 17.171 | −1.600 | 31.330 | 24.122 | −7.208 |
| Point | 2.307 | 2.113 | −0.194 | 17.338 | 12.972 | −4.366 |
| Area | 6.879 | 7.064 | 0.185 | 1.114 | 1.139 | 0.025 |
| Nonroad | 6.245 | 5.329 | −0.916 | 4.389 | 3.689 | −0.700 |
| Onroad | 3.340 | 2.665 | −0.675 | 8.489 | 6.322 | −2.167 |

Table 4 shows that the Milwaukee-Racine area reduced VOC emissions by 19.85 tpd and $NO_X$ emissions by 54.22 tpd between 2005 and 2008, and the Sheboygan area reduced VOC emissions by 1.600 tpd and $NO_X$ emissions by 7.208 tpd between 2005 and 2008. Based on the information summarized above, Wisconsin has adequately demonstrated that the improvement in air quality is due to permanent and enforceable emissions reductions.

4. The Area Has a Fully Approved Maintenance Plan Pursuant to Section 175a of the CAA. (Section 107(d)(3)(E)(iv))

In conjunction with its requests to redesignate the Milwaukee-Racine and Sheboygan nonattainment areas to attainment status, WDNR submitted SIP revisions to provide for the maintenance of the 1997 8-hour ozone NAAQS in the areas through 2022.

a. What is required in a maintenance plan?

Section 175A of the CAA sets forth the required elements of a maintenance plan for areas seeking redesignation from nonattainment to attainment. Under section 175A, the plan must demonstrate continued attainment of the applicable NAAQS for at least ten years after the Administrator approves a redesignation to attainment. Eight years after the redesignation, the state must submit a revised maintenance plan which demonstrates that attainment will continue to be maintained for ten years following the initial ten-year maintenance period. To address the possibility of future NAAQS violations, the maintenance plan must contain contingency measures with a schedule for implementation as EPA deems necessary to assure prompt correction of any future violations of the 1997 8-hour ozone standard.

The September 4, 1992, John Calcagni memorandum provides additional guidance on the content of a maintenance plan. The memorandum clarifies that an ozone maintenance plan should address the following items: The attainment VOC and $NO_X$ emissions inventories, a maintenance demonstration showing maintenance for ten years of the maintenance period, a commitment to maintain the existing

monitoring network, factors and procedures to be used for verification of continued attainment of the NAAQS, and a contingency plan to prevent or correct future violations of the NAAQS.

b. Attainment Inventory

WDNR developed an emissions inventory for 2008, one of the years Wisconsin used to demonstrate monitored attainment of the 1997 8-hour NAAQS, as described above. The attainment level of emissions is summarized in Table 3, above.

c. Demonstration of Maintenance

Along with the redesignation requests, WDNR submitted revisions to the 8-hour ozone SIP to include maintenance plans for the Milwaukee-Racine and Sheboygan areas, in compliance with section 175A of the CAA. These demonstrations show maintenance of the 1997 8-hour ozone standard through 2022 by assuring that current and future emissions of VOC and $NO_X$ for the Milwaukee-Racine and Sheboygan areas remain at or below attainment year emission levels. A maintenance demonstration need not be based on modeling. *See Wall v. EPA,* 265 F.3d 426 (6th Cir. 2001), *Sierra Club v. EPA,* 375 F. 3d 537 (7th Cir. 2004). *See also* 66 FR 53094, 53099–53100 (October 19, 2001), 68 FR 25413, 25430–25432 (May 12, 2003).

Wisconsin is using emissions inventories for the years 2015 and 2022 to demonstrate maintenance. The emissions inventories were developed as described below.

Electric Generating Unit (EGU) point source emissions for 2018 were estimated using IPM3.0. Non-EGU point source emissions for 2018 were derived by applying growth and control factors, developed by Pechan for the Lake Michigan Air Directors Consortium (LADCO), to the 2005 inventory. Growth factors were initially based on the Economic Growth and Analysis System (EGAS) model and were modified for select priority categories by examining emissions activity data. Projected emissions for 2015 and 2022 were estimated using linear interpolation and extrapolation from 2008 and 2018 emissions estimates.

Area source emissions inventories were created by projecting the 2008 emissions inventory. The emission projections were primarily based on growth factors from the EGAS model. If EGAS growth factors were not available, population based growth factors were used.

Nonroad emissions estimates were developed using EPA's NMIM model (2009/05/04 version). In addition, emissions estimates were developed for commercial marine vessels, aircraft, and railroads, three nonroad categories not included in the model. Onroad emissions estimates were generated using the MOVES2010a model.

Emissions data are shown in Tables 5 through 7 below.

TABLE 5—MILWAUKEE-RACINE AND SHEBOYGAN AREA VOC AND $NO_X$ EMISSIONS FOR MAINTENANCE YEAR 2015

[tpd]

| County | Point | | Area | | Nonroad | | Onroad | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ |
| Milwaukee-Racine Area | 15.89 | 45.35 | 53.53 | 13.63 | 30.58 | 29.60 | 21.08 | 51.22 | 121.08 | 139.80 |
| Kenosha County | 0.99 | 13.12 | 3.17 | 0.71 | 2.71 | 2.73 | 1.82 | 4.18 | 8.69 | 20.74 |
| Milwaukee County | 8.37 | 29.42 | 19.64 | 6.20 | 8.37 | 10.40 | 9.10 | 23.08 | 45.48 | 69.10 |
| Ozaukee County | 0.52 | 0.74 | 3.81 | 0.84 | 1.37 | 2.89 | 1.24 | 2.98 | 6.94 | 7.45 |
| Racine County | 1.47 | 0.76 | 5.85 | 1.18 | 3.63 | 3.46 | 2.05 | 4.76 | 13.00 | 10.16 |
| Washington County | 0.51 | 0.15 | 9.34 | 1.17 | 3.32 | 2.51 | 1.77 | 4.24 | 14.94 | 8.07 |
| Waukesha County | 4.03 | 1.16 | 11.72 | 3.53 | 11.18 | 7.61 | 5.10 | 11.98 | 32.03 | 24.28 |
| Sheboygan Area (Sheboygan County) | 2.895 | 11.486 | 6.568 | 1.067 | 3.263 | 2.432 | 2.024 | 4.321 | 14.750 | 19.306 |

TABLE 6—MILWAUKEE-RACINE AND SHEBOYGAN AREA VOC AND $NO_X$ EMISSIONS FOR MAINTENANCE YEAR 2022

[tpd]

| County | Point | | Area | | Nonroad | | Onroad | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ | VOC | $NO_X$ |
| Milwaukee-Racine Area | 19.61 | 51.57 | 59.83 | 13.51 | 23.55 | 21.13 | 15.98 | 31.91 | 118.97 | 118.12 |
| Kenosha County | 0.65 | 17.68 | 3.50 | 0.72 | 1.84 | 1.94 | 1.41 | 2.64 | 7.40 | 22.98 |
| Milwaukee County | 11.22 | 31.93 | 21.88 | 6.03 | 7.48 | 7.76 | 6.78 | 14.18 | 47.36 | 59.90 |
| Ozaukee County | 0.63 | 0.76 | 4.33 | 0.85 | 1.19 | 1.83 | 0.95 | 1.88 | 7.10 | 5.32 |
| Racine County | 1.52 | 0.39 | 6.63 | 1.17 | 2.44 | 2.57 | 1.58 | 3.00 | 12.17 | 7.13 |
| Washington County | 0.53 | 0.05 | 10.43 | 1.20 | 2.52 | 1.59 | 1.36 | 2.69 | 14.84 | 5.53 |
| Waukesha County | 5.06 | 0.76 | 13.06 | 3.54 | 8.08 | 5.44 | 3.90 | 7.52 | 30.10 | 17.26 |
| Sheboygan Area (Sheboygan County) | 3.677 | 10.000 | 7.256 | 1.074 | 2.189 | 1.876 | 1.615 | 2.778 | 14.737 | 15.728 |

TABLE 7—COMPARISON OF MILWAUKEE-RACINE AND SHEBOYGAN AREA 2008, 2015 AND 2022 VOC AND $NO_X$ EMISSIONS

[tpd]

| County | VOC | | | | $NO_X$ | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008 | 2015 | 2022 | Net change (2008–2022) | 2008 | 2015 | 2022 | Net change (2008–2022) |
| Milwaukee-Racine Area | 155.76 | 121.08 | 118.97 | −36.79 | 192.00 | 139.80 | 118.12 | −73.88 |
| Point | 12.17 | 15.89 | 19.61 | 7.44 | 39.16 | 45.35 | 51.57 | 12.41 |
| Area | 57.22 | 53.53 | 59.83 | 2.61 | 14.76 | 13.63 | 13.51 | −1.25 |
| Nonroad | 50.02 | 30.58 | 23.55 | −26.47 | 45.34 | 29.60 | 21.13 | −24.21 |
| Onroad | 36.35 | 21.08 | 15.98 | −20.37 | 92.74 | 51.22 | 31.91 | −60.83 |

TABLE 7—COMPARISON OF MILWAUKEE-RACINE AND SHEBOYGAN AREA 2008, 2015 AND 2022 VOC AND $NO_X$ EMISSIONS—Continued

[tpd]

| County | VOC | | | | $NO_X$ | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008 | 2015 | 2022 | Net change (2008–2022) | 2008 | 2015 | 2022 | Net change (2008–2022) |
| Sheboygan Area | 17.171 | 14.750 | 14.737 | −2.434 | 24.122 | 19.306 | 15.728 | −8.394 |
| Point | 2.113 | 2.895 | 3.677 | 1.564 | 12.972 | 11.486 | 10.000 | −2.972 |
| Area | 7.064 | 6.568 | 7.256 | 0.192 | 1.139 | 1.067 | 1.074 | −0.065 |
| Nonroad | 5.329 | 3.263 | 2.189 | −3.140 | 3.689 | 2.432 | 1.876 | −1.813 |
| Onroad | 2.665 | 2.024 | 1.615 | −1.050 | 6.322 | 4.321 | 2.778 | −3.544 |

The emission projections show that WDNR does not expect emissions in the Milwaukee-Racine and Sheboygan areas to exceed the level of the 2008 attainment year inventory during the maintenance period. In the Milwaukee-Racine area, WDNR projects VOC emissions to decrease by 36.79 tpd and $NO_X$ emissions to decrease by 73.88 tpd between 2008 and 2022. In the Sheboygan area, WDNR projects VOC emissions to decrease by 2.434 tpd and $NO_X$ emissions to decrease by 8.394 tpd between 2008 and 2022.

Further, ozone modeling performed by the Lake Michigan Air Directors Consortium supports the conclusion that the Milwaukee-Racine and Sheboygan areas will maintain the 1997 8-hour ozone standard throughout the maintenance period. Peak modeled ozone levels in the Milwaukee-Racine area for 2012 and 2018 are 0.080 ppm, and 0.077 ppm, respectively. Peak modeled ozone levels in the Sheboygan area for 2012 and 2018 are 0.081 ppm, and 0.076 ppm, respectively. These projected ozone levels were modeled applying only legally enforceable controls; *e.g.,* consent decrees, rules, the $NO_X$ SIP Call, Federal motor vehicle control programs, *etc.*

As part of its maintenance plans, the state elected to include ''safety margins'' for the areas. A ''safety margin'' is the difference between the attainment level of emissions (from all sources) and the projected level of emissions (from all sources) in the maintenance plan, which continues to demonstrate attainment of the standard. The attainment level of emissions is the level of emissions during one of the years in which the area met the NAAQS. The Milwaukee-Racine and Sheboygan areas attained the 8-hour ozone NAAQS during the 2006–2008, 2007–2009, and 2008–2010 time periods. Wisconsin used 2008 as the attainment level of emissions for the areas. In the maintenance plans, WDNR projected emission levels for 2022. For the Milwaukee-Racine area, the emissions from point, area, nonroad, and onroad mobile sources in 2008 equaled 155.76 tpd of VOC. WDNR projected VOC emissions for the year 2022 to be 118.97 tpd of VOC. The SIP submission demonstrates that the Milwaukee-Racine area will continue to maintain the standard with emissions at this level. The safety margin for VOC is calculated to be the difference between these amounts or, in this case, 36.79 tpd of VOC for 2022. By this same method, for the Milwaukee-Racine area, 73.88 tpd (*i.e.,* 192.00 tpd less 118.12 tpd) is the safety margin for $NO_X$ for 2022. For the Sheboygan area, the safety margin for 2022 is 2.434 tpd of VOC and 8.394 tpd of $NO_X$. The safety margin, or a portion thereof, can be allocated to any of the source categories, as long as the total attainment level of emissions is maintained.

d. Monitoring Network

Wisconsin currently operates ten ozone monitors in the Milwaukee-Racine area and one monitor in the Sheboygan area. WDNR has committed to continue to monitor ozone levels in the areas. WDNR will work with EPA should changes in siting become necessary. Wisconsin remains obligated to meet monitoring requirements and continue to quality assure monitoring data in accordance with 40 CFR part 58, and to enter all data into the AQS in accordance with Federal guidelines.

e. Verification of Continued Attainment

Continued attainment of the ozone NAAQS in the Milwaukee-Racine and Sheboygan areas depends, in part, on the state's efforts toward tracking indicators of continued attainment during the maintenance period. Wisconsin's plan for verifying continued attainment of the 8-hour standard in the Milwaukee-Racine and Sheboygan consists of plans to continue ambient ozone monitoring in accordance with the requirements of 40 CFR part 58. WDNR will also continue to develop and submit periodic emission inventories as required by the Federal Consolidated Emissions Reporting Rule (67 FR 39602, June 10, 2002) to track future levels of emissions.

f. Contingency Plan

The contingency plan provisions are designed to promptly correct or prevent a violation of the NAAQS that might occur after redesignation of an area to attainment. Section 175A of the CAA requires that a maintenance plan include such contingency measures as EPA deems necessary to assure that the state will promptly correct a violation of the NAAQS that occurs after redesignation. The maintenance plan should identify the contingency measures to be adopted, a schedule and procedure for adoption and implementation of the contingency measures, and a time limit for action by the state. The state should also identify specific indicators to be used to determine when the contingency measures need to be adopted and implemented. The maintenance plan must include a requirement that the state will implement all measures with respect to control of the pollutant(s) that were contained in the SIP before redesignation of the area to attainment. See section 175A(d) of the CAA.

As required by section 175A of the CAA, Wisconsin has adopted contingency plans for the Milwaukee-Racine and Sheboygan areas to address possible future ozone air quality problems. A contingency plan response will be triggered whenever a three-year average fourth-high monitored value of 0.085 ppm or greater is monitored within the maintenance area. When a response is triggered, WDNR will evaluate existing but not fully implemented, forthcoming, and, if necessary, new control measures to correct the violation of the standard within 18 months. Wisconsin has confirmed EPA's interpretation that this commitment means that the measure will be adopted and implemented within 18 months of the triggering event. In addition, it is EPA's

understanding that to acceptably address a violation of the standard, existing and forthcoming control measures must be in excess of emissions reductions included in the projected maintenance inventories.

WDNR included the following list of potential contingency measures in its maintenance plans:

i. Broaden the application of the $NO_X$ RACT program by including a larger geographic area, and/or including sources with potential emissions of 50 tons per year, and/or increasing the cost-effectiveness thresholds utilized as a basis for Wisconsin's NOx RACT Program;

ii. Develop an anti-idling control program for mobile sources targeting diesel vehicles;

iii. Adopt a rule reducing VOC content in architectural, industrial and maintenance coatings; and

iv. Adopt a rule reducing VOC content in commercial and consumer products.

g. Provisions for Future Updates of the Ozone Maintenance Plan

As required by section 175A(b) of the CAA, WDNR commits to submit to the EPA updated ozone maintenance plans eight years after redesignation of the Milwaukee-Racine and Sheboygan areas to cover an additional ten-year period beyond the initial ten-year maintenance period. As required by section 175A of the CAA, Wisconsin has committed to retain the VOC and $NO_X$ control measures contained in the SIP prior to redesignation.

EPA has concluded that the maintenance plans adequately address the five basic components of a maintenance plan: Attainment inventory, maintenance demonstration, monitoring network, verification of continued attainment, and a contingency plan. Thus EPA proposes to find that the maintenance plan SIP revisions submitted by Wisconsin for the Milwaukee-Racine and Sheboygan areas meet the requirements of section 175A of the CAA.

*B. Adequacy of Wisconsin's MVEBs*

1. How are MVEBs developed and what are the MVEBs for the Milwaukee-Racine and Sheboygan areas?

Under the CAA, states are required to submit, at various times, control strategy SIP revisions and ozone maintenance plans for ozone nonattainment areas and for areas seeking redesignations to attainment of the ozone standard. These emission control strategy SIP revisions (*e.g.,* RFP and attainment demonstration SIP revisions) and ozone maintenance plans create MVEBs based on onroad mobile source emissions for criteria pollutants and/or their precursors to address pollution from onroad transportation sources. The MVEBs are the portions of the total allowable emissions that are allocated to highway and transit vehicle use that, together with emissions from other sources in the area, will provide for attainment or maintenance.

Under 40 CFR part 93, a MVEB for an area seeking a redesignation to attainment is established for the last year of the maintenance plan. The MVEB serves as a ceiling on emissions from an area's planned transportation system. The MVEB concept is further explained in the preamble to the November 24, 1993, transportation conformity rule (58 FR 62188).

Under section 176(c) of the CAA, new transportation projects that receive Federal funding or support, such as the construction of new highways, must "conform" to (*i.e.,* be consistent with) the SIP. Conformity to the SIP means that transportation activities will not cause new air quality violations, worsen existing air quality violations, or delay timely attainment of the NAAQS. If a transportation plan does not conform, most new transportation projects that would expand the capacity of roadways cannot go forward. Regulations at 40 CFR part 93 set forth EPA policy, criteria, and procedures for demonstrating and assuring conformity of such transportation activities to a SIP.

When reviewing SIP revisions containing MVEBs, including attainment strategies, rate-of-progress plans, and maintenance plans, EPA must affirmatively approve or find that the MVEBs are "adequate" for use in determining transportation conformity before the MVEBs can be used. Once EPA affirmatively approves or finds the submitted MVEBs to be adequate for transportation conformity purposes, the MVEBs must be used by state and Federal agencies in determining whether proposed transportation projects conform to the SIP as required by section 176(c) of the CAA. EPA's substantive criteria for determining the adequacy of MVEBs are set out in 40 CFR 93.118(e)(4).

EPA's process for determining adequacy of a MVEB consists of three basic steps: (1) Providing public notification of a SIP submission; (2) providing the public the opportunity to comment on the MVEB during a public comment period; and, (3) EPA taking action on the MVEB. The process for determining the adequacy of submitted SIP MVEBs is codified at 40 CFR 93.118.

The maintenance plans submitted by Wisconsin for the Milwaukee-Racine and Sheboygan areas contain new VOC and $NO_X$ MVEBs for the areas for the years 2015 and 2022. The availability of the SIP submission with these 2015 and 2022 MVEBs was announced for public comment on EPA's Adequacy Web site on December 6, 2011, at: *http://www.epa.gov/otaq/stateresources/transconf/currsips.htm.* The EPA public comment period on adequacy of the 2015 and 2022 MVEBs for the Milwaukee-Racine and Sheboygan areas closed on January 5, 2012. No adverse comments on the submittal were received during the adequacy comment period. The submitted maintenance plan, which included the MVEBs, was endorsed by the Governor (or his or her designee) and was subject to a state public hearing. The MVEBS were developed as part of an interagency consultation process which includes Federal, state, and local agencies. The MVEBS were clearly identified and precisely quantified. These MVEBs, when considered together with all other emissions sources, are consistent with maintenance of the 1997 8-hour ozone standard.

EPA, through this rulemaking, has found adequate and is proposing to approve the MVEBs for use to determine transportation conformity in the Milwaukee-Racine and Sheboygan areas, because EPA has determined that the areas can maintain attainment of the 8-hour ozone NAAQS for the relevant maintenance period with mobile source emissions at the levels of the MVEBs. WDNR has determined the 2015 MVEBs for the Milwaukee-Racine and Sheboygan areas to be 21.08 tpd for VOC and 51.22 tpd for $NO_X$, and 2.024 tpd for VOC and 4.321 tpd for $NO_X$, respectively. WDNR has determined the 2022 MVEBs for the Milwaukee-Racine and Sheboygan areas to be 15.98 tpd for VOC and 31.91 tpd for $NO_X$, and 1.615 tpd for VOC and 2.778 tpd for $NO_X$, respectively. These MVEBs are consistent with the onroad mobile source VOC and $NO_X$ emissions projected by the Wisconsin Department of Transportation for 2015 and 2022, as summarized in Table 7 above. Wisconsin has demonstrated that the Milwaukee-Racine area can maintain the 8-hour ozone NAAQS with mobile source emissions of 21.08 tpd and 15.98 tpd of VOC and 51.22 tpd and 31.91 tpd of $NO_X$ in 2015 and 2022, respectively, since emissions will remain under attainment year emission levels. Wisconsin has demonstrated that the Sheboygan area can maintain the 8-hour ozone NAAQS with mobile source

emissions of 2.024 tpd and 1.615 tpd of VOC and 4.321 tpd and 2.778 tpd of $NO_X$ in 2015 and 2022, respectively, since emissions will remain under attainment year emission levels.

*C. 2005 Comprehensive Emissions Inventory*

As discussed above, section 182(a)(1) of the CAA requires states containing areas classified as marginal and above to submit a comprehensive emissions inventory. As part of Wisconsin's redesignation request for the Milwaukee-Racine and Sheboygan areas, the state submitted a 2005 comprehensive emissions inventory. Emissions contained in the submittal cover the general source categories of point sources, area sources, nonroad mobile sources and onroad mobile sources.

WDNR developed the point source inventory using annually reported point source emissions, EPA's Clean Air Markets Database and EPA techniques for emissions calculation. Where feasible, Federal, state and local controls were factored into the emission calculations. Emissions were estimated by collecting process-level information from each facility that qualifies for inclusion in the Wisconsin's point source database.

The area source inventory was created by backcasting Wisconsin's 2008 emissions inventory that WDNR submitted to EPA for the National Emissions Inventory. The backcasting factors were primarily based on growth factors from the EGAS model. If growth factors were not available for source classification code, population based growth factors were used.

The nonroad mobile inventory was created using NMIM (2009/05/04 version). In addition, emissions estimates were developed for commercial marine vesels, aircraft, and railroads, three nonroad categories not included in the model. Through LADCO, Pechan, an independent contractor, provided marine and rail emission estimates. Aircraft emissions were calculated using the Federal Aviation Administration's Emissions and Dispersion Modeling System.

The Onroad mobile source inventory was developed using EPA's MOVES2010a model. Emissions estimates were made in accordance with the User Guide for MOVES2010a [4] and Technical Guidance on the Use of MOVES2010 for Emission Inventory Preparation in State Implementation Plans and Transportation Conformity [5].

The 2005 emissions estimates are summarized in Table 2, above. EPA is proposing to approve the 2005 emissions inventory as meeting the section 182(a)(1) comprehensive emissions inventory requirement for the Milwaukee-Racine and Sheboygan areas.

**VI. Summary of Actions**

After evaluating the redesignation requests submitted by Wisconsin, EPA concludes that the requests meet the redesignation criteria set forth in section 107(d)(3)(E) of the CAA. Therefore, EPA is proposing to approve the redesignation of the Milwaukee-Racine and Sheboygan areas from nonattainment to attainment for the 1997 8-hour ozone NAAQS. EPA is also proposing to approve Wisconsin's maintenance plan SIP revisions for the Milwaukee-Racine and Sheboygan areas. EPA's proposed approval of the maintenance plans is based on the state's demonstration that the plans meet the requirements of section 175A of the CAA, as described more fully above. EPA is also proposing to approve WDNR's 2005 comprehensive emissions inventories for the Milwaukee-Racine and Sheboygan areas as meeting the requirements of section 182(a)(1) of the CAA. Finally, EPA finds adequate under 40 CFR 93.118(e) and is proposing to approve Wisconsin's 2015 and 2022 MVEBs for the Milwaukee-Racine and Sheboygan areas.

**VII. Statutory and Executive Order Reviews**

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, this action merely approves state law as meeting Federal requirements and does not impose additional requirements beyond those imposed by state law. For that reason, this action:

- Is not a ''significant regulatory action'' subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);
- Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);
- Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);
- Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);
- Does not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);
- Is not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);
- Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);
- Is not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA; and
- Does not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this rule does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because redesignation is an action that affects the status of a geographical area and does not impose any new regulatory requirements on tribes, impact any existing sources of air pollution on tribal lands, nor impair the maintenance of ozone national ambient air quality standards in tribal lands. However, because there are tribal lands located in Milwaukee County, we provided the affected tribe with the opportunity to consult with EPA on the redesignation. The affected tribe raised no concerns with the proposed rule.

**List of Subjects**

*40 CFR part 52*

Environmental protection, Air pollution control, Intergovernmental relations, Nitrogen oxides, Ozone, Volatile organic compounds.

*40 CFR Part 81*

Air pollution control, Environmental protection, National parks, Wilderness areas.

[4] U.S. EPA, Office of Transportation and Air Quality, Assessment and Standards Division, August 2010, EPA–420–B–10–036.

[5] U.S. EPA, Office of Transportation and Air Quality, Transportation and Regional Programs Division, April 2010, EPA–420–B–10–023.

Dated: January 31, 2012.

**Susan Hedman,**

*Regional Administrator, Region 5.*

[FR Doc. 2012–2989 Filed 2–8–12; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 52 and 81

**[EPA–R05–OAR–2009–0666; FRL–9629–3]**

### Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Illinois; Ozone

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA is proposing to approve a request from Illinois to redesignate the Illinois portion of the Chicago-Gary-Lake County, Illinois-Indiana (IL-IN) ozone nonattainment area (the Greater Chicago area) to attainment of the 1997 8-hour ozone National Ambient Air Quality Standard (NAAQS or standard) because the request meets the statutory requirements for redesignation under the Clean Air Act (CAA). The Illinois portion of the Greater Chicago area includes Cook, DuPage, Kane, Lake, McHenry, and Will Counties and portions of Grundy (Aux Sable and Goose Lake Townships) and Kendall (Oswego Township) Counties. The Illinois Environmental Protection Agency (IEPA) submitted this request on July 23, 2009, and supplemented its request in a submittal on September 16, 2011. EPA is proposing to approve, as a revision of the Illinois State Implementation Plan (SIP), the State's plan for maintaining the 1997 8-hour ozone standard through 2025 in the Illinois portion of the Greater Chicago area. EPA is proposing to approve 2002 Volatile Organic Compound (VOC) and Nitrogen Oxides ($NO_X$) emission inventories for the Illinois portion of the Greater Chicago area as a revision of the Illinois SIP because the emission inventories meet the requirements of section 182(a) of the CAA. Finally, EPA proposes to approve the State's 2008 and 2025 VOC and $NO_X$ Motor Vehicle Emission Budgets (MVEBs) for the Illinois portion of the Greater Chicago area.

**DATES:** Comments must be received on or before March 12, 2012.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2009–0666, by one of the following methods:

- *http://www.regulations.gov:* Follow the on-line instructions for submitting comments.
- *Email: aburano.douglas@epa.gov.*
- *Fax:* (312) 408–2279.
- *Mail:* Douglas Aburano, Chief, Attainment Planning and Maintenance Section (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, Chicago, Illinois 60604.
- *Hand Delivery:* Douglas Aburano, Chief, Attainment Planning and Maintenance Section (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, 18th Floor, Chicago, Illinois 60604. Such deliveries are only accepted during the Regional Office's normal hours of operation, and special arrangements should be made for deliveries of boxed information. The Regional Office official hours of business are Monday through Friday, 8:30 a.m. to 4:30 p.m., excluding Federal holidays.

*Instructions:* Direct your comments to Docket ID No. EPA–R05–OAR–2009–0666. EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *www.regulations.gov*, including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through *www.regulations.gov* or email. The *www.regulations.gov* Web site is an ''anonymous access'' system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to EPA without going through *www.regulations.gov*, your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects and viruses. For additional instructions on submitting comments, go to section I of the **SUPPLEMENTARY INFORMATION** section of this document.

*Docket:* All documents in the docket are listed in the *www.regulations.gov* index. Although listed in the index, some information is not publicly available, e.g., CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hard copy at the U.S. Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. We recommend that you telephone Edward Doty at (312) 886–6057 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:**

Edward Doty, Environmental Scientist, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 886–6057, or *Doty.Edward@epa.gov*.

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever ''we,'' ''us,'' or ''our'' is used, we mean EPA. This supplementary information section is arranged as follows:

**Table of Contents**

I. What should I consider as I prepare my comments for EPA?
II. What actions is EPA proposing?
III. What is the background for these actions?
A. General Background
B. What are the impacts of the December 22, 2006, and June 8, 2007, United States Court of Appeals decisions regarding EPA's Phase 1 Ozone Implementation Rule?
1. Summary of Court Decisions
2. Requirements Under the 8-Hour Ozone Standard
3. Requirements Under the 1-Hour Ozone Standard
IV. What are the criteria for redesignation?
V. What is EPA's analysis of the State's ozone redesignation request?
A. Has the Greater Chicago area attained the 1997 8-hour ozone NAAQS?
B. Has the State of Illinois met all applicable requirements of Section 110 and Part D of the CAA for the Illinois portion of the Greater Chicago area, and does the Illinois portion of the Greater Chicago area have a fully approved SIP under Section 110(k) of the CAA?
1. The Illinois Portion of the Greater Chicago Area Has Met All Applicable Requirements of Section 110 and Part D of the CAA for Purposes of Redesignation
2. The Illinois Portion of the Greater Chicago Area Has a Fully Approved SIP for Purposes of Redesignation Under Section 110 of the CAA

3. The Illinois Portion of the Greater Chicago Area Has a Fully Approved SIP and Meets Anti-Backsliding Requirements Under the 1-Hour Ozone Standard
C. Are the air quality improvements in the Greater Chicago area due to permanent and enforceable emission reductions?
1. Permanent and Enforceable Controls Implemented
2. Emission Reductions
D. Does Illinois have a fully approvable ozone maintenance plan?
1. Maintenance Plan Requirements
2. Attainment Inventory
3. Has the State documented maintenance of the ozone standard in the Illinois portion of the Greater Chicago area?
4. What is the contingency plan for the Illinois portion of the Greater Chicago area?
5. Monitoring Network and Verification of Continued Attainment
VI. Has the State adopted approvable motor vehicle emission budgets?
VII. 2002 Emissions Inventories
VIII. Statutory and Executive Order Reviews

## I. What should I consider as I prepare my comments for EPA?

When submitting comments, remember to:

1. Identify the rulemaking by docket number and other identifying information (subject heading, **Federal Register** date and page number).
2. Follow directions—EPA may ask you to respond to specific questions or organize comments by referencing a Code of Federal Regulations (CFR) part or section number.
3. Explain why you agree or disagree; suggest alternatives and substitute language for your requested changes.
4. Describe any assumptions and provide any technical information and/or data you used.
5. If you estimate potential costs or burdens, explain how you arrived at your estimate in sufficient detail to allow for it to be reproduced.
6. Provide specific examples to illustrate your concerns, and suggest alternatives.
7. Explain your views as clearly as possible, avoiding the use of profanity or personal threats.
8. Make sure to submit your comments by the comment period deadline identified in the proposed rule.

## II. What actions is EPA proposing?

EPA is proposing to take several related actions. First, EPA is proposing to approve the redesignation of the Illinois portion of the Greater Chicago area from nonattainment to attainment of the 1997 8-hour ozone NAAQS. EPA is also proposing to approve Illinois' ozone maintenance plan for the Illinois portion of the Greater Chicago area as a revision of the Illinois SIP (such approval being one of the CAA criteria for redesignation to attainment). The ozone maintenance plan demonstrates that the Greater Chicago area should remain in attainment of the 1997 8-hour ozone standard through 2025, and specifies the measures that will be taken in the Illinois portion of the Greater Chicago area to assure maintenance of the 1997 8-hour ozone standard in the Greater Chicago area.

EPA is proposing to approve 2002 VOC and $NO_X$ emission inventories for the Illinois portion of the Greater Chicago area as a revision of the Illinois SIP. These emission inventories satisfy the requirements in section 182(a)(1) of the CAA for comprehensive, accurate, and current emission inventories.

Finally, EPA is proposing to approve VOC and $NO_X$ 2008 and 2025 MVEBs for the Illinois portion of the Greater Chicago area.

## III. What is the background for these actions?

### *A. General Background*

EPA has determined that ground-level ozone ($O_3$) is detrimental to human health. On July 18, 1997 (62 FR 38856), EPA promulgated an 8-hour ozone NAAQS of 0.08 parts per million parts of air (0.08 ppm) (the 1997 8-hour ozone standard). This standard is violated in an area when any monitor in the area records 8-hour ozone concentrations with a 3-year average of the annual fourth-highest daily maximum 8-hour ozone concentrations equaling or exceeding 0.085 ppm.

Ground-level ozone is generally not emitted directly by sources. Rather, emitted $NO_X$ and VOC react in the presence of sunlight to form ground-level ozone, as a secondary pollutant, along with other secondary compounds. $NO_X$ and VOC are "ozone precursors." Reduction of peak ground-level ozone concentrations is achieved through controlling VOC and $NO_X$ emissions.

Section 107 of the CAA required EPA to designate as nonattainment any area that violated the 1997 8-hour ozone standard. EPA promulgated 8-hour ozone designations and classifications on April 30, 2004 (69 FR 23857). The Greater Chicago area was designated and classified as a moderate nonattainment area for the 1997 8-hour ozone standard. The designation and classification became effective on June 15, 2004.

The CAA contains two sets of provisions, subparts 1 and 2, that address planning and emission control requirements for ozone nonattainment areas. Both of these subparts are found in title I, part D of the CAA; sections 171–179 and sections 181–185, respectively. Subpart 1 contains general, less prescriptive requirements for all nonattainment areas of any pollutant, including ozone, governed by a NAAQS. Subpart 2 contains additional, more specific requirements for certain ozone nonattainment areas, and applies to ozone nonattainment areas classified under section 181 of the CAA.

Under EPA's implementation rule for the 1997 8-hour ozone standard (69 FR 23951, April 30, 2004), an area was classified under subpart 2 based on its 8-hour ozone design value (i.e., the 3-year average annual fourth-highest daily maximum 8-hour average ozone concentration at the worst-case monitoring site in the area or in its immediate downwind environs), if it had a 1-hour ozone design value [1] at the time of designation at or above 0.121 ppm. All other areas were covered under subpart 1 based on their 8-hour ozone design values [2] (69 FR 23958). The Greater Chicago area was designated as a subpart 2 moderate ozone nonattainment area by EPA on April 30, 2004 (69 FR 23898), based on air quality monitoring data from 2001–2003 (69 FR 23898).

40 CFR 50.10 and 40 CFR part 50, appendix I provide that the 8-hour ozone standard is attained when the 3-year averages of the annual fourth-highest daily maximum 8-hour average ozone concentrations at all monitoring sites in the area are less than or equal to 0.08 ppm. The ozone data must be complete over the 3-year period, meeting the data completeness requirements of 40 CFR part 50, appendix I, section 2.3(d).

On March 27, 2008 (73 FR 16436), EPA promulgated a revised 8-hour ozone standard of 0.075 ppm (the 2008 8-hour ozone standard). EPA has not yet promulgated area designations for this standard. The actions addressed in this proposed rule relate only to the 1997 8-hour ozone standard.

On July 23, 2009, IEPA requested that EPA redesignate the Illinois portion of the Greater Chicago area to attainment for the 1997 8-hour ozone standard based on ozone data for the period of 2006–2008. On September 16, 2011, IEPA supplemented the original redesignation request, submitting ozone data for the period of 2008–2010, revising the mobile source emission estimates using EPA's new on-road

[1] Fourth-highest daily maximum 1-hour ozone concentration over a 3-year period at the worst-case monitoring site in the area.

[2] Three-year averages of the annual fourth-highest daily maximum 8-hour ozone concentrations at the worst-case monitoring sites in the areas.

mobile source emissions model, MOVES, and extending the demonstration of maintenance through 2025, with new MVEBs.

*B. What are the impacts of the December 22, 2006, and June 8, 2007, United States Court of Appeals decisions regarding EPA's Phase 1 Ozone Implementation Rule?*

1. Summary of Court Decisions

On December 22, 2006, the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit) vacated EPA's Phase 1 implementation rule for the 1997 8-hour ozone standard (69 FR 23591, April 30, 2004). *South Coast Air Quality Management Dist.* v. *EPA*, 472 F.3d 882 (D.C. Cir. 2006). On June 8, 2007, in response to several petitions for rehearing, the D.C. Circuit Court (Court) clarified that the Phase 1 rule was vacated only for those parts of the rule that had been successfully challenged. *Id.*, Docket No. 04 1201. Therefore, several provisions of the Phase 1 rule remain effective: Provisions related to classifications for areas currently classified under subpart 2 of title I, part D of the CAA as 8-hour ozone nonattainment areas; 8-hour ozone attainment dates for these areas; and, the timing of emission reductions needed for attainment of the 8-hour ozone NAAQS in these areas. The June 8, 2007, decision also left intact the Court's rejection of EPA's reasons for implementing the 8-hour ozone standard in certain nonattainment areas under subpart 1 in lieu of subpart 2 of the CAA. By limiting the vacatur, the Court let stand EPA's revocation of the 1-hour ozone standard and those anti-backsliding provisions of the Phase 1 rule that had not been successfully challenged.

The June 8, 2007, decision reaffirmed the December 22, 2006, decision that EPA had failed to retain four measures required for 1-hour ozone nonattainment areas under the anti-backsliding provisions of the regulations: (1) Part D New Source Review (NSR) requirements based on an area's 1-hour nonattainment classification; (2) section 185 penalty fees for 1-hour severe or extreme ozone nonattainment areas; (3) measures to be implemented pursuant to section 172(c)(9) or 182(c)(9) of the CAA, on the contingency of an area not making reasonable further progress toward attainment of the 1-hour ozone NAAQS, or for failure to attain the NAAQS; and, (4) certain transportation conformity requirements for Federal actions. The June 8, 2007, decision clarified that the Court's reference to conformity requirements was limited to requiring the continued use of 1-hour MVEBs until 8-hour MVEBs are available for the 8-hour conformity determinations.

This section sets forth EPA's views on the potential effect of the Court's rulings on this proposed redesignation action. For the reasons set forth below in sections III.B.2 and B.3, EPA does not believe that the Court's rulings alter any requirements relevant to this redesignation action so as to preclude redesignation, and do not prevent EPA from proposing and ultimately finalizing this redesignation. EPA believes that the Court's decisions impose no impediment to moving forward with redesignation of this area to attainment, because, even in light of the Court's decisions, redesignation is appropriate under the relevant redesignation provisions of the CAA and longstanding policies regarding redesignation requests.

2. Requirements Under the 8-Hour Ozone Standard

With respect to the 1997 8-hour ozone standard, the Greater Chicago area is classified as moderate nonattainment under subpart 2, part D of the CAA. The June 8, 2007, decision clarifies that the Court did not vacate the Phase 1 rule's provisions with respect to classifications for areas under subpart 2. The Court's decision, therefore, upholds EPA's classifications for those areas classified under subpart 2 for the 1997 8-hour ozone standard, and all 8-hour ozone requirements for these areas remain in place.

3. Requirements Under the 1-Hour Ozone Standard

In its June 8, 2007, decision, the Court limited its Phase 1 rule vacatur so as to uphold provisions of EPA's anti-backsliding requirements that were not successfully challenged. Therefore, an area must meet the anti-backsliding requirements which apply by virtue of the area's classification for the 1-hour ozone standard. See 40 CFR 51.900, *et seq.;* 70 FR 30592, 30604 (May 26, 2005). As set forth in more detail below, the area must address four anti-backsliding provisions identified by the Court in its decisions.

The anti-backsliding provisions at 40 CFR 51.905(a)(1) prescribe 1-hour ozone standard requirements that continue to apply after revocation of the 1-hour ozone standard for former 1-hour ozone nonattainment areas. Section 51.905(a)(1)(i) provides that:

> The area remains subject to the obligation to adopt and implement the applicable requirements as defined in section 51.900(f), except as provided in paragraph (a)(1)(iii) of this section, and except as provided in paragraph (b) of this section.

Section 51.900(f), as amended by 70 FR 30592, 30604 (May 26, 2005), provides that:

> Applicable requirements means for an area that the following requirements, to the extent such requirements applied to the area for the area's classification under section 181(a)(1) of the CAA for the 1-hour NAAQS at the time of designation for the 8-hour NAAQS, remain in effect:
>
> (1) Reasonably available control technology (RACT).
>
> (2) Inspection and maintenance programs (I/M).
>
> (3) Major source applicability cut-offs for purposes of RACT.
>
> (4) Rate of Progress (ROP) reductions.
>
> (5) Stage II vapor recovery.
>
> (6) Clean fuels fleet program under section 183(c)(4) of the CAA.
>
> (7) Clean fuels for boilers under section 182(e)(3) of the CAA.
>
> (8) Transportation Control Measures (TCMs) during heavy traffic hours as provided under section 182(e)(4) of the CAA. [Not a requirement for the Illinois portion of the Greater Chicago area.]
>
> (9) Enhanced (ambient) monitoring under section 182(c)(1) of the CAA.
>
> (10) TCMs under section 182(c)(5) of the CAA.
>
> (11) Vehicle miles traveled (VMT) provisions of section 182(d)(1) of the CAA.
>
> (12) $NO_X$ requirements under section 182(f) of the CAA.
>
> (13) Attainment demonstration or alternative as provided under section 51.905(a)(1)(ii).

Pursuant to 40 CFR 51.905(c), the Illinois portion of the Greater Chicago area is subject to the obligations set forth in 51.905(a) and 51.900(f).

With regard to part D NSR requirements, EPA has determined that an area being redesignated to attainment need not have an approved nonattainment NSR program, provided that the state demonstrates maintenance of the standard in the area without part D NSR in effect. The rationale for this view is described in a memorandum from Mary Nichols, Assistant Administrator for Air and Radiation dated October 14, 1994, titled, "Part D New Source Requirements for Areas Requesting Redesignation to Attainment." This policy assumes that the state's Prevention of Significant Deterioration (PSD) program will become effective in the area upon redesignation of the area to attainment. Consequently, EPA concludes that an approved part D NSR program is not an applicable requirement for purposes of redesignation. See the more detailed explanations of this issue in the following rulemakings: Detroit, Michigan (60 FR 12467–12468 (March 7, 1995); Cleveland-Akron-Lorain, Ohio

(61 FR 20458, 20469–20470, May 7, 1996); Louisville, Kentucky (66 FR 53665, 53669, October 23, 2001); Grand Rapids, Michigan (61 FR 31831, 31836–31837, June 21, 1996).

The conformity portion of the Court's ruling does not impact the redesignation request for the Illinois portion of the Greater Chicago area except to the extent that the Court, in its June 8, 2007, decision clarified that, for those areas with MVEBs for the 1-hour ozone standard, anti-backsliding requires that these MVEBs must be used for 8-hour conformity determinations until replaced by MVEBs for the 8-hour ozone standard. To meet this requirement, conformity determinations in such areas must comply with the applicable requirements of EPA's conformity regulations at 40 CFR part 93. Note below that EPA is proposing to find adequate and approve 8-hour MVEBs established by Illinois' 8-hour ozone maintenance plan for the Illinois portion of the Greater Chicago area.

Severe ozone nonattainment areas must meet the CAA requirement for section 185 source penalty fees. Since the Greater Chicago area was classified as severe nonattainment under the 1-hour ozone standard, the Illinois portion of the Greater Chicago area and the Illinois SIP for this area are subject to this CAA requirement. It should be noted, however, that on December 30, 2008 (73 FR 79652), EPA published a final rule making a determination that the Greater Chicago area had attained the 1-hour ozone standard and confirming that this finding of attainment relieved Illinois (and Indiana) of the obligation to adopt section 185 source penalty fee regulations for this area.

Finally, with regard to the contingency measure requirements under sections 172(c)(9) and 182(c)9) of the CAA, it is noted that these requirements must be addressed in state ozone Reasonable Further Progress (RFP) and attainment demonstration plans. Illinois addressed these requirements in the 1-hour ozone RFP and attainment demonstration plans for the Illinois portion of the Greater Chicago area by adopting and implementing extra VOC and $NO_X$ emission controls that go beyond the emission reductions needed for RFP and attainment of the 1-hour ozone standard. EPA approved these ozone control plans, including their contingency elements: VOC-15 percent RFP plan (December 18, 1997, 62 FR 66279); post-1996 RFP plan (December 18, 2000, 65 FR 78961); and, 1-hour ozone attainment demonstration and post-1999 RFP plan (November 13, 2001, 66 FR 56904). Therefore, Illinois has met the contingency requirements of sections 172(c)(9) and 182(c)(9) of the CAA for the 1-hour ozone standard. As noted later in this proposed rule, Illinois has committed to retain and to implement all VOC and $NO_X$ emission control measures under the 1-hour ozone RFP and attainment plans for the Illinois portion of the Greater Chicago area.

## IV. What are the criteria for redesignation?

The CAA provides the basic requirements for redesignating a nonattainment area to attainment. Specifically, section 107(d)(3)(E) of the CAA authorizes redesignation provided that: (1) The Administrator determines that the area has attained the applicable NAAQS based on current air quality data; (2) the Administrator has fully approved an applicable state implementation plan for the area under section 110(k) of the CAA; (3) the Administrator determines that the improvement in air quality is due to permanent and enforceable emission reductions resulting from implementation of the applicable SIP, Federal air pollution control regulations, and other permanent and enforceable emission reductions; (4) the Administrator has fully approved a maintenance plan for the area meeting the requirements of section 175A of the CAA; and, (5) the state has met all requirements applicable to the area under section 110 and part D of the CAA.

EPA provided guidance on redesignations in the General Preamble for the Implementation of Title I of the CAA Amendments of 1990 on April 16, 1992 (57 FR 13498), and supplemented this guidance on April 28, 1992 (57 FR 18070).

Two significant policy documents affecting the review of ozone redesignation requests are the following: (1) "Procedures for Processing Requests To Redesignate Areas to Attainment," Memorandum from John Calcagni, Director, Air Quality Management Division, September 4, 1992 (the September 4, 1992 Calcagni memorandum); and, (2) "Reasonable Further Progress, Attainment Demonstration, and Related Requirements for Ozone Nonattainment Areas Meeting the Ozone National Ambient Air Quality Standard," Memorandum from John S. Seitz, Director, Office of Air Quality Planning and Standards, May 10, 1995 (the May 10, 1995 Clean Data Policy memorandum). Additional guidance on processing redesignation requests is included in the following documents:

- "Maintenance Plans for Redesignation of Ozone and Carbon Monoxide Nonattainment Areas," Memorandum from G.T. Helms, Chief Ozone/Carbon Monoxide Programs Branch, April 30, 1992;
- "Contingency Measures for Ozone and Carbon Monoxide (CO) Redesignations," Memorandum from G.T. Helms, Chief, Ozone/Carbon Monoxide Programs Branch, June 1, 1992;
- "State Implementation Plan (SIP) Actions Submitted in Response to Clean Air Act (Act) Deadlines," Memorandum from John Calcagni, Director, Air Quality Management Division, October 28, 1992;
- "Technical Support Documents (TSDs) for Redesignation of Ozone and Carbon Monoxide (CO) Nonattainment Areas," Memorandum from G.T. Helms, Chief, Ozone/Carbon Monoxide Programs Branch, August 17, 1993;
- "State Implementation Plan (SIP) Requirements for Areas Submitting Requests for Redesignation to Attainment of the Ozone and Carbon Monoxide (CO) National Ambient Air Quality Standards (NAAQS) On or After November 15, 1992," Memorandum from Michael H. Shapiro, Acting Assistant Administrator for Air and Radiation, September 17, 1993;
- "Use of Actual Emissions in Maintenance Demonstrations for Ozone and CO Nonattainment Areas," Memorandum from D. Kent Berry, Acting Director, Air Quality Management Division, November 30, 1993; and,
- "Part D New Source Review (Part D NSR) Requirements for Areas Requesting Redesignation to Attainment," Memorandum from Mary D. Nichols, Assistant Administrator for Air and Radiation, October 14, 1994.

## V. What is EPA's analysis of the State's ozone redesignation request?

EPA is proposing to approve Illinois' ozone redesignation request for the Illinois portion of the Greater Chicago area with a determination that the Greater Chicago area has attained the 1997 8-hour ozone standard based on current ozone monitoring data for 2008–2010 and that the State of Illinois and the Illinois portion of this area have met all other applicable redesignation criteria for the 1997 8-hour ozone standard under section 107(d)(3)(E) of the CAA. The basis for EPA's proposed approval of the redesignation request is discussed in more detail as follows.

*A. Has the Greater Chicago area attained the 1997 8-hour ozone NAAQS?*

An area may be considered to be attaining the 1997 8-hour ozone NAAQS if there are no violations of the NAAQS, as determined in accordance with 40 CFR 50.10 and appendix I, based on the most recent 3 consecutive years of complete, quality-assured air quality monitoring data at all ozone monitoring sites in the area and in its nearby downwind environs. To attain this standard, the average of the annual fourth-high daily maximum 8-hour average ozone concentrations measured and recorded at each monitoring site over the most recent 3-year period (the monitoring site's ozone design value) must not exceed 0.084 ppm. The data must be collected and quality-assured in accordance with 40 CFR part 58, and must be recorded in EPA's Air Quality System (AQS).

As part of the July 23, 2009, ozone redesignation request, IEPA summarized the annual fourth-high daily maximum 8-hour ozone concentrations and the 3-year 8-hour ozone design values for the period of 2006–2008 for all ozone monitoring sites in the Greater Chicago area. This ozone data summary also includes ozone concentration data for the Chiwaukee Prairie monitoring site in Wisconsin, an ozone peak downwind impact site for ozone precursor emissions originating in the Greater Chicago area. The September 16, 2011, updated ozone redesignation request from Illinois also summarized the annual fourth-high ozone data for all monitoring sites for the period of 2006–2008.

Table 1 summarizes the monitoring site-specific annual fourth-high daily maximum 8-hour ozone concentrations and 3-year ozone design values for all monitoring sites covered in Illinois' ozone redesignation request for the period of 2006–2010. Note that we have included 2009 and 2010 ozone monitoring data in this summary. These additional data were obtained from EPA's AQS. Since Illinois' July 23, 2009, submittal of the ozone redisignation request, 2009 and 2010 ozone monitoring data have been quality assured and submitted to EPA's AQS.

TABLE 1—ANNUAL FOURTH-HIGH DAILY MAXIMUM 8-HOUR OZONE CONCENTRATIONS IN PARTS PER MILLION (PPM) AND 3-YEAR AVERAGES

| State/County | Monitoring site (AQS Site ID) | 2006 | 2007 | 2008 | 2009 | 2010 | 3-Year average 2006–2008 | 3-Year average 2008–2010 |
|---|---|---|---|---|---|---|---|---|
| Illinois: | | | | | | | | |
| Cook | Alsip (170310001) | 0.078 | 0.085 | 0.066 | 0.069 | 0.073 | 0.076 | 0.69 |
| Cook | Chicago—SWFP (170310032) | 0.075 | 0.082 | 0.067 | 0.065 | 0.074 | 0.074 | 0.069 |
| Cook | Chicago—University of Chicago (170310064) | 0.070 | 0.079 | 0.063 | 0.060 | 0.071 | 0.070 | 0.065 |
| Cook | Chicago—Jardine (170310072) | 0.065 | 0.075 | 0.063 | 0.062 | 0.071 | 0.067 | 0.065 |
| Cook | Chicago—Commonwealth Edison (170310076) | 0.075 | 0.080 | 0.066 | 0.067 | 0.068 | 0.073 | 0.067 |
| Cook | Chicago—Taft (170311003) | 0.077 | 0.079 | 0.064 | 0.064 | 0.070 | 0.073 | 0.066 |
| Cook | Lemont (170311601) | 0.070 | 0.085 | 0.071 | 0.067 | 0.073 | 0.075 | 0.070 |
| Cook | Cicero (170314002) | 0.060 | 0.068 | 0.060 | 0.067 | 0.068 | 0.062 | 0.065 |
| Cook | Des Plaines (170314007) | 0.065 | 0.078 | 0.057 | 0.050 | 0.064 | 0.066 | 0.057 |
| Cook | Northbrook (170314201) | 0.068 | 0.076 | 0.065 | 0.069 | 0.072 | 0.069 | 0.069 |
| Cook | Evanston (170317002) | 0.072 | 0.080 | 0.058 | 0.064 | 0.067 | 0.070 | 0.063 |
| DuPage | Lisle (170436001) | 0.062 | 0.072 | 0.057 | 0.059 | 0.064 | 0.063 | 0.060 |
| Kane | Elgin (170890005) | 0.062 | 0.075 | 0.061 | 0.068 | 0.069 | 0.066 | 0.066 |
| Lake | Waukegan (170971002) | 0.071 | 0.081 | 0.063 | 0.057 | 0.074 | 0.071 | 0.065 |
| Lake | Zion (170971007) | 0.068 | 0.080 | 0.069 | 0.075 | 0.078 | 0.072 | 0.074 |
| McHenry | Cary (171110001) | 0.057 | 0.074 | 0.065 | 0.066 | 0.065 | 0.065 | 0.065 |
| Will | Braidwood (171971011) | 0.068 | 0.071 | 0.060 | 0.063 | 0.065 | 0.066 | 0.063 |
| Indiana: | | | | | | | | |
| Lake | Gary (180890022) | 0.073 | 0.085 | 0.062 | 0.058 | 0.064 | 0.073 | 0.061 |
| Lake | Whiting (180890030) | 0.081 | 0.088 | 0.062 | 0.062 | 0.069 | 0.077 | 0.064 |
| Lake | Hammond (180892008) | 0.075 | 0.077 | 0.068 | 0.065 | 0.069 | 0.073 | 0.067 |
| Porter | Valparaiso (181270026) | 0.071 | 0.080 | 0.061 | 0.064 | 0.061 | 0.070 | 0.062 |
| Wisconsin: | | | | | | | | |
| Kenosha | Chiwaukee Prairie (550590019) | 0.079 | 0.085 | 0.072 | 0.071 | 0.081 | 0.078 | 0.075 |

IEPA notes that the 2006–2008 ozone design values for all monitoring sites are below the 0.084 ppm attainment level. We also note that the 2008–2010 ozone design values for all monitoring sites are below the 0.084 ppm attainment level. Therefore, the ozone monitoring data for the Greater Chicago area and for Chiwaukee Prairie in Wisconsin show attainment of the 1997 8-hour ozone standard.

IEPA commits to continue ozone monitoring at the Illinois monitoring sites in accordance with EPA-approved monitoring plans, as required to confirm maintenance of the 1997 8-hour ozone standard. Should changes in the ozone monitoring system become necessary, IEPA commits to work with the EPA to assure the continued adequacy of the ozone monitoring network in the Illinois portion of the Greater Chicago area.

Based on the available ozone monitoring data, we conclude that the Greater Chicago area has attained the 1997 8-hour ozone standard, and has continued to attain this ozone standard through the most recent three years of quality-assured ozone monitoring data.

*B. Has State of Illinois met all applicable requirements of Section 110 and Part D of the CAA for the Illinois portion of the Greater Chicago area, and does the Illinois portion of the Greater Chicago area have a fully approved SIP under Section 110(k) of the CAA?*

In April 2004, the Greater Chicago area was designated as a moderate nonattainment area with a June 15, 2010, attainment deadline for the 1997 8-hour ozone standard. Prior to this, the Greater Chicago area had been designated as a severe nonattainment area with a November 15, 2007,

attainment deadline for the 1-hour ozone standard. As a result of these nonattainment designations, the State of Illinois was required to submit SIP revisions that meet certain ozone planning and emission control requirements of the CAA.

The September 4, 1992, Calcagni memorandum confirms that a state with an area seeking redesignation to attainment has to fully adopt rules and meet SIP requirements that come due prior to the submittal of a complete redesignation request. See also 60 FR 12459, 12465–66 (March 7, 1995) (redesignation of Detroit-Ann Arbor, Michigan); 68 FR 25424, 25427 (May 12, 2003) (redesignation of St. Louis); *Sierra Club* v. *EPA,* 375 F.3d 537 (7th Cir. 2004); and, 70 FR 19895, 19900 (April 15, 2005) (redesignation of Cincinnati). Furthermore, requirements of the CAA that come due subsequent to the state's submittal of a complete redesignation request would continue to be applicable to the area until redesignation to attainment is approved, but are not required as a prerequisite for redesignation (see section 175A(c) of the CAA). If the redesignation is disapproved or is not completed due to a subsequent violation of the ozone standard in the area prior to final approval of the state's ozone redeignation request, the state remains obligated to fulfill these CAA requirements.

We are proposing to determine that the State of Illinois and the Illinois portion of the Greater Chicago area have met all currently applicable SIP requirements for purposes of redesignation of the Illinois portion of the Greater Chicago area to attainment of the 1997 8-hour ozone standard under section 110 and part D of the CAA. We have determined that the Illinois SIP, with the exception of the 2002 base year VOC and $NO_X$ emission inventories and certain VOC RACT rules: (1) Meets all SIP requirements currently applicable for purposes of redesignation under part D of title I of the CAA, in accordance with section 107(d)(3)(E)(v) of the CAA; and, (2) is fully approved with respect to all applicable requirements for purposes of redesignation to attainment of the 1997 8-hour ozone standard, in accordance with section 107(d)(3)(E)(ii) of the CAA.

As discussed below in section VII, EPA is proposing to approve Illinois' 2002 base year VOC and $NO_X$ emission inventories as meeting the SIP emission inventory requirement of section 182(a)(1) of the CAA. If EPA approves the emission inventories in a final rule, Illinois will have met the ozone precursor emission inventory requirements of the CAA.

In the September 16, 2011, submittal the IEPA submitted VOC emission control regulations and other rule revisions needed to meet the VOC RACT requirements of the CAA.[3] On November 30, 2011, EPA proposed to approve all of these regulations and rule revisions as revisions of the Illinois SIP. If these VOC emission control regulations and revised rules are approved through a final rulemaking and are incorporated into the Illinois SIP, Illinois will have met the CAA requirements for VOC RACT.

Recognizing that the base year VOC and $NO_X$ emission inventories and VOC RACT rules must be approved on or before we complete final rulemaking approving Illinois' ozone redesignation request, we determine here that, assuming that these approvals occur, Illinois will have met all applicable section 110 and part D SIP requirements of the CAA for purposes of approval of Illinois' ozone redesignation request for the Illinois portion of the Greater Chicago area. In making this determination, we have ascertained what SIP requirements are applicable to the Illinois portion of the Greater Chicago area for purposes of redesignation.

1. The Illinois Portion of the Greater Chicago Area Has Met All Applicable Requirements of Section 110 and Part D of the CAA for Purposes of Redesignation

a. Section 110: General Requirements for Implementation Plans

Section 110(a) of the CAA contains the general requirements for a SIP. Section 110(a)(2) provides that the SIP implemented by a state must have been adopted by the state after reasonable public notice and hearing, and that, among other things, it must: (1) Include enforceable emission limitations and other control measures, means or techniques necessary to meet the requirements of the CAA; (2) provide for establishment and operation of appropriate devices, methods, systems and procedures necessary to monitor ambient air quality; (3) provide for implementation of a source permit program to regulate the modification and construction of stationary sources within the areas covered by the plan; (4) include provisions for the implementation of part C PSD and part D NSR permit programs; (5) include criteria for stationary source emission control measures, monitoring, and reporting; (6) include provisions for air quality modeling; and, (7) provide for public and local agency participation in planning and emission control rule development.

Section 110(a)(2)(D) of the CAA requires SIPs to contain measures to prevent sources in a state from significantly contributing to air quality problems in another state. To implement this provision, EPA has required certain states to establish programs to address transport of certain air pollutants, e.g., $NO_X$ SIP call.[4] However, the section 110(a)(2)(D) SIP requirements are not linked with a particular area's designation and classification. EPA concludes that the SIP requirements linked with an area's designation and classification are the relevant measures to evaluate when reviewing a redesignation request for the area. The section 110(a)(2)(D) requirements, where applicable, continue to apply to a state regardless of the designation of any one particular area within the state. Thus, we believe these requirements are not applicable requirements for purposes or redesignation. See 65 FR 37890 (June 15, 2000), 66 FR 50399 (October 19, 2001), 68 FR 25418, 25426–27 (May 13, 2003).

Further, we believe that section 110(a)(2) elements, other than those described above that are not connected with nonattainment plan submissions and that are not linked with an area's attainment status are also not applicable requirements for purposes of redesignation. A state remains subject to these requirements regardless of an area's designation and after the area is redesignated to attainment. We conclude that only the section 110 and part D requirements that are linked with an area's designation and classification are the relevant measures for evaluating this aspect of a redesignation request. This approach is consistent with EPA's policy on applicability of conformity and oxygenated fuel requirements for redesignation purposes, as well as with section 184 ozone transport requirements. See: Reading, Pennsylvania proposed and final rulemakings (61 FR 53174–53176, October 10, 1996 and 62 FR 24826, May

[3] Required VOC RACT rule revisions were also submitted by the IEPA on July 29, 2010 and September 29, 2011.

[4] On October 27, 1998 (63 FR 57356), EPA issued a $NO_X$ SIP call requiring the District of Columbia and 22 States to reduce emissions of $NO_X$ in order to reduce the transport of ozone and ozone precursors. In compliance with EPA's $NO_X$ SIP Call, IEPA developed rules governing the control of $NO_X$ emissions from Electric Generating Units (EGUs), major non-EGU industrial boilers and turbines, and major cement kilns. EPA approved Illinois' rules as fulfilling the requirements of the $NO_X$ SIP call on November 8, 2001, at 66 FR 56449 and 66 FR 56454.

7, 1997); Cleveland-Akron-Loraine, Ohio final rulemaking (61 FR 20458, May 7, 1996); and Tampa, Florida final rulemaking (60 FR 62748, December 7, 1995). See also the discussion on this issue in the Cincinnati, Ohio ozone redesignation (65 FR 37890, June 19, 2000), and the Pittsburgh, Pennsylvania ozone redesignation (66 FR 50399, October 19, 2001).

We have reviewed the Illinois SIP and conclude that it meets the general SIP requirements under section 110 of the CAA applicable to the State's request for redesignation. EPA has previously approved provisions of the Illinois SIP addressing section 110 elements under the 1-hour ozone standard (40 CFR 52.720 and 40 CFR 52.722). Further, in a submittal dated December 12, 2007, Illinois confirmed that the State continues to meet the section 110(a)(2) infrastructure requirements for the 8-hour ozone standard. EPA approved elements of this Illinois submittal on July 13, 2011, at 76 FR 41075. The requirements of section 110(a)(2), however, are statewide requirements that are not linked to the 8-hour ozone nonattainment status of the Illinois portion of the Greater Chicago area. Therefore, EPA concludes that these infrastructure elements are not applicable requirements for purposes of review of the State's 8-hour ozone redesignation request.

b. Part D Requirements

EPA has determined that, if EPA finalizes the approval of the 2002 base year VOC and $NO_X$ emission inventories and the Illinois VOC RACT rules, discussed below under the heading "Subpart 2 Section 182(a) and (b) Requirements," the Illinois SIP will meet the SIP requirements applicable for purposes of redesignation under part D of the CAA for the Illinois portion of the Greater Chicago area. Subpart 1 of part D, found in sections 172–176 of the CAA, sets forth the basic nonattainment area requirements applicable to all nonattainment areas. Subpart 2 of part D, which includes section 182 of the CAA, establishes additional, specific requirements for ozone nonattainment areas depending on an area's ozone nonattainment classification.

As noted above, the Greater Chicago area was classified as moderate nonattainment for the 1997 8-hour ozone standard under subpart 2 of part D of the CAA. Therefore, Illinois must meet the requirements of subpart 1 and subpart 2 of part D of the CAA applicable for purposes of redesignation. The applicable subpart 1 requirements are contained in sections 172(c)(1)–(9) and 176 of the CAA. The applicable subpart 2 requirements are contained in sections 182(a)–(b) (moderate nonattainment area requirements) of the CAA.

**Subpart 1 Section 172 Requirements**

A thorough discussion of the requirements contained in section 172 can be found in the General Preamble for Implementation of Title I (57 FR 13498, April 16, 1992).

Section 172(c)(1) requires the state plans for all nonattainment areas to provide for the implementation of Reasonably Available Control Measures (RACM), including RACT at a minimum, as expeditiously as practicable. EPA interprets this requirement to impose a duty on all states with nonattainment areas to consider all available control measures and to adopt and implement such measures as are reasonably available for implementation in the areas as components of the areas' attainment demonstrations (the attainment demonstrations must address RACM). Because attainment of the 1997 8-hour ozone standard has been reached in the Greater Chicago area, no additional RACM measures, beyond RACT, are needed to provide for attainment, and section 172(c)(1) requirements (other than RACT) are no longer considered to be applicable as a prerequisite for approval of Illinois' redesignation request, provided the Greater Chicago area continues to attain the standard until redesignation of the Illinois portion of the area occurs. See 57 FR 13498, 13564 (April 16, 1991), 40 CFR 51.918.

Section 172(c)(2) requires plans for all nonattainment areas to provide for RFP toward attainment of the NAAQS. This requirement is not relevant to the Greater Chicago area for purposes of redesignation because the Greater Chicago area has monitored attainment of the 1997 8-hour ozone standard. General Preamble, 57 FR 13564. In addition, pursuant to EPA's determination of attainment of the 1997 8-hour ozone standard for the Greater Chicago area, the requirement for RFP under section 172(c)(2), as well as the section 172(c)(9) contingency measure requirement, is suspended pursuant to 40 CFR 51.918.

Section 172(c)(3) requires submission and EPA approval of a comprehensive, accurate, and current inventory of actual emissions. This requirement is superseded by the emission inventory requirement in section 182(a)(1) of the CAA. See the discussion of Illinois' emissions inventory for the Illinois portion of the Greater Chicago area below in section VII of this proposed rule.

Section 172(c)(4) requires the identification and quantification of emissions for major new and modified stationary sources to be allowed in an area, and section 172(c)(5) requires source permits for the construction and operation of new and modified major stationary sources in the nonattainment area. EPA approved the Illinois NSR program [5] on December 17, 1992 (57 FR 59928), September 27, 1995 (60 FR 49780), and May 13, 2003 (68 FR 25504). Further, EPA has determined that, since PSD requirements [6] will apply after redesignation, an area being redesignated to attainment need not comply with the requirement that a NSR program be approved prior to redesignation, provided that the state demonstrates maintenance of the NAAQS in the area without implementation of part D NSR. A more detailed rationale for this view is described in a memorandum from Mary Nichols, Assistant Administrator for Air and Radiation, dated October 14, 1994, titled "Part D New Source Review Requirements for Areas Requesting Redesignation to Attainment." Illinois has demonstrated that the Greater Chicago area will be able to maintain the 1997 8-hour ozone standard without the continued implementation of the State's part D NSR program. Therefore, EPA concludes that the State need not have a fully approved part D NSR program as an applicable requirement for approval of the State's ozone redesignation request. The State's PSD program will become effective in the Chicago area upon redesignation to attainment of the 1997 8-hour ozone standard. See redesignation rulemakings for Detroit, Michigan (60 FR 12467–12468, March 7, 1995); Cleveland-Akron-Lorain, Ohio (61 FR 20458, 20469–20470, May 7, 1996); Louisville, Kentucky (66 FR 53665, October 23, 2001); and, Grand Rapids, Michigan (61 FR 31834–31837, June 21, 1996).

Section 172(c)(6) requires the SIP to contain emission control measures necessary to provide for attainment of the standard. Because attainment has been reached in the Greater Chicago area, no additional emission control measures are needed to provide for attainment of the standard.

Section 172(c)(7) requires the SIP to meet the applicable provisions of section 110(a)(2). As noted above, in

[5] The NSR program controls the growth and permitting of major source emissions in ozone nonattainment areas.

[6] PSD requirements control the growth of new source emissions in areas designated as attainment for a NAAQS.

section V.B.1.a, we conclude the Illinois SIP meets the requirements of section 110(a)(2) applicable for purposes of redesignation.

**Section 176 Conformity Requirements**

Section 176(c) of the CAA requires States to establish criteria and procedures to ensure that Federally-supported or funded activities, including highway projects, conform to the air quality planning goals of the SIPs. The requirement to determine conformity applies to transportation plans, programs, and projects developed, funded, or approved under title 23 of the U.S. Code and the Federal Transit Act (transportation conformity) as well as to all other Federally-supported or funded projects (general conformity). State conformity SIP revisions must be consistent with Federal conformity regulations relating to consultation, enforcement, and enforceability, which EPA promulgated pursuant to CAA requirements.

EPA thinks that it is reasonable to interpret the conformity SIP requirements as not applying for purposes of evaluating the redesignation request under section 107(d) for two reasons. First, the requirement to submit SIP revisions to comply with the conformity provisions of the CAA continues to apply to areas after redesignation to attainment since such areas would be subject to section 175A maintenance plans. Second, EPA's Federal conformity rules require the performance of conformity analyses in the absence of Federally-approved state rules. Therefore, because areas are subject to the conformity requirements regardless of whether they are redesignated to attainment and, because they must implement conformity under Federal rules if state rules are not yet approved, EPA believes it is reasonable to view these requirements as not applying for purposes of evaluating a redesignation request. See *Wall* v. *EPA*, 265 F.3d 426 (6th Cir. 2001), upholding this interpretation. See also 60 FR 62748, 62749–62750 (December 7, 1995) (Tampa, Florida).

EPA approved Illinois' general conformity SIP on December 23, 1997 (62 FR 67000). Illinois does not have a Federally-approved transportation conformity SIP. However, Illinois performs conformity analyses pursuant to EPA's Federal conformity rules. Illinois has submitted on-road motor vehicle emission budgets for the Illinois portion of the Greater Chicago area of 117.23 tons VOC per ozone season weekday and 373.52 tons $NO_X$ per ozone season weekday for 2008 and 48.13 tons VOC per ozone season weekday and 125.27 tons $NO_X$ per ozone season weekday for 2025, respectively. Illinois must use these MVEBs in any conformity determination that is effective on or after the effective date of the ozone maintenance plan approval.

**Subpart 2 Section 182(a) and (b) Requirements**

As set forth in the September 4, 1992, and September 17, 1993, EPA guidance memoranda referenced in section IV of this action, only those requirements which came due prior to Illinois' July 23, 2009, submittal of the request for redesignation of the Illinois portion of the Greater Chicago area must be fully approved into the SIP by the time EPA approves the redesignation of the area to attainment. These requirements are discussed below.

*Comprehensive Emissions Inventory.* Section 182(a)(1) requires the submission of a comprehensive, accurate, current emission inventory of ozone precursor emissions as a revision of the SIP. IEPA submitted inventories of 2002 VOC and $NO_X$ emissions for the Illinois portion of the Greater Chicago area on June 21, 2006, to meet the requirements of section 182(a)(1). On September 16, 2011, IEPA supplemented the 2002 emissions inventory with updated on-road mobile source emission estimates based on the use of EPA's MOVES model. As discussed below, EPA is proposing to approve the 2002 emission inventories as meeting the section 182(a)(1) emission inventory requirement.

*Emission Statements.* Section 182(a)(3)(B) requires a State to adopt provisions in the SIP to require the owners or operators of stationary sources of VOC or $NO_X$ to provide the state with annual statements of actual emissions from the sources. EPA approved Illinois' emission statement SIP revisions on September 9, 1993 (58 FR 47379), and May 15, 2002 (67 FR 34614).

*Reasonable Further Progress and Attainment Demonstrations.* On July 2, 2007, IEPA submitted an attainment demonstration for the Greater Chicago area and an RFP plan for the Illinois portion of the Greater Chicago area as required by section 182(b)(1) of the CAA. Because attainment has been reached,[7] section 182(b)(1) planning requirements are no longer considered to be applicable for purposes of redesignation as long as the area continues to attain the standard. If EPA finalizes approval of the redesignation of the Illinois portion of the Greater Chicago area, EPA will take no further action on the ozone attainment demonstration and RFP plan submitted by Illinois for this area.

*VOC RACT.* Section 182(b)(2) requires states with moderate ozone nonattainment areas to implement RACT under section 172(c)(1) with respect to each of the following: (1) All sources covered by a Control Technology Guideline (CTG) document issued between November 15, 1990, and the date of attainment; (2) all sources covered by a CTG document issued prior to November 15, 1990; and, (3) all other major non-CTG stationary sources.[8]

As required under the 1-hour ozone standard, Illinois submitted VOC RACT rules covering the second and third source categories above. EPA approved these VOC RACT rules on February 21, 1980 (45 FR 11472), November 21, 1987 (52 FR 45333), and September 9, 1994 (59 FR 46562).

EPA issued CTGs for five source categories in September 2006, three source categories in September 2007, and five source categories in September 2008. States with ozone nonattainment areas classified as moderate and above were required to submit VOC RACT for the source categories covered by these CTGs within one year after the release of each CTG, by September 2007, September 2008, and September 2009, respectively.

Illinois submitted a SIP revision to address all of the new CTGs on July 29, 2010, September 16, 2011, and September 29, 2011. EPA is taking action on these revisions in a separate rulemaking action. Full approval of IEPA's VOC RACT submittals is a prerequisite for approval of the redesignation of the Illinois portion of the Greater Chicago area to attainment of the 1997 8-hour ozone standard.

*$NO_X$ RACT.* Section 182(f) of the CAA establishes $NO_X$ requirements for ozone nonattainment areas. Section 182(f)(1) generally requires major sources of $NO_X$ to be covered by the same levels of emission controls as required for major sources of VOC. Since moderate (or above) ozone nonattainment areas are required to be covered by RACT rules for major VOC sources, these ozone nonattainment areas are also required to have $NO_X$ RACT rules. Section 182(f)(1) of the CAA, however, also provides that the requirement for such $NO_X$ emission

[7] EPA proposed, on September 24, 2009 (74 FR 48703), to find that the Greater Chicago nonattainment area had attained the 1997 8-hour ozone standard. EPA finalized this determination of attainment on March 12, 2010 (75 FR 12088).

[8] In moderate ozone nonattainment areas, major stationary sources of VOC are those that have a potential emit 100 tons VOC per year or more.

controls does not apply (can be waived) in an area if the Administrator determines that net air quality benefits are greater in the absence of the $NO_X$ emission reductions. The $NO_X$ emission control requirements can also be waived if the Administrator determines that additional reductions of $NO_X$ emissions would not contribute to attainment of the ozone NAAQS.

In its July 29, 2010, submittal, IEPA requested a waiver from the $NO_X$ RACT requirements based on the fact that the 1997 8-hour ozone standard had been attained in the Greater Chicago area and additional $NO_X$ emission reductions in this area are not needed to attain the ozone standard. Based on a clean air determination for this area for the 1997 8-hour ozone standard, EPA granted Illinois a waiver from $NO_X$ RACT for this area on February 22, 2011 (76 FR 9655).

*Stage II Vapor Recovery.* Section 182(b)(3) of the CAA requires states with moderate nonattainment areas to submit Stage II vapor recovery rules (requiring the capture of gasoline vapor at service stations during vehicle refueling). EPA approved Illinois' Stage II vapor recovery regulations on January 12, 1993 (58 FR 3841). Illinois has implemented and continues to implement Stage II vapor recovery rules in the Illinois portion of the Greater Chicago area.

*Vehicle Inspection and Maintenance (I/M).* Section 182(b)(4) of the CAA and EPA's final I/M regulations in 40 CFR part 85 require states with moderate (or above) ozone nonattainment areas to submit a fully adopted I/M programs as a revision of the SIP. EPA approved Illinois' enhanced I/M program on February 22, 1999 (64 FR 8517).

Thus, as discussed above, with EPA approval of the 2002 base year emission inventories and Illinois' VOC RACT submittals, the Illinois portion of the Greater Chicago area will satisfy the requirements applicable for purposes of redesignation under section 110 and part D of the CAA.

2. The Illinois Portion of the Greater Chicago Area Has a Fully Approved SIP for Purposes of Redesignation Under Section 110 of the CAA

If EPA issues a final approval of the 2002 base year emission inventories and the Illinois VOC RACT submittals, EPA will have fully approved the Illinois SIP for the Illinois portion of the Greater Chicago area under section 110(k) of the CAA for all requirements applicable for purposes of redesignation. EPA may rely on prior SIP approvals when rulemaking on a redesignation request (see page 3 of the September 4, 1992, John Calcagni memorandum; *Southwestern Pennsylvania Growth Alliance* v. *Browner*, 144 F.3d 984, 989–990 (6th Cir. 1998), *Wall* v. *EPA*, 265 F.3d 426 (6th Cir. 2001)) plus any additional measures it may approve in conjunction with a redesignation action. See 68 FR 25412, 25426 (May 12, 2003).

Since the passage of the CAA of 1970, Illinois has adopted and submitted, and EPA has fully approved, SIP provisions addressing various required SIP elements under the 1-hour ozone standard. In this action, EPA is proposing to approve Illinois' 2002 base year emission inventories for the Illinois portion of the Greater Chicago area as meeting the requirement of section 182(a)(1) of the CAA. As noted above, in a separate rule, EPA is proposing action on the Illinois VOC RACT submittals.

No SIP provisions for the Illinois portion of the Greater Chicago area are currently disapproved, conditionally approved, or partially approved.

3. The Illinois Portion of the Greater Chicago Area Has a Fully Approved SIP and Meets Anti-Backsliding Requirements Under the 1-Hour Ozone Standard

The anti-backsliding provisions at 40 CFR 51.905(a)(1) prescribe 1-hour ozone NAAQS requirements that continue to apply after the revocation of the 1-hour ozone NAAQS for former 1-hour ozone nonattainment areas. 40 CFR 51.905(a)(1) provides that:

> The area remains subject to the obligations to adopt and implement the applicable requirements defined in 40 CFR 51.900(f), except as provided in paragraph (a)(1)(iii) of this section and except as provided in paragraph (b) of this section.

40 CFR 51.900(f), as amended by 70 FR 30592, 30604 (May 26, 2005), provides that:

> Applicable requirements means that for an area that the following requirements, to the extent such requirements applied to the area for the area's classification under section 181(a)(1) of the CAA for the one-hour NAAQS at the time of designation for the eight-hour NAAQS, remain in effect:
> (1) RACT.
> (2) I/M.
> (3) Major source applicability cut-offs for purposes of RACT.
> (4) ROP reductions.
> (5) Stage II vapor recovery.
> (6) Clean fuels fleet program under section 182(c)(4) of the CAA.
> (7) Clean fuels for boilers under section 182(e)(3) of the CAA.
> (8) TCMs during heavy traffic hours as provided under section 182(e)(4) of the CAA.
> (9) Enhanced (ambient) monitoring under section 182(c)(1) of the CAA.
> (10) TCMs under section 182(c)(5) of the CAA.
> (11) VMT provisions of section 182(d)(1) of the CAA.
> (12) $NO_X$ requirements under section 182(f) of the CAA.
> (13) Attainment demonstration or alternative as provided under 40 CFR 51.905(a)(1)(ii).

In addition to applicable requirements listed under 40 CFR 51.900(f) and as discussed above, the state must also comply with the 1-hour anti-backsliding requirements discussed in the Court's decisions in *South Coast Air Quality Management Dist.* v. *EPA:* (1) NSR requirements based on the area's 1-hour ozone nonattainment classification; (2) section 185 source penalty fees; (3) contingency measures to be implemented pursuant to section 172(c)(9) or 182(c)(9) of the CAA for areas not making reasonable further progress toward attainment of the 1-hour ozone NAAQS, or for failure to attain the 1-hour ozone NAAQS; and, (4) transportation conformity requirements for certain types of Federal actions.

Pursuant to 40 CFR 51.905(c), the Illinois portion of the Greater Chicago area is subject to the obligations set forth in 40 CFR 51.905(a) and 40 CFR 51.900(f). The following paragraphs address the 1-hour ozone SIP requirements applicable to the Illinois portion of the Greater Chicago area pursuant to these anti-backsliding requirements and those discussed in the Court's decision in *South Coast Air Quality Management Dist.* v. *EPA*. Note that Illinois commits to continue to comply with these requirements unless revised through SIP revisions approved by EPA.

Prior to the revocation of the 1-hour ozone standard on June 15, 2005, the Greater Chicago area was classified as a severe nonattainment area for the 1-hour ozone standard with an attainment deadline of November 15, 2007, and, therefore, was subject to ozone SIP requirements for severe 1-hour ozone nonattainment areas (sections 182(a) through 182(d) of the CAA). In reviewing Illinois' ozone redesignation request for the Illinois portion of the Greater Chicago area, we assessed whether the area satisfied the CAA requirements under the 1-hour ozone standard. We conclude that this area and the State of Illinois have satisfied all anti-backsliding CAA requirements applicable to a severe ozone nonattainment area by complying with all applicable 1-hour ozone SIP requirements. The following discusses how the applicable CAA requirements have been met in the Illinois portion of the Greater Chicago area.

**40 CFR 51.900(f)(1) RACT**

Section 182(a)(2)(A) of the CAA requires RACT corrections. Section 182(b)(2) requires RACT for each category of VOC sources covered by a CTG and for all other major sources of VOC within an ozone nonattainment area. Section 182(d) specifies requirements for severe ozone nonattainment areas, including a major source emissions cut-off of 25 tons per year. Section 182(f), as discussed above in section V.B.2, requires major sources of $NO_X$ in an ozone nonattainment area to be covered by emission control requirements equivalent to those required for major sources of VOC, unless EPA waives the $NO_X$ emission control requirements as provided in section 182(f). The section 182(f) $NO_X$ emission control requirements include $NO_X$ RACT in ozone nonattainment areas required to implement VOC RACT for 1-hour ozone nonattainment areas classified as moderate or above.

Under the 1-hour ozone standard, EPA fully approved Illinois' VOC RACT regulations as SIP revisions for CTG sources and for major non-CTG sources through rulemakings on the following dates: February 21, 1980 (45 FR 11472); November 21, 1987 (52 FR 45333); and, September 9, 1994 (59 FR 46562). As noted elsewhere in this proposed rule, on September 16, 2011, Illinois EPA submitted final, adopted VOC emission control regulations covering CTG-source categories not yet addressed and covered by the Illinois ozone SIP. As noted above, on July 29, 2010, Illinois submitted a $NO_X$ RACT waiver request for the Illinois portion of the Chicago area. On February 22, 2011, at 76 FR 9655, we approved Illinois' $NO_X$ RACT waiver request for this area based on an ozone clean air determination. This suspended the $NO_X$ RACT requirement for the Illinois portion of the Greater Chicago area for as long the Greater Chicago area continues to attain the 1997 8-hour ozone standard, and becomes permanent for the 1997 8-hour ozone standard if EPA approves the redesignation of the Illinois portion of the Greater Chicago area to attainment of this standard.

As noted elsewhere in this proposed rule, we cannot approve Illinois' ozone redesignation request in a final rule until we can also approve all of Illinois' required VOC RACT rules through a final rule. With these new final rule approvals, we can conclude that Illinois has met all RACT requirements under the 1-hour ozone standard, as well as the 1997 8-hour ozone standard.

**40 CFR 51.900(f)(2) Vehicle I/M**

Through rulemaking on February 22, 1999 (64 FR 8517), EPA fully approved Illinois' vehicle I/M program as meeting the enhanced I/M requirements of section 182(c)(3) of the CAA. Therefore, the Illinois portion of the Greater Chicago area meets the I/M requirements for severe 1-hour ozone nonattainment areas.

**40 CFR 51.900(f)(3) Major Source Size Cutoff for RACT**

We have determined that Illinois' VOC RACT rules for CTG source categories already incorporated into Illinois' ozone SIP and the new CTG-based VOC RACT rules currently being reviewed by the EPA cover source size cut-offs that are well below CTG-recommended major source cut-offs for severe ozone nonattainment areas. In addition, Illinois' major non-CTG source RACT rule covers all sources with the potential to emit VOC at or in excess of 25 tons per year. Therefore, Illinois' RACT rules meet the major source size cut-off requirement of section 182(d) of the CAA.

**40 CFR 51.900(f)(4) ROP**

Sections 182(b)(1)(A) and 182(c)(2)(B) of the CAA establish the ROP requirements for ozone nonattainment areas. EPA has fully approved Illinois' SIP revisions that demonstrate that Illinois achieved ROP in the Illinois portion of the Greater Chicago area. On December 18, 1997, at 62 FR 66279, EPA approved Illinois' plan to achieve a 15 percent reduction in VOC emissions in the Illinois portion of the Greater Chicago area, as required in section 182(b) of the CAA. On December 18, 2000, at 65 FR 78961, EPA approved Illinois' plan to achieve ROP between 1996 and 1999 in this area, meeting the ROP requirements of section 182(c) of the CAA. Finally, on November 13, 2001, at 66 FR 56904, EPA approved Illinois' plan to achieve ROP emission reductions for the period of 1999 through 2007. Therefore, Illinois has met all 1-hour ozone ROP requirements for the Illinois portion of the Greater Chicago area.

**40 CFR 51.900(f)(5) Stage II Gasoline Vapor Recovery**

On January 12, 1993 (58 FR 3841), EPA approved Illinois' Stage II gasoline vapor recovery rules for the Illinois portion of the Greater Chicago area as required by section 182(b)(3) of the CAA.

**40 CFR 51.900(f)(6) Clean Fuel Fleet Program**

On March 19, 1996, at 61 FR 11139, EPA approved Illinois' clean fuel fleet program rules as required by section 182(c)(4) of the CAA. Therefore, the State of Illinois has met this CAA requirement under the 1-hour ozone standard.

**40 CFR 51.900(f)(7) Clean Fuels for Boilers**

Section 182(e)(3) of the CAA, which requires clean fuels for boilers, does not apply to the Greater Chicago area. This CAA requirement only applies to extreme ozone nonattainment areas.

**40 CFR 51.900(f)(8) Traffic Control Measures During Heavy Traffic Hours**

This requirement applies to areas subject to section 182(e)(4) of the CAA, which covers extreme ozone nonattainment areas, and, therefore, does not apply to the Greater Chicago area.

**40 CFR 51.900(f)(9) Enhanced Ambient Monitoring**

On February 25, 1994, EPA fully approved Illinois' SIP revision establishing an enhanced monitoring program for ozone in the Illinois portion of the Greater Chicago area. Therefore, Illinois has complied with the enhanced monitoring requirement of section 182(c)(1) of the CAA.

**40 CFR 51.900(f)(10) Transportation Control Measures**

Within six months of November 15, 1990, and every three years thereafter, section 182(c)(5) of the CAA requires states to submit a demonstration that current aggregate vehicle mileage, aggregate vehicle emissions, congestion levels, and other relevant traffic-related and vehicle emissions-related factors (collectively "relevant parameters") are consistent with those used for the area's ozone attainment demonstration for serious and above 1-hour ozone nonattainment areas. If the levels of relevant parameters that are projected in the attainment demonstration are exceeded, a state has 18 months to develop and submit a revision to the SIP to include TCMs to reduce mobile source emissions to levels consistent with the emission levels in the attainment demonstration.

On December 26, 2000, Illinois submitted a SIP revision request consisting of an adopted emissions control strategy and a demonstration that the Greater Chicago area would attain the 1-hour ozone standard by November 15, 2007, the statutory attainment deadline for the area. EPA

approved this requested SIP revision on November 13, 2001 (66 FR 56904). This SIP revision provided base period mobile source information for the Chicago area that can be compared to subsequent mobile source information needed to demonstrate compliance with section 182(c)(5) of the CAA. Through revisions to State's emissions inventory data, submitted to EPA every three years, Illinois has updated the mobile source emissions, and related mobile source data, in the Illinois portion of the Greater Chicago area on a three-year cycle. These updated mobile source emissions can be compared to those documented in the December 26, 2000 Illinois submittal to show the downward trend in mobile source emissions. EPA, therefore, concludes that Illinois has complied with the requirements of section 182(c)(5), has no currently due section 182(c)(5) obligations.

In addition, the section 182(c)(5) requirements are also included in those measures subject to EPA's interpretation under EPA's May 10, 1995, Clean Data Policy memorandum. That is, attainment of the 1-hour ozone standard suspends the need for the State to submit additional TCMs under section 182(c)(5) of the CAA. EPA, therefore, concludes that, since the Greater Chicago area is attaining the 1-hour ozone standard,[9] any requirement for submitting the section 182(c)(5) measures for the Illinois portion of the Greater Chicago area is suspended. See also 40 CFR 51.918.

**40 CFR 51.900(f)(11) Vehicle Miles Travelled**

Section 182(d)(1)(A) of the CAA requires severe ozone nonattainment areas to offset the growth in emissions attributed to growth in VMT; to select and implement TCMs necessary to comply with the periodic emission reduction requirements of sections 182(b) and (c); and, to consider TCMs specified in section 108(f) of the CAA, and implement TCMs as necessary to demonstrate attainment with the ozone standard. Through rulemaking on September 21, 1995, at 60 FR 48896, EPA approved Illinois' TCMs as meeting these requirements of the CAA.

**40 CFR 51.900(f)(12) $NO_X$ Requirements Under Section 182(f)**

As noted above, EPA approved a $NO_X$ emissions control waiver for the Illinois portion of the Greater Chicago area for the 1-hour ozone standard. See 61 FR 2428, January 26, 1996. In addition, we have approved Illinois' $NO_X$ emission control regulations, adopted in response to EPA's $NO_X$ SIP call. See 66 FR 56449 and 66 FR 56454, both published on November 8, 2001.

**40 CFR 51.900(f)(13) Ozone Attainment Demonstration**

As noted above, on November 13, 2001, at 66 FR 56904, EPA fully approved Illinois' 1-hour ozone attainment demonstration SIP revision for the Greater Chicago area. Therefore, Illinois has met the ozone attainment demonstration requirements of sections 182(b)(1)(A) and 182(c)(2)(A) of the CAA for the 1-hour ozone standard.

**New Source Review**

As noted elsewhere in this proposed rule, EPA believes that a part D NSR program is not an applicable requirement for purposes of evaluating an ozone redesignation request. EPA has determined that states with areas being redesignated to attainment need not have an approved part D NSR program, provided that the states demonstrate maintenance of the standard without part D NSR programs in effect.

Nonetheless, as also discussed above, the Court's decision in *South Coast Air Management Dist.* v. *EPA* preserved 1-hour part D NSR requirements as an anti-backsliding requirement. Section 182(a)(2)(C) of the CAA requires states to adopt part D NSR permit programs and to correct the existing part D NSR permit programs to meet EPA NSR guidance issued prior to 1990. EPA approved Illinois' NSR permit program as meeting EPA's guidance and CAA part D NSR requirements for the 1-hour ozone standard, including the requirements in sections 182(c)(6), (c)(7) and (c)(8), and the source offset requirements in section 182(d)(2), through rulemakings on September 27, 1995 (60 FR 49778).

Regardless of how one views the part D NSR requirements of the CAA for purposes of redesignation, we concluded that Illinois has met the NSR requirements with regard to Illinois' ozone redesignation request. The State has an approved NSR program, and the approval status of this NSR program is not relevant to Illinois' ozone redesignation request.

**Section 185 Source Emission Penalty Fees**

On December 30, 2008 (73 FR 79652), EPA finalized a determination that the Greater Chicago area had attained the 1-hour ozone standard based on 2005–2007 ozone data. Based on the determination of attainment, the section 185 fee requirements no longer apply to the Illinois portion of the Greater Chicago area and to the State of Illinois.

**Contingency Measures**

Sections 172(c)(9) and 182(c)(9) of the CAA require the ozone control portion of SIPs to contain measures to be implemented in the event that any milestone (standard attainment date, rate-of-progress emission reduction milestone dates, etc.) in the SIP is missed. EPA approved Illinois' contingency measures for attainment of the 1-hour ozone standard in the Greater Chicago area in our approval of the State's 1-hour ozone attainment plan. See 66 FR 56904, November 13, 2001.

**Transportation Conformity**

The transportation conformity portion of the court's ruling in *South Coast Air Quality Management District* v. *EPA* does not impact the redesignation request for the Illinois portion of the Greater Chicago area because there are no transportation conformity requirements that are relevant to redesignation requests for any standard, including the requirement for a state to submit a transportation conformity SIP.[10] Under longstanding EPA policy, EPA thinks that it is reasonable to interpret the conformity SIP requirements as not applying for purposes of evaluating a redesignation request under section 107(d) because State conformity rules are still required after redesignation and Federal conformity rules apply where state rules have not been approved. See 40 CFR 51.390. Also see *Wall* v. *EPA*, 265 F.3d 426 (6th Cir. 2001), upholding this interpretation, and 60 FR 62748 (December 7, 1995) (Tampa, Florida ozone redesignation).

**Conclusions**

For the above reasons, EPA concludes that Illinois has met all applicable part D SIP requirements for the 1-hour ozone standard as addressed in the court's and EPA's anti-backsliding requirements for the purposes of redesignation of the Illinois portion of the Greater Chicago area to attainment of the 1997 8-hour ozone standard. It is again noted that the State of Illinois has committed in its maintenance plan to maintain the VOC and $NO_X$ emission controls already in place and included in Illinois' ozone SIP, as approved by EPA.

[9] See 73 FR 79652 (December 30, 2008).

[10] CAA section 176(c)(4)(E) requires states to submit revisions to their SIPs to reflect certain Federal criteria and procedures for determining transportation conformity. Transportation conformity SIPs are different from MVEBs that are established in control strategy SIPs and maintenance plans.

*C. Are the air quality improvements in the Greater Chicago area due to permanent and enforceable emission reductions?*

EPA finds that Illinois has demonstrated that the observed air quality improvement in the Greater Chicago area is due to permanent and enforceable reductions in emissions resulting from the implementation of the Illinois and Indiana SIPs, Federal measures, and other State-adopted measures. As discussed below, Illinois made this demonstration by considering VOC and $NO_X$ emissions in the entire Greater Chicago area as well as emission reductions in upwind areas (primarily resulting from the implementation of EPA's $NO_X$ SIP call) contributing to pollution transport into the Greater Chicago area.

In making this demonstration, Illinois first determined and documented the changes in VOC and $NO_X$ emissions in the Illinois portion of the Greater Chicago area between 2002 (a standard-violation year) and 2008 (an attainment year). Second, the State documented the VOC and $NO_X$ emission controls that have been implemented in the Greater Chicago area. Illinois demonstrated that the reductions in emissions and the corresponding improvement in air quality over the intervening period (2002–2008) can be attributed to a number of regulatory control measures that the Greater Chicago area and upwind areas have implemented in recent years.

1. Permanent and Enforceable Controls Implemented

The following is a discussion of the permanent and enforceable emission control measures that have been implemented in the Greater Chicago area and in upwind areas that have resulted in VOC and $NO_X$ emission reductions subsequent to the ozone standard violation period (2001–2003) in the Greater Chicago area.

a. Attainment Demonstration Emission Control Measures

On March 18, 2009, IEPA submitted an ozone attainment demonstration plan for the Greater Chicago area to EPA. Even though EPA has not taken action on this attainment demonstration as a revision of the Illinois SIP,[11] Illinois notes that the VOC and $NO_X$ emission controls contained in the attainment plan have been implemented, resulting in VOC and $NO_X$ emission reductions that have contributed to attainment of the 1997 8-hour ozone standard in the Greater Chicago area. The implemented emission control measures include the following:

- $NO_X$ SIP call emission controls
- New Source Performance Standards (NSPS), National Emission Standards for Hazardous Air Pollutants (NESHAPS), and Maximum Available Control Technology (MACT) standards for new sources
- VOC Solvent Category Emission Controls: Aerosol Coatings; Architectural and Industrial Maintenance (AIM) Coatings; and Consumer Solvents
- Enhanced Vehicle Inspection and Maintenance
- Reformulated Gasoline
- Federal Tier 2 Motor Vehicle Emission Standards and Gasoline Sulfur Control Requirements
- Federal On-Highway Heavy-Duty Engine and Vehicle Standards, and Federal Highway Diesel Fuel Sulfur Control Requirements
- Federal Off-Road Mobile Source Emission Control Programs Incorporated into EPA's NONROAD Emissions Model, including EPA's Nonroad Diesel Emissions Control Rule and Evaporative Large Spark Ignition and Recreational Vehicle Standards
- Federal Tier 4 Nonroad Diesel Engine Standards and Diesel Fuel Sulfur Content Restrictions
- Marine Compression-Ignition Engine Standards and Locomotive Engine Standards
- Consent Decrees requiring emission controls for: Dynergy Midwest Generation; Conoco Phillips; CITGO; Exxon-Mobil; Marathon Ashland; and Archer Daniels Midland.

All of these emission controls are permanent and are currently being enforced by the State or by the Federal government.

b. Reasonable Further Progress (RFP)

Since the Greater Chicago area was classified as a moderate nonattainment area for the 1997 8-hour ozone standard, Illinois was required to achieve a 15 percent net reduction in VOC emissions in the Illinois portion of the Greater Chicago area between 2002 and 2008 to meet the RFP requirements of CAA section 182(b)(1)(A). These emission reductions were primarily achieved through the implementation of the emission controls listed above for the ozone attainment demonstration plan. These emission controls resulted in a 15.7 percent reduction in VOC emissions in the Illinois portion of the Greater Chicago area between 2002 and 2008, and continued to provide additional VOC emission controls in 2009 and 2010. IEPA estimates that these VOC emission controls resulted in a VOC emission reduction of 210 tons per day between 2002 and 2008 in the Illinois portion of the Greater Chicago area.

c. Reasonably Available Control Technology

RACT is required for all major stationary sources of VOC in the Greater Chicago area. Since the Greater Chicago area was designated as a moderate nonattainment area for ozone under the 1997 8-hour ozone standard, a major stationary source is any source that has a potential to emit VOC equal to or greater than 100 tons per year. EPA defines RACT as the lowest emission limitation that a source is capable of meeting by the application of control technology that is reasonably available considering technological feasibility and economic reasonableness (70 FR 71612, November 29, 2005). The sum of emissions from all emission units at a source facility determines if the source facility is a major source and, therefore, subject to RACT requirements.

Sections 172 and 182(b)(2) of the CAA required implementation of VOC RACT for sources that are subject to CTGs that have been published by the EPA. In addition to CTG source categories, major VOC sources that are not covered by any CTG must also be covered by State RACT regulations.

Illinois has adopted and implemented all required VOC RACT regulations with the exception of source categories covered by CTGs published in 2006, 2007, and 2008. The State has documented that the implemented VOC RACT rules have reduced VOC emissions in the Illinois portion of the Greater Chicago area, contributing to the attainment of the 1997 8-hour ozone standard in the Greater Chicago area.

d. Additional Emission Control Measures

In addition to VOC emission reductions resulting from the implementation of VOC RACT in the Illinois portion of the Greater Chicago area, IEPA points out that additional VOC emission reductions were achieved in this area as the result of the implementation of MACT and achieving NESHAPS for VOC sources that also emit toxic chemicals, and implementation of NSPS for new VOC sources. Illinois believes that all of these emission control requirements are more stringent than RACT, and, therefore, have resulted in additional VOC

[11] Since EPA has determined that the Greater Chicago nonattainment area has attained the 1997 8-hour ozone standard (March 12, 2010, 75 FR 12088), EPA concludes that it is not necessary for it to take action on Illinois' ozone attainment demonstration.

reductions in the Illinois portion of the Greater Chicago area.[12]

e. Federal Emission Control Measures

Reductions in VOC and $NO_X$ emissions have occurred statewide and in upwind areas as a result of Federal emission control measures, with additional emission reductions expected to occur in the future. Federal emission control measures include the following.

*Tier 2 Emission Standards for Vehicles and Gasoline Sulfur Standards.* 40 CFR part 86, subpart S. These emission control requirements result in lower VOC and $NO_X$ emissions from new cars and light duty trucks, including sport utility vehicles. The Federal rules were phased in between 2004 and 2009. EPA has estimated that, by the end of the phase-in period, the following vehicle $NO_X$ emission reductions will occur nationwide: Passenger cars (light duty vehicles) (77 percent); light duty trucks, minivans, and sports utility vehicles (86 percent); and larger sports utility vehicles, vans, and heavier trucks (69 to 95 percent). VOC emission reductions are expected to range from 12 to 18 percent, depending on vehicle class, over the same period. Although some of these emission reductions occurred by the attainment years (2006–2008) in the Greater Chicago area, additional emission reductions will occur during the maintenance period for the Illinois portion of the Greater Chicago area. For example, the Tier 2 emission standards for passenger vehicles weighing over 8,500 pounds were not implemented until 2008 or later.

*Heavy-Duty Diesel Engine Rule.* EPA issued this rule in January 2001 (66 FR 5002). This rule includes standards limiting the sulfur content of diesel fuel, which went into effect in 2004. A second phase took effect in 2007, which further reduced the highway diesel fuel sulfur content to 15 parts per million, leading to additional reductions in combustion $NO_X$ and VOC emissions. This rule is expected to achieve a 95 percent reduction in $NO_X$ emissions from diesel trucks and buses.

*Non-Road Diesel Rule.* EPA issued this rule in June 2004 (69 FR 38958), which applies to diesel engines used in industries, such as construction, agriculture, and mining. It is estimated that compliance with this rule will cut $NO_X$ emissions from non-road diesel engines by up to 90 percent. The non-road diesel rule was fully implemented by 2010.

*NSPS, NESHAPS, and MACT.* A broad range of emission sectors are subject to Federal NSPS, NESHAPS, and MACT standards with compliance deadlines that led to VOC emission reductions after 2002 and prior to 2008/2009.

f. Controls To Remain in Effect

Illinois commits to maintain all of the current emission control measures for VOC and $NO_X$ after the Illinois portion of the Greater Chicago area is redesignated to attainment. Illinois also commits to submit any emission control revisions needed for maintenance of the ozone standard in the Greater Chicago area to the EPA as requested SIP revisions. Illinois has the legal authority and necessary resources to actively enforce against any violations of the State's air pollution emission control rules.

2. Emission Reductions

Illinois chose 2008 (the end of the 3-year period in which the Greater Chicago area first attained the 1997 8-hour ozone standard) as the attainment year. IEPA compared 2002 and 2008 VOC and $NO_X$ emissions to show that emission reductions have occurred in the area, explaining the ozone air quality improvement in the area.

As required by sections 172(c)(3) and 182(a)(1) of the CAA and EPA's Phase 2 ozone implementation rule (November 29, 2005, at 70 FR 71612), IEPA prepared comprehensive VOC and $NO_X$ emission inventories for 2002. These emission inventories and their documentation were submitted to the EPA in June 2006. Table 2 summarizes the 2002 VOC and $NO_X$ emissions by source category and by pollutant for the Illinois portion of the Greater Chicago area. For a discussion of emission inventory preparation methods used to develop these emission inventories, see the discussion of 2002 base year emission inventories below in section VII of this proposed rule.

TABLE 2—TOTAL ANTHROPOGENIC VOC AND $NO_X$ EMISSIONS IN THE ILLINOIS PORTION OF THE GREATER CHICAGO AREA IN 2002

[Tons per ozone season weekday]

| Source category | VOC | $NO_X$ |
|---|---|---|
| Point Sources | 76.62 | 307.73 |
| Area Sources | 520.21 | 42.93 |
| On-Road Mobile Sources | 168.06 | 540.13 |
| Off-Road Mobile Sources | 233.77 | 326.65 |
| Total | 998.66 | 1217.44 |

To demonstrate that VOC and $NO_X$ emissions have decreased between a standard violation year and the attainment year, IEPA documented the VOC and $NO_X$ emissions in the Illinois portion of the Greater Chicago area for 2008 and compared these emissions to those in 2002.

For the attainment year, point source emissions were compiled from 2008 annual emission reports submitted to the IEPA, in compliance with the State's point source emission statement reporting regulations, and from EPA's Clean Air Markets Division emissions database for electric utilities. Area sources were projected from the 2002 area source emissions using source type-specific growth factors. On-road mobile source emissions were calculated using EPA's MOVES emissions model and vehicle miles travelled data provided by the Illinois Department of Transportation. Off-road emissions were calculated using EPA's NONROAD emissions model. These emission estimation procedures are consistent with those used to develop the 2002 emission inventories. Biogenic emissions were not included in the 2008 emission inventories (and also not in the 2002 emission inventories) because it was assumed that these emissions are

[12] It should be noted that Illinois' VOC RACT rules generally exclude sources subject to MACT, NSPS, and NESHAPS from VOC RACT rules' emission reduction requirements. Nonetheless, we agree that additional emission reduction requirements have further lowered VOC emissions in the subject area.

approximately constant over the time period (2002–2008) considered.

Table 3 summarizes the 2008 VOC and $NO_X$ emissions in the Illinois portion of the Greater Chicago area. From this table and table 2, it can be seen that VOC and $NO_X$ emissions have decreased significantly in the Illinois portion of the Greater Chicago area between 2002 and 2008. IEPA concludes that the decrease in VOC and $NO_X$ emissions during the 2002–2008 period are primarily due to the implementation of permanent and enforceable emission controls, and are the primary cause (along with emission reductions in the Indiana portion of the Greater Chicago area) of the ozone air quality improvement in the Greater Chicago area. We concur with the State's conclusion.

TABLE 3—TOTAL ANTHROPOGENIC VOC AND $NO_X$ EMISSIONS IN THE ILLINOIS PORTION OF THE GREATER CHICAGO AREA IN 2008

[Tons per ozone season weekday]

| Source category | VOC | $NO_X$ |
|---|---|---|
| Point Sources ... | 53.27 | 154.50 |
| Area Sources .... | 351.51 | 38.56 |
| On-Road Mobile Sources ......... | 117.23 | 373.52 |
| Off-Road Mobile Sources ......... | 265.44 | 330.18 |
| Total ........... | 787.45 | 896.76 |

One must also consider the total VOC and $NO_X$ emissions for the Greater Chicago area. EPA has consistently concluded that emissions from all portions of ozone nonattainment areas have the potential to contribute to ozone standard violations anywhere within the ozone nonattainment areas. Therefore, for the Greater Chicago area, it is important to also consider the changes in VOC and $NO_X$ emissions from the Indiana portion of the Greater Chicago area. In a March 12, 2010, proposed rulemaking (75 FR 12090) addressing an ozone redesignation request from the State of Indiana, we discussed the 2002, 2006, and 2010 VOC and $NO_X$ emissions for Lake and Porter Counties, Indiana. Table 2 of that proposed rule (75 FR 12103) lists 2002 VOC and $NO_X$ emissions for Lake and Porter Counties, and table 7 of that proposed rulemaking (75 FR 12106) lists 2006 and 2010 VOC and $NO_X$ emissions for these counties. The 2006 and 2010 emissions may be interpolated to estimate the 2008 emissions for Lake and Porter Counties. Adding 2002 and estimated 2008 Lake and Porter Counties' emissions to those in tables 2 and 3 for the Illinois portion of the Greater Chicago area above gives the total 2002 and 2008 VOC and $NO_X$ emissions for the Greater Chicago area. The total 2002 and 2008 VOC and $NO_X$ emissions for the Greater Chicago area are listed in table 4 of this proposed rule. The change in emissions between 2002 and 2008 emissions for the Greater Chicago area shows that VOC and $NO_X$ emissions have significantly decreased in this area between 2002 and 2008. We conclude that these emission reductions have contributed to attainment of the ozone standard in this area.

TABLE 4—2002 AND 2008 VOC AND $NO_X$ EMISSIONS TOTALS IN THE GREATER CHICAGO AREA

[Tons per ozone season/summer weekday]

| Source category | VOC 2002 | VOC 2008 |
|---|---|---|
| Point Sources ... | 101.18 | 71.87 |
| Area Sources .... | 555.30 | 382.15 |
| On-Road Mobile Sources ......... | 188.06 | 129.65 |
| Off-Road Mobile Sources ......... | 268.86 | 281.06 |
| Total VOC .. | 1113.4 | 864.7 |
| | $NO_X$ 2002 | $NO_X$ 2008 |
| Point Sources ... | 494.17 | 272.82 |
| Area Sources .... | 48.65 | 45.08 |
| On-Road Mobile Sources ......... | 595.13 | 422.89 |
| Off-Road Mobile Sources ......... | 365.26 | 360.02 |
| Total $NO_X$ .. | 1503.2 | 1100.8 |

Besides the 2002–2008 reductions in VOC and $NO_X$ emissions in the Illinois and Indiana portions of the Greater Chicago area, IEPA also notes that upwind areas have lowered their VOC and $NO_X$ emissions during this period. Illinois, however, has not documented these emission reductions in the redesignation request.

*D. Does Illinois have a fully approvable ozone maintenance plan?*

1. Maintenance Plan Requirements

Section 175A of the CAA sets forth the required elements of a maintenance plan for areas seeking redesignation from nonattainment to attainment. Under section 175A, the maintenance plan must demonstrate continued attainment of the applicable NAAQS for at least 10 years after the Administrator approves a redesignation to attainment. Eight years after the redesignation, the state must submit a revised maintenance plan which demonstrates that attainment of the NAAQS will continue to be maintained for 10 years following the initial 10-year maintenance period. To address the possibility of future NAAQS violations, the maintenance plan must contain contingency measures with a schedule for implementation, as EPA deems necessary, to assure prompt correction of any future standard violations.

The September 4, 1992, John Calcagni memorandum provides additional guidance on the content of maintenance plans. The memorandum clarifies that an ozone maintenance plan should, at minimum, address the following: (1) The attainment VOC and $NO_X$ emission inventories; (2) a maintenance demonstration showing maintenance for the 10-year maintenance period; (3) a commitment to maintain the existing monitoring network; (4) factors and procedures to be used for verification of continued attainment of the NAAQS; and, (5) a contingency plan to prevent or correct future violations of the NAAQS.

2. Attainment Inventory

As noted above, 2008 is the final year of the 3-year period (2006–2008) in which all ozone monitors in the Greater Chicago nonattainment area recorded attainment of the 1997 8-hour ozone standard. Therefore, IEPA chose 2008 as an attainment year. The discussion above describes how Illinois derived the 2008 VOC and $NO_X$ emission inventories for the Illinois portion of the Greater Chicago area.

3. Has the State documented maintenance of the ozone standard in the Illinois portion of the Greater Chicago area?

The maintenance plan, as revised in the State's September 16, 2011, submittal, shows maintenance of the 1997 8-hour ozone standard through 2025 by showing that future (2015, 2020, and 2025) VOC and $NO_X$ emissions for the Illinois portion of the Greater Chicago area remain at or below attainment year (2008) emission levels.[13]

Point source emissions in the Illinois portion of the Greater Chicago area were projected to 2015, 2020, and 2025 using 2002 and 2008 point source emissions and source category-specific growth factors. Area source emissions were similarly projected to 2015, 2020, and 2025 using the 2002 and 2008 area source emissions and source category-specific growth factors. Area source category emissions, determined using county populations, were projected by

[13] A maintenance demonstration need not be based on ozone modeling. See *Wall* v. *EPA*, 375 F.3d 537 (7th Cir. 2004). See also 66 FR 53094, 53099–53100 (October 19, 2001), and 68 FR 25413, 25430–25432 (May 12, 2003).

using projected growth in county-specific populations. Off-road mobile source emissions were projected using the 2002 emissions and growth factors contained in EPA's NONROAD model. On-road mobile source emissions were estimated using projected VMT levels and the MOVES model. The projected mobile source emissions assumed the continued use of reformulated gasoline, the phase-in of Tier 2 motor vehicle emission standards, and the operation of an enhanced vehicle inspection and maintenance program in the Illinois portion of the Greater Chicago area.

Table 5 compares the VOC and $NO_X$ emissions estimated for the Illinois portion of the Greater Chicago area for 2008 with those for 2015, 2020, and 2025 by source category. The projected VOC and $NO_X$ emissions show that VOC and $NO_X$ emissions in Illinois portion of the Greater Chicago area are expected to remain below the attainment levels throughout the 10-year-plus maintenance period.

TABLE 5—2008 AND PROJECTED VOC AND $NO_X$ EMISSIONS IN THE ILLINOIS PORTION OF THE GREATER CHICAGO AREA

[Tons per ozone season weekday]

| Source Category | VOC 2008 | VOC 2015 | VOC 2020 | VOC 2025 |
|---|---|---|---|---|
| Point Sources | 53.27 | 62.02 | 67.63 | 72.79 |
| Area Sources | 351.51 | 363.86 | 385.73 | 406.96 |
| On-Road Mobile Sources | 117.23 | 50.33 | 37.98 | 41.35 |
| Off-Road Mobile Sources | 265.44 | 90.83 | 84.16 | 90.25 |
| Total | 787.45 | 567.04 | 575.50 | 611.85 |
| | $NO_X$ 2008 | $NO_X$ 2015 | $NO_X$ 2020 | $NO_X$ 2025 |
| Point Sources | 154.50 | 150.06 | 171.13 | 180.13 |
| Area Sources | 38.56 | 39.85 | 40.57 | 41.35 |
| On-Road Mobile Sources | 373.52 | 197.14 | 116.69 | 108.93 |
| Off-Road Mobile Sources | 330.18 | 106.36 | 84.34 | 96.70 |
| Total | 896.76 | 493.41 | 412.73 | 427.11 |

Illinois has successfully demonstrated maintenance of the 1997 8-hour ozone standard between 2008 and 2025. In addition, VOC and $NO_X$ emissions in the Greater Chicago area are projected to decline between 2006 and 2020 (see table 8 in the proposed rule to redesignate Lake and Porter Counties, Indiana to attainment of the 1997 8-hour ozone standard, March 12, 2010, 75 FR 12106).

IEPA has demonstrated maintenance of the 1997 8-hour ozone standard during the 10-year ozone maintenance period for the Illinois portion of the Greater Chicago area through projected VOC and $NO_X$ emissions that show that the emissions will remain below the 2008 attainment levels during the maintenance period.

4. What is the Contingency Plan for the Illinois Portion of the Greater Chicago Area?

Section 175A of the CAA requires the maintenance plan to include such contingency measures as EPA deems necessary to assure that the state will promptly correct a violation of the NAAQS that might occur after redesignation. The maintenance plan must identify the contingency measures to be considered for possible adoption, a schedule and procedure for adoption and implementation of the selected contingency measures, and a time limit for action by the state. The state should also identify specific indicators to be used to determine when the contingency measures need to be adopted and implemented. The maintenance plan must include a requirement that the state will implement all measures with respect to control of pollutant(s) that were controlled through the SIP before the redesignation of the area to attainment. See section 175A(d) of the CAA.

As required by section 175A of the CAA, Illinois has adopted a contingency plan to address possible future ozone air quality problems. The contingency plan has two levels of actions/responses depending on whether a violation of the 1997 8-hour ozone standard is only threatened (Level I) or has actually occurred (Level II).

A Level I response will be triggered whenever: (1) An annual (1-year) fourth-high daily maximum 8-hour ozone concentration of 84 parts per billion (ppb) (0.084 ppm) is monitored at any site in the Greater Chicago area; or, (2) the Illinois portion of the Greater Chicago area's $NO_X$ or VOC emissions increase more than 5 percent above the 2006 emissions levels.[14] A Level I action will consist of a study of whether adverse air quality or adverse emission trends are likely to continue. If so, Illinois will determine what and where emission controls will be needed to avoid a violation of the 1997 8-hour ozone standard. The study will be completed within 9 months after the action is triggered. If necessary, emission control measures will be adopted within 18 months of determination of the Level I triggering and implemented as expeditiously as practicable, taking into consideration the ease of implementation and the technical and economic feasibility of the selected measures.

A Level II response will be triggered when a violation of the 1997 8-hour ozone standard is monitored at any monitoring site in the Greater Chicago area. If triggered, the IEPA will conduct a thorough study to determine the appropriate emission control measures to address the cause of the ozone standard violation. Analysis will be completed within 6 months of the triggering of the Level II response. Selected emission control measures will be implemented within 18 months of the determination of the ozone standard violation.

[14] Illinois commits to compiling VOC and $NO_X$ emission inventories every three years for the duration of the maintenance period to facilitate emission trends analyses. The 2006 emissions levels were derived as part of the three-year cycle of updating emission estimates. Although 2008 is the year used to demonstrate the emission reductions leading to the attainment of the 1997 8-hour ozone standard and as the base year for the demonstration of maintenance of this ozone standard, IEPA chose the 2006 emissions levels as the base year for the Level I contingency emissions growth trigger. 2006 is part of the 2006–2008 period in which the Greater Chicago area first attained the 1997 8-hour ozone standard.

Adoption of any additional emission control measures prompted by either of the contingency triggers will be subject to the necessary administrative and legal processes dictated by State law. This process will include publication of public notices, public hearings, and other measures required by Illinois law.

Contingency measures contained in the maintenance plan are those emission controls or other measures that the State chooses to adopt and implement in response to either of the contingency triggers discussed above. Possible contingency measures contained in Illinois' contingency plan include, but are not limited to, the following:

- Illinois' Multi-Pollutant Program for electric generating units.
- $NO_X$ RACT.
- Cross-State Air Pollution Rule.
- Best Available Retrofit Technology.
- Broader geographic applicability of existing measures.
- Tier 2 vehicle standards and low sulfur fuel.
- High-enhanced vehicle I/M.
- Federal railroad/locomotive standards.
- Federal commercial marine vessel engine standards.
- Portable fuel containers (replacement with low leak containers)
- AIM Coatings
- Commercial and consumer products standards
- Aerosol coatings standards
- Other measures to be identified.

5. Monitoring Network and Verification of Continued Attainment

In the State's ozone redesignation request and maintenance plan, IEPA has committed to continue to monitor ozone levels in the Illinois portion of the Greater Chicago area according to an EPA-approved monitoring plan. Should changes in the locations of ozone monitors become necessary, IEPA commits to work with EPA to ensure the adequacy of the ozone monitoring network in this area. Illinois remains obligated to continue to quality assure ozone monitoring data in accordance with 40 CFR part 58 and to enter all ozone data into EPA's Air Quality System in accordance with Federal guidelines.

Application of Illinois' ozone maintenance plan for the Illinois portion of the Greater Chicago area and continued attainment of the 1997 8-hour ozone standard in the Greater Chicago area depend, in part, on the State's efforts in tracking of ozone monitoring data to verify continued attainment of the ozone standard. IEPA's plan for verifying continued attainment of the 1997 8-hour ozone standard in the Greater Chicago area (Indiana is similarly tracking continued attainment of the standard in this area) consists of plans to continue ambient ozone monitoring in accordance with the requirements of 40 CFR part 58. IEPA will also continue to develop, review, and submit periodic emission inventories as required by the Federal Consolidated Emissions Reporting Rule (67 FR 19602, June 10, 2002) to track future levels of emissions.

## VI. Has the State adopted approvable motor vehicle emission budgets?

Under the CAA, States are required to submit, at various times, SIP revisions, such as ozone attainment demonstrations and RFP plans, and ozone maintenance plans for applicable areas (for ozone nonattainment areas and for areas seeking redesignation to attainment of the ozone standard). These SIP revisions, including ozone maintenance plans, must create and document MVEBs based on on-road mobile source emissions allocated to highway and transit vehicle use that, together with emissions from other sources in the area, will provide for attainment and maintenance of the ozone NAAQS.

Under 40 CFR part 93, a MVEB for an area seeking a redesignation to attainment is established for the last year of the maintenance plan (MVEBs may also be specified for additional years during the maintenance period). The MVEB serves as a ceiling on emissions that would result from an area's planned transportation system. The MVEB concept is further explained in the preamble to the November 24, 1993, transportation conformity rule (58 FR 62188). The preamble describes how to establish the MVEB in the SIP and how to revise the MVEB if needed.

Under section 176(c) of the CAA, new transportation projects, such as the construction of new highways, must "conform" to (i.e., be consistent with) the SIP. Conformity to the SIP means that transportation activities will not cause new air quality violations, worsen existing air quality violations, or delay timely attainment of the NAAQS. CAA section 176(c)(1). If a transportation plan does not conform, most new transportation projects that would expand the capacity of roadways cannot go forward. Regulations at 40 CFR part 93 set forth EPA policy, criteria, and procedures for demonstrating and assuring conformity of such transportation activities to a SIP.

When reviewing SIP revisions containing MVEBs, including attainment strategies, rate-of-progress plans, and maintenance plans, EPA must affirmatively approve or find that the MVEBs are "adequate" for use in determining transportation conformity. Once EPA affirmatively approves or finds the submitted MVEBs to be adequate for transportation conformity purposes, the MVEBs must be used by state and Federal agencies in determining whether proposed transportation projects conform to the SIP as required by section 176(c) of the CAA. EPA's substantive criteria for determining the adequacy of MVEBs are set out in 40 CFR 93.118(e)(4).

EPA's process for determining adequacy of a MVEB consists of three basic steps: (1) Providing public notification of a SIP submission; (2) providing the public the opportunity to comment on the MVEB during a public comment period; and, (3) making a finding of adequacy. The process for determining the adequacy of a submitted MVEB is codified at 40 CFR 93.118.

The ozone maintenance plan submitted by Illinois for the Illinois portion of the Greater Chicago area, as revised in Illinois' September 16, 2011, supplemental submittal, contains new VOC and $NO_X$ MVEBs for the Illinois portion of the Greater Chicago area for 2008 and 2025. The availability of the SIP submission with MVEBs was announced for public comment on EPA's Adequacy Web site on September 26, 2011, at: *http://www.epa.gov/otaq/stateresources/tansconf/currsips.htm*, which provided a 30-day public comment period. The comment period for this notification ended on October 26, 2011, and EPA received no comments from the public. Note, however, that a second mechanism is also provided for EPA review and public comment on MVEBs, as described in 40 CFR 93.118(f)(2). This mechanism provides for EPA's review of the adequacy of an implementation plan MVEB simultaneously with its review and approval and disapproval of the implementation plan itself. In this action, EPA used the web notification discussed above to solicit public comments on the adequacy of Illinois' MVEBs for the Illinois portion of the Greater Chicago area, but is taking comment on the approvability of the submitted MVEBs through this proposed rule.

Illinois' ozone maintenance plan for the Illinois portion of the Greater Chicago area contains VOC and $NO_X$ MVEBs for 2008 and 2025. Any and all comments on the approvability of the MVEBs should be submitted during the comment period stated in the **DATES** section of this notice.

EPA intends to approve 2008 and 2025 MVEBs for the Illinois portion of the Greater Chicago area for transportation conformity purposes in the final rulemaking on Illinois' ozone redesignation request. If EPA approves the MVEBs in the final rulemaking action, the new MVEBs must be used in future transportation conformity determinations for the Illinois portion of the Greater Chicago area. The new MVEBs, if approved in the final rulemaking, will be effective on the date of EPA's final rulemaking in the **Federal Register**. For required regional emission analysis years that involve 2013 (the year after EPA is expected to approve the ozone maintenance plan and Illinois' VOC and $NO_X$ MVEBs) or beyond, the applicable VOC and $NO_X$ MVEBs for the Chicago area are defined in table 6.

TABLE 6—MVEBS FOR THE ILLINOIS PORTION OF THE GREATER CHICAGO AREA

[Tons per ozone season weekday]

| Year | VOC | $NO_X$ |
|---|---|---|
| 2008 | 117.23 | 373.52 |
| 2025 | 48.13 | 125.27 |

The MVEBs are the on-road mobile source VOC and $NO_X$ emissions for the Illinois portion of the Greater Chicago area for 2008 and 2025, including 15 percent safety margins for 2025. The MVEBs are compatible with the 2008 and 2025 on-road mobile source VOC and $NO_X$ emissions included in Illinois' 2008 and 2025 VOC and $NO_X$ emission inventories, as summarized above in table 5. The derivation of the MVEBs is thoroughly discussed in appendix B of IEPA's April 5, 2009, ozone maintenance plan and in Illinois' September 16, 2011, supplement to the ozone maintenance plan.

EPA is proposing to approve the MVEBs for 2008 and 2025 as part of Illinois' 1997 8-hour ozone standard maintenance plan. EPA has determined that the MVEB emission targets are consistent with emission control measures in the SIP and that the Greater Chicago area can maintain attainment of the 1997 8-hour ozone NAAQS.

## VII. 2002 Emissions Inventories

Section 182(a)(1) of the CAA requires States with ozone nonattainment areas to submit a comprehensive, accurate, and current inventory of actual emissions (emissions of VOC and $NO_X$) from all sources in the nonattainment areas, in accordance with guidance provided by the EPA. On June 21, 2006, IEPA submitted 2002 base year emissions inventories for the Illinois portion of the Greater Chicago nonattainment area. Emissions contained in that submittal cover the general source categories of point sources, area sources, on-road mobile sources, and non-road mobile sources. All emission summaries were accompanied by source-specific descriptions of emission calculation procedures and sources of input data.

IEPA prepared the point source emissions using source-reported actual 2002 emissions data for VOC and $NO_X$. The emissions were adjusted for a typical summer day at each emissions unit within the source facilities. The annual emission reports provided ozone season hourly emissions and operating schedules that enabled the calculations of ozone season weekday emissions.

Illinois used several methods to estimate area source activity levels and emissions, including applying local activity levels, apportioning national or statewide activity levels to the local level, and applying per capita emission factors considering county-specific populations. The documentation supplied in the emissions inventory submittal shows how the county-specific emissions were calculated for each area source category.

Non-road mobile source emissions were generated using EPA's NONROAD model. In addition, separate emission estimates were developed for commercial marine vessels, aircraft, and railroads, non-road source categories not included in the NONROAD model.

On-road mobile source emissions contained in the June 21, 2006, submittal were prepared by the IEPA using EPA's MOBILE6 emissions model and daily VMT and speed estimates provided by the Illinois Department of Transportation. Note, however, that the 2002 on-road mobile source emissions documented in the September 16, 2011, submittal were derived using the MOVES mobile source emissions model rather than MOBILE6. MOVES is the currently EPA-accepted model for the determination of on-road mobile source emissions.

Illinois' September 16, 2011, submittal documents 2002 emissions for the Illinois portion of the Greater Chicago area in units of tons per summer day. These emissions were modified relative to those included in the June 21, 2006, submittal, reflecting revised mobile source emissions calculated using MOVES (the mobile source emissions included in the June 21, 2006 submittal were calculated using MOBILE6 mobile source emission factors). The 2002 emissions are summarized in table 2 above in section V.C.

EPA is proposing to approve this 2002 base year emissions inventory, as revised in the September 16, 2011, submittal, as meeting the requirements of section 182(2)(1) of the CAA.

## VIII. Statutory and Executive Order Reviews

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, this action merely approves state law as meeting Federal requirements and does not impose additional requirements beyond those imposed by state law. For that reason, this action:

- Is not a "significant regulatory action" subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);
- Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);
- Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);
- Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);
- Does not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);
- Is not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);
- Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);
- Is not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the Clean Air Act; and
- Does not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this rule does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because the SIP is not approved to apply in Indian country located in the state, and EPA notes that it will not impose substantial direct costs on tribal governments or preempt tribal law.

**List of Subjects**

*40 CFR Part 52*

Environmental protection, Air pollution control, Intergovernmental relations, Nitrogen dioxide, Ozone, Volatile organic compounds.

*40 CFR Part 81*

Environmental protection, Air pollution control, National parks, Wilderness areas.

Dated: January 31, 2012.

**Susan Hedman,**

*Regional Administrator, Region 5.*

[FR Doc. 2012–2991 Filed 2–8–12; 8:45 am]

BILLING CODE 6560–50–P

---

## NATIONAL TRANSPORTATION SAFETY BOARD

### 49 CFR Parts 821 and 826

**[Docket No. NTSB–GC–2011–0001]**

### Rules of Practice in Air Safety Proceedings; Rules Implementing the Equal Access to Justice Act of 1980

**AGENCY:** National Transportation Safety Board (NTSB or Board).

**ACTION:** Notice of proposed rulemaking (NPRM).

**SUMMARY:** The NTSB proposes various amendments to our regulations, which sets forth rules of procedure for the NTSB's review of certificate actions taken by the Federal Aviation Administration (FAA); and rules of procedure concerning applications for fees and expenses under the Equal Access to Justice Act of 1980 (EAJA). The NTSB previously issued an advance notice of proposed rulemaking (ANPRM) and has carefully considered comments submitted in response to the ANPRM concerning these procedural rules. This document contains both a discussion of the comments and explanations for the changes proposed herein.

**DATES:** Send your comments on or before April 9, 2012.

**ADDRESSES:** You may send comments identified by Docket ID Number NTSB–GC–2011–0001 using any of the following methods:

*Federal eRulemaking Portal:* Go to *http://www.regulations.gov* and follow the instructions for sending your comments electronically.

*Mail:* Send comments to NTSB Office of General Counsel, 490 L'Enfant Plaza East, SW., Washington, DC 20594–2003.

*Facsimile:* Fax comments to 202–314–6090.

*Hand Delivery:* Bring comments to 490 L'Enfant Plaza East, SW., 6th Floor, Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

For more information on the rulemaking process, see the **SUPPLEMENTARY INFORMATION** section of this document.

*Privacy:* We will post all comments we receive, without change, to *http://www.regulations.gov*, including any personal information provided.

**FOR FURTHER INFORMATION CONTACT:** David Tochen, General Counsel, (202) 314–6080.

**SUPPLEMENTARY INFORMATION:**

**I. Background—Advance Notice of Proposed Rulemaking**

On December 22, 2010, the NTSB published an ANPRM inviting public comments concerning the NTSB procedural rules codified at 49 CFR parts 821 and 826. 75 FR 80452. The NTSB specifically sought comments concerning the standard of review for emergency determinations, discovery and exchanges of information between parties, and electronic filing of documents in air safety enforcement cases before the Board. The NTSB also sought comments concerning outdated rules in 49 CFR part 826, governing claims brought under the EAJA.

The ANPRM included a discussion of the rationale for the Board's procedure for handling certain aspects of emergency cases. The FAA issues emergency orders when it determines the interests of aviation safety require that the order take effect immediately, and, in those cases, the certificate holder may not exercise certificate privileges during the pendency of an appeal with the NTSB. Section 716 of the Aviation Investment and Reform Act for the 21st Century [1] (hereinafter, "the Act") amended 49 U.S.C. 44709 by granting the NTSB authority to review such emergency determinations. The ANPRM sought comments concerning this review process. Specifically, the NTSB described the considerations, including Federal court rulings and comments received in response to the NTSB's Interim Rule (published on July 11, 2000 (64 FR 42637), initially implementing section 716 of the Act) resulting in the adoption, in the Final Rule (published on April 29, 2003 (68 FR 22623)), of the standard of review found in 49 CFR 821.54(e). Section 821.54(e) directs NTSB's law judges to dispose of petitions for review of the FAA's emergency determinations by "consider[ing] whether, based on the acts and omissions alleged in the Administrator's order, and assuming the truth of such factual allegations, the Administrator's emergency determination was appropriate under the circumstances, in that it supports a finding that aviation safety would likely be compromised by a stay of the effectiveness of the order during the pendency of the respondent's appeal." 75 FR at 80452–80453. The aspect of the standard relating to the law judges' assumption of the truth of the FAA's allegations of fact prompted much feedback from commenters.

The ANPRM also sought comments pertaining to other matters. With regard to discovery and the parties' exchanges of information, the ANPRM requested feedback as to whether law judges should routinely issue prehearing orders to govern discovery, and whether a standard sanction should apply if parties fail to comply with a prehearing order or discovery obligation. *Id.* at 80453. On the subject of the electronic filing of documents, the ANPRM sought comments as to how to fashion electronic filing rules that could apply to *pro se* litigants, who may not have computer or Internet access. Finally, with regard to procedural rules applicable to applications for attorney's fees and expenses under the EAJA, the ANPRM sought general comments concerning updates to outdated provisions in 49 CFR part 826. For example, the ANPRM cited 49 CFR 826.40, which provides incorrect contact information for the FAA office overseeing the payment of fee awards under the EAJA. Id. at 80453–80454. The language of the ANPRM indicated, however, that the Board welcomed all comments relating to the procedural rules found in 49 CFR parts 821 and 826.

**II. Comments Received**

The NTSB received 20 relevant comments in response to the ANPRM, which are available at *http://www.regulations.gov* (Docket No. NTSB–GC–2011–0001). The Board has carefully reviewed and considered all comments it received, and greatly appreciates the time and thought the commenters devoted to providing detailed comments, as the comments

[1] Public Law 106–181, section 716 (2000) (codified at 49 U.S.C. 44709(e)(3)).

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Parts 52 and 81**

**[EPA–R05–OAR–2010–0523; FRL–9610–5]**

## Approval and Promulgation of Implementation Plans and Designation of Areas for Air Quality Planning Purposes; Illinois; Redesignation of the Illinois Portion of the St. Louis, MO-IL Area to Attainment for the 1997 8-Hour Ozone Standard

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** EPA is proposing to approve a request from Illinois to redesignate the Illinois portion of the St. Louis, MO-IL nonattainment area, "the St. Louis area," to attainment for the 1997 8-hour ozone standard because the request meets the statutory requirements for redesignation under the Clean Air Act (CAA). The St. Louis area includes Jersey, Madison, Monroe, and St. Clair Counties in Illinois and St. Louis City and Franklin, Jefferson, St. Charles and St. Louis Counties in Missouri. The Illinois Environmental Protection Agency (IEPA) submitted this request on May 26, 2010 and supplemented it on September 16, 2011. (EPA will address the Missouri portion of the St. Louis area in a separate rulemaking action.) This proposed approval also involves several related actions. EPA is proposing to approve, as a revision to the Illinois State Implementation Plan (SIP), the State's plan for maintaining the 1997 8-hour ozone National Ambient Air Quality Standard (NAAQS) through 2025 in the area. EPA is proposing to approve the 2002 emissions inventory, submitted by IEPA on June 21, 2006, and supplemented on September 16, 2011, as meeting the comprehensive emissions inventory requirement of the CAA for the Illinois portion of the St. Louis area. Finally, EPA finds adequate and is proposing to approve the State's 2008 and 2025 Motor Vehicle Emission Budgets (MVEBs) for the Illinois portion of the St. Louis area.

**DATES:** Comments must be received on or before January 23, 2012.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2010–0523, by one of the following methods:

1. *http://www.regulations.gov:* Follow the on-line instructions for submitting comments.
2. *Email: Aburano.Douglas@epa.gov.*
3. *Fax:* (312) 353–6960.
4. *Mail:* Doug Aburano, Chief, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, Chicago, Illinois 60604.
5. *Hand delivery:* Doug Aburano, Chief, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, 18th floor, Chicago, Illinois 60604. Such deliveries are only accepted during the Regional Office normal hours of operation, and special arrangements should be made for deliveries of boxed information. The Regional Office official hours of business are Monday through Friday, 8:30 a.m. to 4:30 p.m., excluding Federal holidays.

*Instructions:* Direct your comments to Docket ID No. EPA–R05–OAR–2010–0523. EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through *www.regulations.gov* or email. The *www.regulations.gov* Web site is an "anonymous access" system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to EPA without going through *www.regulations.gov,* your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses. For additional instructions on submitting comments, go to section I of this document, "What Should I Consider as I Prepare My Comments for EPA?"

*Docket:* All documents in the docket are listed in the *www.regulations.gov* index. Although listed in the index, some information is not publicly available, *e.g.,* CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *www.regulations.gov* or in hard copy at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. We recommend that you telephone Kathleen D'Agostino, Environmental Engineer, at (312) 886–1767 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:**
Kathleen D'Agostino, Environmental Engineer, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), U.S. Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 886–1767, *dagostino.kathleen@epa.gov.*

**SUPPLEMENTARY INFORMATION:**
Throughout this document whenever "we," "us," or "our" is used, we mean EPA. This supplementary information section is arranged as follows:

### Table of Contents

I. What should I consider as I prepare my comments for EPA?
II. What actions is EPA proposing to take?
III. What is the Background for these actions?
A. What is the general background information?
B. What are the impacts of the December 22, 2006, and June 8, 2007, United States Court of Appeals decisions regarding EPA's Phase 1 Implementation Rule?
1. Summary of Court Decision
2. Requirements Under the 8-Hour Standard
3. Requirements Under the 1-Hour Standard
IV. What are the criteria for redesignation to attainment?
V. What is EPA's analysis of the state's request?
A. Redesignation
1. The Area Has Attained the 8-Hour Ozone NAAQS (Section 107(d)(3)(E)(i))
2. The Area Has Met All Applicable Requirements Under Section 110 and Part D; and the Area Has a Fully Approved SIP under Section 110(k) (Sections 107(d)(3)(E)(v) and 107(d)(3)(E)(ii))
3. The Improvement in Air Quality Is Due to Permanent and Enforceable Reductions in Emissions Resulting From Implementation of the SIP and Applicable Federal Air Pollution Control Regulations and Other Permanent and Enforceable Reductions (Section 107(d)(3)(E)(iii))
4. The Area Has a Fully Approved Maintenance Plan Pursuant to Section

175A of the CAA (Section 107(d)(3)(E)(iv))
B. Adequacy of the MVEBs
C. 2002 Comprehensive Emissions Inventory
VI. Summary of Actions
VII. Statutory and Executive Order Reviews

## I. What should I consider as I prepare my comments for EPA?

When submitting comments, remember to:

1. Identify the rulemaking by docket number and other identifying information (subject heading, **Federal Register** date and page number).
2. Follow directions—EPA may ask you to respond to specific questions or organize comments by referencing a Code of Federal Regulations (CFR) part or section number.
3. Explain why you agree or disagree; suggest alternatives and substitute language for your requested changes.
4. Describe any assumptions and provide any technical information and/or data that you used.
5. If you estimate potential costs or burdens, explain how you arrived at your estimate in sufficient detail to allow for it to be reproduced.
6. Provide specific examples to illustrate your concerns, and suggest alternatives.
7. Explain your views as clearly as possible, avoiding the use of profanity or personal threats.
8. Make sure to submit your comments by the comment period deadline identified.

## II. What actions is EPA proposing to take?

EPA is proposing to determine that the Illinois portion of the St. Louis area has met the requirements for redesignation under section 107(d)(3)(E) of the CAA. EPA is thus proposing to approve the request from IEPA to change the legal designation of the Illinois portion of the St. Louis area from nonattainment to attainment for the 1997 8-hour ozone NAAQS. EPA is also taking several additional actions related to the State's redesignation request, as discussed below.

EPA is proposing to approve, as a revision to the Illinois SIP, the State's maintenance plan (such approval being one of the CAA criteria for redesignation to attainment status). The maintenance plan is designed to keep the St. Louis area in attainment of the ozone NAAQS through 2025.

EPA is proposing to approve the 2002 volatile organic compound (VOC) and nitrogen oxides ($NO_X$) emissions inventories for the Illinois portion of the St. Louis area, documented in IEPA's May 26, 2010, and September 16, 2011 submittals. These emissions inventories satisfy the requirement in section 182(a)(1) of the CAA for a comprehensive emission inventory.

Finally, EPA finds adequate and is proposing to approve the newly-established 2008 and 2025 MVEBs for the Illinois portion of the St. Louis area. The adequacy comment period for the MVEBs began on September 26, 2011, with EPA's posting of the availability of the submittal on EPA's Adequacy Web site (at *http://www.epa.gov/otaq/stateresources/transconf/adequacy.htm*). The adequacy comment period for these MVEBs ended on October 26, 2011. EPA did not receive any requests for this submittal, or comments on this submittal during the adequacy comment period. Please see section V.B. of this rulemaking, "Adequacy of the MVEBs," for further explanation of this process. Therefore, EPA finds adequate, and is proposing to approve, the State's 2008 and 2025 MVEBs for the Illinois portion of the St. Louis area. These MVEBs will be used in future transportation conformity analyses for the area.

## III. What is the background for these actions?

### *A. What is the general background information?*

Ground-level ozone is not emitted directly by sources. Rather, emissions of $NO_X$ and VOCs react in the presence of sunlight to form ground-level ozone. $NO_X$ and VOCs are referred to as precursors of ozone.

The CAA establishes a process for air quality management through the NAAQS. Before promulgation of the 8-hour standard, the ozone NAAQS was based on a 1-hour standard. On November 6, 1991 (56 FR 56693, 56751 and 56813), the St. Louis area was designated as a moderate nonattainment area under the 1-hour ozone NAAQS. Jersey County, Illinois, was not included as part of the St. Louis area, and was designated as a marginal nonattainment area under the 1-hour standard (56 FR 56693 and 56751). The Illinois portion of the St. Louis area was subsequently redesignated to attainment of the 1-hour standard effective May 12, 2003. (See 68 FR 25442, published May 12, 2003.) Jersey County was redesignated to attainment of the 1-hour standard effective April 13, 1995. (See 60 FR 13631, published March 14, 1995.) These attainment designations were thus in effect at the time EPA revoked the 1-hour ozone NAAQS, on June 15, 2005.

On July 18, 1997 (62 FR 38856), EPA promulgated an 8-hour ozone standard of 0.08 parts per million parts (ppm). On April 30, 2004 (69 FR 23857), EPA published a final rule designating and classifying areas under the 8-hour ozone NAAQS. These designations and classifications became effective June 15, 2004. EPA designated as nonattainment any area that was violating the 8-hour ozone NAAQS based on the three most recent years of air quality data, 2001–2003.

The CAA contains two sets of provisions, subpart 1 and subpart 2, that address planning and control requirements for nonattainment areas. (Both are found in title I, part D, of the CAA; 42 U.S.C. 7501–7509a and 7511–7511f, respectively.) Subpart 1 contains general requirements for nonattainment areas for any pollutant, including ozone, governed by a NAAQS. Subpart 2 provides more specific requirements for ozone nonattainment areas.

Under EPA's implementation rule for the 1997 8-hour ozone standard, (69 FR 23951, published April 30, 2004), an area was classified under subpart 2 based on its 8-hour ozone design value (*i.e.* the three-year average annual fourth-highest daily maximum 8-hour average ozone concentration), if it had a 1-hour design value at the time of designation at or above 0.121 ppm (the lowest 1-hour design value in Table 1 of subpart 2) (69 FR 23954). All other areas were covered under subpart 1, based upon their 8-hour design values (69 FR 23958). The St. Louis area was designated as a subpart 2, 8-hour ozone moderate nonattainment area by EPA on April 30, 2004 (69 FR 23857, 23898, and 23915), based on air quality monitoring data from 2001–2003 (69 FR 23860).

40 CFR 50.10 and 40 CFR part 50, appendix I provide that the 8-hour ozone standard is attained when the three-year average of the annual fourth-highest daily maximum 8-hour average ozone concentration is less than or equal to 0.08 ppm, when rounded. The data completeness requirement is met when the average percent of days with valid ambient monitoring data is greater than 90%, and no single year has less than 75% data completeness. See 40 CFR part 50, appendix I, 2.3(d).

IEPA submitted a request to redesignate the Illinois portion of the St. Louis area to attainment for the 8-hour ozone standard on May 26, 2010 and supplemented the request on September 16, 2011. Complete, quality-assured and certified data for 2008–2010 indicate that the 8-hour NAAQS for ozone, as promulgated in 1997, has been attained for the St. Louis area. In addition, available preliminary monitoring data for 2011 continue to show the area in attainment of the standard. Under the CAA, nonattainment areas may be

redesignated to attainment if sufficient complete, quality-assured data are available for the Administrator to determine that the area has attained the standard, and the area meets the other CAA redesignation requirements in section 107(d)(3)(E).

On March 27, 2008 (73 FR 16436), EPA promulgated a revised 8-hour ozone standard of 0.075 ppm. EPA has not yet designated areas under the 2008 standard. The actions addressed in today's proposed rulemaking relate only to the 1997 8-hour ozone standard.

*B. What are the impacts of the December 22, 2006, and June 8, 2007, United States Court of Appeals decisions regarding EPA's Phase 1 Implementation Rule?*

1. Summary of Court Decision

On December 22, 2006, in *South Coast Air Quality Management Dist.* v. *EPA*, the U.S. Court of Appeals for the District of Columbia Circuit vacated EPA's Phase 1 Implementation Rule for the 8-hour Ozone Standard (69 FR 23951, April 30, 2004). 472 F.3d 882 (DC Cir. 2006). On June 8, 2007, in response to several petitions for rehearing, the D.C. Circuit Court (Court) clarified that the Phase 1 Rule was vacated only with regard to those parts of the rule that had been successfully challenged. *Id.*, Docket No. 04 1201. Therefore, several provisions of the Phase 1 Rule remain effective: Provisions related to classifications for areas currently classified under subpart 2 of title I, part D, of the CAA as 8-hour ozone nonattainment areas; the 8-hour ozone attainment dates; and the timing for emissions reductions needed for attainment of the 8-hour ozone NAAQS. The June 8, 2007, decision also left intact the Court's rejection of EPA's reasons for implementing the 8-hour standard in certain nonattainment areas under subpart 1 in lieu of subpart 2. By limiting the vacatur, the Court let stand EPA's revocation of the 1-hour standard and those anti-backsliding provisions of the Phase 1 Rule that had not been successfully challenged.

The June 8, 2007, decision reaffirmed the December 22, 2006, decision that EPA had improperly failed to retain four measures required for 1-hour nonattainment areas under the anti-backsliding provisions of the regulations: (1) Nonattainment area New Source Review (NSR) requirements based on an area's 1-hour nonattainment classification; (2) section 185 penalty fees for 1-hour severe or extreme nonattainment areas; (3) measures to be implemented pursuant to section 172(c)(9) or 182(c)(9) of the CAA, on the contingency of an area not making reasonable further progress toward attainment of the 1-hour NAAQS, or for failure to attain that NAAQS; and (4) certain transportation conformity requirements for certain types of Federal actions. The June 8, 2007, decision clarified that the Court's reference to conformity requirements was limited to requiring the continued use of 1-hour motor vehicle emissions budgets until 8-hour budgets were available for 8-hour conformity determinations.

This section sets forth EPA's views on the potential effect of the Court's rulings on this proposed redesignation action. For the reasons set forth below in sections B.2. and B.3., EPA does not believe that the Court's rulings alter any requirements relevant to this redesignation action so as to preclude redesignation or prevent EPA from proposing or ultimately finalizing this redesignation. EPA concludes that the Court's December 22, 2006, and June 8, 2007, decisions impose no impediment to moving forward with redesignation of this area to attainment, because even in light of the Court's decisions, redesignation is appropriate under the relevant redesignation provisions of the CAA and longstanding policies regarding redesignation requests.

2. Requirements Under the 8-Hour Standard

With respect to the 8-hour standard, the St. Louis area is classified under subpart 2. The June 8, 2007, opinion clarifies that the Court did not vacate the Phase 1 Rule's provisions with respect to classifications for areas under subpart 2. The Court's decision therefore upholds EPA's classifications for those areas classified under subpart 2 for the 1997 8-hour ozone standard.

3. Requirements Under the 1-Hour Standard

With respect to the 1-hour standard requirements, the St. Louis area and Jersey County area were attainment areas subject to a CAA section 175A maintenance plan under the 1-hour standard. The DC Circuit's decisions with respect to 1-hour nonattainment anti-backsliding requirements do not impact redesignation requests for these types of areas, except to the extent that the Court, in its June 8, 2007, decision, clarified that for those areas with 1-hour motor vehicle emissions budgets in their maintenance plans, anti-backsliding requires that those 1-hour budgets must be used for 8-hour conformity determinations until replaced by 8-hour budgets. All conformity determinations must comply with the applicable requirements of EPA's conformity regulations at 40 CFR part 93.

The three other anti-backsliding provisions for the 1-hour standard that the Court found were not properly retained, the nonattainment NSR requirements, contingency measures (pursuant to section 172(c)(9) or 182(c)(9)), and penalty fee provisions, do not apply to the St. Louis area and Jersey County area because these areas are attainment areas subject to a maintenance plan for the 1-hour standard, and have been redesignated to attainment for the 1-hour standard.

Thus, the decision in South Coast Air Quality Management Dist. would not preclude EPA from finalizing the redesignation of the St. Louis area.

**IV. What are the criteria for redesignation to attainment?**

The CAA provides the requirements for redesignating a nonattainment area to attainment. Specifically, section 107(d)(3)(E) allows for redesignation provided that: (1) The Administrator determines that the area has attained the applicable NAAQS; (2) the Administrator has fully approved the applicable implementation plan for the area under section 110(k); (3) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable SIP and applicable Federal air pollutant control regulations and other permanent and enforceable reductions; (4) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 175A; and, (5) the state containing such area has met all requirements applicable to the area under section 110 and part D. Illinois' request for redesignation of the Illinois portion of the St. Louis area is evaluated for each of these requirements in section V.A. below.

EPA provided guidance on redesignation in the General Preamble for the Implementation of Title I of the CAA Amendments of 1990 on April 16, 1992 (57 FR 13498), and supplemented this guidance on April 28, 1992 (57 FR 18070). EPA has provided further guidance on processing redesignation requests in the following documents:

"Ozone and Carbon Monoxide Design Value Calculations," Memorandum from William G. Laxton, Director Technical Support Division, June 18, 1990;

"Maintenance Plans for Redesignation of Ozone and Carbon Monoxide Nonattainment Areas," Memorandum from G.T. Helms,

Chief, Ozone/Carbon Monoxide Programs Branch, April 30, 1992;

"Contingency Measures for Ozone and Carbon Monoxide (CO) Redesignations," Memorandum from G.T. Helms, Chief, Ozone/Carbon Monoxide Programs Branch, June 1, 1992;

"Procedures for Processing Requests to Redesignate Areas to Attainment," Memorandum from John Calcagni, Director, Air Quality Management Division, September 4, 1992;

"State Implementation Plan (SIP) Actions Submitted in Response to Clean Air Act (ACT) Deadlines," Memorandum from John Calcagni, Director, Air Quality Management Division, October 28, 1992;

"Technical Support Documents (TSD's) for Redesignation Ozone and Carbon Monoxide (CO) Nonattainment Areas," Memorandum from G.T. Helms, Chief, Ozone/Carbon Monoxide Programs Branch, August 17, 1993;

"State Implementation Plan (SIP) Requirements for Areas Submitting Requests for Redesignation to Attainment of the Ozone and Carbon Monoxide (CO) National Ambient Air Quality Standards (NAAQS) On or After November 15, 1992," Memorandum from Michael H. Shapiro, Acting Assistant Administrator for Air and Radiation, September 17, 1993;

"Use of Actual Emissions in Maintenance Demonstrations for Ozone and CO Nonattainment Areas," Memorandum from D. Kent Berry, Acting Director, Air Quality Management Division, to Air Division Directors, Regions 1–10, November 30, 1993.

"Part D New Source Review (part D NSR) Requirements for Areas Requesting Redesignation to Attainment," Memorandum from Mary D. Nichols, Assistant Administrator for Air and Radiation, October 14, 1994; and

"Reasonable Further Progress, Attainment Demonstration, and Related Requirements for Ozone Nonattainment Areas Meeting the Ozone National Ambient Air Quality Standard," Memorandum from John S. Seitz, Director, Office of Air Quality Planning and Standards, May 10, 1995.

**V. What is EPA's analysis of the state's request?**

*A. Redesignation*

EPA is proposing to determine that the Illinois portion of the St. Louis area has met all applicable redesignation criteria under CAA section 107(d)(3)(E). The basis for EPA's proposed approval of the redesignation request is as follows:

1. The Area Has Attained the 8-Hour Ozone NAAQS (Section 107(d)(3)(E)(i))

On June 9, 2011 (76 FR 33647) EPA made a determination that the St. Louis area attained the 1997 8-hour ozone NAAQS based on monitoring data for the 2008–2010 time period. An area may be considered to be attaining the 8-hour ozone NAAQS if there are no violations, as determined in accordance with 40 CFR 50.10 and part 50, appendix I, based on three complete, consecutive calendar years of quality-assured air quality monitoring data. To attain this standard, the three-year average of the fourth-highest daily maximum 8-hour average ozone concentration measured at each monitor within an area over each year must not exceed 0.08 ppm. Based on the rounding convention described in 40 CFR part 50, appendix I, the standard is attained if the design value[1] is 0.084 ppm or below. The data must be collected and quality-assured in accordance with 40 CFR part 58, and recorded in the EPA's Air Quality System (AQS). The monitors generally should have remained at the same location for the duration of the monitoring period required for demonstrating attainment.

All 2008–2010 monitoring data have been quality-assured in accordance with 40 CFR 58.10, recorded in the AQS database, and certified. The data meet the completeness criteria in 40 CFR part 50, appendix I, which requires a minimum completeness of 75 percent annually and 90 percent over each three-year period. Monitoring data are presented in Table 1 below. In addition, available preliminary monitoring data for 2011 continue to show the area in attainment of the standard.

TABLE 1—ANNUAL 4TH HIGH DAILY MAXIMUM 8-HOUR OZONE CONCENTRATION AND THREE YEAR AVERAGES OF 4TH HIGH DAILY MAXIMUM 8-HOUR OZONE CONCENTRATIONS

| State | County | Monitor | 2008 4th high (ppm) | 2009 4th high (ppm) | 2010 4th high (ppm) | 2008–2010 average (ppm) |
|---|---|---|---|---|---|---|
| Illinois | Jersey | Jerseyville 17–083–1001. | 0.069 | 0.068 | 0.072 | 0.069 |
| | Madison | Alton 17–119–0008 | 0.068 | 0.067 | 0.080 | 0.071 |
| | | Maryville 17–119–1009 | 0.070 | 0.074 | 0.074 | 0.072 |
| | | Wood River 17–119–3007. | 0.067 | 0.066 | 0.070 | 0.067 |
| | St. Clair | East St. Louis 17–163–0010. | 0.064 | 0.069 | 0.072 | 0.068 |
| Missouri | Jefferson | Arnold 29–099–00019 | 0.070 | 0.070 | 0.077 | 0.072 |
| | St. Charles | Orchard Farm 29–183–1004. | 0.072 | 0.073 | 0.077 | 0.074 |
| | | West Alton 29–183–1002. | 0.076 | 0.071 | 0.084 | 0.077 |
| | St. Louis | Maryland Heights 29–189–0014. | 0.069 | 0.070 | 0.076 | 0.071 |
| | | Pacific 29–189–0005 | 0.064 | 0.064 | 0.069 | 0.065 |
| | St. Louis City | Blair Street 29–510–0085. | 0.073 | 0.065 | 0.071 | 0.069 |

[1] The design value is the highest three-year average of the fourth-highest daily maximum 8-hour average for all monitors within the area.

As discussed in section V.A.4. below with respect to the maintenance plan, IEPA has committed to continue to operate an EPA-approved monitoring network as necessary to demonstrate maintenance of the NAAQS. Should changes in the location of an ozone monitor become necessary, IEPA has committed to work with EPA to ensure the adequacy of the monitoring network. Illinois and Missouri remain obligated to continue to quality assure monitoring data in accordance with 40 CFR part 58 and enter all data into AQS in accordance with Federal guidelines.

2. The Area Has Met All Applicable Requirements Under Section 110 and Part D; and the Area Has a Fully Approved SIP Under Section 110(k) (Sections 107(d)(3)(E)(v) and 107(d)(3)(E)(ii))

We have determined that Illinois has met all currently applicable SIP requirements for purposes of redesignation for the Illinois portion of the St. Louis area under section 110 of the CAA (general SIP requirements). We have also determined that the Illinois SIP meets all SIP requirements currently applicable for purposes of redesignation under part D of title I of the CAA (requirements specific to moderate nonattainment areas), in accordance with section 107(d)(3)(E)(v). In addition, with the exception of the comprehensive emissions inventory and certain VOC reasonably available control technology (RACT) regulations, we have determined that the Illinois SIP is fully approved with respect to all applicable requirements for purposes of redesignation, in accordance with section 107(d)(3)(E)(ii). As discussed below, in this action EPA is proposing to approve IEPA's 2002 emissions inventory as meeting the comprehensive emissions inventory requirement. EPA is taking action on the Illinois VOC RACT regulations in a separate rule.

In proposing these determinations, we have ascertained which SIP requirements are applicable to the Illinois portion of the St. Louis area for purposes of redesignation, and have determined that there are SIP measures meeting those requirements and that these measures have been fully approved or will be fully approved under section 110(k) of the CAA by the time EPA takes final action on the redesignation request. See discussions in sections a. and b. below.

In the context of redesignations, EPA has interpreted requirements related to attainment as not applicable for purposes of redesignation. For example, in the General Preamble EPA stated that:

[t]he section 172(c)(9) requirements are directed at ensuring RFP and attainment by the applicable date. These requirements no longer apply when an area has attained the standard and is eligible for redesignation. Furthermore, section 175A for maintenance plans * * * provides specific requirements for contingency measures that effectively supersede the requirements of section 172(c)(9) for these areas. "General Preamble for the Interpretation of Title I of the Clean Air Act Amendments of 1990," (General Preamble) 57 FR 13498, 13564 (April 16, 1992).

See also the September 4, 1992, Calcagni memorandum ("Procedures for Processing Requests to Redesignate Areas to Attainment," Memorandum from John Calcagni, Director, Air Quality Management Division, September 4, 1992) at 6 ("The requirements for reasonable further progress and other measures needed for attainment will not apply for redesignations because they only have meaning for areas not attaining the standard.").

a. The Illinois Portion of the St. Louis Area Has Met All Applicable Requirements for Purposes of Redesignation Under Section 110 and Part D of the CAA

i. Section 110 General SIP requirements

Section 110(a) of title I of the CAA contains the general requirements for a SIP. Section 110(a)(2) provides that the implementation plan submitted by a state must have been adopted by the state after reasonable public notice and hearing, and that, among other things, it includes enforceable emission limitations and other control measures, means or techniques necessary to meet the requirements of the CAA; provides for establishment and operation of appropriate devices, methods, systems and procedures necessary to monitor ambient air quality; provides for implementation of a source permit program to regulate the modification and construction of any stationary source within the areas covered by the plan; includes provisions for the implementation of part C, Prevention of Significant Deterioration (PSD) and part D, NSR permit programs; includes criteria for stationary source emission control measures, monitoring, and reporting; includes provisions for air quality modeling; and provides for public and local agency participation in planning and emission control rule development.

Section 110(a)(2)(D) of the CAA requires that SIPs contain measures to prevent sources in a state from significantly contributing to air quality problems in another state. To implement this provision, EPA has required certain states to establish programs to address transport of air pollutants ($NO_X$ SIP Call,[2] Clean Air Interstate Rule (CAIR) (70 FR 25162, May 12, 2005), and Cross-State Air Pollution Rule (CSAPR) (75 FR 48208, August 8, 2011), which replaces CAIR). However, the section 110(a)(2)(D) requirements for a state are not linked with a particular nonattainment area's designation and classification. EPA concludes that the requirements linked with a particular nonattainment area's designation and classification are the relevant measures to evaluate in reviewing a redesignation request. The section 110(a)(2)(D) requirements, where applicable, continue to apply to a state regardless of the designation of any one particular area in the state. Thus, we conclude that these requirements should not be construed to be applicable requirements for purposes of redesignation.

Further, we conclude that the other section 110 elements described above that are not connected with nonattainment plan submissions and not linked with an area's attainment status are also not applicable requirements for purposes of redesignation. A state remains subject to these requirements after an area is redesignated to attainment. We conclude that only the section 110 and part D requirements which are linked with a particular area's designation and classification are the relevant measures which we may consider in evaluating a redesignation request. This approach is consistent with EPA's existing policy on applicability of conformity and oxygenated fuels requirements for redesignation purposes, as well as with section 184 ozone transport requirements. See Reading, Pennsylvania, proposed and final rulemakings (61 FR 53174–53176, October 10, 1996), (62 FR 24826, May 7, 1997); Cleveland-Akron-Lorain, Ohio, final rulemaking (61 FR 20458, May 7, 1996); and Tampa, Florida, final rulemaking (60 FR 62748, December 7, 1995). See also the discussion on this issue in the Cincinnati, Ohio 1-hour

[2] On October 27, 1998 (63 FR 57356), EPA issued a $NO_X$ SIP Call requiring the District of Columbia and 22 states to reduce emissions of $NO_X$ in order to reduce the transport of ozone and ozone precursors. In compliance with EPA's $NO_X$ SIP Call, IEPA developed rules governing the control of $NO_X$ emissions from Electric Generating Units (EGUs), major non-EGU industrial boilers, major cement kilns, and internal combustion engines. EPA approved the Illinois rules as fulfilling Phase I of the $NO_X$ SIP Call on June 28, 2001 (66 FR 34382) and November 21, 2001 (66 FR 56454), and as meeting Phase II of the $NO_X$ SIP Call on June 26, 2009 (74 FR 30466).

ozone redesignation (65 FR 37890, June 19, 2000), and in the Pittsburgh, Pennsylvania 1-hour ozone redesignation (66 FR 50399, October 19, 2001).

We have reviewed the Illinois SIP and have concluded that it meets the general SIP requirements under section 110 of the CAA applicable to the State's request for redesignation. EPA has previously approved provisions of the Illinois SIP addressing section 110 elements under the 1-hour ozone standard (40 CFR 52.1870). Further in a submittal dated December 12, 2007, Illinois confirmed that the State continues to meet the section 110(a)(2) infrastructure requirements for the 8-hour ozone standard. EPA approved some elements of this Illinois submittal on July 13, 2011, at 76 FR 41075. The requirements of section 110(a)(2), however, are statewide requirements that are not linked to the 8-hour ozone nonattainment status of the St. Louis area. Therefore, EPA concludes that these infrastructure SIP elements are not applicable requirements for purposes of review of the State's 8-hour ozone redesignation request.

ii. Part D Requirements

EPA has determined that, if EPA finalizes the approval of the 2002 comprehensive emissions inventory, discussed in section V.C. of this rulemaking, and the VOC RACT submittal, discussed below under the heading "Subpart 2 Section 182(a) and (b) Requirements," the Illinois SIP will meet the SIP requirements applicable for purposes of redesignation under part D of the CAA for the Illinois portion of the St. Louis area. Subpart 1 of part D, found in sections 172–176 of the CAA, sets forth the basic nonattainment requirements applicable to all nonattainment areas. Subpart 2 of part D, which includes section 182 of the CAA, establishes additional specific requirements depending on the area's nonattainment classification.

The St. Louis area was classified as a moderate nonattainment area under subpart 2, therefore the state must meet the applicable requirements of both subpart 1 and subpart 2 of part D. The applicable subpart 1 requirements are contained in sections 172(c)(1)–(9) and in section 176. The applicable subpart 2 requirements are contained in sections 182(a) and (b) (marginal and moderate nonattainment area requirements).

*Subpart 1 Section 172 Requirements.*

For purposes of evaluating this redesignation request, the applicable section 172 SIP requirements for the St. Louis area are contained in sections 172(c)(1)–(9). A thorough discussion of the requirements contained in section 172 can be found in the General Preamble for Implementation of Title I (57 FR 13498, April 16, 1992).

Section 172(c)(1) requires the plans for all nonattainment areas to provide for the implementation of all reasonably available control measures as expeditiously as practicable and to provide for attainment of the national primary ambient air quality standards. EPA interprets this requirement to impose a duty on all states containing nonattainment areas to consider all available control measures and to adopt and implement such measures as are reasonably available for implementation in each area as components of the area's attainment demonstration. Because attainment has been reached in the St. Louis area, no additional measures are needed to provide for attainment, and section 172(c)(1) requirements are no longer considered to be applicable as long as the area continues to attain the standard until redesignation. See 40 CFR 51.918.

The reasonable further progress (RFP) requirement under section 172(c)(2) is defined as progress that must be made toward attainment. This requirement is not relevant for purposes of redesignation because the St. Louis area has monitored attainment of the ozone NAAQS. (General Preamble, 57 FR 13564). See also 40 CFR 51.918. In addition, because the St. Louis area has attained the ozone NAAQS and is no longer subject to an RFP requirement, the requirement to submit the section 172(c)(9) contingency measures is not applicable for purposes of redesignation. *Id.*

Section 172(c)(3) requires submission and approval of a comprehensive, accurate and current inventory of actual emissions. This requirement is superseded by the emission inventory requirement in section 182(a)(1).

Section 172(c)(4) requires the identification and quantification of allowable emissions for major new and modified stationary sources to be allowed in an area, and section 172(c)(5) requires source permits for the construction and operation of new and modified major stationary sources anywhere in the nonattainment area. EPA approved the Illinois nonattainment NSR program on December 17, 1992 (57 FR 59928), September 27, 1995 (60 FR 49780) and May 13, 2003 (68 FR 25504). Further, EPA has determined that, since PSD requirements will apply after redesignation, areas being redesignated need not comply with the requirement that a part D NSR program be approved prior to redesignation, provided that the area demonstrates maintenance of the NAAQS without a part D NSR program. A more detailed rationale for this view is described in a memorandum from Mary Nichols, Assistant Administrator for Air and Radiation, dated October 14, 1994, entitled, "Part D New Source Review Requirements for Areas Requesting Redesignation to Attainment." Illinois has demonstrated that the St. Louis area will be able to maintain the 1997 8-hour ozone standard without a part D NSR program in effect; therefore, EPA concludes that the State need not have a fully approved part D NSR program prior to approval of the redesignation request. The State's PSD program will become effective in the St. Louis area upon redesignation to attainment. See rulemakings for Detroit, Michigan (60 FR 12467–12468, March 7, 1995); Cleveland-Akron-Lorain, Ohio (61 FR 20458, 20469–20470, May 7, 1996); Louisville, Kentucky (66 FR 53665, October 23, 2001); and Grand Rapids, Michigan (61 FR 31834–31837, June 21, 1996).

Section 172(c)(6) requires the SIP to contain control measures necessary to provide for attainment of the standard. Because attainment has been reached, no additional measures are needed to provide for attainment.

Section 172(c)(7) requires the SIP to meet the applicable provisions of section 110(a)(2). As noted above in section i, we conclude the Illinois SIP meets the requirements of section 110(a)(2) applicable for purposes of redesignation.

*Subpart 1 Section 176 Conformity Requirements.*

Section 176(c) of the CAA requires states to establish criteria and procedures to ensure that federally supported or funded activities, including highway projects, conform to the air quality planning goals in the applicable SIPs. The requirement to determine conformity applies to transportation plans, programs and projects developed, funded or approved under title 23 of the U.S. Code and the Federal Transit Act (transportation conformity) as well as to all other Federally supported or funded projects (general conformity). State conformity revisions must be consistent with Federal conformity regulations relating to consultation, enforcement, and enforceability, which EPA promulgated pursuant to CAA requirements.

EPA thinks that it is reasonable to interpret the conformity SIP requirements as not applying for purposes of evaluating the redesignation request under section 107(d) for two reasons. First, the requirement to submit SIP revisions to comply with the

conformity provisions of the CAA continues to apply to areas after redesignation to attainment since such areas would be subject to a section 175A maintenance plan. Second, EPA's Federal conformity rules require the performance of conformity analyses in the absence of Federally approved state rules. Therefore, because areas are subject to the conformity requirements regardless of whether they are redesignated to attainment and, because they must implement conformity under Federal rules if state rules are not yet approved, EPA concludes it is reasonable to view these requirements as not applying for purposes of evaluating a redesignation request. See *Wall* v. *EPA*, 265 F.3d 426 (6th Cir. 2001), upholding this interpretation. See also 60 FR 62748, 62749–62750 (Dec. 7, 1995) (Tampa, Florida).

EPA approved Illinois's general conformity SIP on December 23, 1997 (62 FR 67000). Illinois does not have a federally approved transportation conformity SIP. However, Illinois performs conformity analyses pursuant to EPA's Federal conformity rules. Illinois has submitted on-road MVEBs for the Illinois portion of the St. Louis area of 17.27 and 5.68 tons per day (tpd) VOC and 52.57 and 15.22 tpd $NO_X$ for the years 2008 and 2025, respectively. Illinois must use these MVEBs in any conformity determination that is effective on or after the effective date of the maintenance plan approval.

*Subpart 2 Section 182(a) and (b) Requirements.*

*Comprehensive Emissions Inventory.* Section 182(a)(1) requires the submission of a comprehensive emissions inventory. IEPA submitted a 2002 emissions inventory on June 21, 2006. On September 16, 2011, IEPA supplemented this inventory with on-road mobile emissions estimates based on the MOVES model. As discussed below in section V.C., EPA is proposing to approve the 2002 inventory as meeting the section 182(a)(1) comprehensive emissions inventory requirement.

*Emissions Statements.* EPA approved the Illinois emission statement SIP required by section 182(a)(3)(B), on September 9, 1993 (58 FR 47379) and May 15, 2002 (67 FR 34614).

*Reasonable Further Progress and Attainment Demonstration.* On July 2, 2007, IEPA submitted an attainment demonstration and reasonable further progress plan for the Illinois portion of the St. Louis area as required by section 182(b)(1) of the CAA. Because attainment has been reached, section 182(b)(1) requirements are no longer considered to be applicable as long as the area continues to attain the standard. If EPA finalizes approval of the redesignation of the Illinois portion of the St. Louis area, EPA will take no further action on the attainment demonstration submitted by Illinois for the area.

*VOC RACT.* Section 182(b)(2) requires states with moderate nonattainment areas to implement RACT under section 172(c)(1) with respect to each of the following: (1) All sources covered by a Control Technology Guideline (CTG) document issued between November 15, 1990, and the date of attainment; (2) all sources covered by a CTG issued prior to November 15, 1990; and, (3) all other major non-CTG stationary sources. As required under the 1-hour ozone standard, Illinois submitted VOC RACT rules covering the second and third categories. EPA approved these VOC RACT rules on February 21, 1980(45 FR 11472), November 21, 1987 (52 FR 45333), and September 9, 1994 (59 FR 46562). With respect to the first category, EPA issued CTGs for five source categories in September 2006, three source categories in September 2007, and five additional source categories in September 2008. Areas classified as moderate and above were required to submit VOC RACT for the source categories covered by these CTGs, by September 2007, September 2008, and September 2009, respectively. IEPA submitted a SIP revision to address these CTGs on July 29, 2010, September 16, 2011, and September 29, 2011. EPA is taking action on these revisions in a separate rulemaking action. Full approval of IEPA's VOC RACT submittal is a prerequisite for approval of the redesignation of the Illinois portion of the St. Louis area to attainment.

*$NO_X$ RACT.* Section 182(f) establishes $NO_X$ requirements for ozone nonattainment areas. However, it provides that these requirements do not apply to an area if the Administrator determines that $NO_X$ reductions would not contribute to attainment. On February 22, 2011 (76 FR 9655), EPA approved a request from IEPA to exempt sources of $NO_X$ in the Illinois portion of the St Louis area from section 182(f) $NO_X$ RACT requirements. Therefore, the State of Illinois need not have fully approved $NO_X$ control measures under section 182(f) for the Illinois portion of the St. Louis area to be redesignated to attainment.

*Stage II Vapor Recovery.* Section 182(b)(3) of the CAA requires states with moderate nonattainment areas to submit Stage II vapor recovery rules. EPA approved Illinois's Stage II vapor recovery regulations on January 12, 1993 (58 FR 3841). Further, section 202(a)(6) of the CAA provides that Stage II vapor recovery regulations are not required if EPA promulgates on-board vapor recovery regulations for vehicles. EPA promulgated such regulations on April 6, 1994 (59 FR 16262), which became effective on May 6, 1994. Therefore, pursuant to section 202(a)(6) of the CAA, Stage II regulations are no longer required in the area. EPA approved the removal of Stage II vapor recovery regulations from the Illinois SIP on December 16, 1994 (59 FR 64853).

*Vehicle Inspection and Maintenance (I/M).* Section 182(b)(4) and EPA's final I/M regulations in 40 CFR part 85 require the States to submit a fully adopted I/M program. EPA approved the Illinois enhanced I/M program on February 22, 1999 (64 FR 8517).

Thus, as discussed above, with approval of the comprehensive emissions inventory and the Illinois VOC RACT submittal, the Illinois portion of the St. Louis area will satisfy the requirements applicable for purposes of redesignation under section 110 and part D of the CAA.

b. The Illinois Portion of the St. Louis Area Has a Fully Approved Applicable SIP Under Section 110(k) of the CAA

If EPA issues a final approval of the comprehensive emissions inventory and the Illinois VOC RACT submittal, EPA will have fully approved the State's SIP for the Illinois portion of the St. Louis area under section 110(k) of the CAA for all requirements applicable for purposes of redesignation. EPA may rely on prior SIP approvals in approving a redesignation request (See page 3 of the September 4, 1992, John Calcagni memorandum; *Southwestern Pennsylvania Growth Alliance* v. *Browner*, 144 F.3d 984, 989–990 (6th Cir. 1998); *Wall* v. *EPA*, 265 F.3d 426 (6th Cir. 2001)) plus any additional measures it may approve in conjunction with a redesignation action. See 68 FR 25413, 25426 (May 12, 2003). Since the passage of the CAA of 1970, Illinois has adopted and submitted, and EPA has fully approved, provisions addressing various required SIP elements under the 1-hour ozone standard. In this action, EPA is proposing to approve the comprehensive 2002 emissions inventory for the Illinois portion of the St. Louis area as meeting the requirement of section 182(a)(1) of the CAA. In a separate rule, EPA will take action on the Illinois VOC RACT submission. No SIP provisions for the Illinois portion of the St. Louis area are currently disapproved, conditionally approved, or partially approved.

3. The Improvement in Air Quality Is Due to Permanent and Enforceable Reductions in Emissions Resulting From Implementation of the SIP and Applicable Federal Air Pollution Control Regulations and Other Permanent and Enforceable Reductions (Section 107(d)(3)(E)(iii))

EPA finds that Illinois has demonstrated that the observed air quality improvement in the St. Louis area is due to permanent and enforceable reductions in emissions resulting from implementation of the SIP, Federal measures, and other state-adopted measures discussed below.

In making this demonstration, IEPA has calculated the change in emissions between 2002 and 2008. For the nonattainment inventory, Illinois is using the 2002 emissions inventory developed to meet the comprehensive emissions inventory requirement of section 182(a)(1) of the CAA. Illinois developed an attainment inventory for 2008, one of the years the St. Louis area monitored attainment of the standard. The reduction in emissions and the corresponding improvement in air quality over this time period can be attributed to a number of regulatory control measures that St. Louis and upwind areas have implemented in recent years.

a. Permanent and Enforceable Controls Implemented

The following is a discussion of permanent and enforceable measures that have been implemented in the area:

i. Stationary Source $NO_X$ Rules

IEPA has developed rules governing the control of $NO_X$ emissions from Electric Generating Units (EGUs), major non-EGU industrial boilers, major cement kilns, and internal combustion engines. EPA approved the Illinois rules as fulfilling Phase I of the $NO_X$ SIP Call on June 28, 2001 (66 FR 34382) and November 21, 2001 (66 FR 56454), and as meeting Phase II of the $NO_X$ SIP Call on June 26, 2009 (74 FR 30466). Illinois began complying with Phase I of this rule in 2004. Compliance with Phase II of the SIP Call requires the control of $NO_X$ emissions from large stationary internal combustion engines. Implementation of Phase II began in 2007 and was projected to result in an 82 percent $NO_X$ reduction from 1995 levels.

ii. Consumer Products and Architectural and Industrial Maintenance Coatings (AIM) Rules

Illinois adopted consumer products and AIM rules on May 7, 2009. Compliance with these rules was required by July 1, 2009. EPA is acting on these rules in a separate rulemaking.

iii. Reformulated Gasoline (RFG)

Illinois requested that EPA extend the requirement for sale of RFG to Jersey, Madison, Monroe, and St. Clair counties. EPA granted this request on April 24, 2007, with compliance required by July 1, 2007.

iv. Consent Decrees—Dynegy Midwest Generation and ConocoPhillips

Dynegy Midwest Generation and ConocoPhillips entered separate settlement agreements with EPA in 2005. The settlement reached with Dynegy Midwest Generation for alleged violations at the Baldwin Generating Station included the requirements to "commence operation of the SCRs installed at Baldwin Unit 1, Unit 2 * * * so as to achieve and maintain a 30-day rolling average emission rate from each such unit of not greater than 0.100 lb/mmbtu $NO_X$" and "maintain a 30-day rolling average emission rate of not greater than 0.120 lb/mmbtu $NO_X$ at Baldwin Unit 3." Low $NO_X$ burners and overfire air technology are required on Dynegy Midwest Generation's Wood River Units #4 and #5. At the Dynegy Midwest Generation's Baldwin Generating station, ozone season emissions were reduced from 13,204 tons in 2001 to 1,696 tons in 2009. The ConocoPhillips settlement provided for near-term installation of low-$NO_X$ burners and ultra low-$NO_X$ burners on combustion units at its "Distilling West" operations. Other $NO_X$ emission reduction requirements are set forth in the consent decree, as are provisions for carbon monoxide (CO), sulfur dioxide ($SO_2$), and particulate matter reductions.

v. Federal Emission Control Measures

Reductions in VOC and $NO_X$ emissions have occurred statewide and in upwind areas as a result of Federal emission control measures, with additional emission reductions expected to occur in the future. Federal emission control measures include the following.

*Tier 2 Emission Standards for Vehicles and Gasoline Sulfur Standards.* These emission control requirements result in lower VOC and $NO_X$ emissions from new cars and light duty trucks, including sport utility vehicles. The Federal rules were phased in between 2004 and 2009. The EPA has estimated that, by the end of the phase-in period, the following vehicle NOx emission reductions will occur nationwide: passenger cars (light duty vehicles) (77 percent); light duty trucks, minivans, and sports utility vehicles (86 percent); and, larger sports utility vehicles, vans, and heavier trucks (69 to 95 percent). VOC emission reductions are expected to range from 12 to 18 percent, depending on vehicle class, over the same period. Some of these emission reductions occurred by the attainment years (2007–2009) and additional emission reductions will occur throughout the maintenance period.

*Heavy-Duty Diesel Engine Rule.* EPA issued this rule in July 2000. This rule includes standards limiting the sulfur content of diesel fuel, which went into effect in 2004. A second phase took effect in 2007 which further reduced the highway diesel fuel sulfur content to 15 parts per million, leading to additional reductions in combustion $NO_X$ and VOC emissions. This rule is expected to achieve a 95 percent reduction in $NO_X$ emissions from diesel trucks and busses.

*Non-Road Diesel Rule.* EPA issued this rule in 2004. This rule applies to diesel engines used in industries, such as construction, agriculture, and mining. It is estimated that compliance with this rule will cut $NO_X$ emissions from non-road diesel engines by up to 90 percent. Some of these emission reductions occurred by the attainment years (2007–2009) and additional emission reductions will occur throughout the maintenance period.

*New Source Performance Standards (NSPS), National Emissions Standards for Hazardous Air Pollutants (NESHAPS) and Maximum Achievable Control Technology Standards (MACT).* A broad range of emission sectors are subject to Federal NSPS, NESHAP, and MACT standards with compliance requirements which take effect post-2002 and prior to 2009.

vi. Control Measures in Upwind Areas

On October 27, 1998 (63 FR 57356), EPA issued a $NO_X$ SIP Call requiring the District of Columbia and 22 states (including Illinois) to reduce emissions of $NO_X$. Affected states were required to comply with Phase I of the SIP Call beginning in 2004, and Phase II beginning in 2007. The reduction in $NO_X$ emissions has resulted in lower concentrations of transported ozone entering the St. Louis area. Emission reductions resulting from regulations developed in response to the $NO_X$ SIP Call are permanent and enforceable.

b. Emission Reductions

Illinois is using the 2002 comprehensive emissions inventory developed to meet the requirement of section 182(a)(1) of the CAA as the nonattainment inventory. This inventory is discussed in more detail in section V.C., below. In summary, IEPA developed the point source inventory

using source reported actual 2002 emissions data from annual emissions reports. The area source inventory was developed using various methodologies to estimate area source activity levels and emissions including applying local activity levels, apportioning national or statewide activity levels to the local level, using per capita emission factors, using per employee emission factors, and using data from inventories complied by others. The documentation supplied in the submittal shows how the county-specific emissions were calculated for each area source category. Non-road mobile source emissions were generated using the NONROAD model version 2.20a. In addition, emissions estimates were developed for commercial marine vessels, aircraft, and railroads, three non-road categories not included in the NONROAD model. On-road mobile emissions were prepared by the IEPA using the MOVES emissions model and daily vehicle miles traveled (VMT) data provided by the Illinois Department of Transportation (IDOT).

Illinois prepared a comprehensive 2008 emissions inventory to use as the attainment year inventory. Point source information was compiled from the 2008 annual emissions reports submitted to IEPA by sources and EPA's Clean Air Markets Division database for electric utilities. Area source emissions were calculated using the most recently available methodologies and emissions factors from EPA along with activity data (population, employment, fuel use, etc.) specific to 2008. Non-road mobile source emissions were calculated using EPA's NONROAD emissions model. In addition, emissions estimates were calculated for commercial marine vessels, aircraft, and railroads, three non-road categories not included in the NONROAD model. On-road mobile source emissions were calculated using EPA's MOVES emissions model with 2008 VMT data provided by IDOT.

Using the inventories described above, as well as emissions inventories provided by Missouri, Illinois has documented changes in VOC and $NO_X$ emissions from 2002 to 2008 for the St. Louis area. Emissions data are shown in Tables 2 through 5 below.

TABLE 2—ST. LOUIS AREA VOC AND $NO_X$ EMISSIONS FOR NONATTAINMENT YEAR 2002

[tpd]

| | VOC | | | $NO_X$ | | |
|---|---|---|---|---|---|---|
| | Illinois | Missouri | Area total | Illinois | Missouri | Area total |
| Point | 17.41 | 32.70 | 50.11 | 53.24 | 127.20 | 180.44 |
| Area | 29.86 | 71.30 | 101.16 | 1.40 | 19.40 | 20.80 |
| On-road | 25.90 | 79.57 | 105.47 | 76.82 | 226.03 | 302.85 |
| Non-road | 12.04 | 47.00 | 59.04 | 36.79 | 60.70 | 97.49 |
| Total | 85.21 | 230.57 | 315.78 | 168.25 | 433.33 | 601.58 |

TABLE 3—ST. LOUIS AREA VOC AND $NO_X$ EMISSIONS FOR ATTAINMENT YEAR 2008

[tpd]

| | VOC | | | $NO_X$ | | |
|---|---|---|---|---|---|---|
| | Illinois | Missouri | Area total | Illinois | Missouri | Area total |
| Point | 11.92 | 18.00 | 29.92 | 39.86 | 88.80 | 128.66 |
| Area | 23.21 | 98.70 | 121.91 | 1.50 | 6.50 | 8.00 |
| On-road | 17.27 | 58.50 | 75.77 | 52.57 | 160.40 | 212.97 |
| Non-road | 12.66 | 46.40 | 59.06 | 39.25 | 60.90 | 100.15 |
| Total | 65.06 | 221.60 | 286.66 | 133.18 | 316.60 | 449.78 |

TABLE 4—COMPARISON OF 2002 AND 2008 VOC AND $NO_X$ EMISSIONS FOR THE ILLINOIS PORTION OF THE ST. LOUIS AREA

[tpd]

| | VOC | | | $NO_X$ | | |
|---|---|---|---|---|---|---|
| | 2002 | 2008 | Net change (2002–2008) | 2002 | 2008 | Net change (2002–2008) |
| Point | 17.41 | 11.92 | −5.49 | 53.24 | 39.86 | -13.38 |
| Area | 29.86 | 23.21 | −6.65 | 1.40 | 1.50 | 0.10 |
| On-road | 25.90 | 17.27 | −8.63 | 76.82 | 52.57 | −24.25 |
| Non-road | 12.04 | 12.66 | 0.62 | 36.79 | 39.25 | 2.46 |
| Total | 85.21 | 65.06 | −20.15 | 168.25 | 133.18 | -35.07 |

TABLE 5—COMPARISON OF 2002 AND 2008 VOC AND $NO_X$ EMISSIONS FOR THE ENTIRE ST. LOUIS AREA

[tpd]

| | VOC | | | $NO_X$ | | |
|---|---|---|---|---|---|---|
| | 2002 | 2008 | Net change (2002–2008) | 2002 | 2008 | Net change (2002–2008) |
| Point | 50.11 | 29.92 | −20.19 | 180.44 | 128.66 | −51.78 |
| Area | 101.16 | 121.91 | 20.75 | 20.80 | 8.00 | −12.80 |
| On-road | 105.47 | 75.77 | −29.70 | 302.85 | 212.97 | −89.88 |
| Non-road | 59.04 | 59.06 | 0.02 | 97.49 | 100.15 | 2.66 |
| Total | 315.78 | 286.66 | −29.12 | 601.58 | 449.78 | −151.80 |

Table 4 shows that the Illinois portion of the St. Louis area reduced VOC emissions by 20.15 tpd and $NO_X$ emissions by 35.07 tpd between 2002 and 2008. As shown in Table 5, the entire St. Louis area reduced VOC emissions by 29.12 tpd and $NO_X$ emissions by 151.80 tpd between 2002 and 2008. Based on the information summarized above, Illinois has adequately demonstrated that the improvement in air quality is due to permanent and enforceable emissions reductions.

4. The Area Has a Fully Approved Maintenance Plan Pursuant to Section 175A of the CAA. (Section 107(d)(3)(E)(iv))

In conjunction with its request to redesignate the Illinois portion of the St. Louis nonattainment area to attainment status, IEPA submitted a SIP revision to provide for maintenance of the 1997 8-hour ozone NAAQS in the area through 2025.

a. Maintenance Plan Requirements

Section 175A of the CAA sets forth the required elements of a maintenance plan for areas seeking redesignation from nonattainment to attainment. Under section 175A, the plan must demonstrate continued attainment of the applicable NAAQS for at least ten years after the Administrator approves a redesignation to attainment. Eight years after the redesignation, the state must submit a revised maintenance plan which demonstrates that attainment will continue to be maintained for ten years following the initial ten-year maintenance period. To address the possibility of future NAAQS violations, the maintenance plan must contain contingency measures with a schedule for implementation as EPA deems necessary to assure prompt correction of any future 8-hour ozone violations.

The September 4, 1992, John Calcagni memorandum provides additional guidance on the content of a maintenance plan. The memorandum clarifies that an ozone maintenance plan should address the following items: The attainment VOC and $NO_X$ emissions inventories, a maintenance demonstration showing maintenance for the ten years of the maintenance period, a commitment to maintain the existing monitoring network, factors and procedures to be used for verification of continued attainment of the NAAQS, and a contingency plan to prevent or correct future violations of the NAAQS.

b. Attainment Inventory

IEPA developed an emissions inventory for 2008, one of the years used to demonstrate monitored attainment of the 8-hour NAAQS, as described above. The attainment level of emissions is summarized in Table 3, above.

c. Demonstration of Maintenance

Along with the redesignation request, IEPA submitted a revision to the Illinois 8-hour ozone SIP that includes a maintenance plan for the Illinois portion of the St. Louis area, in compliance with section 175A of the CAA. This demonstration shows maintenance of the 1997 8-hour ozone standard through 2025 by showing that current and future emissions of VOC and $NO_X$ for the St. Louis area remain at or below attainment year emission levels. A maintenance demonstration need not be based on modeling. See *Wall* v. *EPA*, 265 F.3d 426 (6th Cir. 2001), *Sierra Club* v. *EPA*, 375 F. 3d 537 (7th Cir. 2004). See also 66 FR 53094, 53099–53100 (October 19, 2001), 68 FR 25413, 25430–25432 (May 12, 2003).

Illinois is using emissions inventory projections for the years 2015, 2020 and 2025 to demonstrate maintenance. Point and area source emissions for 2015, 2020 and 2025 were estimated using the 2008 attainment inventory and growth factors appropriate for each source category. Non-road emissions projections were developed using the growth factors contained in EPA's NONROAD model. On-road motor vehicle emissions were estimated using the EPA's MOVES motor vehicle emissions model.

As discussed in section V.a.3.a.v. (Permanent and Enforceable Controls Implemented) above, many of the control programs that helped to bring the area into attainment of the standard will continue to achieve additional emission reductions over the maintenance period. These control programs include Tier 2 emission standards for vehicles and gasoline sulfur standards, the heavy-duty diesel engine rule, and the non-road diesel rule. Emissions data are shown in Tables 6–10, below.

TABLE 6—ST. LOUIS AREA PROJECTED VOC AND $NO_X$ EMISSIONS FOR INTERIM YEAR 2015

[tpd]

| | VOC | | | $NO_X$ | | |
|---|---|---|---|---|---|---|
| | Illinois | Missouri | Area total | Illinois | Missouri | Area total |
| Point | 13.70 | 21.73 | 35.43 | 31.86 | 86.37 | 118.23 |
| Area | 23.76 | 109.52 | 133.28 | 1.55 | 6.64 | 8.19 |
| On-road | 9.11 | 33.98 | 43.09 | 27.85 | 83.79 | 111.64 |
| Non-road | 9.27 | 37.33 | 46.60 | 36.41 | 52.61 | 89.02 |

TABLE 6—ST. LOUIS AREA PROJECTED VOC AND $NO_X$ EMISSIONS FOR INTERIM YEAR 2015—Continued

[tpd]

| | VOC | | | $NO_X$ | | |
|---|---|---|---|---|---|---|
| | Illinois | Missouri | Area total | Illinois | Missouri | Area total |
| Total | 55.84 | 202.56 | 258.40 | 97.67 | 229.41 | 327.08 |

TABLE 7—ST. LOUIS AREA PROJECTED VOC AND $NO_X$ EMISSIONS FOR INTERIM YEAR 2020

[tpd]

| | VOC | | | $NO_X$ | | |
|---|---|---|---|---|---|---|
| | Illinois | Missouri | Area total | Illinois | Missouri | Area total |
| Point | 14.73 | 24.59 | 39.32 | 30.71 | 86.63 | 117.34 |
| Area | 25.04 | 117.75 | 142.79 | 1.56 | 6.73 | 8.29 |
| On-road | 4.99 | 23.51 | 28.50 | 16.32 | 51.51 | 67.83 |
| Non-road | 7.73 | 30.81 | 38.54 | 33.56 | 46.72 | 80.28 |
| Total | 52.49 | 196.66 | 249.15 | 82.15 | 191.59 | 273.74 |

TABLE 8—ST. LOUIS AREA VOC AND $NO_X$ EMISSIONS FOR MAINTENANCE YEAR 2025

[tpd]

| | VOC | | | $NO_X$ | | |
|---|---|---|---|---|---|---|
| | Illinois | Missouri | Area total | Illinois | Missouri | Area total |
| Point | 15.78 | 27.59 | 43.37 | 32.12 | 88.24 | 120.36 |
| Area | 26.32 | 126.34 | 152.66 | 1.58 | 6.82 | 8.40 |
| On-road | 5.68 | 17.74 | 23.42 | 15.22 | 34.17 | 49.39 |
| Non-road | 7.31 | 24.30 | 31.61 | 32.33 | 40.84 | 73.17 |
| Total | 55.09 | 195.97 | 251.06 | 81.25 | 170.07 | 251.32 |

TABLE 9—COMPARISON OF 2008, 2015, 2020 AND 2025 VOC AND $NO_X$ EMISSIONS FOR THE ILLINOIS PORTION OF THE ST. LOUIS AREA

[tpd]

| | VOC | | | | | $NO_X$ | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2015 | 2020 | 2025 | Net change (2008–2025) | 2008 | 2015 | 2020 | 2025 | Net change (2008–2025) |
| Point | 11.92 | 13.70 | 14.73 | 15.78 | 3.86 | 39.86 | 31.86 | 30.71 | 32.12 | −7.74 |
| Area | 23.21 | 23.76 | 25.04 | 26.32 | 3.11 | 1.50 | 1.55 | 1.56 | 1.58 | 0.08 |
| On-road | 17.27 | 9.11 | 4.99 | 5.68 | −11.59 | 52.57 | 27.85 | 16.32 | 15.22 | −37.35 |
| Non-road | 12.66 | 9.27 | 7.73 | 7.31 | −5.35 | 39.25 | 36.41 | 33.56 | 32.33 | −6.92 |
| Total | 65.06 | 55.84 | 52.49 | 55.09 | −9.97 | 133.18 | 97.67 | 82.15 | 81.25 | −51.93 |

TABLE 10—COMPARISON OF 2008, 2015, 2020, AND 2025 VOC AND $NO_X$ EMISSIONS FOR THE ENTIRE ST. LOUIS AREA

[tpd]

| | VOC | | | | | $NO_X$ | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2015 | 2020 | 2025 | Net change (2008–2025) | 2008 | 2013 | 2020 | 2025 | Net change (2008–2025) |
| Point | 29.92 | 35.43 | 39.32 | 43.37 | 13.45 | 128.66 | 118.23 | 117.34 | 120.36 | −8.30 |
| Area | 121.91 | 133.28 | 142.79 | 152.66 | 30.75 | 8.00 | 8.19 | 8.29 | 8.40 | 0.40 |
| On-road | 75.77 | 43.09 | 28.50 | 23.42 | −52.35 | 212.97 | 111.64 | 67.83 | 49.39 | −163.58 |
| Non-road | 59.06 | 46.60 | 38.54 | 31.61 | −27.45 | 100.15 | 89.02 | 80.28 | 73.17 | −26.98 |
| Total | 286.66 | 258.40 | 249.15 | 251.06 | −35.60 | 449.78 | 327.08 | 273.74 | 251.32 | −198.46 |

The emission projections show that Illinois and Missouri do not expect emissions in the St. Louis area to exceed the level of the 2008 attainment year inventory during the maintenance period. As shown in Table 9, VOC and $NO_X$ emissions in the Illinois portion of the St. Louis area are projected to decrease by 9.97 tpd and 51.93 tpd, respectively, between 2008 and 2025. As shown in Table 10, VOC and $NO_X$ emissions in the entire St. Louis area are projected to decrease by 35.60 tpd and 198.46 tpd, respectively, between 2008 and 2025.

Because the St. Louis area is affected by the transport of ozone and its precursors, the reduction of $NO_X$ emissions in upwind areas will help to ensure that the area will maintain the 1997 8-hour ozone standard in the future. On August 8, 2011, at 76 FR 48208, EPA promulgated the CSAPR to address interstate transport of emissions. The CSAPR requires substantial reductions of $NO_X$ emissions from EGUs across most of Eastern United States, with implementation beginning on January 1, 2012. Compared to 2005 emissions, EPA estimates that by 2014 this rule and other Federal rules will lower $NO_X$ ozone season emissions from power plants by 340,000 tons.

Further, ozone modeling performed by the Lake Michigan Air Directors Consortium supports the conclusion that the St. Louis area will maintain the 1997 8-hour ozone standard throughout the maintenance period. Peak modeled ozone levels in the area for 2012 and 2018 are 0.084 ppm, and 0.080 ppm, respectively. These projected ozone levels were modeled applying only legally enforceable controls; *e.g.*, consent decrees, rules, the $NO_X$ SIP Call, Federal motor vehicle control programs, etc. The modeling runs did not include emission reductions for implementation of the CSAPR. With the implementation of the CSAPR, actual 2018 ozone levels would be expected to be lower.

As part of its maintenance plan, Illinois elected to include a "safety margin" for the area. A "safety margin" is the difference between the attainment level of emissions (from all sources) and the projected level of emissions (from all sources) in the maintenance plan which continues to demonstrate attainment of the standard. The attainment level of emissions is the level of emissions during one of the years in which the area met the NAAQS. The St. Louis area attained the 1997 8-hour ozone NAAQS during the 2007–2009 time period. Illinois used 2008 as the attainment level of emissions for the area. For the Illinois portion of the St. Louis area, the emissions from point, area, non-road, and mobile sources in 2008 equaled 65.06 tpd of VOC. In the maintenance plan, IEPA projected VOC emissions for the year 2025 to be 55.09 tpd of VOC. The SIP submissions demonstrate that the St. Louis area will continue to maintain the standard with emissions at this level. The safety margin for VOC is calculated to be the difference between these amounts or, in this case, 9.97 tpd of VOC for 2025. By this same method, 51.93 tpd (i.e., 133.18 tpd less 81.25 tpd) is the safety margin for $NO_X$ for 2025. The safety margin, or a portion thereof, can be allocated to any of the source categories, as long as the total attainment level of emissions is maintained.

d. Monitoring Network

Illinois currently operates five ozone monitors and Missouri operates six monitors in the St. Louis area. In its redesignation request, IEPA has committed to continue to monitor ozone levels according to an EPA approved monitoring plan. Should changes in the location of an ozone monitor become necessary, IEPA commits to work with EPA to ensure the adequacy of the monitoring network. Illinois remains obligated to continue to quality assure monitoring data in accordance with 40 CFR part 58 and enter all data into the AQS in accordance with Federal guidelines.

e. Verification of Continued Attainment.

Continued attainment of the ozone NAAQS in the St. Louis area depends, in part, on the State's efforts toward tracking indicators of continued attainment during the maintenance period. IEPA's plan for verifying continued attainment of the 8-hour standard in the St. Louis area consists of plans to continue ambient ozone monitoring in accordance with the requirements of 40 CFR part 58. In addition IEPA commits to compiling VOC and $NO_X$ emissions inventories every three years to facilitate emissions trends analyses. The State is required to develop and submit periodic emission inventories as specified in the Federal Consolidated Emissions Reporting Rule (67 FR 39602, June 10, 2002).

f. Contingency Plan

The contingency plan provisions are designed to promptly correct or prevent a violation of the NAAQS that might occur after redesignation of an area to attainment. Section 175A of the CAA requires that a maintenance plan include such contingency measures as EPA deems necessary to assure that the state will promptly correct a violation of the NAAQS that occurs after redesignation. The maintenance plan should identify the contingency measures to be adopted, a schedule and procedure for adoption and implementation of the contingency measures, and a time limit for action by the state. The state should also identify specific indicators to be used to determine when the contingency measures need to be adopted and implemented. The maintenance plan must include a requirement that the state will implement all measures with respect to control of the pollutant(s) that were contained in the SIP before redesignation of the area to attainment. See section 175A(d) of the CAA.

As required by section 175A of the CAA, Illinois has adopted a contingency plan for the St. Louis area to address possible future ozone air quality problems. The contingency plan adopted by Illinois has two levels of response, Level I and Level II.

A Level I response will be triggered in the event that: (1) The fourth highest 8-hour ozone concentration at any monitoring site in the St. Louis area exceeds 84 parts per billion (ppb) in any year, or (2) if VOC or $NO_X$ emissions increase more than 5% above the levels contained in the attainment year emissions inventory. IEPA will work with the Missouri Department of Natural Resources to evaluate the causes of high ozone levels or the emissions trends and to determine appropriate control measures needed to ensure continued attainment of the ozone standard. Control measures selected under a Level I trigger will be adopted within 18 months after a determination is made and implemented within 24 months of adoption.

A Level II response will be triggered in the event that a violation of the 8-hour standard is monitored within the St. Louis area. To select appropriate corrective measures, IEPA will work with Missouri to conduct a comprehensive study to determine the causes of the violation and the control measures necessary to mitigate the problem. Implementation of necessary controls in response to a Level II trigger will take place as expeditiously as possible, but in no event later than 18 months after IEPA makes a determination, based on quality-assured ambient monitoring data, that a violation of the NAAQS has occurred.

IEPA included the following list of potential contingency measures in its maintenance plan:

i. Multi-Pollutant Program for electric generating units;
ii. $NO_X$ RACT;
iii. Clean Air Transport Rule;

iv. Best Available Retrofit Technology;

v. Broader geographic applicability of existing measures;

vi. Tier 2 Vehicle Standards and Low Sulfur Fuel;

vii. Heavy Duty Diesel Standards and Low Sulfur Diesel Fuel;

viii. High-enhanced I/M;

ix. Federal railroad/locomotive standards;

x. Federal commercial marine vessel engine standards;

xi. Portable fuel containers;

xii. Architectural/Industrial Maintenance (AIM) Coatings rule;

xiii. Commercial and Consumer Products rule; and

xiv. Aerosol coatings rule.

To qualify as a contingency measure, emissions reductions from that measure must not be factored into the emissions projections used in the maintenance plan.

g. Provisions for Future Updates of the Ozone Maintenance Plan

As required by section 175A(b) of the CAA, IEPA commits to submit to the EPA an updated ozone maintenance plan eight years after redesignation of the St. Louis area to cover an additional ten-year period beyond the initial ten-year maintenance period. As required by section 175A of the CAA, Illinois has committed to retain the VOC and $NO_X$ control measures contained in the SIP prior to redesignation. Illinois also states that any revision to the control measures included as part of the maintenance plan will be submitted to EPA for approval as a SIP revision, and will be accompanied by a showing that such changes will not interfere with maintenance of the NAAQS.

EPA has concluded that the maintenance plan adequately addresses the five basic components of a maintenance plan: attainment inventory, maintenance demonstration, monitoring network, verification of continued attainment, and a contingency plan. Thus EPA proposes to find that the maintenance plan SIP revision submitted by Illinois for the St. Louis area meets the requirements of section 175A of the CAA.

*B. Adequacy of the MVEBs*

Under the CAA, states are required to submit, at various times, control strategy SIP revisions and ozone maintenance plans for ozone nonattainment areas and for areas seeking redesignations to attainment of the ozone standard. These emission control strategy SIP revisions (*e.g.*, RFP and attainment demonstration SIP revisions) and ozone maintenance plans create MVEBs based on on-road mobile source emissions for criteria pollutants and/or their precursors to address pollution from cars and trucks. The MVEBs are the portions of the total allowable emissions that are allocated to highway and transit vehicle use that, together with emissions from other sources in the area, will provide for attainment or maintenance.

Under 40 CFR part 93, a MVEB for an area seeking a redesignation to attainment is established for the last year of the maintenance plan. The MVEB serves as a ceiling on emissions from an area's planned transportation system. The MVEB concept is further explained in the preamble to the November 24, 1993, transportation conformity rule (58 FR 62188).

Under section 176(c) of the CAA, transportation plans and transportation improvement programs (TIPs) must "conform" to (i.e., be consistent with) the SIP. Conformity to the SIP means that transportation activities will not cause new air quality violations, worsen existing air quality violations, delay timely attainment of the NAAQS or delay an interim milestone. If a transportation plan or TIP does not conform, most new transportation projects that would expand the capacity of roadways cannot go forward. Regulations at 40 CFR part 93 set forth EPA policy, criteria, and procedures for demonstrating and assuring conformity of such transportation activities to a SIP.

When reviewing SIP revisions containing MVEBs, including attainment strategies, rate-of-progress plans, and maintenance plans, EPA must affirmatively approve and find that the MVEBs are "adequate" for use in determining transportation conformity. Once EPA affirmatively approves or finds the submitted MVEBs to be adequate for transportation conformity purposes, the MVEBs must be used by state and Federal agencies in determining whether proposed transportation projects conform to the SIP as required by section 176(c) of the CAA. EPA's substantive criteria for determining the adequacy of MVEBs are set out in 40 CFR 93.118(e)(4).

EPA's process for determining adequacy of a MVEB consists of three basic steps: (1) Providing public notification of a SIP submission; (2) providing the public the opportunity to comment on the MVEB during a public comment period; and, (3) EPA's finding of adequacy. The process of determining the adequacy of submitted SIP MVEBs is codified at 40 CFR 93.118.

The maintenance plan submitted by Illinois for the St. Louis area contains new VOC and $NO_X$ MVEBs for the Illinois portion of the area for the years 2008 and 2025. The availability of the SIP submission with these 2008 and 2025 MVEBs was announced for public comment on EPA's Adequacy Web site on September 26, 2011, at: *http://www.epa.gov/otaq/stateresources/transconf/currsips.htm*. The EPA public comment period on adequacy of the 2008 and 2025 MVEBs for the Illinois portion of the St. Louis area closed on October 26, 2011. No comments on the submittal were received during the adequacy comment period. The submitted maintenance plan, which included the MVEBs, was endorsed by the Governor (or his or her designee) and was subject to a State public hearing. The MVEBs were developed as part of an interagency consultation process which includes Federal, State, and local agencies. The MVEBs were clearly identified and precisely quantified. These MVEBs, when considered together with all other emissions sources, are consistent with maintenance of the 1997 8-hour ozone standard.

EPA, through this rulemaking, has found adequate and is proposing to approve the MVEBs for use to determine transportation conformity in the Illinois portion of the St. Louis area because EPA has determined that the area can maintain attainment of the 1997 8-hour ozone NAAQS for the relevant maintenance period with mobile source emissions at the levels of the MVEBs. IEPA has determined the 2008 MVEBs for the Illinois portion of the St. Louis area to be 17.27 tpd for VOC and 52.57 tpd for $NO_X$. IEPA has determined the 2025 MVEBs for the Illinois portion of the St. Louis area to be 5.68 tpd for VOC and 15.22 tpd for $NO_X$. These MVEBs are consistent with the on-road mobile source VOC and $NO_X$ emissions for 2008 and 2025, as summarized in Table 8 above. Illinois has demonstrated that the St. Louis area can maintain the 1997 8-hour ozone NAAQS with mobile source emissions in the Illinois portion of the area of 16.53 tpd and 7.70 tpd of VOC and 30.84 tpd and 10.34 tpd of $NO_X$ in 2008 and 2025, respectively, since emissions will remain under attainment year emission levels.

Because the MVEBs are based on the MOVES model, the grace period before MOVES is required for new conformity determinations for the Illinois portion of the St. Louis area ends on the effective date of this approval. See Question 11 of the Policy Guidance on the Use of MOVES2010 for SIP Development (*http://epa.gov/otaq/models/moves/420b09046.pdf*).

*C. 2002 Comprehensive Emissions Inventory*

As discussed above, section 182(a)(1) of the CAA requires states with ozone nonattainment areas to submit comprehensive, accurate and current inventories of actual emissions from all sources in the nonattainment area. On June 21, 2006, IEPA submitted a 2002 emissions inventory to meet this requirement. On September 16, 2011, IEPA supplemented this submittal by replacing on-road emissions estimates derived using the MOBILE6 model with on-road emissions estimates derived using EPA's MOVES model. Emissions contained in the comprehensive 2002 inventory cover the general source categories of point sources, area sources, on-road mobile sources, and non-road mobile sources. All emission summaries were accompanied by source-specific descriptions of emission calculation procedures and sources of input data.

IEPA prepared the point source inventory using source reported actual 2002 emissions data from annual emissions reports. Where necessary, the emissions were adjusted for a typical summer day at each emission unit within the source. The annual emissions reports provided ozone season hourly emissions and operating schedules that enabled the calculation of ozone season weekday emissions.

Illinois used several methodologies to estimate area source activity levels and emissions including applying local activity levels, apportioning national or statewide activity levels to the local level, using per capita emission factors, using per employee emission factors, and using data from inventories complied by others. Sources used by IEPA to determine activity/commodity level data and emission information include: EPA's AP–42, EPA's FIRE emission factor database, data from Federal and state agencies including EPA, the U.S. Department of Energy, the U.S. Bureau of Labor Statistics, IDOT, the Illinois Bureau of the Budget, the Illinois Department of Conservation, the Illinois Secretary of State, the Illinois Department of Revenue, and the Illinois Department of Agriculture. The documentation supplied in the submittal shows how the county-specific emissions were calculated for each area source category.

Non-road mobile source emissions were generated using the NONROAD model version 2.20a. In addition, emissions estimates were developed for commercial marine vessels, aircraft, and railroads, three non-road categories not included in the NONROAD model.

On-road mobile emissions were prepared by IEPA using EPA's MVOES emissions model and daily VMT data provided by IDOT.

IEPA's submittal documents 2002 emissions in the Illinois portion of the St. Louis area in units of tons per summer day. The 2002 summer day emissions of VOC and $NO_X$ are summarized in Table 2, above. EPA is proposing to approve this 2002 inventory as meeting the section 182(a)(1) comprehensive emissions inventory requirement.

## VI. Summary of Actions

After evaluating the redesignation request submitted by Illinois, EPA concludes that the request meets the redesignation criteria set forth in section 107(d)(3)(E) of the CAA. Therefore, EPA is proposing to approve the redesignation of the Illinois portion of the St. Louis area from nonattainment to attainment for the 1997 8-hour ozone NAAQS. EPA is also proposing to approve the maintenance plan SIP revision for the Illinois portion of the St. Louis area. EPA's proposed approval of the maintenance plan is based on the State's demonstration that the plan meets the requirements of section 175A of the CAA, as described more fully above. EPA is also proposing to approve IEPA's 2002 comprehensive emissions inventory for the Illinois portion of the St. Louis area as meeting the requirements of section 182(a)(1) of the CAA. Finally, EPA finds adequate under 40 CFR 93.118(e) and is proposing to approve the State's 2008 and 2025 MVEBs for the Illinois portion of the St. Louis area.

## VII. Statutory and Executive Order Reviews

Under the CAA, redesignation of an area to attainment and the accompanying approval of a maintenance plan under section 107(d)(3)(E) are actions that affect the status of a geographical area and do not impose any additional regulatory requirements on sources beyond those imposed by state law. A redesignation to attainment does not in and of itself create any new requirements, but rather results in the applicability of requirements contained in the CAA for areas that have been redesignated to attainment. Moreover, the Administrator is required to approve a SIP submission that complies with the provisions of the CAA and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, these actions do not impose additional requirements beyond those imposed by state law and the CAA. For that reason, these actions:

- Are not "significant regulatory actions" subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);
- Do not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);
- Are certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);
- Do not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);
- Do not have Federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);
- Are not an economically significant regulatory action based on health or safety risks subject to Executive Order 13045 (62 FR 19885, April 23, 1997);
- Are not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001);
- Are not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA; and
- Do not provide EPA with the discretionary authority to address, as appropriate, disproportionate human health or environmental effects, using practicable and legally permissible methods, under Executive Order 12898 (59 FR 7629, February 16, 1994).

In addition, this rule does not have tribal implications as specified by Executive Order 13175 (65 FR 67249, November 9, 2000), because redesignation is an action that affects the status of a geographical area and does not impose any new regulatory requirements on tribes, impact any existing sources of air pollution on tribal lands, nor impair the maintenance of ozone national ambient air quality standards in tribal lands.

## List of Subjects

*40 CFR Part 52*

Environmental protection, Air pollution control, Intergovernmental relations, Nitrogen oxides, Ozone, Volatile organic compounds.

*40 CFR Part 81*

Air pollution control, Environmental protection, National parks, Wilderness areas.

Dated: December 14, 2011.

**Susan Hedman,**

*Regional Administrator, Region 5.*

[FR Doc. 2011–32828 Filed 12–21–11; 8:45 am]

BILLING CODE 6560–50–P

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 52 and 81

**[EPA–R05–OAR–2011–0468; FRL–9610–4]**

### Approval, and Promulgation of Air Quality Implementation Plans; Ohio; Redesignation of the Ohio Portion of the Huntington-Ashland Area to Attainment of the 1997 Annual Standard for Fine Particulate Matter

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** On May 4, 2011, the Ohio Environmental Protection Agency submitted a request for EPA to approve the redesignation of the Ohio portion of the Huntington-Ashland (OH-KY-WV) nonattainment area to attainment of the 1997 annual standard for fine particulate matter ($PM_{2.5}$). EPA is proposing to approve Ohio's request. EPA is proposing to approve several additional related actions. EPA is proposing to determine that the entire Huntington-Ashland (OH-KY-WV) area continues to attain the 1997 annual $PM_{2.5}$ standard. EPA is proposing to approve, as revisions to the Ohio State Implementation Plan (SIP), the state's plan for maintaining the 1997 annual $PM_{2.5}$ NAAQS through 2022 in the area. EPA is proposing to approve the 2005 emissions inventory for the Ohio portion of the Huntington-Ashland area as meeting the comprehensive emissions inventory requirement of the Clean Air Act (CAA or Act). Ohio's maintenance plan submission includes an insignificance finding for the mobile source contribution of $PM_{2.5}$ and nitrogen oxides ($NO_X$) to Ohio's portion of the Huntington-Ashland $PM_{2.5}$ Area for transportation conformity purposes. EPA agrees with this finding. These proposed actions are being taken in accordance with the CAA and EPA's implementation regulation regarding the 1997 p.m.$_{2.5}$ NAAQS.

**DATES:** Comments must be received on or before January 23, 2012.

**ADDRESSES:** Submit your comments, identified by Docket ID No. EPA–R05–OAR–2011–0468, by one of the following methods:

1. *http://www.regulations.gov:* Follow the on-line instructions for submitting comments.
2. *Email: blakley.pamela@epa.gov.*
3. *Fax:* (312) 692–2450.
4. *Mail:* Pamela Blakley, Chief, Control Strategies Section (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, Chicago, Illinois 60604.
5. *Hand Delivery:* Pamela Blakley, Chief, Control Strategies Section (AR–18J), U.S. Environmental Protection Agency, 77 West Jackson Boulevard, Chicago, Illinois 60604. Such deliveries are only accepted during the Regional Office normal hours of operation, and special arrangements should be made for deliveries of boxed information. The Regional Office official hours of business are Monday through Friday, 8:30 a.m. to 4:30 p.m. excluding Federal holidays.

*Instructions:* Direct your comments to Docket ID No. EPA–R05–OAR–2011–0468. EPA's policy is that all comments received will be included in the public docket without change and may be made available online at *http://www.regulations.gov,* including any personal information provided, unless the comment includes information claimed to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Do not submit information that you consider to be CBI or otherwise protected through *http://www.regulations.gov* or email. The http://*www.regulations.gov* Web site is an "anonymous access" system, which means EPA will not know your identity or contact information unless you provide it in the body of your comment. If you send an email comment directly to EPA without going through *http://www.regulations.gov* your email address will be automatically captured and included as part of the comment that is placed in the public docket and made available on the Internet. If you submit an electronic comment, EPA recommends that you include your name and other contact information in the body of your comment and with any disk or CD–ROM you submit. If EPA cannot read your comment due to technical difficulties and cannot contact you for clarification, EPA may not be able to consider your comment. Electronic files should avoid the use of special characters, any form of encryption, and be free of any defects or viruses. For additional instructions on submitting comments, go to Section I of the **SUPPLEMENTARY INFORMATION** section of this document.

*Docket:* All documents in the docket are listed in the *http://www.regulations.gov* index. Although listed in the index, some information is not publicly available, e.g., CBI or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *http://www.regulations.gov* or in hard copy at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays. We recommend that you telephone Carolyn Persoon, Environmental Engineer, at (312) 353–8290 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:**
Carolyn Persoon, Environmental Engineer, Control Strategies Section, Air Programs Branch (AR–18J), Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 353–8290, *persoon.carolyn@epa.gov.*

**SUPPLEMENTARY INFORMATION:** This supplementary information section is arranged as follows:

I. What should I consider as I prepare my comments for EPA?
II. What actions is EPA proposing to take?
III. What is the background for these actions?
IV. What are the criteria for redesignation to attainment?
V. What is EPA's analysis of the state's request?
1. Attainment
2. The Area Has Met All Applicable Requirements Under Section 110 and Part D and Has a Fully Approved SIP Under Section 110(k) (Sections 107(d)(3)(E)(v) and 107(d)(3)(E)(ii)).
3. The Improvement in Air Quality Is Due to Permanent and Enforceable Reductions in Emissions Resulting From Implementation of the SIP and Applicable Federal Air Pollution Control Regulations and Other Permanent and Enforceable Reductions (Section 107(d)(3)(E)(iii))
4. Ohio Has a Fully Approved Maintenance Plan Pursuant to Section 175A of the CAA (Section 107(d)(3)(E)(iv))
5. Insignificance Determination for the Mobile Source Contribution to $PM_{2.5}$ and $NO_X$
6. 2005 Comprehensive Emissions Inventory
7. Summary of Proposed Actions
VI. What are the effects of EPA's proposed actions?
VII. Statutory and Executive Order Reviews